UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA *EX REL.*          CIVIL ACTION
BRANCH CONSULTANTS, L.L.C.

VERSUS                                      NO: 06-4091

ALLSTATE INSURANCE. CO., ET AL.             SECTION: R

## ORDER AND REASONS

Before the Court is defendants' Motion to Dismiss (R. Doc. 116). For the following reasons, the motion is GRANTED IN PART and DENIED IN PART.

## I. Background

This case arises out of the aftermath of Hurricane Katrina. The storm struck southern Louisiana and Mississippi in late August of 2005, causing damage in the billions of dollars. In numerous places, particularly within New Orleans, homes and commercial property were damaged by the wind and rain generated from the hurricane, as well as by flooding that inundated the area after the storm had passed through the region.

While insurance against wind and rain is available from private insurance companies, flood insurance generally is not. "It is uneconomical for private insurance companies to provide flood insurance with reasonable terms and conditions to those in

flood prone areas." *Gowland v. Aetna*, 143 F.3d 951, 953 (5th Cir. 1998).  In 1968, the federal government established the National Flood Insurance Program ("NFIP"), which provides coverage "at or below actuarial rates," and payments on these insurance policies are made with federal money.  *Id*.  The NFIP is in turn administered by the Federal Emergency Management Agency ("FEMA").  In 1983, FEMA established a program within the NFIP known as "Write Your Own" ("WYO"), which allowed for certain private insurers to issue standard, government-guaranteed flood insurance policies in their own names.  *See generally* 44 C.F.R. § 62.23.  The policies are drafted by FEMA and cannot be altered by the insurance company without governmental approval.  *Id*. §§ 61.4(b), 61.13(d); *see also Dwyer v. Fidelity Nat. Prop. & Cas. Co.*, 565 F.3d 284, 285 (5th Cir. 2009).  The private companies under WYO act as fiscal agents of the United States and are responsible for adjustment, settlement, payment, and defense of claims under the policies.  44 C.F.R. § 62.23(d)-(g).  Payments under the policies, however, "ultimately come[] from the United States treasury."  *Dwyer*, 565 F.3d at 285.

The damage caused by Hurricane Katrina resulted in a tremendous number of NFIP claims.  The government approximates that it paid 162,000 Katrina-related flood damage claims by May of 2006.  U.S. GOVERNMENT ACCOUNTABILITY OFFICE, NATIONAL FLOOD INSURANCE PROGRAM: NEW PROCESSES AIDED HURRICANE KATRINA CLAIMS HANDLING, BUT FEMA'S

OVERSIGHT SHOULD BE IMPROVED 6 (Dec. 2006).  On account of this strain, FEMA, through the Acting Federal Insurance Administrator, relaxed the standards for submitting proofs of loss claiming flood damage.  Specifically, when policyholders did not dispute the insurance company's adjustment, the proof-of-loss requirement was waived and the claim was to be paid on the basis of the adjuster's report.  *See Monistere v. State Farm Fire & Cas. Co.*, 559 F.3d 390, 394-95 (5th Cir. 2009); *Eckstein v. Fidelity Nat. Prop. & Cas. Ins. Co.*, 07-4567, 2009 WL 1870558, at *4 (E.D. La. June 29, 2009).

Plaintiff Branch Consultants ("Branch") brought this *qui tam* action on behalf of the United States government under the False Claims Act.  Defendants are WYO insurance companies and adjusters that were involved in the adjustment of NFIP flood claims after Katrina.  Branch alleges that the circumstances after Katrina gave defendants complete control over the adjustment and payment of the NFIP policies.  Specifically, it contends that when defendants adjusted claims arising from Hurricane Katrina, they systematically and on a massive scale overstated the amount of flood losses to the properties they adjusted.  In so doing, defendants exaggerated the amount of money that the government should pay under the individual flood policies, which in turn reduced the amount that the insurance companies would themselves be obligated to pay under wind and rain policies.  Stated

differently, Branch asserts that defendants "passed off" the costs of paying for wind damage to the government by fraudulently claiming that the damage was caused by flood.  Because of the expedited claims-handling process that was put into effect after Katrina, many of these claims were allegedly not scrutinized by the government as they would have been in more typical circumstances.  This resulted in the submission of myriad fraudulent insurance claims, which the federal government then paid.

Branch asserts that it reexamined numerous properties that defendants had fraudulently adjusted, and in so doing found the *actual* flood damage to be substantially less than defendants claimed when they sought payment from the government.  In its amended complaint, Branch provides specifics on fifty-seven of these properties, including the street address, the WYO insurer of the property, the policy number, the amount of flood damage Branch found during its readjustment, and the amount paid by the government under defendants' adjustment report.  For all of these properties, the actual flood damage is allegedly less than the amount the government paid.  Many of the examples display minimal flood damage despite an adjustment near or equal to the policy limits.  Branch also generally alleges that defendants engaged in a pervasive and systematic scheme in which these fifty-seven properties are but examples, and that this scheme included

"hundreds of millions if not billions of dollars in fraudulent insurance claims" submitted to and paid by the government while the defendant insurance companies underpaid for damage caused by wind.

Branch filed its original complaint under seal on August 2, 2006, and the government did not timely intervene under 31 U.S.C. § 3730(b)(2). (R. Doc. 23, 36.) Branch filed its First Amended Complaint on June 22, 2007, and defendants moved to dismiss the case in partial reliance on the "first to file" bar of the FCA. *See* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."). At that time, defendants argued that a pending case against some of the then-defendants had been filed in a different court before this action was filed, and this case should thus be dismissed under the first-to-file bar. The district court agreed and dismissed the suit entirely. *Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 06-4091, 2007 WL 3118310 (E.D. La. Oct. 17, 2007) (dismissing case based on *United States ex rel. Rigsby v. State Farm Ins. Co.*, No. 06-433 (S.D. Miss. filed Apr. 26, 2006)).

On appeal, the Fifth Circuit found that the first-to-file bar applied only to the defendants named in the first-filed case. *See United States ex rel. Branch Consultants v. Allstate Ins.*

*Co.*, 560 F.3d 371, 381 (5th Cir. 2009).  The court affirmed the dismissal of the two defendants who appeared in both cases, Allstate Insurance Company and State Farm Insurance Company, and it reversed the ruling with respect to the remaining defendants and remanded the case to this Court.

Reurging their motion to dismiss, defendants make three arguments.[1]  First, they assert that the Court does not have subject matter jurisdiction over this suit because it is based upon a public disclosure of the fraud, and Branch is not an "original source" of the information in its complaint.  Second, they argue that the Court lacks subject matter jurisdiction because Branch did not file its amended complaint under seal.  Third, they contend that Branch failed to state a claim upon which relief can be granted.  Each of these arguments will be addressed in turn.

## II. Discussion

---

[1]  Before the district court dismissed this case on first-to-file grounds, defendant State Farm had filed a Supplemental Motion to Dismiss.  (R. Doc. 117.)  Because State Farm has been dismissed as a party to this litigation and no other party joined its supplemental motion, the Court will not address the arguments therein.  In addition, adjuster defendant NCA Group, Inc., has filed a Supplemental Memorandum in Support of Defendants' Motion to Dismiss.  (R. Doc. 182.)  This will be considered alongside the joint motion.

A. The "Public Disclosure" Bar and "Original Source" Exception of the False Claims Act

The False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, "permits, in certain circumstances, suits by private parties on behalf of the United States against anyone submitting a false claim to the Government." *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 941 (1997). A violator of the FCA is liable to the United States for civil penalties and three times the amount of the government's damage. 31 U.S.C. § 3729(a). When non-governmental parties, called "relators," file FCA claims, they prosecute the case on behalf of the government and in turn receive a percentage of any recovery that might result from a successful suit. *Id.* § 3730(b)(1), (d)(1)-(4). Because relators have such strong financial incentives to bring FCA suits, the Act attempts to balance the "promot[ion of] private citizen involvement in exposing fraud against the government" against the "prevent[ion of] parasitic suits by opportunistic late-comers who add nothing to the exposure of fraud." *United States ex rel. Reagan v. East Tex. Med. Cent. Reg'l Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004).

One provision that seeks to strike this balance is the jurisdictional bar on suits that are based upon a "public disclosure" of the fraud. The provision bars jurisdiction

> over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional,

7

administrative, or Government Accounting Office report,
hearing, audit, or investigation, or from the news media,
unless the action is brought by the Attorney General or
the person bringing the action is an original source of
the information.

31 U.S.C. § 3730(e)(4)(A).  In this section, the term "original

source" refers to "an individual who has direct and independent

knowledge of the information on which the allegations are based

and has voluntarily provided the information to the Government

before filing an action under this section which is based on the

information."  *Id*. § 3730(e)(4)(B).  If a relator who is not an

original source brings a FCA suit that is based upon a public

disclosure, a district court will not have subject matter

jurisdiction over the suit.  *Rockwell Int'l Corp. v. United

States*, 549 U.S. 457, 467-68 (2007).

When analyzing whether a suit is barred under this section,

the Court engages in a three-part inquiry.  First, it must ask

whether there has been a "public disclosure" of the allegations

or transactions.  Second, it finds whether the *qui tam* action is

"based upon" the publicly disclosed allegations.  Third and

finally, it inquires into whether the relator is an "original

source" of the information.  *Fed. Recovery Servs., Inc. v. United

States*, 72 F.3d 447, 450 (5th Cir. 1995).

1. "Public Disclosure"

8

Defendants claim that allegations of the fraud made here have been publicly disclosed, which would divest the Court of jurisdiction over this suit. A federal court always has jurisdiction to determine its own jurisdiction. *United States v. Ruiz*, 536 U.S. 622, 628 (2002); *Omari v. Holder*, 562 F.3d 314, 318 (5th Cir. 2009).

In particular, defendants point to several purported public disclosures of allegations against WYO companies for fraudulent conduct similar to that alleged in the complaint. The parties disagree, however, over whether the Court should take judicial notice of the materials that defendants identify. Defendants request that the Court judicially notice a large volume of materials relevant to their argument that a public disclosure has taken place. Branch, in opposition, asserts that the information is largely duplicative, irrelevant, or inappropriate.

