## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *EX REL.* **BRANCH CONSULTANTS, L.L.C.,** | **CIVIL ACTION NO.: 06-4091** |
| **Plaintiff** | **SECTION: "R" (1)** |
| **VERSUS** | **JUDGE: VANCE** |
| **ALLSTATE INSURANCE COMPANY,** *et al.,* | |
| **Defendants** | **MAGISTRATE: SHUSHAN** |

### MEMORANDUM IN OPPOSITION TO BRANCH CONSULTANT'S, LLC'S MOTION TO STRIKE THIRD-PARTY COMPLAINT

NOW INTO COURT, through undersigned counsel come the Defendants/Third-Party Plaintiffs, Fidelity National Property and Casualty Insurance Company and Fidelity National Insurance Company, (hereinafter referred to collectively as "Fidelity"), Write-Your-Own ("WYO") Program insurance carriers participating in the United States government's National Flood Insurance Program ("NFIP"), pursuant to the National Flood Insurance Act of 1968 ("NFIA"), as amended,[1] appearing herein in their "fiduciary"[2] capacity as the "fiscal agent of the United States."[3]

At the outset, Fidelity desires to make clear that its status as a WYO carrier is, according to the Fifth Circuit, "a matter of law." *Gowland v. Aetna,* 143 F.3d 951, 953 (5th Cir.1998). That status is not a question of fact, and it is not subject to control by the artful pleadings of Plaintiff's counsel, a point explained in detail in *Moffett v. CSC,* 457 F.Supp.2d 571, 587 (D.Md. Sept. 29,

---

[1] 42 U.S.C. § 4001, *et seq.*
[2] 44 C.F.R. § 62.23(f).
[3] 42 U.S.C. § 4071(a)(1); *Gowland v. Aetna,* 143 F.3d 951, 953 (5th Cir.1998).

2006).[4] As a matter of law, Fidelity holds the status of fiduciary and fiscal agent of the United States unless and until the Acting Administrator of the NFIP, Edward Connor, issues a letter to Fidelity informing it that <u>he</u> has decided to strip Fidelity of that status. 44 C.F.R. Pt. 62, App. A, Art. III(D)(3)(b). The call is his and his alone to make. *Id*.

Second, Fidelity joins Plaintiff's request for oral argument. Fidelity desires oral argument so that it might assert to this Court, in open court, that Branch obtained jurisdiction over Fidelity, as well as the other Defendants, via deceit. As will be explained in the first section of this memorandum, the matters raised by Plaintiff's Motion will require the Court to consider matters outside of the pleadings. As per the Fifth Circuit, it is the Plaintiff who bears the burden of proof upon its claim that Fidelity's insureds should not be joined in this case. As will be explained later herein, this memorandum is <u>designed</u> to allow the Court to get beyond the time where Branch's allegations are merely accepted as the truth.

As to those allegations, the attached Affidavit establishes that Branch falsely claimed to this Court that Fidelity "typically" issues both homeowners and flood policies. That Affidavit also attests, *inter alia*, that Branch falsely asserted that Fidelity employed FEMA's "expedited claims handling process" in massive quantities. The Affidavit also attests that FEMA has indeed authorized its WYO Program carriers to sue NFIP insureds who have received overpayments of federal funds for repayment of those funds to the Federal Treasury.

In this memorandum, Fidelity will establish that it acted most appropriately (both legally and morally) in naming the insureds as Third-Party Defendants in this action, so as to both (1) bring all appropriate issues and parties before the Court in one setting, and (2) allow those

---

[4] The *Moffett* case is particularly instructive as to these issues for two reasons. First, it also included allegations of fraud by WYO carriers and the adjusting companies. Second, FEMA was a direct party, which allowed Judge Messitte to hear directly from Government lawyers as to how these issues are <u>actually</u> handled by the agency charged by Congress to keep the NFIP successful year after year.

insureds to obtain counsel before they are set upon by the dozens of law firms involved in this case. The following topics will be addressed in sequence within this memorandum:

1.  Considering matters outside the pleadings and assigning the burden of proof.

2.  That there are three distinct outcomes to this case is virtually determinative of the instant motion.

3.  WYO carriers aren't just sued; they also sue.

4.  Plaintiff seeks to deceive with its *Times-Picayune*-based "evidence."

5.  Labeling: Is Fidelity's "Third-Party Complaint" properly a "Third-Party Demand," or properly a "Counterclaim"?

6.  To decide Plaintiff's Motion, the Court will need to decide if the Third-Party Demand is "compulsory" under Rule 13.

7.  Fidelity maintains that joinder is required under Rule 19.

8.  Recent FCA caselaw supports allowing the Third-Party Complaint on due-process grounds.

9.  Analysis of *Public Integrity* does not support the Plaintiff's claims here.

10. Justice Holmes' "square corners" maxim.

11. Both parties' concerns for the intimidation of witnesses.

12. Discussion of the "agreement in principle" to delay service.

Upon due consideration of this memorandum, Fidelity contends that this Court will determine that it is both appropriate and important that the insureds whose properties are listed in the First Amended Complaint be brought into this action as parties, and that they be allowed to obtain counsel to protect their own interests.

## 1.    CONSIDERING MATTERS OUTSIDE THE PLEADINGS AND ASSIGNING THE BURDEN OF PROOF

At the Eighteenth Defense of Fidelity's Answer, it asserted that Plaintiff had failed to join necessary and indispensible parties. Specifically, Fidelity asserted therein that, "This would

include any NFIP participant that Branch alleges received an overpayment of United States Treasury funds." Thereafter, in Fidelity's Third-Party Complaint,[5] Fidelity sought to join those same insureds as parties Defendant to this cause. Branch now objects, but cites to nothing beyond a *Times-Picayune* newspaper article in support of its position.