"In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)). Judicial notice is authorized by Rule 201 of the Federal Rules of Evidence, which allows a court to recognize adjudicative facts that are "either (1) generally known within the territorial jurisdiction of the

9

trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Courts may not take judicial notice of irrelevant facts, *see Gisclair v. Galliano Marine Serv.*, No. 05-5223, 2007 WL 1266396, at *1 (E.D. La. Apr. 30, 2007), and the court should take judicial notice "only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents." *Lovelace*, 78 F.3d at 1018.

The Court will not delve into Branch's many, specific objections to each of defendants' proffered documents, some of which focus exclusively on the merits of whether the document is in fact a public disclosure. Nor will it sift individually through more than five hundred pages that defendants have presented in support of their claim, many of which are not relevant to the direct question of whether there has been a public disclosure. *See de la O v. Housing Auth. of City of El Paso, Tex.*, 417 F.3d 495, 501 (5th Cir. 2005) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)). Instead, the Court, cognizant that it is hearing a challenge to its subject matter jurisdiction, will take judicial notice of defendants' exhibits to the extent that particular disclosures are identified in the body of the Motion to Dismiss, and it will do so only for the purpose of determining whether there has been

10

a public disclosure, not for the truth of the assertions made within the disclosures themselves.

First, defendants point to statements made in congressional hearings noting the possibility and opportunity for fraud by WYO insurers.  In October of 2005, J. Robert Hunter, a former Federal Insurance Administrator with FEMA, testified before the Senate Banking, Housing, and Urban Affairs Committee.  During this testimony, he noted the conflict of interest arising from the structure of the WYO program, specifically mentioning that the insurers had the opportunity and the incentive to overstate flood damage to covered properties at the expense of taxpayers.  *Nat'l Flood Ins. Program: Hearing Before the Comm. on Banking*, *Housing, and Urban Affairs*, 109th Cong., 2005 WL 2661294 (Oct. 18, 2005) (statement of Robert Hunter).  He repeated the same concerns in another hearing before the same committee in February of 2006, when he recommended a Government Accountability Office audit of the allocation between wind and flood damage in the claims the government paid.  *Nat'l Flood Ins. Program: Hearing Before the Comm. on Banking*, *Housing, and Urban Affairs*, 109th Cong., 2006 WLNR 1848600 (Feb. 2, 2006) (statement of Robert Hunter).

In addition, by June of 2006 a congressman made the same general observation about the potential for fraud in the WYO system, but went further to publicly accuse the WYO insurers of defrauding the federal government.  Representative Gene Taylor

11

made statements during a hearing of the Subcommittee on
Investigations of the House Homeland Security Committee, during
which he noted the conflict of interest faced by the WYO
insurers.  He urged an investigation into the matter and
predicted that "we will find that the taxpayers got stuck for not
thousands, not hundreds of thousands, not millions — my gut tells
me the taxpayers were stuck for billions of dollars." *Waste,
Fraud and Abuse in the Aftermath of Hurricane Katrina: Hearing of
the Subcomm. on Investigations of the House Homeland Sec. Comm.*,
109th Cong. (June 14, 2006) (statement of Rep. Taylor).  He
echoed these concerns in the House later that month, stating that
"I believe that fraud took place," and encouraged the Inspector
General of the Department of Homeland Security to investigate
and, if necessary, to file a False Claims Act suit.  152 Cong.
Rec. H4589-02, H4603, (daily ed. June 27, 2006) (statement of
Rep. Taylor).

Next, also in June of 2006, the House of Representatives
entertained passage of the Flood Insurance Reform and
Modernization Act of 2006.  H.R. 4973, 109th Cong. (2d Sess.
2006).  Rep. Taylor proposed an amendment to this legislation
that would require the Inspector General to investigate "whether,
and to what extent, the [WYO] companies improperly assigned
damages to flooding covered by NFIP that should have been paid by
the windstorm coverage provided by the insurance companies."

H.R. REP. NO. 109-530 (2006); *see also* 152 Cong. Rec. S7632-04, S7633 (daily ed. July 17, 2006) (Senate consideration of similar proposal).  Congress eventually passed a law enacting this proposal and appropriating funds for the Inspector General to conduct an investigation into the issue.  Department of Homeland Security Appropriations Act, 2007, Pub. L. No. 109-295, 120 Stat. 1355, 1357 (2006) (authorizing an investigation into whether the WYO insurers "improperly attributed damages from [Katrina] to flooding covered under the insurance coverage provided under the [NFIP] rather than to windstorms covered under coverage provided by such insurers" and directing the Inspector General to submit a report on the issue to Congress).

Congress also heard testimony about this investigation after Branch filed this suit but before it filed its first amended complaint.  In that testimony, the Deputy Inspector General noted that it had access to little information as to the extent and cost of wind damage at WYO-adjusted properties.  *Nat'l Flood Ins. Program: Issues Exposed by the 2005 Hurricanes: Joint Hearing of the Subcomm. on Oversight and Investgations of the House Comm. on Fin. Servs. and the Subcomm. on Mgmt., Investigations, and Oversight of the Comm. on Homeland Sec.*, 110th Cong. (June 12, 2007) (prepared statement of Matt Jadacki, Deputy Inspector General for Disaster Assistance Oversight).  At that time, the investigation's "limited review of the flood claims indicated

13

that payouts on flood claims were timely and complied to NFIP terms. However, there [was] little evidence in flood claim files to determine whether payouts were fair and equitable for damages caused by both wind and water affecting the same structure." *Id*. The investigators had, at the time of the testimony, issued administrative subpoenas to WYO companies for records on adjustments that dealt with both wind and flood damage. *Id*.[2]

Fourth, defendants note the existence of two suits that were filed before Branch filed its complaint. One was filed in the Southern District of Mississippi in which the plaintiff alleged that State Farm, a WYO insurer that had issued a wind policy to the plaintiff, had made a policy decision to offer the limits of the flood insurance without regard to the actual source of damage, and thereby defrauded NFIP. *See Fowler v. State Farm Fire & Cas. Co.*, No. 06-CV-489 (S.D. Miss. filed May 16, 2006). In the other, also filed in the Southern District of Mississippi, the plaintiffs brought contractual claims, claims under the

---

[2]  The report from this investigation was released in September of 2008. Based on the files the Inspector General examined, it concluded, despite the difficulty of distinguishing between wind and flood damage, that "NFIP did not pay for wind damage." DEPARTMENT OF HOMELAND SECURITY, OFFICE OF INSPECTOR GENERAL, HURRICANE KATRINA: WIND VERSUS FLOOD ISSUES 5 (2008). It further found a perception that adjusters overstated the amount of flood damage to benefit the WYO insurers at NFIP's expense, but the report did not find a factual basis for this perception. *Id*. The existence of this report is not part of the public disclosure analysis, as it was issued more than a year after Branch filed its amended complaint, and nothing in that complaint can be based on the report.

Mississippi Consumer Protection Act, and claims involving coercion and false representation. The thrust of their allegations was that certain insurance companies, including Nationwide, Allstate, State Farm, Travelers, and unnamed "insurance entities," had denied claims on the allegedly erroneous basis that the damage to the property was caused by flooding. In making this argument, the complaint suggests that the rationale behind the decision was to save money and pass the costs of the loss onto the NFIP. *See Cox v. Nationwide Mut. Ins. Co.*, No. 05-436 (S.D. Miss. filed Sept. 20, 2005).

Finally, defendants argue that a number of news reports covered the alleged fraud. One article appearing in the New Orleans *Times-Picayune* on May 19, 2006, covered a Government Accountability Office performance audit of wind and water allocations, and noted that insurers have an incentive to shift damages toward flood. Rebecca Mowbray, *Review to Look at Wind vs. Water; Label of Damage by Insurers is Key*, NEW ORLEANS TIMES-PICAYUNE, May 19, 2006, at Money p.1. Several other newspaper articles covered the effort by Representative Taylor to launch an investigation, mentioning his claim that the WYO insurers had defrauded the government. *See*, *e.g.*, Max Follimer, *Insurance Probe Advances; Republican Opposition May Derail It*, BILOXI SUN HERALD, June 27, 2006, at A7. At least one piece from July of 2006 details support for the proposed investigation by other

15

lawmakers, and notes that then-Senator Trent Lott echoed Rep. Taylor's suspicion that fraud was taking place within the WYO program.  Bill Swindell, *Lott, Taylor Continue Quest to Probe Flood Insurance Practices*, NATIONAL JOURNAL CONGRESSDAILY, July 27, 2006, at Finance Section.

Branch argues that several of these articles were made available to the public after it filed its Complaint on August 2, 2006, and are thus irrelevant.  Branch, however, filed its First Amended Complaint on June 22, 2007.  As the Fifth Circuit pointed out while reviewing this very case, "[o]ur focus is on the allegations in Branch's first amended complaint because 'when a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction.'"  *Branch Consultants*, 560 F.3d at 375 n.5 (quoting *Rockwell*, 549 U.S. at 473-74).

The question before the Court is whether any or all of this information adds up to a "public disclosure" as contemplated by the FCA.  The sources defendants have identified — civil and administrative hearings, congressional reports, and articles from the news media — are mentioned in the text of the jurisdictional bar.  Defendants assert that these disclosures are sufficient to "put the government 'on the trail' of the alleged fraud" and thus deprive the Court of jurisdiction.  *Reagan*, 384 F.3d at 174.

There is no dispute that the materials publicly disclose

16

allegations of the *potential* for fraud in the post-Katrina circumstances by a large number of insurance companies. The generalized accusations in the materials outline the nature of the fraudulent scheme that Branch alleges in this action. Nevertheless, they do not identify any defendant in the case before the Court. State Farm was the defendant in the *Fowler* case noted by defendants, and Allstate and State Farm were defendants in the *Cox* case. Both State Farm and Allstate have been dismissed from this suit. 560 F.3d at 381. In addition, the *Cox* complaint lists the Travelers Insurance Company as a defendant. Here, St. Paul Travelers was erroneously listed as an original defendant before being properly changed to Standard Fire Insurance Company, which is a separate subsidiary entity of the Travelers Companies. (*See* R. Doc. 110.) Furthermore, Rep. Taylor noted that "we count on an Allstate, a State Farm, a Nationwide to write the policy." Nationwide is not a direct defendant in this action and, as mentioned, the other two insurance companies have been dismissed. In addition, it is clear from the context of Taylor's statements that he refers to the most prominent WYO insurers and their role in the program without making specific allegations of fraud against them.