First, questions pertaining to whether a party should, or should not, be joined pursuant to F.R.C.P. Rule 19 often turn on factual disputes. *Pulitzer-Polster v. Pulitzer*, 784 F.2d 1305, 1309 (5th Cir. 1986). As such, the Court may consider matters outside the pleadings and weigh conflicting evidence. See, *e.g.*, *Dou Yee Enterprises PTE, Ltd. v. Advantek, Inc.*, 149 F.R.D. 185, 187 (D.Mn. 1993). As to this weighing of the facts, Fidelity understands that the initial burden is on the party raising the defense to demonstrate that the non-party is a person needed for just adjudication under Rule 19(a) or "indispensible" under Rule 19(b). However, the Fifth Circuit has expressly declared that, "When an initial appraisal of the facts indicates that a possible necessary party is absent, the burden of disputing this initial appraisal falls on the party who opposes joinder." *Pulitzer-Polster, supra*, at 1309. Under these decisions, Fidelity submits that:

First, it is appropriate that Fidelity submit to this Court a sworn Affidavit declaring that it was not the issuer of both the flood policy and the homeowners policy except in less than one percent of the claims that were presented to it after Hurricane Katrina. Ninety-nine percent of the time it was only the flood carrier. As such, Plaintiff's core claim of shifting wind losses to flood policies (FAC, ¶¶ 4, 17, 20) *CANNOT* be a truthful claim as to Fidelity. (Ex. A)

Second, that first fact changes the entire dynamic of this case at least as it relates to Fidelity, because the federal funds that Branch thinks were inappropriately taken by Fidelity, were never possessed by Fidelity. If overpayments occurred, the federal funds have always been

---

[5] Section 5 of this memorandum will deal with whether Fidelity's "Third-Party Complaint" should properly be left with that label, or relabeled as a "Counterclaim." While F.R.C.P. makes clear that labeling does not matter, Branch has obviously sought to take advantage of the label undersigned counsel employed.

in possession of the persons who claimed them, that being the insureds. (Ex. A) The insureds are active and direct participants in whatever occurred, good or bad.

Third, in light of the fact that every Defendant could stand before this Court and establish that Branch has deceived the Court to obtain its jurisdiction as to all remaining Defendants (because none of the remaining Defendants employed the expedited claims handling process that is at the heart of Branch's claims as per FAC, ¶ 17), cause exists to tender to Branch the burden of proof of establishing that if it is confined to making truthful claims, that it is somehow inappropriate to allow the homeowners whose claims are the subject of this case, to be made parties Defendant so that they might be given an opportunity to obtain counsel.

## 2.    THAT THERE ARE THREE DISTINCT OUTCOMES TO THIS CASE IS VIRTUALLY DETERMINATIVE OF THE INSTANT MOTION

There are three - - not two - - possible outcomes of this lawsuit. Consideration of those *three* outcomes is virtually determinative of the instant Motion.

First, Branch could lose outright. If that occurs, then every other issue is moot.

Second, Branch could prevail to the limited extent of proving that overpayments did occur, but then fail on its claim of fraud (a.k.a. *scienter*) by the WYO carriers. In other words, it is unlikely, but still a real possibility that Plaintiff could prove that some of the persons whose properties are put at issue by Branch did in fact receive overpayments of federal funds, but then fail to prove that this was caused by systemic wrongdoing by Fidelity. It could be a simple mistake; it could be innocent or negligent or improper transmission of information by an adjuster or by an insured; or it could be any other number of factors. However, in this possibility, the Court will have achieved findings of fact in a public court of record that citizens of the United States are in possession of Treasury funds to which they are not entitled. *What then*?

Third, it is possible that the Plaintiff could achieve both of its aims, that being to prove

overpayments, and that this was caused by fraud by the carriers. Fidelity of course denies that this will happen, but must include this possibility for the purpose of its argument.

It is the second possibility to which the Third-Party Complaint speaks. It is as to that possibility that Fidelity has moved forward in proper and appropriate acknowledgement of its fiduciary duties to the United States, to make certain that <u>if</u> this Court's proceedings lead to evidence of overpayments, those amounts can be recouped.

### 3.    WYO CARRIERS AREN'T JUST SUED; THEY ALSO SUE

Plaintiff contends - - without any authority whatsoever - - that the legal relationship between the Government and its WYO carrier fiscal agents is such that those fiscal agents can only be sued for the purpose of efforts to obtain additional federal funds from the Program, but cannot sue to obtain monies for the Program. This is not true. The attached Affidavit establishes the WYO carriers are indeed so authorized by FEMA. (Ex. A)

Overpayments are a rarity. However, in anything as complicated as the NFIP, such events are bound to occur. Two examples of Fidelity exercising these authorities are as follows:

In *Fidelity Nat'l. Prop. Ins. Co. v. Tibbs*, Docket No.: 3:05-CV-00421-MRC-EMT (N.D.Fla.), Fidelity sued NFIP participant, Ronald Tibbs, in federal court expressly invoking Fidelity's role and status as the fiscal agent and fiduciary of the United States. Fidelity sought the return of overpaid federal funds to Mr. Tibbs. Mr. Tibbs filed two motions to dismiss challenging the Court's jurisdiction to entertain Fidelity's claims, and objecting to Fidelity's standing.

The Honorable M. Casey Rodgers of the Northern District of Florida denied Mr. Tibbs' motions. (Ex. B) In her Order, Judge Rodgers first expressed her dismay at Mr. Tibbs' sparse motions that cited "no caselaw and provide[d] virtually no argument in their support." That is exactly what is happening here. Thereafter, Judge Rodgers ruled that, "The Court has general

federal question jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, and under Federal Rule of Civil Procedure 17(a) Plaintiff is a proper party to bring this suit." (Ex. B) Fidelity submits that it is unaware of any ruling anywhere in the United States where any court has held that FEMA's fiscal agents cannot file an action on FEMA's behalf to obtain a repayment of federal funds.