In addition, the disclosures point to few allegations of specific instances of fraud, and none of these are linked to any defendant in this case. This case is therefore not as

straightforward as those in which the public disclosure directly identifies the perpetrator and the specifics of the alleged instance of fraud, *see, e.g., Fed'l Recovery Servs.*, 72 F.3d at 451-52 (state court suit named defendants and disclosed details of fraud), or scenarios in which there had been a full investigation with results at the time the relator filed suit.

Plaintiffs urge the Court to follow the Eleventh Circuit's reasoning in *Cooper v. Blue Cross & Blue Shield of Fla.*, 19 F.3d 562 (11th Cir. 1994). In that case, the relator was a "working aged" public employee who qualified for both Medicare and the Federal Employees Health Benefits Program, which was administered by the defendant. When a beneficiary submitted a claim for medical bills to the defendant, the defendant would typically return them with instructions to submit them to Medicare first. After discovering that the defendant was required to pay on his claims before the balance was sent to Medicare, the relator filed suit under the FCA. *Id*. at 564-65. In response, defendant argued that the allegations were publicly disclosed by a number of materials that mentioned similar activities to the ones alleged by the relator. Some of these materials mentioned the defendant by name and others made general allegations of fraud against the healthcare industry. *Id*. at 565-66 & n.5.

In its public-disclosure analysis, the court "consider[ed] it crucial whether [defendant] was mentioned by name or otherwise

18

specifically identified in public disclosures," and held that

"[t]he allegations of widespread . . . fraud in sources in which

[defendant] was not specifically named or otherwise directly

identified are insufficient to trigger the jurisdictional bar."

*Id*. at 566.  The court went on to note that

> [r]equiring that allegations specific to a particular
> defendant be publicly disclosed before finding the action
> potentially barred encourages private citizen involvement
> and increases the chances that every instance of specific
> fraud will be revealed.  To hold otherwise would preclude
> any *qui tam* suit once widespread — but not universal —
> fraud in an industry was revealed.  The government often
> knows on a general level that fraud is taking place and
> that it, and the taxpayers, are losing money.  But it has
> difficulty identifying all of the individual actors
> engaged in the fraudulent activity.

*Id*.  The court further found that a disclosure that mentioned the

potential for conflicts of interest and specifically referred to

the defendant did not qualify as a public disclosure because

there was no allegation that the defendant engaged in wrongdoing.

The court ultimately did find a public disclosure in another

scenario because the defendant was mentioned in a House

subcommittee hearing on industry-wide fraud at which the

defendant's counsel was present.  *Id*. at 567.

Defendants encourage the Court not to follow *Cooper*, but

rather to adopt the reasoning of a handful of other cases.

*United States ex rel. Gear v. Emergency Medical Associates of

Illinois, Inc.*, 436 F.3d 726 (7th Cir. 2006), concerned a suit

under the FCA alleging that two providers of medical services had

19

committed fraud against the government by submitting bills to
Medicare that indicated that services had been performed by
attending physicians.  According to the relator, such services
had in fact been performed by medical residents.  *Id*. at 727.
The defendants, to support their argument that the allegations
had been publicly disclosed, highlighted a number of industry-
wide allegations that Medicare was being billed in the manner
that the relator described.  These included a report issued by
the General Accounting Office to a House subcommittee,
settlements between the Department of Justice and university
hospitals, nationwide audits and investigations of teaching
hospitals, and coverage of all these events in the media.  *Id*. at
728-29.  The defendants in the case were not specifically named
in any of these materials.  The court found that it was "not a
close question" that the allegations had been publicly disclosed.
In response to the argument that individual defendants were not
named, the court noted that it was

> unpersuaded by an argument that for there to be public
> disclosure, the specific defendants named in the lawsuit
> must have been identified in the public records.  The
> disclosures at issue here were of industry-wide abuses
> and investigations.  Defendants were implicated.
> Industry-wide public disclosures bar *qui tam* actions
> against any defendant who is directly identifiable from
> the public disclosures.

*Id*. at 729.

Additionally, in *United States ex rel. Fine v. Sandia Corp.*,
70 F.3d 568 (10th Cir. 1998), the relator's FCA action alleged

20

that a laboratory under contract with the Department of Energy was illegally appropriating funds intended for disposal of radioactive waste and using them for research. Before the relator brought suit, the Government Accountability Office issued a report indicating that at least two laboratories were engaging in the practice, and the Department of Energy was aware of it. A congressional hearing was later held examining the misuse of funds by labs under contract with the Energy Department. *Id*. at 569-70. Although neither of these disclosures mentioned the defendant by name, the court found that the allegations were publicly disclosed because "the GAO report and the congressional hearing set the government squarely on the trail of the alleged fraud without Mr. Fine's assistance . . . ." *Id*. at 571; *see also In re Natural Gas Royalties Qui Tam Litig.*, 566 F.3d 956, 961 (10th Cir. 2009). The court distinguished *Cooper* on the grounds that that case involved broad allegations against an entire industry. In *Fine*, there were only eight other labs that were similarly situated to the defendant, and the GAO report had exposed the fraudulent practice at two of them. "When attempting to identify individual actors, little similarity exists between combing through the private insurance industry in search of fraud and examining the operating procedures of nine, easily identifiable, DOE-controlled, and government-owned laboratories." *Fine*, 70 F.3d at 572.

Finally, defendants cite to *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997), in which the relators alleged fraud arising from vending machines at a federal correctional facility that used utilities paid for by the Bureau of Prisons, but the profits from which were collected by an employees' group. The court looked to a 1952 opinion issued by the Comptroller General, a Senate report from 1974, and an earlier decision by the Federal Circuit, all of which questioned the legality of the ongoing practice but did not refer to the specifics outlined in the relators' complaint. *Id.* at 685-86. Holding that the suit was barred by these public disclosures, the court held that "the public disclosures here specifically identify the nature of the fraud — illegal retention of monies owed to the government and unauthorized administrative approval of the practice — as well as the federal employee actors engaged in the allegedly fraudulent activity." *Id.* at 687. The court found *Cooper* distinguishable for the same reason that the *Fine* court did, and determined that "we have no trouble in finding enough information in the public domain to identify the employees' groups' allegedly fraudulent transactions." *Id.*

These cases are not inconsistent in every respect. In *Cooper*, the disclosures in question were directed at an entire industry in which the government may very well have "difficulty identifying all of the individual actors engaged in the

fraudulent activity," 19 F.3d at 566, and a specific reference
would thus be necessary for the government to identify and
prosecute the fraud.  In *Gear*, the defendants did not need to be
named for the public disclosure bar to be triggered because the
specific defendants were already implicated by the disclosures.
436 F.3d at 729.  The cases further agree that publicly disclosed
allegations from which specific defendants cannot be identified
do not invoke the jurisdictional bar.  Based on the weight of
appellate authority, the Court declines to apply *Cooper* when the
allegation of fraud was not made against an entire industry, and
when particular defendants are already identifiable.  While
*Cooper*'s insistence that the defendant be specifically named in
the disclosure provides an attractive and easily applicable
principle, the government is still put "on the trail of fraud"
when a defendant is identifiable, though not explicitly named,
from the disclosures.

    The Fifth Circuit's decision in *United States ex rel. Fried
v. West Independent School District*, 527 F.3d 439 (5th Cir.
2008), does not directly confront the question of how detailed
the public disclosures must be to trigger the jurisdictional bar,
but the facts are instructive.  The relator brought suit against
a single Texas school district, alleging that it had defrauded
the Social Security Administration through a practice of allowing
teachers, who would otherwise not be eligible for Social Security

on account of a separate retirement plan, to spend their last day of work in a position not covered by the separate plan. This allowed them to collect benefits they would not otherwise earn. *Id.* at 440-41. According to the court, "the very essence of the allegations" made by the relator were already disclosed in a GAO report and congressional hearings regarding the practice, and the jurisdictional bar was thus implicated. *Id.* at 442. Although the opinion does not say so explicitly, the reports and hearings focused on the practice in Texas school districts at large, and did not single out the specific school district that was the defendant in the case. The court did note that the defendant's program "was disclosed in trade publications and on the internet." *Id.* These fora, however, are not the same as those mentioned in the language of 31 U.S.C. § 3730(e)(4)(A). The Fifth Circuit's analysis focused on the governmental hearings and investigations, and it found a public disclosure even though the defendant was not specifically named.

Here, too, the public disclosures have placed the "very essence of the allegations" into the public domain, and they are sufficient to identify particular defendants. The jurisdictional bar is thus implicated. The Court does not disagree with the concerns voiced in *Cooper* that the purpose of the FCA would be ill-served if generalized accusations against an entire industry could prevent good-faith relators from bringing suit and exposing

24

fraud that the government would otherwise have difficulty identifying. *See Cooper*, 19 F.3d at 566; *see also United States ex rel. Found. Aiding the Elderly v. Horizon West, Inc.*, 265 F.3d 1011, 1016 n.5 (9th Cir. 2001) (noting that general allegations of fraud against an entire industry would be insufficient to trigger the public-disclosure jurisdictional bar). But that is not the situation here. Branch makes allegations against WYO insurers who handled flood claims after Hurricane Katrina, with a few mentioned by name. While there are numerous WYO insurers, the possible perpetrators of the fraud alleged in the complaint are identifiable because the government can ascertain the identities of the WYO insurers from its records. In addition, the public disclosures point to a specific time period that followed a region-wide catastrophic loss. The circumstances following Hurricane Katrina were unusual enough that FEMA suspended its regular proof-of-loss standards. The particular allegations concern only the WYO insurers who submitted proofs of loss during this time period, in this region, and under these extraordinary conditions. Accordingly, the government would not face great difficulty in identifying possible perpetrators from these disclosures.