A second example is a matter entitled, *Fidelity v. Boardwalk*, Docket No. 3:07cv278-MCR/EMT (N.D. Fla). In this matter, it was discovered after a very large claim payment had been made to a condominium association that inaccurate information had been provided to Fidelity by the association as to the construction date of the property. When the accurate information was obtained, it was realized that an overpayment had occurred. After due consultation with the appropriate officials at FEMA, Fidelity filed a lawsuit in its role and status as the fiscal agent and fiduciary of the United States, seeking return of those overpaid federal funds. That action remains pending today.

FEMA's regulations make it clear that WYO carriers are authorized to sue on behalf of the Government. Please see 44 C.F.R. Pt. 62.23(i)(8), which provides as follows:

> (8) Regarding the handling of subrogation, if a WYO Company prefers to forego pursuit of subrogation recovery, it may do so by referring the matter, with a complete copy of the claim file, to FIA. Subrogation initiatives may be truncated at any time before suit is commenced (after commencing an action, special arrangement must be made). FIA, after consultation with FEMA's Office of the General Counsel (OGC), will forward the cause of action to OGC or to the NFIP Bureau and Statistical Agent for prosecution. Any funds received will be deposited, less expenses, in the National Flood Insurance Fund.

Under this provision, if a WYO carrier pays a claim for flooding, and then learns that that flooding was the fault of some third-person, the WYO carrier is authorized to institute a legal action against that third-party, and then to deposit in the Treasury any recovery obtained. Similarly, in the *Tibbs* action, when that matter was settled, Fidelity transferred the recovered

funds to the Treasury. The same would happen at bar.

Other regulations speak to these points as well. At 44 C.F.R. Pt. 62.23(i)(5) and (j)(7), the carriers are given specific duties to try to detect fraud. The carriers are also required to cooperate with FEMA's Office of General Counsel on "matters pertaining to litigation and subrogation." *Id.*, at (i)(ii). Nothing in any of these regulations would indicate that FEMA charges its fiscal agents and fiduciaries with only being sued, or only suing third-parties for subrogation. Clearly, as in any complex insurance operation, the insurer must have the right to sue the insured for an overpayment, a fact attested to in the attached sworn Affidavit. (Ex. A) To conclude otherwise, would be to conclude that the United States Government must utilize the resources of Assistant U.S. Attorneys all over the United States (persons often who have no prior understanding of the workings of the NFIP) to handle such cases when they arise. Such would be incredibly inefficient and wasteful. In addition, an Assistant U.S. Attorney would not be answerable to FEMA.

If this Court has any doubts as to these points, it has the ability to determine for itself whether FEMA does indeed authorize its WYO carriers to seek return of overpayments via lawsuits such as the *Tibbs* and *Boardwalk* matters. Any of the Department of Justice attorneys involved in this case could be directed to ask Mr. James Sadler, the Director of Claims at FEMA, if the representations made herein are correct. This point is not made lightly. If this Court were to rule that WYO carriers "cannot" seek recovery of such overpayments, then this Court will have thereby significantly altered and curtailed the relationship between the Government and the WYO carriers.

**4.     PLAINTIFF SEEKS TO DECEIVE WITH ITS *TIMES-PICAYUNE*-BASED "EVIDENCE"**

Actually citing to *The Times-Picayune*, Plaintiff represents as truth the following:

Indeed, public reports indicate that, "directly contrary to Fidelity's purported claim on behalf of the United States, FEMA already has made a policy decision *not* to seek reimbursement from insureds. (emphasis in original) Plaintiff's Memorandum in Support of Motion to Strike, p. 3 (Doc. 253-2)

Please carefully examine this particular attempt to deceive the Court, which is made specifically as to Fidelity. Branch's First Amended Complaint is based upon the proposition (now known to be false) that Fidelity was "typically" the issuer of both the homeowners and the flood policy. (FAC, ¶¶ 4, 17, 20) That is the exact proposition that *The Times-Picayune's* Rebecca Mowbray presented to FEMA's Mr. Pasterick in the newspaper article. Based upon that false premise, Branch asserts to this Court that "FEMA already has made a policy decision *not* to seek reimbursement from insureds."

That which Branch does not tell the Court, is the rest of what Mr. Pasterick said in that same interview. In the same interview, the same *Times-Picayune* article explains that Mr. Pasterick made clear that, "Under normal circumstances, Pasterick said, FEMA would ask anyone who was overpaid by the flood program to return the money." Not one sentence in the article applies to Fidelity other than that one sentence. Fidelity did not have the wind policy. Fidelity applied the "normal" adjusting processes after Katrina, and did not do expedited claims handling. In short, and despite Branch's efforts to mislead the Court with a *Times-Picayune* newspaper article, that article does nothing but bolster Fidelity's contention that it is expected by the Government to recover the money if indeed overpayments did occur.

5.    **LABELING: IS FIDELITY'S "THIRD-PARTY COMPLAINT" PROPERLY A "THIRD-PARTY DEMAND," OR PROPERLY A "COUNTERCLAIM"?**

Branch is well aware that labels do not matter in the context in the Federal Rules of Civil Procedure. See F.R.C.P. Rule 8(c)(2) and (d)(1) and (e). Undersigned counsel fully appreciates that one could engage in an interesting debate as to whether the Third-Party Complaint should be

"labeled" as a "Third-Party Demand" or as a "Counterclaim." Undersigned counsel asks that if the Court would prefer a different designation to the document, that Fidelity be required to cure any perceived defect at the time it responds to the Second Amended Complaint that Branch has indicated on several occasions now, is soon to be filed.