Lastly, the character and sheer volume of the materials in question counsel in favor of finding that the allegations have been publicly disclosed. This is not a situation in which the

allegation was disclosed once in an obscure government
publication.  Defendants have pointed to congressional and
administrative testimony, judicial proceedings, and media
coverage that provide the allegations.  Furthermore, that the
disclosures include a federal law authorizing an investigation
into the issue provides ample reason to conclude that the
government was sufficiently apprised of the allegations of fraud.
The Court therefore finds that the allegations in Branch's
complaint have been "publicly disclosed" for the purposes of the
FCA.

### 2. "Based Upon"

The existence of a public disclosure does not automatically
divest the court of jurisdiction over the suit.  The FCA action
must also be "based upon" the public disclosure.  A suit that is
even partially based upon a public disclosure is jurisdictionally
barred.  *See Fried*, 527 F.3d at 442; *Fed. Recovery Servs.*, 72
F.3d at 451.

The Courts of Appeals have taken two general approaches to
the determination of whether a FCA action is "based upon" a
public disclosure.  One circuit follows the ordinary meaning of
the term "based upon," and finds that the jurisdictional bar
applies "only where the relator has actually derived from that
disclosure the allegations upon which his *qui tam* action is

based." *United States ex rel. Siller v. Becton Dickinson & Co.*, 21 F.3d 1339, 1347-48 (4th Cir. 1994). A decisive majority of the remaining circuits holds that the plain-meaning approach would render the "original source" exception superfluous. If the jurisdictional bar applied only when a relator had actually derived her allegations from a public disclosure, it is difficult to see how she could ever fall into an exception for original sources with "direct and independent knowledge of the information on which the allegations are based." *See Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 915 (7th Cir. 2009) (collecting cases); *but see United States ex rel. Mistick v. Housing Auth. of City of Pittsburgh*, 186 F.3d 376, 399-400 (3d Cir. 1999) (Becker, C.J., dissenting) (explaining that the ordinary-meaning approach would not swallow the exception when a relator's claim is based partially on public disclosures and partially on original knowledge, or when it is difficult to separate the two). Having rejected the plain-meaning approach, courts in a majority of circuits find that "a lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser*, 570 F.3d at 915.

Although the Fifth Circuit has been counted among those circuits that take the latter approach, *see id.* (listing the Fifth Circuit's *Fed. Recovery Servs.* decision as an example of

27

this approach), its actual approach is not exactly clear.  In
*Federal Recovery Services*, the court found that the suit was
"based upon" public disclosures in part because the relator "has
conceded as much" in a filed motion.  72 F.3d at 451.  The
relator attempted to argue that only one instance of fraud was
based upon the earlier public disclosure and that the suit
included instances of fraud that had not been disclosed.  The
court held that a suit even partially based on a public
disclosure is barred, and that the relator "cannot avoid the
jurisdictional bar simply by adding other claims that are
substantively identical to those previously disclosed . . . ."
*Id.*  The decision therefore only holds that, when a relator
brings a claim that is actually based upon a public disclosure,
that relator cannot survive the jurisdictional bar simply by
adding substantively similar claims that have not been disclosed.
The case does not take a position on the circuit split, and other
Fifth Circuit cases that engage in the "based upon" analysis
similarly involve claims that were actually based upon the public
disclosure.  *See Fried*, 527 F.3d at 442 (claims partially based
on information gathered through Texas Public Information Act
request); *Reagan*, 384 F.3d at 176 (claims partially based on
information gathered through Freedom of Information Act request);
*United States ex rel. Laird v. Lockheed Martin Eng'g & Science
Servs. Co.*, 336 F.3d 346, 352 (5th Cir. 2003) (relator did not

challenge that his suit was based upon a public disclosure),
*overruled on other grounds by Rockwell*, 549 U.S. at 472.

In the unpublished case of *United States ex rel. Lam v.
Tenet Healthcare Corp.*, 287 Fed. Appx. 396 (5th Cir. 2008), the
court found the claim to be precluded by the public disclosure
bar because there was a public disclosure of the information, and
the relators were not an original source.  The court did not
engage in an in-depth analysis of whether the suit was based upon
the disclosure.  Rather, it simply mentioned that the theory of
fraud espoused by the government and the relators had been
disclosed in a publication before the relators filed suit.  *Id*.
at 399.  The court made no mention of whether the relators
actually relied on the publication, but found the public-
disclosure bar to be triggered nonetheless.

The absence of any mention of actual reliance in *Lam*,
together with the cogent reasoning behind the majority position
and the number of circuits that have subscribed to it, lead this
Court to conclude that the Fifth Circuit would require only
substantial similarity between the allegations before the
jurisdictional bar is invoked.  Here, there is no doubt that the
allegations in the public disclosures are substantially similar
to those in Branch's complaint.  Both allege that, after the
proof-of-loss standards were temporarily relaxed during the
recovery from Hurricane Katrina, WYO insurers overstated flood

29

damage to properties with NFIP policies and understated the amount of damage resulting from causes of loss for which the insurers had to pay themselves.  The Court accordingly finds that Branch's suit is based upon the public disclosures, and it will be barred unless Branch qualifies as an "original source."

### 3. "Original Source"

Branch argues that it is, nonetheless, an original source of the information.  Under the FCA bar, a relator is not forbidden from bringing suit based upon a public disclosure if the relator is the original source of the information in its complaint.  In order to qualify for original-source status, a relator must pass a two-part test.  First, "the relator must demonstrate that he or she has 'direct and independent knowledge of the information on which the allegations are based,'" and second, "the relator must demonstrate that he or she has 'voluntarily provided the information to the Government before filing' his or her qui tam action." *Reagan*, 384 F.3d at 177 (quoting *Laird*, 336 F.2d at 352); *see also* 31 U.S.C. § 3730(e)(4)(B).  The "allegations" in question are those in the relator's complaint, not the allegations that were subject to public disclosure. *See Rockwell*, 549 U.S. at 470-71.  Furthermore, the relator must be the original source of every claim it brings. *Id.* at 476.

Under the Fifth Circuit's jurisprudence, a relator's

30

knowledge is "direct" when it "derive[s] from the source without interruption or [is gained] by the relator's own efforts rather than learned second-hand through the efforts of others." *Reagan*, 384 F.3d at 177 (quoting *Laird*, 336 F.3d at 355)). The relator's knowledge is "independent" if it is not derived from the public disclosure. *Reagan*, 384 F.3d at 177. In analyzing whether a relator is an original source, courts "must look to the factual subtleties of the case before it and attempt to strike a balance between those individuals who, with no details regarding its whereabouts, simply stumble upon a seemingly lucrative nugget and those actually involved in the process of unearthing important information about a false or fraudulent claim." *Laird*, 336 F.3d at 356.

Defendants contend that Branch has not pleaded specific facts that would establish original-source status. They contend that, because Branch is a corporation, it cannot have "direct" knowledge of fraud. Furthermore, they argue that Branch did not actually see any false claim because it merely conducted re-examinations of property. Lastly, they contend that Branch does not have "independent" knowledge because it essentially alleges a difference of opinion as to the proper estimate of flood claims, and its estimating expertise does not transform it into an original source.

Here, Branch has pleaded facts that establish direct

knowledge of the fraud because this knowledge was acquired
through the relator's own efforts.  *See Reagan*, 384 F.3d at 177.
The First Amended Complaint describes in detail the results of
Branch's examinations of fifty-seven properties.  Each
description lists the address of the reexamined property, the
insurer, a description of the damage, the amount of flood
insurance paid, and Branch's determination of the actual amount
of flood damage.  The allegations indicate that, for some of the
listed properties, there was very little flood damage or no flood
damage at all.  Branch claims that these examples come from the
hundreds of properties in southern Louisiana that it inspected.
The complaint does not allege, and defendants do not argue, that
this information was actually supplied or gathered by an
intermediary or third party.

The alleged information Branch gleaned from these
reexaminations of WYO-insured property is qualitatively different
from the information that had been placed into the public domain
by the disclosures.  For the most part, the disclosures
identified by the defendants, while sufficient to notify the
government of the potential for fraud, consist of unsubstantiated
accusations and generalized suspicions of fraud, as well as basic
descriptions of the possibility, opportunity, and incentives for
the WYO insurers to shift their costs onto the government.  Other
than the *Cox* and *Fowler* complaints, the disclosures do not point

32

to a single specific instance of fraud, nor do they identify individual insurance companies or adjusters who may have participated in a particular instance of fraud. These disclosures supply exceedingly few specifics to support the abstract outline of the fraudulent scheme they allege. Branch, in contrast, provides allegations of specific properties, specific perpetrators, and specific amounts. This scenario is therefore distinguishable from one in which numerous examples of fraud are publicly disclosed or discovered by the government before a relator files suit to offer one additional instance, similar in kind to those already made known.

The *Cox* complaint, in addition to listing defendants different from those sued here, does not allege details of specific instances of fraud. It merely claims that a then-uncertified class of insurance company defendants had their adjusters claim that wind damage was actually caused by flood. Complaint (R. Doc. 1), *Cox v. Nationwide Mut. Ins. Co.*, No. 05-436 (S.D. Miss. filed Sept. 20, 2005). It does not provide specifics for properties that were the subjects of the alleged fraud, nor does it allege facts to tie the named and unnamed insurance company defendants to the fraudulent scheme. The insurance company class was never certified because the court found that individual questions of fact and law preponderated over the common questions. The court dismissed the insurance

33

company defendants and allowed the plaintiffs to pursue
individual actions against them.  *Id*. (R. Doc. 74).

The complaint in the *Fowler* case alleges that the
plaintiffs' home was reduced to a slab by Hurricane Katrina and
not the resultant flooding, and asserts that the defendant State
Farm made a policy decision at a high corporate level to shift
costs to the government.  Complaint (R. Doc. 1), *Fowler v. State
Farm Fire & Cas. Co.*, No. 06-CV-489 (S.D. Miss. filed May 16,
2006).  This case, however, involved a single piece of property
insured by a single insurance company that is no longer a
defendant here.  The complaint makes broader allegations as to
corporate decisions made by State Farm with respect to all its
Katrina-affected insureds, but there is no factual basis in the
complaint to suggest that the plaintiff had any knowledge that
such decisions actually took place or that the insurer even
attempted to overstate flood damage on any other property other
than plaintiff's.  The complaint seeks to extrapolate from
plaintiff's experience, but this has no factual basis other than
the motive and opportunity of the insurance company.
Furthermore, the complaint alleges few facts about why the
Fowlers suspected that their home was destroyed by wind and not
flood.  The detailed information Branch provides about numerous
properties in southern Louisiana is qualitatively different than
the allegations outlined in the public disclosures or the alleged

34

facts about the property at issue in the *Fowler* case.