In these regards, Branch makes much of caselaw indicating that "an entirely separate and independent claim cannot be maintained against a third-party under Rule 14, even though it does arise out of the same general set of facts as the main claim." (Branch's Memo in Opp., p. 4) However, claims pursuant to *Rule 13* are not so encumbered. A counterclaim may seek relief in excess of the amount demanded or different in kind from that sought by the opposing party. See, *e.g., Calnetics Corp. v. Volkswagen of America, Inc.*., 532 F.2d 674, 678 (9th Cir. 1976). At bottom, and regardless of whether Fidelity's "claim" against the insureds is *labeled* a counterclaim or a third-party demand, Fidelity contends that joinder of those individuals is required by the mandatory compulsory counterclaim provisions of Rule 13, <u>and</u> by the mandatory required joinder provisions of Rule 19.[6] Application of those rules will be discussed in the next section of this memorandum.

**6.    TO DECIDE THE PLAINTIFF'S MOTION, THE COURT WILL NEED TO DECIDE IF THE THIRD-PARTY DEMAND IS "COMPULSORY" UNDER RULE 13**

Plaintiff's only authority against the filing of the Third-Party Demand is *Public Integrity v. Therapeutic Technology, Inc.*, 895 F.Supp. 294 (S.D. Ala. 1995). *Public Integrity* will be examined in detail later in this memorandum. For now, the Court is asked to note that Judge Vollmer's analysis in *Public Integrity* made clear that one of the central factors that he

---

[6] As for Rule 19, the only way that Branch avoided its obligations under Rule 19(c) to explain why it was not suing the insureds was its dual false claims that (a) Fidelity paid the claim first and then was reimbursed by the Federal Government (First Amended Complaint at ¶ 15), and (b) Fidelity was "typically" the insurer of both policies. (First Amended Complaint, ¶¶ 4, 17, and 20) These points bear special consideration as to the owner of the property put at issue at FAC paragraph 23(a).

considered was determining whether the original defendant's due process rights would be violated by denying the amendment. Judge Vollmer resolved this issue in *Public Integrity* by determining that the third-party claims in that matter were not "compulsory" counterclaims. As he wrote, "Because these claims are not compulsory counterclaims, dismissal would not deny them due process." *Id*. at 296.

At bar, the Third-Party Demand does not raise any type of state-law-based claim such as was raised in *Public Integrity*, or in <u>any</u> of the other cases barring third-party actions in False Claims Act cases. At bar, a federal fiscal agent is asserting under federal (not state) law that <u>regardless</u> of its own liability under the False Claims Act, and independent of that claim, if the Plaintiff proves an overpayment to these citizens/insureds/property owners, then in that event, the United States Treasury funds must be returned. Examining the Third-Party Demand against F.R.C.P. Rule 13 reveals the following:

First, Rule 13(a) reads as follows:

**(a) Compulsory counterclaim.**

> **(1) *In General*.** A pleading must state as a counterclaim any claim that - - at the time of its service - - the pleader has against an opposing party if the claim:

> (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim;

> (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Under F.R.C.P. Rule 13(a)(1)(A), the First Amended Complaint (at ¶ 23) directly puts at issue the NFIP/SFIP claims presented by each Third-Party Defendant to Fidelity, and which was handled by Fidelity. Both the First Amended Complaint and the Third-Party Complaint arise out of the exact same transaction or occurrence. Fidelity was the payor of the funds, and the insureds

were the recipients. The claim that is alleged to be fraudulent is the insureds' claim. Further, under F.R.C.P. Rule 13(a)(1)(B), adding the Third-Party Defendants does not in any sense defeat this Court's subject matter jurisdiction. As Judge M. Casey Rodgers held in *Fidelity v. Tibbs*, the Court would have, at the very least, federal question jurisdiction over the claim for return of federal funds. Further, neither of the exceptions set forth in Rule 13(a)(2) apply. And, as per F.R.C.P. Rule 13(c), "A counterclaim need not diminish or defeat the recovery sought by the opposing party. It may request relief that exceeds in amount or differs in kind from the relief sought by the opposing party." In other words, it is not necessary that the Third-Party Complaint be made dependent upon the overall success of the First Amended Complaint.

Under the test set forth by the Fifth Circuit in *Underwriters at Interest on Cover Note v. Nautronix, Ltd*., 79 F.3d 480, 483 (5th Cir. 1996), Fidelity's claims against its insureds are compulsory counterclaims. According to the Fifth Circuit in *Underwriters*, "the test for whether a claim is compulsory is:

> (1) Whether the issues of fact and law raised by the claims and counterclaim largely are the same;
>
> (2) Whether *res judicata* would bar a subsequent suit on defendant's claim absent the compulsory counterclaim rule;
>
> (3) Whether substantially the same evidence will support or refute plaintiff's claim as well as the defendant's counterclaim; and
> (4) Whether there is any logical relationship between the claim and counterclaim. *Id*. at FN2.

According to the Fifth Circuit, "An affirmative answer to any of the four questions indicates the claim is compulsory." *Id*. at FN 2. Given that Fidelity and the insureds are the direct parties to the one transaction being put at issue by Branch, it is hard to see how Branch could even *argue* that all four tests are not met in this circumstance. The claims are clearly compulsory under

*Underwriters*, such that none of the FCA caselaw discussed by Branch is applicable.[7]

**7.    FIDELITY MAINTAINS THAT JOINDER IS REQUIRED UNDER RULE 19**

Fidelity does not contend that joinder is required by F.R.C.P. Rule 19(a)(1)(A). However, under Rule 19(a)(1)(B), joinder of the individual homeowners/insureds is required.[8] Under that rule, a person who is subject to service of process and the Court's subject matter jurisdiction must be joined as a party if:

> (B) that person claims an interest relating to the subject of the action and is so-situated that disposing of the action in the person's absence may:
>
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Each of the insureds has an obvious interest in keeping the federal funds he or she sought and obtained from Fidelity. Moreover, <u>both</u> subparagraphs (i) and (ii) apply to the instant situation. As for section (i), these homeowners are about to be set upon by countless lawyers. The First Amended Complaint at paragraph 19 makes clear that they have already been contacted by representatives of Branch. As Fidelity makes clear in paragraph XIX of its Answer to the First Amended Complaint, cause exists to be concerned about what Branch's representatives told these people to obtain access to their homes, and to obtain their cooperation in reaching conclusions that these people received overpayments of federal dollars. Simply put, and based upon Branch's allegations, Fidelity wonders whether Branch told these persons that (1) Branch was acting "for the Government," and (2) whether Branch informed these persons that a finding

---

[7] See also *McDaniel v. Anheuser-Busch, Inc. v. Force Corporation*, 987 F.2d 298, 304 (5th Cir. 1993), where the court wrote, "A counterclaim is compulsory when both the original claim and the counterclaim arise from the same 'aggregate of operative facts'."