Furthermore, the properties listed in the complaint, which Branch alleges that it directly investigated, are the specific subjects of the allegedly fraudulent claims.  The situation is therefore distinguishable from cases in which the relator relied exclusively upon secondhand information transmitted from other people and at no point directly observed the source of the alleged fraud.  *See, e.g., Fried*, 527 F.3d at 443 (investigation that consisted of conversations and email exchanges with employees about fraudulent scheme did not give relator direct knowledge of the fraud); *Lam*, 287 Fed. Appx. at 400 ("Relators found to have direct and independent knowledge are those who actually viewed source documents or viewed first hand the fraudulent activity that is the basis for their qui tam suit.").

The cases that discuss similar investigations with similar results provide support for the determination that Branch is an original source of the information.  Furthermore, they refute defendants' contention that Branch is not an original source because it is not an "insider" that worked with or for any of the defendants.  Because these claims were compiled through extensive examination of Katrina-affected properties, Branch's actions are akin to those discussed in *Cooper v. Blue Cross & Blue Shield of Florida*.  There, the court held that the relator, who was a beneficiary of the defendant Blue Cross & Blue Shield of Florida,

35

had direct knowledge of fraud when he acquired his information about fraudulent Medicare billing through "three years of his own claims processing, research, and correspondence with members of Congress and HCFA."  19 F.3d at 568.

Additionally, in *Kennard v. Comstock Resources, Inc.*, 363 F.3d 1039 (10th Cir. 2004), the relator owned royalty interests in a piece of land and received royalty payments from the gas wells that operated upon it.  The operator of the wells sold its lease interests to defendant, and the relator's royalty payments decreased.  Suspecting that the defendant might be underpaying him, he began his own investigation into the matter.  The scope of this investigation included whether the defendant was also underpaying a division of the Department of the Interior, which collected royalties from another gas lease between the defendant and a local tribe of American Indians.  After the relator filed suit alleging fraud against the government, the court found that the relator, whose knowledge derived from his own investigation and research that relied in part on public records not discussing the alleged fraud, qualified as an original source.  When a relator bases its claim on research and investigation that implicate materials already in the public domain, "[t]here must be some consideration to the availability of the information and the amount of labor and deduction required to construct the claim."  *Id*. at 1046.  The relators sorted through voluminous

records and conducted extensive research, and their claim "did not derive from a third party's research and investigation." *Id*. "Through discovery and deduction, Relators ferreted out the alleged fraud in this case and must, therefore, qualify as an original source." *Id.; see also United States ex rel. Durcholz v. FKW Inc.*, 997 F. Supp. 1159, 1166 (S.D. Ind. 1998) (finding relator to be an original source based on the information it unearthed in an investigation following an unsuccessful bid on a public project).

Furthermore, in *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994), a relator brought suit claiming that a labor arbitrator had billed the government for arbitral activities on days when he had not actually performed any.  The relator, the employer in the labor dispute, discovered this state of affairs in an earlier suit it brought to challenge the arbitration, during the course of which the arbitrator's pay vouchers were produced in discovery.  The relator alleged that the arbitrator had overbilled the government, but the court did not reach this claim.  *Id*. at 647-48.  In the FCA suit it brought soon after, the relator claimed that it had investigated the matter after seeing the vouchers and discovered the fraudulent overbilling.  The D.C. Circuit found the relator to be an original source of the information, even though both the materials and the allegation had been made public

37

in the previous litigation.  It held that because "the pay vouchers and phone records did not themselves suffice to indicate fraud, [the relator] had to have bridged the gap by its own efforts and experience, which in this case included personal knowledge of the arbitration proceedings and interviews with individuals and businesses identified in the telephone records. [It] started with innocuous public information; it completed the equation with information independent of any preexisting public disclosure."  *Id.* at 657.

Finally, a similar situation to the one before the Court arose in *United States ex rel. Farmer v. City of Houston*, No. 03-3713, 2005 WL 1155111 (S.D. Tex. May 5, 2005).  There, after her roof was damaged by a tropical storm, the relator applied for home repair assistance under a program run by the City of Houston that was funded by the Department of Housing and Urban Development.  After the program estimated the costs of repair, relator noticed that the material requested was in excess of what she would need to repair the damage.  She used the Texas Public Information Act ("TPIA") to examine other repairs made by the program, and determined that the program routinely requested materials that were never used.  *Id.* at *1.  In ruling on a summary judgment challenge to the relator's FCA suit, the court found that the information requested by the relator through the TPIA was publicly disclosed, but that she had direct and

independent knowledge because the information "was gathered through her own efforts." *Id*. at *5. The court noted that "her entire investigation began as a result of her independent knowledge that [the program] overestimated materials to repair her roof," that she knew based on past repairs what materials would be needed to repair her roof, and that her subsequent investigation "unearthed important information about fraudulent claims." *Id*.

Here, too, Branch's investigation proceeded based on its determination that the WYO companies' adjustments of flood damage for the properties it observed differed from the actual flood damage found by Branch. And, in the course of its investigation, it unearthed numerous additional facts and considerable information about the alleged fraud. It should be noted again that, other than the one allegation in the *Fowler* complaint, the public disclosures did not contain information about any specific instance of fraud. The facts gathered from Branch's investigation, taken as true, supply ample detail about numerous, specific examples of fraud, with supporting descriptions and identified perpetrators.

While it is true that a relator must do "more than apply his expertise to publicly-disclosed information," *Fried*, 527 F.3d at 443 (citing *Reagan*, 384 F.3d at 179), here Branch has, through its actual efforts, provided a host of "additional compelling

facts" about the alleged fraud that were nowhere previously available. *Reagan*, 384 F.3d at 179. These facts, because there is no allegation that they were previously known, comprise "qualitatively different information than what had already been discovered." *Fed'l Recovery Servs.*, 72 F.3d at 452. And the information Branch gathered is considerable, unlike the investigations that were found wanting in other cases. *See, e.g., Fried*, 527 F.3d at 443 (discussing a claim that was based almost entirely on public documents and relator's investigation produced only minor facts about the fraud, "[e]very aspect" of which was already in the public domain); *Grayson v. Advanced Mgmt. Tech., Inc.*, 221 F.3d 580, 583 (4th Cir. 2000) (relators not original sources because their investigation "at best verified" public disclosure). Considering the scope of Branch's investigation and the alleged facts it produced, especially in light of the generality of the public disclosures, the Court finds that Branch has "direct" knowledge of the fraud.

The Court finds no merit in defendants' argument that Branch's status as a corporation deprives it of ability to have direct knowledge. Defendants cite to *Federal Recovery Services* as well as the Tenth Circuit case of *United States ex rel. Precision Co. v. Koch Industries, Inc.*, 971 F.2d 548 (10th Cir. 1992). Neither case stands for the proposition that corporations cannot have direct knowledge of fraud. In fact, in both cases

40

the court analyzed whether the corporation actually did have
direct knowledge, but concluded that it did not because the
corporation could not have had direct knowledge of anything that
took place before its incorporation, and all post-incorporation
knowledge would have been "the product and outgrowth" of
investigations that began before the corporation came into
existence. *Fed'l Recovery Servs.*, 72 F.3d at 451-52; *see also
Precision*, 971 F.2d at 554.  Nether court holds that a
plaintiff's corporate status, without more, would have foreclosed
its claims.  In addition, other courts have affirmatively held
that a corporate relator can have direct knowledge under the FCA.
*See, e.g., Minn. Ass'n of Nurse Anesthetists v. Allina Health
Sys. Corp.*, 276 F.3d 1032, 1049 (8th Cir. 2002) ("No courts have
held that corporations responsible for the discovery of
information cannot have 'direct knowledge' because they have to
act through agents.").

Next, defendants argue that Branch cannot have direct
knowledge of the fraud because it did not have knowledge of any
false claim submitted to the government.  As an initial matter,
the language of the public-disclosure bar does not require this.
It requires only "direct and independent knowledge *of the
information on which the allegations are based*."  31 U.S.C. §
3730(e)(4)(B) (emphasis added).  The Tenth Circuit in *Kennard*,
responding to the exact argument defendants make, looked at the

41

language of the direct-knowledge requirement to find that "[k]nowledge of the actual fraudulent conduct is not necessary" for original-source status.  363 F.3d at 1044.  "[T]he fact that Relators did not have knowledge of the actual alleged fraudulent submissions to the Government cannot disqualify them as an original source."  *Id.; see also Quinn*, 14 F.3d at 656-57 ("On the basis of plain meaning, then, we find that § 3730(e)(4)(B) does not require that the *qui tam* relator possess direct and independent knowledge of *all* of the vital ingredients to a fraudulent *transaction*.") (emphasis in original).  Because Branch has demonstrated direct knowledge of the information upon which its allegations are based, that it does not have direct knowledge of the false claims themselves is not fatal to the original-source finding.

Defendants also assert that Branch lacks independent knowledge of the fraud because Branch has not shown that it knew of the fraud before the public disclosures, and also because the "knowledge" Branch provides is merely a difference of opinion as to the proper estimate of flood damage.  With respect to the first argument, although a relator may be able to establish independent knowledge by showing that it had knowledge of the fraud before the public disclosure, *see United States ex rel. Reagan v. E. Tex. Med. Cent. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 853 (S.D. Tex. 2003) (quoting *United States ex rel.*

42

*Devlin v. State of Cal.*, 84 F.3d 358, 361 n.5 (9th Cir. 1996)),
defendants have not pointed to any authority *requiring* a relator
to do so.  In fact, no rule that a relator must show that it
learned of the fraud before the public disclosure can be
sustained by the language of the FCA.  The "original source"
exception applies only if the suit is based upon a public
disclosure.  A relator's information cannot be based upon a
disclosure that has not yet happened.  If the relator must have
discovered the fraud before the disclosure, the original source
exception could never be invoked.  Such a conclusion is
untenable.