[8] The second (and more common) ground for ordering joinder is potential prejudice to the interest of the parties - - both existing parties and those sought to be joined. See *Pulitzer-Pollster v. Pulitzer*, 784 F.2d 1305, 1310-1311 (5th Cir. 1986). For another application of these principles by the Fifth Circuit, see *Local 1351 International Longshoremen Ass'n. v. Sea-Land Service, Inc.*, 214 F.3d 566, 570 (5th Cir. 2000).

of an overpayment might lead to their legal liability to return the funds to the Government. Literally at the core of Branch's case is the question of whether these people currently illegally possess U.S. Treasury funds.

Suffice it to say, each of these homeowners is going to be questioned at length by numerous lawyers in lengthy depositions. Every relevant financial record they possess will be sought by subpoena. There is no way for this case to proceed without there being a great legal entanglement of each of those homeowners in this case. It is a distinct possibility that these persons may decide to claim they are owed <u>more</u> benefits under their flood policies.[9] They may file counterclaims of their own. It therefore stands to reason that they should have their own counsel for these proceedings. If they are brought into these proceedings as parties, then they have a seat at the table through their own counsel during all developments, and, they have their own counsel during the handling of any depositions or discovery requests. Otherwise, their interests are significantly at risk in a manner that is unwarranted.[10]

Currently everyone else besides the insureds has counsel. The United States does, Branch does, Fidelity does, and all of the adjusters do. The only relevant interest in this entire situation that is not protected by counsel, are the insureds whose claims are the subject of the case.

Turning to subsection (B)(ii), Branch's inappropriate reference to the *Times-Picayune* newspaper article establishes that <u>both</u> Fidelity and these homeowners <u>are</u> at risk for the possibility of inconsistent obligations. If this proceeding ends with a finding of fact that

---

[9] **THIS POSSIBILITY SHOULD NOT BE DISCOUNTED. AS IS MADE CLEAR BY FIDELITY'S RESPONSE TO BRANCH'S ALLEGATIONS AT PARAGRAPH 23(A) OF THE FIRST AMENDED COMPLAINT, BRANCH'S PLEADINGS ASSERT THAT THAT INSURED IS OWED $62,000 <u>MORE</u> IN FEDERAL FUNDS THAN FIDELITY BELIEVED WAS OWED. CERTAIN OF THE CLAIMS SO QUICKLY REVIEWED BY BRANCH COULD END UP BEING CLAIMS WHERE <u>MORE</u> IS OWED, NOT LESS.**

[10] "The caselaw under Rule 19 has recognized that the establishment of a negative precedent can provide the requisite prejudice to the absentee." *Pulitzer-Polster v. Pulitzer*, 784 F.3d 1305, 1310 (5th Cir. 1986). These persons should have counsel during all times that the Court is considering whether they are illegally in possession of federal funds.

overpayments to Fidelity insureds did occur, but that Fidelity committed no fraud, then it is unassailable that these insureds are in possession of United States Treasury funds to which they are not entitled. In that event, what grounds would FEMA have to tell either Fidelity or these insureds to "blow off" that issue, and just keep the money? Every relevant case on federal funds overpayments makes clear that the money would have to be returned. In other words, absent the filing of the Third-Party Complaint, Fidelity risks winning this case against Branch and the Department of Justice lawyers, only to then face claims from FEMA lawyers demanding that Fidelity either seek return of the funds from all of the insureds, or pay that overpayment out of its own coffers.[11] Every one of those persons would then get sued. Each would then be outraged that they were not allowed to be a part of the original proceeding.

This situation is most analogous to lawsuits where there are rival claimants to property and not all of the rivals are before the court. Here, this Court should presume that each of the insureds is of a mindset that he or she is honestly and appropriately entitled to all of the federal dollars that they did receive. They might believe they are entitled to more![12] In contrast, Branch claims that they are not owed the monies that they are holding. Under the relevant caselaw, if an action seeks to determine conflicting claims to ownership or possession of property among its owners, all co-owners should be joined as parties. See, *e.g.*, *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975). As another example, in *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 788 (D.C. Cir. 1983), a private party had a proprietary interest in a federal lease, which plaintiff sought to cancel. All parties having an interest in the lease were "indispensible." At bar, the insureds have an obvious interest in this Court's findings as to whether their claim was

---

[11]  This is precisely the sort of "inconsistent obligations" with which F.R.C.P. Rule 19(B)(ii) is concerned.
[12]  Again, please examine Fidelity's Answer at paragraph 23(a) as to Branch's allegations of the FAC at paragraph 23(a). Branch asserts that this person is owed $62,000 more in federal funds. Fidelity denied that claim outright. See Exhibit A.

properly paid. They are therefore "indispensible" to this case, and must be joined under Rule 19. See also, *Hilton v. Atlantic Refining Co*., 327 F.2d 217 (5th Cir. 1964).