      The Court also rejects defendants' argument that Branch's
statements of flood damage are mere opinion and thus not
independent knowledge.  Defendants' argument is nothing more than
a self-serving characterization of plaintiff's allegations.  Once
again, the FCA requires "independent knowledge of the information
on which the allegations are based."  31 U.S.C. § 3730(e)(4)(B).
Here, the "information" upon which the allegations are based is
information plaintiff allegedly gathered and gleaned from
observations of damaged properties.

      Lastly, defendants claim that Branch has not pleaded facts
establishing that, before filing suit, it voluntarily provided
the information upon which the suit is based to the government,
which is required by 31 U.S.C. § 3730(e)(4)(B).  In support,

defendants point to a number of authorities establishing the undisputed requirement that a relator must voluntarily provide the information the government before filing suit.  Plaintiff's complaint, however, states very clearly: "Prior to filing this action, Branch voluntarily disclosed to the Government the information forming the basis of this Complaint pursuant to 31 U.S.C. § 3730(e)(4)(B)."  (R. Doc. 49 at 4.)  Defendants further argue that Branch has failed to plead specific facts demonstrating that it voluntarily provided the information to the government, relying upon *United States ex rel. Vuyyuru v. Jadhav*, No. 06-180, 2007 WL 951851, at *4 (E.D. Va. Mar. 28, 2007), and *United States ex rel. Westerfield v. Univ. of San Francisco*, No. 04-3440, 2006 WL 335316, at *5 (N.D. Cal. Feb. 14, 2006). *Vuyyuru*, however, does not stand for the proposition that a relator must plead specific facts alleging that it provided the information to the government.  The portion of the case to which defendants point indicates that the relator failed to provide specific information about when he met with FBI agents regarding the fraud.  But the import of when he met with the FBI did not concern the requirement that the relator voluntarily provide the information to the government.  It was discussed in the context of the relator's argument that he knew of the alleged fraud *before* a public disclosure and his suit was not based upon it. 2007 WL 951851, at *3-4.  In *Westerfield*, the relator failed to

44

allege in her complaint that she had voluntarily notified the
government of the information upon which the suit was based, and
the court dismissed the FCA complaint with leave to amend "to
allege facts demonstrating Westerfield voluntarily provided the
information to the government before filing this suit."  2006 WL
335316, at *5.  Because the relator in that case did not allege
*any* facts that could lead a court to determine that it had met
the requirement of voluntarily conveying the information to the
government, the Court cannot conclude from this one case that
Branch's allegation, which must be taken as true at the motion-
to-dismiss stage, is insufficient because it does not include
additional facts about Branch's communications with the
government.  Accordingly, Branch has both direct and independent
knowledge of the information upon which its allegations are
based, and it voluntarily provided the information to the
government before filing suit.  It therefore qualifies as an
original source for the purposes of the FCA, and the Court is not
deprived of jurisdiction.


B. *The Requirement that Complaints Be Filed Under Seal*

     Under 31 U.S.C. § 3730(b)(2), a relator must file its
complaint in camera and under seal for sixty days before it can
be served upon the defendant.  Defendants next argue that
although Branch filed its initial complaint under seal, it failed

to do so with its First Amended Complaint.  They point to two cases in which an amended complaint was dismissed for the relator's failure to file under seal.[3]  In both *Friedman v. Fed'l Deposit Ins. Corp.*, No. 93-277, 93-415, 1995 WL 608642, at *3 (E.D. La. Oct. 16, 1995), and *United States ex rel. Bain v. Ga. Gulf Corp.*, No. 01-562 (M.D. La. 2005) (order granting summary judgment), the court held that failure to file the amended complaint under seal warrants dismissal.

The Court finds this argument meritless.  First of all, the two cases upon which defendants rely do not analyze in any detail the finding that § 3730(b)(2) is jurisdictional and requires dismissal when violated.  Secondly, the plain language of § 3730(b)(2) refers only to "the complaint," not amended or subsequent complaints.  This fact has been recognized by other courts.  *See United States ex rel. Milam v. Regents of the Univ. of Cal.*, 912 F. Supp. 868, 899-90 (D. Md. 1995) ("Neither the statute nor any relevant case law imposed upon [the relator] the duty to file any amendments to that complaint in camera and under seal."); *see also United States ex rel. Mikes v. Straus*, 931 F. Supp. 248, 259-61 (S.D.N.Y. 1996).  In *Wisz v. C/HCA Dev., Inc.*, 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998), the court noted that the statute imposed no requirement on amended complaints, and

---

[3] Defendants point to a third case, *Erickson v. Am. Inst. of Biological Sciences*, 716 F. Supp. 908, 911-12 (E.D. Va. 1989), but there the dispute concerned the original complaint.

46

also pointed out that the relator's "second amended complaint
alleged the same type of fraudulent conduct as the original
complaint, which the Government already had a chance to review."
Here, too, Branch's First Amended Complaint alleges the same type
of fraudulent conduct as the original complaint, albeit with many
more individual examples.  Finally, even assuming for the sake of
argument that Branch violated the requirements of § 3730(b)(2),
numerous courts have held that such requirements are not
jurisdictional and their violation does not require dismissal of
the complaint.  *See, e.g., In re Natural Gas Royalties* Qui Tam
*Litig.*, 467 F. Supp. 2d 1117, 1228 (D. Wyo. 2006); *Wisz*, 31 F.
Supp. 2d at 1062; *United States v. Fiske*, 968 F. Supp. 1347, 1352
(E.D. Ark. 1997); *Mikes*, 931 F.Supp. at 259; *United States ex
rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242, 245 (9th Cir.
1995); *but see Erickson*, 716 F. Supp. at 912.  That Branch did
not file its First Amended Complaint under seal neither requires
dismissal nor deprives this Court of jurisdiction.

*C. The Sufficiency of Plaintiff's Amended Complaint*

    Next, defendants challenge the sufficiency of plaintiff's
First Amended Complaint.  In this complaint, Branch alleges
violations of three different provisions of the FCA.  First,

§ 3729(a)(1)(A)[4] imposes liability upon any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the government.  Secondly, § 3729(a)(1)(B) renders liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Third, § 3729(a)(1)(G) makes it a violation for any person to "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[] or knowingly and improperly avoid[] or decrease[] an obligation to pay or transmit money or property to the Government."

For the purposes of the statute, "knowing" and "knowingly" indicate that a person either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information."  *Id.* § 3729(b)(1)(A). The mental-state requirement of the FCA requires nothing more. § 3729(b)(1)(B).

In order to demonstrate liability for a violation of §§ 3729(a)(1)(A) and (B) of the FCA, a court must look to

---

[4]  The subsections of § 3729 were reorganized by statute in 2009 as part of the Fraud Enforcement and Recovery Act of 2009. *See* Pub. L. No. 111-21, 123 Stat. 1617, 1621-22 (2009). References will be to the current version of the statute.

"(1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Longhi v. Lithium Power Techs.*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)) (quotation marks removed).

Under this framework, defendants argue that the complaint fails to meet the pleading standards required for FCA suits. Actions brought under the FCA must meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2008); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). This standard supplements the pleading requirements of Federal Rule of Civil Procedure 8(a), and together the two rules necessitate that a plaintiff supply "simple, concise, and direct" allegations of the circumstances amounting to the fraud. *Grubbs*, 565 F.3d at 186. These allegations "must make relief plausible, not merely conceivable,

49

when taken as true." *Id.; see also Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949–50 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

In order to plead fraud with particularity, "a plaintiff must state the factual basis for the fraudulent claim with particularity and cannot rely on speculation or conclusional allegations." *United States ex rel. Rafizadeh v. Continental Common, Inc.*, 553 F.3d 869, 873 (5th Cir. 2008). In general, such a statement should include the "time, place, and contents of the false representation, as well as the identity of the person making the misrepresentation and what that person obtained thereby." *Grubbs*, 565 F.3d at 186 (quoting *United States ex rel. Russell v. Epic Healthcare Mgmt. Corp.*, 193 F.3d 304, 308 (5th Cir. 1999)); *see also Thompson*, 125 F.3d at 903.

In certain circumstances, the pleading requirements of Rule 9(b) may be slightly relaxed and the plaintiff may plead on information and belief, in particular when facts about the fraud are "peculiarly within the perpetrator's knowledge." *United States ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 330 (5th Cir. 2005) (quoting *Russell*, 193 F.3d at 308); *see also United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 454 (5th Cir. 2005). Such relaxation, however, "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *Thompson*, 125 F.3d at 903 (quoting

*Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)).

### 1. Claims under 31 U.S.C. § 3729(a)(1)(A)

First, plaintiff claims that defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to the government. Again, in order to meet all the elements of liability under the FCA, the plaintiff's allegations, taken as true, must demonstrate that there was a false statement or fraudulent course of conduct, that the statement was provided knowingly, that the statement was material, and that the government paid money as a result. *Longhi*, 575 F.3d at 467.

With respect to the first element, defendants contend that plaintiff cannot show the "who, what, when, where, and how" of the alleged fraud. *See Thompson*, 125 F.3d at 903. Specifically, they argue that Branch has not identified any actual false claims and has alleged nearly nothing about the conduct of the adjusters. Defendants also assert that Branch does not allege that the properties described were covered by a wind policy or how much, if any, was paid for the wind damage the property sustained. Lastly, they argue that Branch has not demonstrated how any claims were false or fraudulent, as opposed to reflecting a mere difference of opinion as to the proper adjustment of flood

claims.

What Branch's First Amended Complaint has provided is, for each insurer defendant, a listing of properties that led to the allegedly fraudulent flood claims, the addresses of those properties, the policy numbers of the policy under which flood claims were paid, a brief description of the damage each property suffered, the amount paid under the flood insurance policy, whether or not that amount represented the policy limits, and the amount of flood damage Branch determined the property to have actually suffered. For each insurer defendant, Branch also identifies an adjuster that, upon Branch's information and belief, it believes served as the insurer's adjuster for the listed properties. In addition, for each adjuster discussed in the complaint, Branch alleges that the information listing the particular properties adjusted by that company is within the exclusive control of defendants because it was not provided to the insured or, Branch pleads on information and belief, to the government. Branch also generally alleges, contrary to defendants' contention, that the defendants had wind policies on the listed properties. Such policies provide a motive to overstate flood damage for which the government is obligated to pay and to understate wind damage for which the insurance companies are responsible.