As one final point here, just because it makes sense for Fidelity to file a third-party demand does not mean that such would be appropriate for all WYO carriers. FEMA's regulations (see, *e.g.*, 44 C.F.R. Pt. 62.23(a)) are specifically designed to allow all types of property and casualty insurance companies to participate in the Program. This would include both companies that do typically issue both homeowners and flood policies to their customers, and companies such as Fidelity who do not. Regardless of the decisions made by other WYO Companies, due process and fairness and individual treatment of each Defendant calls for the Court to recognize that Fidelity is quite different from some of the other Defendants.

## 8.    RECENT FCA CASELAW SUPPORTS ALLOWING THE THIRD-PARTY COMPLAINT ON DUE-PROCESS GROUNDS

Despite the monumental sums allegedly involved, and despite the obvious future impact upon the NFIP as a whole, the only FCA case Branch provides this Court to review is the 15 year-old decision in *Public Integrity*. While Fidelity will review *Public Integrity* in a moment, it first asks for the Court's review of a much more recent FCA decision entitled, *Miller v. Bill Harbert Int'l. Construction, Inc.*, 505 F.Supp.2d 20 (D.D.C. 2007). In *Miller*, the court reviewed the development of the relevant caselaw from the time of *Public Integrity*, until two years ago. According to *Miller*, the caselaw does not support a blanket holding that literally "all" counterclaims are barred in FCA cases. What are barred, according to *Miller*, are only "particular" counterclaims in FCA cases. *Id*. at 25.

According to *Miller*, that which is barred are "the third-party complaints [which] essentially sought contribution and indemnification for the FCA violations based on the relators' alleged role in their commission." *Id*. at 26. As the *Miller* court explained, "The FCA is in no

way intended to ameliorate the liability of wrongdoers by providing defendants with a remedy against a *qui tam* plaintiff with 'unclean hands.'" *Id.* at 26. However, and as *Miller* further explains, that is not the end of the inquiry:

> On the other hand, courts have held that "a *qui tam* defendant may maintain a claim for independent damages; that is, a claim that is not dependent on a finding that the *qui tam* defendant is liable." [case cite omitted] These cases recognize that not all counterclaims in FCA cases will be contrary to the statute's interest, and that there would be real due process concerns if *all* counterclaims were to be barred, particularly compulsory ones, which would be lost forever. *Id.* at 26-27.

At bar, Fidelity's counterclaim is not directed at the Relator *at all*. Moreover, Fidelity's Third-Party Complaint was worded most carefully to avoid making the success of the Third-Party Complaint *dependent* upon a finding of Fidelity's liability to Branch. Please notice that the Third-Party Complaint's opening paragraph, its paragraphs 20, 22, 23, 24 and 31, as well as each Prayer for Relief, all make the same repetitive point: The Third-Party Complaint is triggered by its own terms only upon the finding of an overpayment. It is not worded such that the trigger is the finding of a liability under the False Claims Act. This is because Fidelity, acting as the Government's fiduciary, must preserve for the Government the claim that if the jury were to hold that overpayments did occur, it is still inescapable that those federal funds would have been returned by Fidelity's customers. Under the more recent analysis of these issues contained in *Miller*, Fidelity's Third-Party Complaint is not barred by FCA caselaw.

9.    **ANALYSIS OF *PUBLIC INTEGRITY* DOES NOT SUPPORT THE PLAINTIFF'S CLAIMS HERE**

Each of the following points establishes that the holding in *Public Integrity* does not govern the circumstances at bar.

To begin, the situation in *Public Integrity* was the traditional FCA situation, where the False Claims Act defendant "received payments from the United States." *Id.* at 295. At bar, and

as a matter of binding Fifth Circuit precedent, this never occurred. Despite Plaintiff's erroneous allegations at paragraph 15 of the First Amended Complaint asserting that WYO carriers paid the insureds' claims from their own coffers, and then were "reimbursed" from federal funds, the Fifth Circuit has recognized that this is not the way the NFIP works. As per *Gowland, supra*, and as per the Arrangement at 44 C.F.R. Pt. 62, App. A, Art. III(A), claims payments are made directly from the Treasury to the insured. The WYO carrier is never the recipient of the funds, or the possessor of the money. The "claimant," as that term is used in *Public Integrity* is not Fidelity. The "claimant" at bar is the insured who submitted his or her claim to Fidelity.

Second, each of the claims put at issue by the Third-Party Complaint in *Public Integrity* were "state law claims" for which the third-party plaintiff sought an exercise of the district court's "supplemental jurisdiction." *Id*. at 296. At bar, Fidelity's claims against the insureds are borne of federal law, and are predicated upon an exercise of this Court's jurisdiction under 42 U.S.C. § 4072 and 28 U.S.C. § 1331. Note, Branch does not challenge this Court's jurisdiction to hear a controversy involving a claim to recover United States Treasury funds.

Third, the rule concerning the barring of counterclaims is purely court-made law. It is not to be found anywhere within the FCA statute. It derives from the judiciary's attempt to devise "factors" (*Id*. at 296) to determine when counterclaims should be allowed, and when they should not. Nowhere does Branch afford this Court any discussion of relevant factors that would weigh pro or con as to whether the compulsory counterclaim at issue at bar should be allowed. Fidelity submits the following as to that exact point:

If "the purpose of the FCA is to deter future fraudulent claims, as well as recoup the Government's losses due to fraud," then what principled argument would exist barring claims against the actual claimants for those funds (in this context, the insureds, not the WYO carriers)?

All that was received by the WYO carrier was a 3.3 percent commission. 44 C.F.R. Pt. 62, App. A, Art. III(C). One hundred percent of the overpayment, if such existed, was paid to the insured. Assuming the judiciary is not to legislate, on what basis would the Court predicate a holding that only FEMA's fiscal agents can be held liable to return those federal funds, but the persons who actually made the claim itself, and who now possess the money, *cannot* be brought into the action? On what basis are the insureds to, in effect, be afforded an immunity *by the courts*?