The "who" in the complaint is alleged with sufficient

particularity.  Branch alleges that particular insurance companies "presented, or caused to be presented" false or fraudulent claims for payment to the government.  Their complaint identifies particular insurance companies and lists representative properties with which each company had insurance policies.  In addition, Branch has alleged that each adjuster overstated flood damages to insured properties and, in so doing, made false statements and certifications to the government and caused the submission of false claims for payment to NFIP.  It alleges on information and belief which adjuster was responsible for the adjustment of which property.  Although the details about the conduct and involvement of each adjuster are not as extensive as those involving the insurance companies, the Rule 9(b) pleading requirements are relaxed because Branch has pleaded that the specific properties that each adjuster defendant adjusted, and thus their specific involvement with fraudulent claims other than those specified for each adjuster, are within the control of the defendants.  *See Williams*, 417 F.3d at 454; *Doe*, 343 F.3d at 330.  This requirement is relaxed no more than necessary, and only to the extent that Branch has specifically pleaded that this information is under the exclusive control of defendants and not available elsewhere, and also lists which insurance company each adjuster defendant provided services for.  *See, e.g., United States ex rel. Price v. J-M Mfg. Co.*, No. 00-1755, 2001 WL

53

823730, at *1 (E.D. La. July 20, 2001) (noting that complaint must set forth a factual basis for the information and belief upon which the fraud claims are founded).  For the majority of adjuster defendants, Branch lists at least one specific named and fraudulently adjusted property for which each company served as adjuster, which serves as the factual basis for its allegation on information and belief.  (*See, e.g.,* R. Doc. 49 at 20, 29, 34.)

Three exceptions must be noted.  Again, for several of the adjuster defendants, Branch singles out specific policies that each defendant adjusted on behalf of a corresponding insurance company.  For Pilot Catastrophe Services, Crawford & Company, and NCA Group Inc., however, Branch only alleges that on information and belief that they were the primary Louisiana adjusters for specific insurance company defendants, and it does not list any factual basis, such as a property that Branch is aware these companies adjusted, for its information or belief.  Accordingly, Branch is not entitled to a relaxation of Rule 9(b), and the complaint is insufficient as to those defendants.  Pilot Catastrophe Services, Crawford & Company, and NCA Group must be dismissed without prejudice, and the Court grants Branch the opportunity to amend its complaint to allege an adequate factual basis for its allegations.

With respect to the remaining defendants, Branch has pleaded with particularity as to the "when," "where," and "what."

54

Branch's complaint makes allegations against the defendants with respect to the post-Katrina time period when FEMA's expedited claims-handling policy was in effect.  Representative properties that were the subject of the alleged fraud are listed by mailing address in the complaint.  And Branch has also laid out in the complaint with some detail the outline of the alleged fraud and the discrepancies between the amount of flood insurance paid under the policies and the estimate of actual flood damage.

Defendants, however, challenge the "how" of the fraud, specifically by noting that Branch makes no mention of actual false claims made to the government.  Section 3729(a)(1)(A) contains an express requirement that a false claim be presented to the government.  *Grubbs*, 565 F.3d 188.  This is consistent with the fact that the False Claims Act is concerned with false claims and not general fraud against the federal government.  *See United States v. McNinch*, 356 U.S. 595, 599 (1958) (noting that it is "clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government").  In making this observation, defendants rely upon cases that require details about the false claim as part of the Rule 9(b) standard.  *See United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004) ("As applied to the FCA, Rule 9(b)'s requirement that averments of fraud be stated with particularity — specifying the 'time, place, and content' of the

alleged false or fraudulent misrepresentations, means that a
relator must provide details that identify particular false
claims for payment that were submitted to the government."); *see
also United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*,
290 F.3d 1301, 1312 & n.21 (11th Cir. 2002) (noting that relator
did not identify the amounts requested in the false claims or the
dates upon which they were submitted, failed to describe billing
policies, and did not provide copies of actual bills or
payments).

Although § 3729(a)(1)(A) requires that the defendants
presented a false claim to the government, the Fifth Circuit does
not require copious details about the claim in order to meet the
Rule 9(b) standard.  In *United States ex rel. Grubbs v.
Kanneganti*, the relator filed a complaint that alleged a scheme
of fraudulent billing of Medicare and Medicaid, as well as at
least one overt act of false billing for each defendant.  565
F.3d at 184-85.  Each listing of acts made reference to a false
claim, but did not provide extensive details about it.  Hearing a
challenge to whether the relator had met the Rule 9(b) standard,
the court held that "Rule 9(b)'s ultimate meaning is context-
specific," *id*. at 188 (quoting *Williams v. WMX Techs., Inc.*, 112
F.3d 175, 178 (5th Cir. 1997)), and that "[i]t is adequate to
allege that a false claim was knowingly presented regardless of
its exact amount . . ." *Grubbs*, 565 F.3d at 189.  Furthermore,

56

> [i]f at trial a *qui tam* plaintiff proves the existence of
> a billing scheme and offers particular and reliable
> indicia that false bills were actually submitted as a
> result of the scheme — such as dates that services were
> fraudulently provided or recorded, by whom, and evidence
> of the department's standard billing procedure — a
> reasonable jury could infer that more likely than not the
> defendant presented a false bill to the government, this
> despite no evidence of the particular contents of the
> misrepresentation.  Of course, the exact dollar amounts
> fraudulently billed will often surface through discovery
> and will in most cases be necessary to sufficiently prove
> actual damages above the [False Claims] Act's civil
> penalty.  Nevertheless, a plaintiff does not necessarily
> need the exact dollar amounts, billing numbers, or dates
> to prove to a preponderance that the fraudulent bills
> were actually submitted.  To require these details at
> pleading is one small step shy of requiring production of
> actual documentation with the complaint, a level of proof
> not demanded to win at trial and significantly more than
> any federal pleading rule contemplates.

*Id*. at 189-90.  With all this in mind, the court held that "to

plead with particularity the circumstances constituting fraud for

a False Claims Act [§ 3729(a)(1)(A)] claim, a relator's

complaint, if it cannot allege the details of an actually

submitted false claim, may nevertheless survive by alleging

particular details of a scheme to submit false claims paired with

reliable indicia that lead to a strong inference that claims were

actually submitted."  *Id*. at 190; *see also United States ex rel.

Duxbury v. Ortho Biotech Prods. L.P.*, 579 F.3d 13, 29 (1st Cir.

2009) (noting that details about the false claims are not

required by 9(b) when the plaintiff alleged sufficient factual

evidence of fraud).

     Branch has met this standard.  There is no question that it

has pleaded the existence of a broad scheme to defraud the government, as well as provided numerous individual examples that are allegedly part of the scheme.  In so doing, it has pointed to particular flood policies on particular properties, demonstrated how much was paid under the policy, and provided its determination of how much *should* have been paid out under the policy.  Taking all Branch's well-pleaded facts as true, *see United States v. McFerrin*, 570 F.3d 672, 676 (5th Cir. 2009), that the government allegedly made payment under an existing flood policy necessarily presupposes the submission of a claim for payment.  By showing the existence of an insurance arrangement and a paid claim, Branch has provided reliable indicia that a claim was actually presented to the government, and that the defendants either presented that claim or, specifically with respect to the adjuster defendants, caused it to be presented to the government.  Branch's particular allegations that the amount paid differs from the damage incurred provides from the well-pleaded facts the inference that the claim was false.  Furthermore, the general allegation that each property was covered by a wind policy provides the incentive for the defendants to engage in the scheme.  Just as in *Grubbs*, "[t]hat fraudulent bills were presented to the Government is the logical conclusion of the particular allegations in [the] complaint even though it does not include exact billing amounts."

58

565 F.3d at 192; *Duxbury*, 579 F.3d at 29.

Defendants, however, contend that a disagreement over flood adjustments does not rise to the level of fraud.  It claims that the differences between Branch's adjustment and the amounts paid under the policy relate to something that is "not precise or measurable," that the process involves judgment calls, and that disputed estimates of flood damage are not the kind of "fraud" upon which FCA liability can be predicated.  *See United States ex rel. Morton v. A Plus Benefits, Inc.*, 139 Fed. Appx. 980, 983 (10th Cir. 2005) ("We agree that liability under the FCA must be predicated on an objectively verifiable fact."); *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675 (5th Cir. 2003) (en banc) (noting the dangers of conditioning FCA liability on a subjective assessment of whether living conditions are "decent, safe, and sanitary"); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 810 (D. Utah 1988) (holding that "an engineering judgment and recommendation to NASA in regard to the implication of launching at temperatures colder than previously experienced . . . [is] not a statement of fact that can be said to be true or false, and thus cannot form the basis of an FCA claim").

It is true that, under the FCA, "a lie is actionable but not an error." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).  The Court does not, however, accept the argument that adjustment of flood damage is

necessarily a subjective process.  At the motion-to-dismiss
stage, the Court must take all of Branch's well-pleaded facts as
true.  Branch has alleged not just a difference between the two
figures, but in some cases quite a dramatic difference, and it
gives reasons for the discrepancy.  In some cases, the difference
between Branch's determination and the amount paid under the
policy is over $200,000.  (*See, e.g.,* R. Doc. 49 at 17.)  In
other examples, the property allegedly suffered no flood damage
at all, even though nearly $100,000 was paid under each flood
policy.  (*Id*. at 25-26.)  In addition, even one of the cases
defendants rely on recognizes that the involvement of some degree
of judgment in a particular practice does not foreclose the
possibility of FCA liability.  *Morton*, 139 Fed. Appx. at 983 ("we
are not prepared to conclude that in all instances, merely
because the verification of a fact relies upon clinical medical
judgment, or involves a decision of coverage under an ERISA plan,
the fact cannot form the basis of an FCA claim"); *see also*
*Harrison v. Westinghouse Savannah River Co*., 176 F.3d 776, 792
(4th Cir. 1999) (noting that in the FCA context, "an opinion or
estimate carries with it 'an implied assertion, not only that the
speakers knows no facts which would preclude such an opinion, but
that he does know facts which justify it'") (quoting W. PAGE
KEETON, ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 109 (5th ed.
1984)).  The Court therefore cannot say at this stage in the

60

litigation that the differences that Branch alleges can be explained as a mere disagreement.  Branch has adequately alleged a fraudulent scheme to submit false claims under Rule 9(b).