Fourth, Judge Vollmer found in *Public Integrity* that allowing the counterclaims in that matter "would interfere with the Government's effort to recover for fraud." *Id*. at 296. In *Public Integrity*, that made sense because the subject of the third-party demand in that action was the unrelated transaction of which the third-party plaintiff desired to complain. At bar, the opposite is true. Here, the exact same evidence must be examined regardless. Also, if we do not bring the insureds into the one action, then we are forcing the Government, via its fiscal agent or directly, to endure the expense of yet another proceeding to accomplish the exact same objective of recovering the alleged overpayments, if indeed overpayments did occur. Through the simple process of making certain the insureds are parties to the lawsuit, we obviate the need of the Government pursuing separate and later litigation.

Finally, Judge Vollmer found definitively that "because these claims are not compulsory counterclaims, dismissal would not deny them due process." The only way that *Public Integrity* is applicable to the situation at bar is if this Court affirmatively rules that the claims brought in this action are not compulsory counterclaims, such that either the United States or its fiscal agent would retain the right to sue those insureds for the overpayments many years from now after this lawsuit is over and concluded, and that neither principles of *res judicata*, nor time limitations, nor any other doctrine would prevent the United States or its fiscal agents from moving forward

to recoup the overpayments if such is found in the trial of this cause.[13]

## 10.    JUSTICE HOLMES' "SQUARE CORNERS" MAXIM

Justice Oliver Wendell Holmes' maxim that men must turn "square corners" when they deal with their government is fully applicable both to Fidelity, and to Branch. The Fifth Circuit employed that phrase in its conclusion of the *Gowland* case. Branch is standing upon the name of the United States of America in the making of its claims. However, it is now apparent and unassailable that Branch obtained this Honorable Court's jurisdiction through calculated acts of deception. Plainly, Branch prepared an incredibly dramatized and alarming First Amended Complaint that was designed and calculated to overcome the Defendants' Rule 12 Motions with false claims, and to bypass FCA procedural safeguards so as to allow Branch to conduct an open-ended fishing expedition in a sea of 160,000 flood claims emanating from Hurricane Katrina. Upon this point, and as we are about embark upon that enormous cost and expense, Fidelity points out two irrefutable realities:

First, the National Flood Insurance Program is quite literally operating upon its last leg. In 1968, when Congress adopted the Program, it adopted it putting into place within the statutes the only three known possible operating systems pursuant to which anyone had dreamed up any way of operating a system of flood insurance within the United States.[14] Two of those three operating systems were previously tried, and have already failed. One operated from 1968 until 1978. A second operated from 1978 until 1983. The current operating system has been working successfully since 1983. If the courts, the Department of Justice, and the Administrator of FEMA were to adopt a view that it is only the WYO carriers that must turn "square corners," and that this rule does not apply to Branch or to the insureds, or to the adjusters, then it should not be

---

[13] It's Branch's Motion, and so Branch should bear the burden of proof and persuasion on all such points. It must prevail on <u>all</u> <u>four</u> of the *Pulitzer-Polster* factors.
[14] The "Johnson Report" to Congress discussing these points can be provided upon request.

assumed that the private corporations that have thus far been willing to continue to operate within the NFIP, will continue to do so. The strict rules of the Program must apply equally to all, or the WYO carriers will very likely withdraw from this untenable and indefensible risk.

Second, it is inescapable that Branch <u>knew</u> at the time of the status conference held with the Court on November 19, 2009, which was just after the Fifth Circuit ruling, that its factual claims were absolutely false and completely inapplicable to <u>any</u> of the remaining Defendants in the case. This Court can confirm through the Justice Department lawyers that Branch's alleged scheme wherein WYO carriers abused FEMA's expedited claims handling process (FAC, ¶ 17) to reap inappropriate federal funds <u>cannot</u> possibly succeed against any of the remaining Defendants.  This is because <u>not one</u> of the remaining Defendants became involved in that process. Of all of the remaining Defendants, Fidelity attempted that process with a group of less than 50 claims, and proceeded no further. (Ex. A) No other Defendant did any such claims at all.[15] Everyone slogged through each individual claim via the "normal" rules alluded to in Mr. Pasterick's interview with *The Times-Picayune*.

At paragraph 9 of the First Amended Complaint, Branch touted its "direct, first-hand knowledge" of the Defendants' fraudulent scheme. It repeatedly claimed its so-called "direct, first-hand knowledge" of this scheme in opposition to the Defendants' Rule 12 motions to Judge Beer, to the Fifth Circuit and then to this Court. Logic dictates that either Branch misled each judge about its "direct, first-hand knowledge" (FAC, ¶ 9) such that it actually did not know that Fidelity did not issue homeowners' policies and did not engage in the expedited claims handling process (see FAC, ¶¶ 4, 17, and 20), or, Branch did have "direct, first-hand knowledge" and with

---

[15] Only about 10 percent of all Hurricane Katrina's flood claims were handled via the expedited process put at issue at paragraph 17 of the First Amended Complaint. Of that 10 percent, over 99 percent were handled by WYO carriers other than the remaining WYO carriers here. <u>If</u> Branch was being honest as to its "direct, first-hand knowledge" (FAC, ¶ 9), it already knew this.

knowledge of their falsity, pleaded false claims as to Fidelity. Either paragraph 9 is a lie, or paragraphs 14, 17, and 20 were pleaded knowing that they were false.