Allegation of a fraudulent scheme or statement, however, is insufficient to plead all the elements necessary for liability under the FCA.  A relator must also plead the requisite scienter, that the false statements were material, and that the government actually paid or forfeited money.  *Longhi*, 575 F.3d at 467.

As to the scienter requirement, § 3729(a)(1)(A) requires that the acts be taken "knowingly," which in turn means that a person either "has actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information."  *Id*. § 3729(b)(1)(A).  Again, while Rule 9(b) of the Federal Rules of Civil Procedure specifies a heightened pleading standard for fraud and mistake, it also states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The First Amended Complaint alleges generally that each defendant acted knowingly in violation of § 3729(a)(1)(A), and this element is thus satisfied by the pleadings.

The third element of FCA liability requires that the false statement was material.  As an initial matter, it appears that there is a split within the Fifth Circuit as to the definition of

"materiality" for FCA purposes.  In *Longhi*, the court examined
competing definitions and agreed that "the FCA requires proof
only that the defendant's false statements 'could have'
influenced the government's payment decision or had the
'potential' to influence the government's decision."  575 F.3d at
469.  The court referred to this test as the "natural tendency to
influence or capable of influencing" test, which requires that
the false statements "either (1) make the government prone to a
particular impression, thereby producing some sort of effect, or
(2) have the ability to effect the government's actions, even if
this is a result of indirect or intangible actions on the part of
defendants.  All that is required under the test for materiality,
therefore, is that the false or fraudulent statements have the
potential to influence the government's decisions."  *Id.* at 470.
A year earlier, however, in *United States ex rel. Marcy v. Rowan
Cos., Inc.*, 520 F.3d 384, 389 (5th Cir. 2008), the court defined
a "material claim" as "one that is required to be made in order
to receive the relevant government benefit."

      This Court, however, need not decide between the two
competing standards, as both materiality tests are met by
Branch's pleadings.  Again, Branch alleges that all the
complained-of conduct took place during the period when FEMA had
suspended the proof-of-loss requirement for the payment of
Hurricane Katrina claims, as long as the adjustment of those

62

claims was not disputed by the policyholders.  And it has alleged that those claims were actually paid under the policy.  The false claims, then, were required to be made to receive the government benefit and, because they did in fact result in payment, had the potential to influence the government's decisions.  Branch has pleaded enough facts to show that the false claims were material.

Finally, with respect to the fourth element requiring that the government actually made payment on the fraudulent claims, Branch's complaint alleges that it did, complete with specific amounts paid under representative policies at specific properties.  Accordingly, Branch has pleaded a violation of § 3729(a)(1)(A) with particularity, and dismissal is not warranted on this claim.

### 2. Claims under 31 U.S.C. § 3729(a)(1)(B)

Branch also attempts to plead a cause of action under § 3729(a)(1)(B), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Again, Branch must satisfy the four elements of FCA liability from *Longhi*.  With respect to the first two elements, a plaintiff must allege "that the defendant made a false record or statement for the purpose of getting a false or fraudulent claim paid or approved by the Government." *Rafizadeh*, 553 F.3d at 874 (quoting

*Allison Engine Co., Inc. v. United States ex rel. Sanders*, 128 S.Ct. 2123, 2130 (2008)).  This does not require an allegation that the false claim was actually presented to the government. *Allison Engine*, 128 S.Ct. at 2129-30; *see also Grubbs*, 565 F.3d at 192-93.

Defendants argue that Branch fails to plead this claim with particularity for the same reasons it failed to plead with particularity under § 3729(a)(1)(A), and for the additional reason that Branch has not identified any false record or statement as required by § 3729(a)(1)(B).  Defendants also argue that this claim fails because Branch has not identified any false claim that was presented to the government.  Defendants' brief in support of its motion to dismiss was submitted before the Supreme Court's decision in *Allison Engine*, which, by holding that § 3729(a)(1)(B) does not require that a false claim actually be presented to the government, has foreclosed this last argument.

The Court has already found that Branch has supplied many of the circumstances of the fraud, and that it is a short step to infer from the reliable indicia supplied by Branch's well-pleaded facts that a false claim was presented to the government for payment.  Together, the allegation that particular properties were covered by flood policies and the allegation that claims for flood damage under these policies were actually paid necessarily imply that a claim was submitted to the government for payment.

64

Branch alleges that as part of the fraudulent scheme, defendants overstated flood damage when the actual flood damage was less than the amount the government paid for.  These allegations, taken as true, mean that the claim was false.  It is an even shorter step for the Court to make the reasonable inference, in the light most favorable to the plaintiff, that a record was made to support these claims.  It strains credulity to imagine how, if the allegations are taken as true as they must be, *Rafizadeh*, 553 F.3d at 872, a specific claim for an articulable amount of flood damage could be paid by the government without a record ever having been made by the both the adjuster and the insurance company.  This scenario is vastly different from one in which a plaintiff simply posits, on scanty foundation, the existence of a statement or record.  Instead, Branch has provided considerable factual details that simply cannot be true without the existence of a statement or record having been made by defendants.  This can be said for both the insurance company defendants as well as for the adjuster defendants, who could not have adjusted the properties without the making of *some* record to support their estimates.  Accordingly, Branch's pleading makes sufficiently particular allegations to meet the requirement of a false record or statement under § 3729(a)(1)(B).

These reasons also demonstrate that the First Amended Complaint meets the element of scienter necessary for FCA

liability.  Again, intent, knowledge, and mental state may be alleged generally.  FED. R. CIV. P. 9(b).  Branch's complaint alleges generally that the defendants acted knowingly when engaging in the alleged violation of § 3729(a)(1)(B).  In addition, the defendants must have acted "for the purpose of getting the false or fraudulent claim paid by the Government." *Grubbs*, 565 F.3d at 193; *Rafizadeh*, 553 F.3d at 874; *Allison Engine*, 128 S.Ct. at 2130.  The false records that can be inferred from Branch's complaint are inferred from the alleged fact that the claims were actually paid in specific amounts. This, in concert with the general scheme that Branch outlines, is sufficient to meet the general pleading requirement that the defendants did make the records with the intent of getting them paid by the government.  This in turn is adequate to satisfy the scienter requirement for FCA liability.  In addition, the third and fourth elements — whether the claim was material and whether it was actually paid by the government — are satisfied for the same reason they were satisfied in § 3729(a)(1)(A).  As a result, Branch has sufficiently pleaded a claim under § 3729(a)(1)(B) of the FCA.

### 3. Claims under 31 U.S.C. § 3729(a)(1)(G)

Finally, Branch alleges that defendants violated the provision of the FCA that prohibits "reverse false claims."  This

66

section makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).  The forbidden conduct "is called a reverse false claim because the action of the defendant results not in improper payment to the defendant from the Government, but rather no payment to the Government when payment is otherwise obligated." *Doe*, 343 F.3d at 329.  A claim under § 3729(a)(1)(G) requires (1) that the defendant had an obligation to pay money to the government, (2) that the defendant used a false statement to avoid or decrease that obligation, (3) that the false statement was material, and (4) that the defendant made the false statement knowingly.  *See United States ex rel. Ramadoss v. Caremark, Inc.*, 586 F. Supp. 2d 668, 685 (W.D. Tex. 2008).

Here, Branch's complaint fails to plead a violation of this section with particularity because it has not identified an obligation that would require defendants to pay money to the government.  Under the NFIP arrangement, the government is the entity that ultimately pays for flood claims, and Branch claims that the defendants "used the same adjustments [of the flood claims in question] to avoid their obligation to reimburse the

67

Government." (R. Doc. 153 at 38.) This, however, is not the

kind of obligation contemplated by the FCA. The Fifth Circuit

has noted on more than one occasion that

> the reverse false claims act does not extend to potential
> or contingent obligations to pay the government fines or
> penalties which have not been levied or assessed (and as
> to which no formal proceedings to do so have been
> instituted) and which do not arise out of an economic
> relationship between the government and the defendant
> (such as a lease or a contract or the like) under which
> the government provides some benefit to the defendant
> wholly or partially in exchange for an agreed or expected
> payment or transfer of property by (or on behalf of) the
> defendant to (or for the economic benefit of) the
> government.

*Marcy*, 520 F.3d at 391 (quoting *United States ex rel. Bain v. Ga.*

*Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004)).

The scenarios foreclosed by *Marcy* and *Bain* are precisely the

same as the one Branch attempts to allege here. Branch argues

that its § 3729(a)(1)(G) claim is legitimate because the

allegedly false flood claims that defendants submitted to the

government also sought to reduce or avoid the obligation to repay

the fraudulent gains. But in so doing, Branch predicates its

§ 3729(a)(1)(G) claim on "potential or contingent obligations to

pay the government fines or penalties which have not been levied

or assessed (and to which no formal proceedings to do so have

been instituted)." And while there can be no doubt that the NFIP

insurer defendants have an economic relationship with the

government, Branch has not shown that it is a relationship "under

which the government provides some benefit to the defendant

68

wholly or partially in exchange for an agreed or expected payment or transfer of property by (or on behalf of) the defendant to (or for the economic benefit of) the government." Branch has alleged the exact opposite relationship. Under the NFIP arrangement, it is the government that pays the WYO insurers for the benefits they provide. Accordingly, Branch has failed to plead a violation of § 3729(a)(1)(G).

## III. Conclusion

For the foregoing reasons, defendants' Motion to Dismiss is GRANTED IN PART to the extent that Branch has failed to plead a violation of § 3729(a)(1)(G), and has not pleaded sufficient facts with respect to the adjuster defendants NCA Group, Crawford & Company, and Pilot Catastrophe Services. Those defendants are accordingly DISMISSED WITHOUT PREJUDICE and Branch will be afforded the opportunity to amend its complaint to make adequate allegations against them. The remainder of the Motion to Dismiss is DENIED.

New Orleans, Louisiana, this _____19th_____ day of October, 2009.

_Sarah Vance_
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

69