Undersigned counsel is loathe to cite to *The Times-Picayune*. However, the Courts needs to be told, given Plaintiff's use of that source as an authority of which defense counsel should have been aware, (Doc. 253-2, p. 3) of an article in that paper published on June 21, 2007. Possibly as a coincidence, that is the exact same date Branch filed its First Amended Complaint. In that article, attached hereto as Exhibit C, then-NFIP Administrator David Maurstad explained that only four WYO carriers had even attempted to employ the expedited claims process. Moreover, he named the four companies. Of those four, one was never a defendant, two have been dismissed already, and the last is Fidelity. As is explained in the attached Affidavit, Fidelity found after less than 50 claims that is couldn't use that process. (Ex. A)

Wouldn't an actual whistleblower with actual "direct, first-hand knowledge" know these facts? At the very least, shouldn't Branch have confessed these facts to the Court before it allowed the Court to work-up its 70-page ruling about facts that *everyone* but the Court knew were untrue? Branch is very quick to use the "fraud" word. However, it is not nearly so quick to inform the Court when it has used that word inappropriately.

The objective? The objective is to hope that the Court will simply forget what claims were made to overcome the Rule 12 Motions, and then to hope that the Court has no problem with Branch simply commencing expensive discovery upon tens of thousands of claims upon which it doesn't even *claim* first-hand knowledge. Branch is betting that there will be no consequences whatsoever for having deceived the Court to get to discovery. Fidelity only hopes that "square corners" applies to Branch, too.

11.    **BOTH PARTIES' CONCERNS FOR THE INTIMIDATION OF WITNESSES**

Only a few weeks have passed since this Honorable Court denied the Defendants' motions to dismiss, and already attorneys on both sides have raised the specter of inappropriate intimidation of witnesses. Fidelity's Answer, at paragraph XIX, questions what was communicated to Fidelity's insureds to cause them to allow Branch's representatives to enter those dwellings. That paragraph also asks what comments might have been made by Branch representatives to Fidelity insureds, as to whether overpayments of federal funds would have to be repaid to the Federal Government. Now, in Branch's Motion to Strike Fidelity's Third-Party Demand, it asserts that Fidelity's only motive for filing its Third-Party Demand is "to intimidate these potential witnesses." (Doc. 248, pp. 5-6)

With all respect to all concerned, these persons are going to be at risk for intimidation. They are about to be under an intense microscope, wherein skillful lawyers for very large corporations and the United States Government are soon to question them, asking piercing questions about everything they said and did after Hurricane Katrina with respect to their claim for federal benefits. All of their financial records will soon be subject to subpoena. Cause definitely does exist for all concerned to have a serious conversation with the Court about how best to <u>not</u> trample the due process rights of these individual citizens.

As a beginning point, simply assuming that all of Branch's contacts have been benign, while all of the Defendants' contacts would constitute "intimidation," is both inappropriate and frivolous. However, that seems to be the position Branch has taken. For its part, Fidelity can say to this Court that it has had absolutely no contact with these people whatsoever since the day it learned of this lawsuit. A decision was made early on to await guidance from the Court as to how this ticklish issue should be handled.

12.    **DISCUSSION OF THE "AGREEMENT IN PRINCIPLE" TO DELAY SERVICE**

On page 2 of Branch's Motion to Strike, it writes that, "Counsel for Fidelity agreed in principle to this request," meaning the agreement to delay service. In emails that can be presented to the Court, the <u>only</u> agreement made was that undersigned counsel would delay service <u>if</u> he could determine that such would not prejudice anyone's interest, and <u>if</u> such was possible under the rules. <u>Immediately</u> after the making of this "agreement in principle" various Defendants began receiving in the mail incredibly broad written discovery, including unilaterally set Rule 30(b)(6) depositions of all corporate Defendants to occur less than 30 days from now, in mid-December. **Not one call exhibiting any courtesy to opposing counsel or these out-of-town witnesses was placed.**

Fidelity cannot know how this Court will structure discovery. Judge Senter in the *Rigsby* False Claims Act suit pending in Mississippi adopted an efficient means of limiting discovery that the Court might find persuasive.[16] However, this Court might not adopt that course. As such, undersigned counsel does not believe it is his place to delay letting these insureds know of what is occurring (by withholding service of process) unless the Court directly orders Fidelity to withhold service. Undersigned counsel does not believe that it is appropriate of him to simply choose that these people should not be told of what is going on, or to decide that somehow it is in their best interest that these facts be kept from them. As such, undersigned counsel submits that it is his intention to formally issue the service of process to each of the seven Third-Party Defendants at close of business on the date of the hearing of Branch's Motion to Strike the Third-Party Complaint. If the Court would like undersigned counsel to delay issuing that service, undersigned counsel will of course fully comply with the Court's instructions. Otherwise, these

---

[16] See Orders dated March 20, 2009, and August 10, 2009 (at page 10), by Judge Senter in *Rigsby v. State Farm, et al*, Docket No.: 1:06CV0433LTS-RHW. (Exs. D & E) Discovery in *Rigsby* was limited to the claims expressly put at issue in the plaintiffs' Complaint.

people have the right to know what is going on, and to find counsel. They are each adult citizens of this country. They will figure out what Branch is doing, just as Fidelity has. They have a right to <u>advance</u> notice of what is coming their way.

## CONCLUSION

For all of the reasons assigned herein, Fidelity maintains that its decision to file its Third-Party Complaint against the Third-Party Defendants was both legally warranted and morally appropriate. It prays that the Court will deny the Plaintiff's Motion to Strike.

Respectfully submitted,

NIELSEN LAW FIRM, LLC
/s/ Gerald J. Nielsen
Gerald J. Nielsen (17078)
gjnielsen@aol.com
William T. Treas (26537)
wtreas@nielsenlawfirm.com
3838 North Causeway Blvd, Suite 2850
Metairie, Louisiana 70002
Telephone: (504) 837-2500
**Attorneys for Fidelity National Insurance
Company, Fidelity National Property and
Casualty Insurance Company**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has this date been served upon all parties to this suit through counsel by filing into the Court's electronic filing system and, for non-participants, by placing same in the U.S. mail, postage prepaid and properly addressed on this 2nd day of December, 2009.

/s/ Gerald J. Nielsen