## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA,** *EX REL.*    **CIVIL ACTION NO.: 06-4091**
**BRANCH CONSULTANTS, L.L.C.,**

          **Plaintiff**        **SECTION: "R" (1)**

**VERSUS**

                              **JUDGE: VANCE**

**ALLSTATE INSURANCE COMPANY,** *et al.,*

          **Defendants**      **MAGISTRATE: SHUSHAN**

### MEMORANDUM IN SUPPORT OF FIDELITY'S MOTION TO COMPEL

MAY IT PLEASE THE COURT:

Defendants, Fidelity National Property and Casualty Insurance Company and Fidelity National Insurance Company, (hereinafter referred to collectively as "Fidelity"), Write-Your-Own ("WYO") Program insurance carriers participating in the United States Government's National Flood Insurance Program ("NFIP"), pursuant to the National Flood Insurance Act of 1968 ("NFIA"), as amended,[1] appearing herein in their "fiduciary"[2] capacity as the "fiscal agent of the United States,"[3] respectfully submit the following Memorandum in Support of Fidelity's Motion to Compel.

Fidelity seeks this Court's Order requiring Branch to provide proper responses to Fidelity's Interrogatories numbers 6, 7, 8, 11, 15, 18, and 20; Fidelity's Request for Production of Documents numbers 2, 10, 11, 16, 17, 28, 34, and 35;[4] and Fidelity's Request for Admissions numbers 1, 14, and 18. (Exs. 1, 2, 3)

---

[1] 42 U.S.C. § 4001, *et seq.*
[2] 44 C.F.R. § 62.23(f).
[3] 42 U.S.C. § 4071(a)(1); *Gowland v. Aetna,* 143 F.3d 951, 953 (5th Cir.1998).
[4] In addition, Fidelity asks the Court to order Plaintiff to remove the confusing "if any" inappropriate modifier found at the end of requests 12, 14, 15, and 19.

This Memorandum will be divided into five topical categories. Those are:

1.      What we already know about Plaintiff's First Amended Complaint;

2.      The Sedona Conference v. "Surprise at Trial";

3.      Plaintiff's answers to the Interrogatories;

4.      Plaintiff's responses to the Request for Production of Documents; and

5.      Plaintiff's responses to the Request for Admissions;

6.      Branch's objections; and

7.      Confusion as to what  was produced on January 28, 2010.

As to each of these said categories, Fidelity submits the following:

**1.      What We Already Know About Plaintiff's First Amended Complaint**

Branch's claims are currently alive specifically because Branch successfully persuaded Judge Vance to deny the Defendants' Motion to Dismiss by arguing to her that Branch was an "original source" of information concerning the Defendants' fraudulent scheme. (Doc. 228) Branch did this by persuading Judge Vance that Branch had pleaded with particularity under FRCP Rule 9(b) a *particular* scheme where <u>each</u> of the Defendants had (a) taken advantage of FEMA's post-Katrina relaxation of its claims handling standards (Judge Vance's October 19, 2009 Order, pp. 3, 4, 25, 29-30, 32, 55, and 62), and (b) issued <u>both</u> the homeowners and the flood policies on "each" of the properties at issue. (*Id*. at 3, 5, 11-15, 30, 51-52, 58) In response to Branch's efforts, Judge Vance was most specific as to how she understood the scheme that Branch had pleaded with particularity under Rule 9(b):

> Plaintiff Branch Consultants ("Branch") brought this *qui tam* action on behalf of the United States government under the False Claims Act.  Defendants are WYO insurance companies and adjusters that were involved in the adjustment of NFIP flood claims after Katrina.  Branch alleges that the circumstances after Katrina gave defendants complete control over the adjustment and payment of the NFIP policies.   Specifically, it contends that when defendants adjusted claims

arising from Hurricane Katrina, they systematically and on a massive scale overstated the amount of flood losses to the properties they adjusted. In so doing, defendants exaggerated the amount of money that the government should pay under the individual flood policies, which in turn reduced the amount that the insurance companies would themselves be obligated to pay under wind and rain policies. Stated differently, Branch asserts that defendants "passed off" the costs of paying for wind damage to the government by fraudulently claiming that the damage was caused by flood. Because of the expedited claims-handling process that was put into effect after Katrina, many of these claims were allegedly not scrutinized by the government as they would have been in more typical circumstances. This resulted in the submission of myriad fraudulent insurance claims, which the federal government then paid. *Id.* at 3-4.

\*        \*        \*

The circumstances following Hurricane Katrina were unusual enough that FEMA suspended its regular proof-of-loss standards. The particular allegations concern only the WYO insurers who submitted proofs of loss during this time period, in this region, and under these extraordinary conditions. (*Id*. at 25)

\*        \*        \*

Here, there is no doubt that the allegations in the public disclosures are substantially similar to those in Branch's Complaint. Both allege that, after the proof-of-loss standards were temporarily relaxed during the recovery from Hurricane Katrina, WYO insurers overstated flood damage to properties with NFIP policies and understated the amount of damage resulting from causes of loss for which the insurers had to pay themselves. (*Id*. at 29-30)

\*        \*        \*

Branch also generally alleges, contrary to defendants' contention, that the defendants had wind policies on the listed properties. Such policies provide a motive to overstate flood damage for which the government is obligated to pay and to understate wind damage for which the insurance companies are responsible. (*Id.* at 52)

\*        \*        \*

Furthermore, the general allegation that each property was covered by a wind policy provides the incentive for the defendants to engage in the scheme. (*Id*. at 58)

Subsequent to Judge Vance's October 19, 2009 Order, Fidelity filed its Answer and Third-Party Demand (Doc. 247), propounded Interrogatories, Request for Production of

Documents, and Request for Admissions, all on November 19, 2009. Branch tendered its discovery responses to each of those three discovery requests on December 21, 2009. (Exs. 1, 2, 3) The required Rule 37 conference was conducted on January 5, 2010. (See Rule 37 Certificate.)

Before delving into the responses challenged via this Motion to Compel, Fidelity believes it important that the Court be cognizant of what has already been learned about the extent to which Branch misled Judge Vance to obtain her October 19, 2009 Order. These points are <u>critical</u> to Fidelity's motion, for they establish Fidelity's good cause in pressing for legitimate answers to the rest of Fidelity's discovery. That which we already know is the following:

As per Branch's answer to Interrogatory number 1, that which is called Branch Consultants, LLC, is at best four guys, not one of whom declares in his résumé that he has any significant pre-Katrina experience adjusting flood claims. (Ex. 1)

As per Branch's answer to Interrogatory number 3, Branch now admits it <u>knew</u> the name of each company that had issued the homeowner's policy on <u>each</u> of the properties put at issue against Fidelity at paragraph 23 of the FAC, <u>when</u> the FAC was filed. (Ex. 1) In other words, during all of the time that Branch was making Judge Vance work up a 69-page ruling wherein she repeatedly predicated her ruling upon Branch's allegations of WYO carriers shifting their own wind losses to flood policies those same companies had likewise issued, Branch had actual knowledge that these allegations were absolutely false as to Fidelity.[5]

As per Branch's response to Interrogatory number 7, as well as its response to Request for Admissions numbers 16-19, Branch had absolutely no basis whatsoever at the time it filed its FAC, at the time it filed its Opposition to the Motion to Dismiss, and at the time it filed its briefs to the Fifth Circuit, to allege that Fidelity had adjusted the claims put at issue in this case by

---

[5] See also Branch's response to Request for Admission number 4, where Branch admits that at the time it filed its FAC, it was not in possession of any documents indicating that at the time of Hurricane Katrina, Fidelity was the issuer of the homeowner's policy on any of the properties put at issue at paragraph 23 of the FAC. (Ex. 3)

means of FEMA's expedited claims handling process. (Exs. 1, 3) Moreover, rather than simply admit that it has been caught at misleading the Court, Branch pretends at its response to Interrogatory number 7 that its FAC at paragraph 17 does not actually allege that Fidelity utilized that process in the first place. (Ex. 1)

Further, and despite all of Branch's claims about being an "original source," and about itself as being the party that brought the actual facts to light about the supposed fraud, it now finds itself unable to identify <u>any</u> rules of the NFIP that were breached; <u>any</u> facts supporting its claims of pre-existing wind damage (Int. no. 11); or <u>any</u> other obvious information of a factual nature that an "insider" who would be qualified as an "original source" would be expected to have.

As Judge Senter recognized in *Rigsby*, "the gravamen of the Relator's cause of action . . . is their direct and independent knowledge, qualifying them as an original source, of Defendants' alleged wrongdoing." *U.S. ex rel. Cori Rigsby and Kerri Rigsby. v. State Farm Ins. Co., et al.*, No. 1:06CV0433 (S.D.Miss. 08/10/09). As Judge Senter also commented, "What is also problematic for the Court at this point is that it appears that Relators are seeking to depend on outside sources to support an imposition of liability against Defendants." *Id.* at 2.

**2.    The Sedona Conference vs. "Surprise at Trial"**

At the January 20, 2010 discovery conference, this Court noted to all involved counsel that we will all be working together for quite some time to accomplish discovery on this complex matter. In the context of that discussion, the Court asked all involved counsel to abide the principles of "The Sedona Conference," and handed each involved counsel a copy of a set of principles that emanated from that conference. (A copy is attached hereto as Exhibit 4.) Perhaps the most important principle to be found within that document is a statement that it is the purpose

of the federal rules regarding discovery that we are all to avoid "surprise at trial." (Ex. 4, p. 2)

It is on that very point that Fidelity has the most concern. Beyond Branch's current written discovery responses, which Fidelity contends are clearly calculated and designed to avoid legitimate discovery, Fidelity believes it necessary at the time of this initial presentment of a discovery dispute, to advise this Court that one of Branch's law firms publically advocates and attracts clients based upon an avowed policy of creating "surprise at trial." The following is found on the Susman Godfrey website regarding this exact point:

**How We Handle Cases**

In handling complex litigation, our firm is guided by two principles, both of which reduce expense without sacrificing chances for success. First, less is best. Excess discovery is not just nonproductive, it often is counterproductive. Excess discovery removes the element of **surprise at trial**, forces the opposition lawyers and witnesses to get prepared earlier than they otherwise would, and often takes the eyes of the lawyers who engage in it off the ball. The best lawyers are best able to handle (and create) **surprise at trial**. We believe in retaining our natural advantage. (emphasis added) (Ex. 5)

Fidelity presumes that the firm of Susman Godfrey, LLP, has a fine reputation, and comprises lawyers who are most ethical. That is not at issue. However, whether Branch will be allowed by this Court to "create surprise at trial" is at issue.

The advisory committee notes for the 1983 amendments to FRCP Rule 26, together with the holding of the U.S. Supreme Court cited therein, make clear that it is not just the Sedona Conference that precludes Branch and its counsel from embarking upon a process of "creating surprise at trial." As those advisory committee notes confirm:

The purpose of discovery is to provide a mechanism for making relevant information available to the litigants. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).

Fidelity asks that the Court be mindful of above-stated passage as it reads Branch's repeated efforts to evade providing meaningful discovery. Further, it is important to recognize that these points are all the more important in this particular piece of litigation, given its great public importance, as noted below:

This Court has not just taken jurisdiction (a.k.a. "power") over the case and the parties. Without a doubt, the Court has taken jurisdiction over the future of the NFIP itself. Branch (which we now know to be just four guys with little or no NFIP experience) claims that almost the entire WYO Program industry is riddled - - in virtually every major company - - with people who would knowingly defraud the United States.

If a jury were to conclude Branch's allegations are true, the NFIP is over. In such an event, the Government would quickly shut down the current operating system, and private industry would just as quickly retreat from it. This is no small problem, for there are no other possible operating systems for the Program that haven't already been attempted in years past. As can be explained in clear detail by undersigned counsel based upon Government reports, ***THAT*** is perhaps the single most significant part of what is at stake in this case. The ability of the Congress to actually accomplish its objectives for the NFIP, as well as the ability of over 5 million different households and small businesses to be able to obtain flood insurance at all, is squarely at issue in how this case is conducted.

If a jury correctly concludes that Branch's allegations are true, then so be it. The Program would and should be ended if Branch's allegations are true. However, and as this Court knows well, not every jury gets it right. "Surprise at trial" only increases the risk of error.

Because Branch's four guys are putting at risk a program that has taken the federal government over five *decades* to develop, and which is now counted on by over 5 million of

these four guys' fellow citizens, Branch should not be allowed to play any games designed for trial-by-ambush, or for creating "surprise at trial." (Ex. 5)

3.    **Plaintiff's Answers to the Interrogatories**

**INTERROGATORY NO. 6 - - WHAT RULES DID FIDELITY BREACH?**

Fidelity accepts Branch's concession, that being that its four personnel are not themselves able - - without the assistance of legal counsel - - to state the applicable rules that Fidelity failed to follow.[6] (Ex. 1) Yet, that is precisely what Branch alleges the Defendants did.

Branch alleges that the independent adjusters and the WYO company claims examiners all made decisions to pay NFIP claims arising from Hurricane Katrina that "obviously should not be fully covered by flood policies." (FAC, ¶ 17) Branch pleaded that the question was "obvious." *Id*. It expressly pleaded that its claims are predicated upon its assessment of the appropriate scope of "coverage." *Id*. It further pleaded that it individually re-examined each property it has put at issue over a period of "many months," and has sworn that it has prepared a "detailed report" as to each separate property. (FAC, ¶ 9; Doc. 153-3, ¶¶ 1, 8) Branch has touted its "direct, first-hand knowledge," and has asserted that before it filed this action, it "discovered and documented Defendants' scheme" and "voluntarily disclosed to the Government the information forming the basis of this Complaint." (FAC, ¶ 9)

Fidelity also notes that Branch was unable to answer this Interrogatory before it obtained discovery from Fidelity in this case. Prior to being able to answer Interrogator No. 6, Branch demanded that Fidelity produce a copy of the Arrangement (a federal law), and demanded that Fidelity produce its claims files. That has now been done. As such, whatever answer Branch provides now will be based upon information Branch learned during this lawsuit, not based upon

---

[6] If it is true that the relevant Program rules cannot even be stated without the assistance of counsel, then it is also true that Defendants' argument that judgment and opinion in such determinations is true as well.

its pre-suit knowledge.

As a third point, Branch now seeks to plead in its proposed Second Amended Complaint that the Defendants failed to follow "the claims policies and flood adjusting guidelines issued by FEMA." (Doc. 281-2, ¶ 17) On what possible basis would Branch seek to plead this, and also assert that it can avoid divulging <u>which</u> policies and guidelines it is talking about? Also, as Branch has told the Court that its Second Amended Complaint does <u>not</u> change any of its claims, it necessarily also is claiming it knew all of these rules violations and told them to the Government BEFORE this suit was filed.

As Fidelity has indicated in its Memorandum in Opposition to Branch's Motion for Leave to File Second Amended Complaint (Doc. 297, p. 10), Fidelity has offered to accept resolution of this problem <u>either</u> via a further amendment of Branch's pleadings (the technically correct course), or via very specific orders of this Court requiring Branch to "specify exactly" which regulations, rules, or guidelines Branch alleges were violated by the Defendants. As the caselaw makes clear, Fidelity will <u>need</u> this information in order to prepare an Answer to the Second Amended Complaint, and, the Court will <u>need</u> this information to evaluate whether Branch has stated any claim in the first place. See *U.S. ex rel. Bly-Magee v. Premo*, 333 Fed.Appx. 169, 2009 WL 1396825 (9th Cir. 2009) (failing to "specify exactly" which requirements were allegedly violated precludes the defendants' ability "to prepare an answer"); *U.S. ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005) (Second Amended Complaint's vague reference to "regulatory framework" insufficient; "it is not incumbent upon the district judge to become an expert in all of the regulations" at issue); *U.S. ex rel. Grosche v. Univ. of Chicago Hospitals*., 206 WL 516577 *8 (N.D. Ill 2006) (same); and *U.S. ex rel. Fowler v. Casemark RX, Inc.*, 2006 WL 3469537 *6 (N.D. Ill. 2006) (same).

Beyond the problem of preparing an Answer, Fidelity submits that it will <u>need</u> this basic underlying information in order to defend itself on the "objective falsehood" element of False Claims Act (FCA) liability. As is recognized by FCA treatises, "In most cases in which falsity is disputed, the question of falsity is based on the interpretation of a government regulation, contract or agreement, or state or federal law."  1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.03[B] (3d ed. 2009). As the Fifth Circuit has made clear, "Whether a claim is valid depends on the contract, regulation, or statute that supposedly warrants it." *U.S. v. Southland Management Corp.*, 326 F.3d 669, 674 (5th Cir. 2003) (*en banc*). As Chief Judge Jones recognized in her concurrence in *Southland*, "Where there are legitimate grounds for disagreement over the scope of a contractual or regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim." *Id*. at 684. In *Southland*, the Fifth Circuit sitting *en banc* affirmed summary judgment against the Government because the court found a "wide difference of opinion" concerning what was meant by a provision of the federal contract at issue in that matter. *Id*. at 675.

In addition, the information Fidelity seeks is just as necessary in regards to the *mens rea* or *scienter* element of FCA liability. As the Fifth Circuit explained in its analysis of whether summary judgment was properly granted against the relator on the *mens rea* element in *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 341 (5th Cir. 2008):

> A jury would conclude that the regulatory environment in which Defendants were operating was not nearly as cut-and-dry as Farmer's proffered evidence suggests. Indeed, during deposition, HUD officials admitted that there is nothing in HUD's CBDG regulations that objectively defined what is a reasonable cost. See R. 1171, 1304. With this information in mind, the jury would be considerably less likely to infer that the alleged overcharges and other misstatements show that Defendants acted "knowingly" for FCA purposes.

Please see also, *Willard v. Human Health Plan of Texas, Inc.*, 336 F.3d 375, 380 (5th Cir.

2003) (relator failed to identify any false claims because defendant's claims were actually valid under federal HMO discrimination regulations; *Matthews v. Health South Corp.*, No. 99-604, 2007 U.S. Dist. LEXIS 52397 (W.D.La. July 18, 2007) (noting that coding of medical records had a "subjective element" and finding that relator had not shown the defendant's coding was incorrect); and finally *U.S. Ex Rel Gudur v. Deloitte Consulting, LLP*, No. H-00-1169, 2007 WL 836935, at *25 (S.D. Tex. Mar. 15, 2007) (relator failed to cite any specific provisions in state code or state Medicaid plan defining specific rate-setting methodology to be used or to provide any evidence that Deloitte's rate-setting methodology failed to comply with them).

Allowing Branch to avoid declaring such fundamental points about its own case, thereby requiring both the Defendants and the Court to merely guess at Branch's predicates, will only waste time. Inevitably, such would require Defendants to waste resources attempting to defend all manner of possibilities guessing what Branch might actually be claiming is the alleged violation of the rules. Such conduct surely does not advance the Court's objective of getting discovery completed by October 1, 2010. However, it surely would advance Branch's objective of creating "surprise at trial." (Ex. 5)

Branch should be required to "specify exactly" what rules are predicating its claims. *Bly-Magee, supra*. Branch should not be allowed to "surprise" Fidelity's witnesses with previously unmentioned allegations of violations of rules that have never been mentioned in any of Branch's prior pleadings, memoranda, or discovery responses. The federal courts abhor trial by ambush. The future to the NFIP should not be made dependant on defendants' witnesses' ability to win at Branch's game of "pop quiz."

**INTERROGATORY NO. 7 - - USE OF EXPEDITED CLAIMS HANDLING**

The Court is asked to examine paragraph 17 of the FAC. (Doc. 49)  The Court is also

asked to examine paragraph 17 of the proposed Second Amended Complaint, wherein Branch is currently attempting to change its allegations against Fidelity. (Doc. 281-2) Without a doubt, Branch led Judge Vance to believe via the FAC that <u>all</u> of the WYO carrier Defendants, including Fidelity, had indeed adjusted the claims put at issue in the FAC by means of FEMA's expedited claims handling process. (Doc. 228, pp. 3, 4, 25, 29-30, 32, 55, 62) Accordingly, since Branch chose to put this process at issue, it is "fair game" for Fidelity to ask Branch to state its factual basis for the making of those allegations against Fidelity. It cannot make serious allegations of fraudulent activity, and then when pressed for a basis for its claims in discovery, argue that the facts regarding its own claims are irrelevant.

Branch has a choice to make. It can either state definitively what it suggests in its answer to Interrogatory No. 7, that being that its allegations concerning the expedited claims handling process are <u>not</u> applicable to Fidelity and thus may be dismissed, or, Branch can persist in those allegations against Fidelity, and provide its factual basis. <u>If</u> Branch asserts these allegations do not regard Fidelity, Fidelity asks that the Court's order upon this motion reflect this.

## INTERROGATORY NO. 8 - - ISSUING BOTH HOMEOWNERS AND FLOOD POLICIES

As with the previous interrogatory, Branch begins its response by stating that, "Plaintiff objects to this Interrogatory in that it misconstrues Branch's FAC." (If this is true, then so too did Judge Vance. She read the FAC the same way, as noted earlier.) As Fidelity explained above, Branch is likewise at this moment seeking to change its allegations against Fidelity in its proposed Second Amended Complaint. (Doc. 281-2, ¶¶ 4, 15, 17, 20) Moreover, at Branch's answer to Interrogatory No. 3, it admitted it knew the name of each homeowner's carrier for each of the Fidelity flood properties *at the time the FAC was filed*. (Ex. 1)

The relevance of the request is straightforward and obvious. Fidelity seeks to know if

Branch had any factual basis for that which Judge Vance assumed to be true throughout her October 19, 2009 ruling. Is this allegation truthful and fact-based, or was it made for the purpose of circumventing the procedural safeguards to be found within the FCA, such as the "original source" rule? Further, what possible claim of privilege could apply to this information? Given what we have learned via Branch's answer to Interrogatory number 3, and the great effort to which Branch went to convince Judge Vance upon this exact point, all objections should be removed, and Branch should be required to provide an actual answer.

Simply put, Branch may either consent to dismissal of this allegation as to Fidelity, or provide its evidentiary basis. In any event, Branch's frivolous objections should be removed.

**INTERROGATORY NO. 11 - - PROOF OF PREEXISTING WIND DAMAGE**

To understand the import if this interrogatory, the Court is asked to examine each of the pleaded descriptions following each of the properties found at paragraph 23 of the FAC. (Doc. 49) Please see also paragraphs 4, 9, 16, 17, 19, and 20 of the FAC. Throughout those paragraphs, Branch asserts that within the City of New Orleans itself (and not out along the Mississippi Gulf Coast), that Katrina's hurricane-force winds were sufficiently strong to have rendered each of these properties a constructive total loss and/or "destroyed" and/or "ruined" prior to the moment when the levees first breached. All that this interrogatory asks of Branch is to state the facts peculiar to each of the individual properties Branch chose to specifically plead within the FAC that establish they were destroyed by wind before the floodwaters arrived. This is at the crux of the claim that Branch is making. It is (or at least, was) their theory of the case. Moreover, and as noted earlier, Branch touted to Judge Vance that it already possesses a "detailed report"

regarding each of these properties.[7]  At the very least, Fidelity is entitled to discovery of this information in preparation of the deposition of Max Johnson, Branch's owner and president.

At trial, it can be expected that Branch will provide to the jury a detailed recitation of its enumerable so-called "facts" proving that a reasonable adjuster either knew or should have known that these properties were indeed destroyed by wind before the floodwaters arrived. All that Fidelity seeks is to be told of these facts now in the context of discovery, and not be "surprised" with them at trial. According to Branch, it already possesses "direct, first-hand knowledge" of all of this, and already provided it to the Government. (Doc. 49, ¶ 9)

**INTERROGATORY NO. 15 - - WHO GOT THE MONEY?**

Previously, Branch has been most content to tout its theory of shifting wind losses to flood losses. (Doc. 49, ¶¶4, 17, 20) However, now that it has admitted in answer to Interrogatory No. 3 that Fidelity did not issue the wind policy, Branch seems not to want to answer any questions. The fact that it seems "obvious" that in regards to Fidelity, it would be the insureds who possess the federal funds, is not a basis for an objection. Given Branch's shifting theories, Fidelity is entitled to hard and concrete answers to its questions, so as to start nailing down some of the ephemeral supposed realities of this case.

Because the Supreme Court has ruled that the False Claims Act is a punitive statute,[8] it is critical that the due process rights of the Defendants be protected. In regards to this particular interrogatory, Fidelity emphasizes that in the FAC, Branch claims that Fidelity was itself the claimant and the possessor of fully 100 percent of the amount of the claims payment. (FAC, ¶¶ 4,

---

[7] Please consider that Branch's decision to prepare a separate "detailed report" is an admission that the facts and circumstances of each house, and of the unique damage to each, will be different for each property. Please see *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 340 (5th Cir. 2008), where the court also explained that it would be appropriate for the jury to consider each individual property in that matter individually.

[8] *Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 784 (2000); and *Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003).

17, 20) As Judge Vance indicated in her October 19, 2009 Order, the essence of Branch's allegation was that the Defendants had "passed off" their own losses on wind policies to the Government's losses on matching flood policies. *Id.* at 3-4.

However, Branch now seeks to retain Fidelity as a Defendant, *seemingly* (Fidelity is not quite sure) as to the question of allegedly improperly obtained "fees." (See the proposed Second Amended Complaint, at ¶¶ 4, 15, 17)

Given Branch's shifting and ephemeral claims, Fidelity submits it has good cause to *nail down* the fact that it was NOT the claimant for the flood claim itself. Monetarily, it makes a huge difference - - 100 percent of the claim payment versus a 3.3 percent handling "fee."

As this Court is well aware, one of the purposes of discovery is to end factual debate upon as many topics as possible, so as to streamline the issues for trial. It is obvious from the nature of all of Branch's responses that it is doing exactly the opposite. Fidelity has contended in its answer to the FAC that it was never the "claimant" as that term is used in FCA caselaw, and that the "claimant" of the federal funds that Branch contends were improperly overpaid, was Fidelity's insureds. The False Claims Act is a punitive statute, and this question goes to the heart of the extent to which Fidelity could possibly be "punished" without offending the Constitution. That this argument does not fit within Branch's view of its own case is not grounds for it to be able to decide that it need not answer Fidelity's discovery. As it has done a detailed report on each of these properties, it should provide the answer to this question.

## INTERROGATORY NO. 18 - - "ACTIVELY CONCEALING"

Once again, Branch provides what amounts to a speaking objection, but not an answer. To overcome the Defendants' Motion to Dismiss, Plaintiff chose to file a highly dramatized Complaint designed to convince Judge Vance that Branch actually did have "insider" and

"whistleblower" type information. Branch is the one that chose to plead that it had a factual basis under Rule 9(b) to assert that Fidelity had been engaged in "actively concealing" its alleged fraudulent practices from the United States Government. (FAC, ¶ 3) Further, as Judge Vance made clear at the January 20, 2010 hearing, her focus is squarely upon the issue of fraud. This Interrogatory goes to the heart of what Judge Vance has said she plans to focus the trial upon. As such, Branch should be required at this juncture to actually and fully state its factual basis for this averment, or to admit it has no basis whatsoever.

**INTERROGATORY NO. 20 - - HOW MANY "FLOOD" RETAINERS?**

Fidelity is most curious as to why Branch has so studiously avoided answering this question. At paragraph 19 of the FAC, Branch affirmatively alleged that it "has been retained by numerous insureds to reexamine adjustments done by the WYO insurers' in-house adjusters or other adjuster agencies employed by them following Hurricane Katrina." Oddly in response to Interrogatory No. 9, Branch responded that "Branch did not have a customer or other monetary relationship with any of the owners of the properties listed in the FAC." Then, in response to this interrogatory, Branch vaguely offers that it "performed adjusting services for approximately 1,000 Hurricane Katrina-related claims and reviewed adjustments for an additional 200." *That does not answer the question*. Fidelity asks Branch to - - exactly as it stated in its Interrogatory No. 20 - - "put a number to the word 'numerous' used in paragraph 19 of the FAC." The Interrogatory is most specific in asking for that number regarding what Branch pleaded, that being the reexaminations of "adjustments done the WYO insurers . . ." (FAC, ¶ 19) As with so many other interrogatories, Fidelity simply wants to test the allegations affirmatively pleaded by Branch that Judge Vance relied upon in denying the motion to dismiss.

In light of the Court's Order of January 20, 2010 (Doc. 309), Fidelity is amenable to limiting the scope of this interrogatory to just the properties listed in the First Amended Complaint. If the Court intends to allow the filing of the Second Amended Complaint, then Fidelity asks that this listing include the one Fidelity property added via the Second Amended Complaint, which is the 109 Lighthouse Drive property put at issue against Fidelity at paragraph 23(j) of the Second Amended Complaint. (Doc. 281) At bottom, Fidelity believes it is entitled to know if there was any type of relationship whatsoever between Branch and these insureds.

**4.    Plaintiff's Responses to the Request for Production of Documents**

All defense counsel have worked quite hard to achieve an agreement with counsel for Branch as to the exchange of documents. While the Defendants have generally (each much speak for itself) indicated a willingness to provide the entirety of their claims files for the pleaded properties without anything being held back, Branch's counsel takes the position that a significant portion of Branch's documentation is privileged. However, defense counsel have been unable to ascertain, in plain English, what documents are being withheld, and precisely what privileges are being claimed. Again, it is the problem of Branch's effort to avoid discovery and to "create surprise at trial."

Late on the afternoon of Thursday, January 28, 2010, Branch delivered to each defense counsel a "flash drive" containing approximately 3,000 documents. Fidelity was not able to start examining what was produced until the afternoon of Friday, January 29, 2010. Given how Branch decided to produce whatever it produced, it is very difficult to know whether particular requests have been responded to or not.

The items raised below with respect to Branch's responses to Fidelity's Request for Production of Documents are those items that (1) fall within the current scope of the Court's

Order allowing discovery only as to the pleaded properties, and (2) appear to be items that Branch has refused to produce. However, once Fidelity has had an opportunity to discern the extent to which Branch has withheld documents, a second Motion to Compel will be filed if that problem cannot be resolved between counsel.

## REQUEST NO. 2 - - THE "DETAILED" REPORT

The Court is asked to examine Max Johnson's affidavit found at document 153-3 in the record. There, Max Johnson swore under oath that Branch had prepared a "detailed report" as to each different property put at issue in the First Amended Complaint. Via this Request for Production, Fidelity asks to see that report. Apparently, either it does not actually exist, or Branch is claiming that the report is privileged. Fidelity submits that it is frivolous to contend that the report would be privileged. This is particularly the case since Branch relied upon the existence of these reports to obtain denial of the Defendants' Rule 12 Motions. In addition, given that the Court is at this moment attempting to discern if Branch has indeed changed its legal theories (see this Court's January 28, 2010 Order), production of these "detailed reports" - - if they exist - - would likely aid the Court in deciding if Branch was pursuing one claim of fraud in the year 2007, and now advancing a different theory in the year 2010. In any event, in order to allow the Defendants to prepare for trial by knowing what Branch believes the Defendants did wrong, each of these detailed reports ought to be produced.

## REQUEST NO. 10 - - DOCS PROVIDED TO GOVERNMENT

Branch is not entitled to avoid allowing the Defendants to see what was produced to the Government pre-suit. Branch objects to the request relying upon *U.S. ex rel. Purcell v. MWI Corp.*, 209 F.R.D. 21 (D.D.C. 2002). However, Branch's reliance upon this case is not applicable. In the *Purcell* case, the defendants sought documents during the parties' preparation

for the taking of a key witness.  The specific material sought was authored by the relator's counsel and the *government* claimed work-product privileges under the joint-defense privilege. The *Purcell,* court held that there can be a joint-prosecutorial privilege between the government and the relator *where the government intervenes in the case*. *Id*. at 27.

That is not the case here.  Fidelity is seeking all documents submitted by Branch to the government presuit. The Government has not intervened in this case so *Purcell* is not applicable. In fact, the *Purcell* court clearly stated that its holding is limited to cases where the government intervenes.  See *Purcell* 209 F.R.D. at FN 6.

Facts submitted by a relator to the Government pursuant to 31 U.S.C. § 3730(b)(2), such as its disclosure statement, are discoverable. *See United States ex rel. Robinson v. Northrop Corp.*, 824 F. Supp. 830, 838-39 (N.D. Ill. 1993) (compelling production of evidence and information relator was required to provide to Government when it filed False Claims Act complaint); *United States ex rel. Stone v. Rockwell Int'l Corp.*, 144 F.R.D. 396, 401 (D. Colo. 1992) (in *qui tam* action, finding "no legitimate reason exists for preserving the confidentiality of the written disclosure statement [to the Government], since it contains nothing more than the evidence and information which must come to light in any event once the case proceeds"). No "joint-prosecutorial privilege" applies to prevent disclosure as Branch contends. *See United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 918 F. Supp. 1338, 1346 (E.D. Mo. 1996) ("[A]ll the courts to address this issue in published opinions have compelled the relator and government to produce the written disclosure . . . ."). Indeed, the case Branch relies upon stands for the limited proposition that such privilege exists where, unlike here, the Government intervenes in a *qui tam* action. *See United States ex rel. Purcell v. MWI Corp.,* 209 F.R.D. 21, 26 (D.D.C. 2002) (recognizing that courts find statutory disclosure statement to Government

discoverable notwithstanding privilege); *see also United States ex rel. Burns v. A.D. Roe Co., Inc.*, 904 F. Supp. 592, 595 (W.D. Ky. 1995) (in FCA case in which Government intervened, concluding that statement of material evidence provided by the relator to the Government is discoverable).

Moreover, because Branch was required by statute to disclose the information to the Government, *see* 31 U.S.C. § 3730(b)(2), Defendants' entitlement to such information is paramount. *See, e.g., Stone*, 144 F.R.D. at 401 (finding that: (i) if plaintiff failed to comply with statute, "matters which can be raised by the plaintiff may well be limited to those set out in the Disclosure Statement"; and (ii) "threshold standing question relating to original source must be resolved largely on the basis of the knowledge of the private plaintiff at the time he first made disclosure of the facts supporting his claims, rather than on what he might know at the time discovery takes place in the *qui tam* suit").

Perhaps the best authority of Fidelity's legitimate basis for seeking all such information is the Supreme Court's decision in *Rockwell International Corp. v. U.S.*, 549 U.S. 457 (2007). In *Rockwell*, the entire case turned upon a comparison of those documents that had been provided by the relator to the Government in advance of the filing of the lawsuit as required by § 3730(e)(4)(B) of the FCA. Specifically because the evidence of fraud the relator presented at trial was not to be found within the documents relator provided to the Government pre-suit, the Supreme Court in *Rockwell* held that the district court lacked subject matter jurisdiction, and reversed the relator's judgment. Fidelity submits, on authority of *Rockwell*, that it is absolutely entitled to see every single piece of paper that Branch submitted to the Government pre-suit.[9] It likewise submits the Court will also need this information to decide the scope of its jurisdiction.

---

[9] Again, and out of an abundance of caution, this definitely includes the confidential disclosure statement discussed by the Court in *Rockwell*, *supra* at 464. Fidelity asks that the Court's order so reflect.

**REQUEST NO. 11 - - EXPEDITED CLAIMS HANDLING DOCS**

To evaluate this response, the Court is again asked to examine FAC paragraph 17, answer to Interrogatory No. 7, as well Branch responses for Request for Admissions 16 – 19. (Ex. 1, 3) Clearly, Branch is trying to avoid legitimate discovery. It must either consent to a dismissal of this allegation as to Fidelity, or produce its factual basis.

**REQUEST NO. 12, 14, 15, AND 19 - - THE "IF ANY" PROBLEM**

The Court is asked to examine the last sentence of Branch's response to requests numbers 12, 14, 15, and 19. It is confusing that Branch adds the modifier "if any" to these responses. If indeed Branch is attempting to portray to Fidelity and to the Court that it indeed has no documents that are responsive to these requests, then the modifier, "if any," should be removed.

**REQUEST NO. 16 - - DOCS FROM OWNERS**

In this response, Branch represents that there is a "protective order and/or confidentiality agreement" that precludes discovery. However, Branch does not divulge what this agreement concerns. Fidelity objects, and asks that the Court require Branch to specify what this concerns, so that Fidelity can have a meaningful opportunity to rebut Branch's contentions.

**REQUEST NO. 17 - - EFFORTS TO OBTAIN HOMEOWNERS MONEY**

In evaluating this response, please again see Branch's answer to Interrogatory No. 9, wherein it stated that it did not have any type of monetary relationship with any owner of the properties put at issue at paragraph 23 of the FAC. Now, Branch contends that Fidelity is seeking information "protected by the attorney-client privilege or that is work product." If Branch became involved in assisting any of the property owners put at issue at paragraph 23 with obtaining any type of insurance proceeds for their Hurricane Katrina loss, then all information regarding that effort is of course discoverable.

**REQUEST NO. 34 - - ADJUSTER COMPETENCE**

This request goes to the issue of *scienter*. Fidelity seeks to know if Branch possesses any materials that would indicate that Fidelity either knew or should have known that the adjusting companies that it retained after Katrina were somehow either incompetent or not trustworthy. Either Branch possesses such materials or it does not. Either way, Fidelity is entitled to a proper response.  Again, this is the issue on which Judge Vance has indicated she is most focused.

**REQUEST NO. 35 - - SUPPLEMENTATION DUE TO NEW ALLEGATIONS**

In the proposed Second Amended Complaint, Plaintiff added a new property to paragraph 23, that being its allegations against Fidelity. The new property address is 109 Lighthouse Drive in Slidell. Branch is asked via this request to respond all of the Requests for Production that are germane to whatever information it might have about this address. In addition, Branch is asked to provide complete responses to this Request for Production of Documents for its new claims and theories as found at paragraphs 4, 15, 17, and 20 of the Second Amended Complaint.

**5.    Plaintiff's Responses to the Request for Admissions**

**REQUEST FOR ADMISSION NO. 1**

Given Branch's answer to Interrogatory No. 3, its qualified denial of this request "for lack of information" is frivolous. Moreover, given Branch's allegations in the FAC at paragraphs 4, 9, 17, and 20, it is a bit late in the day for Branch to claim its lack of knowledge. Branch has answered providing the name of the actual homeowner's carrier on each of the said properties. Branch has also persuaded Judge Vance that it is an original source. How, in any form of good conscience or good faith, could Branch persist with denying this request for lack of information? Branch should be required to provide an unequivocal admission or denial, without any qualifiers.

**REQUEST FOR ADMISSION NO. 14**

How could this <u>not</u> be relevant? The False Claims Act is only triggered by fraudulent payments *of federal funds*. This goes to the crux of Branch's claim. All that is occurring here is that Branch does not want to admit that it is indeed the property owners who have the overpayment. That Fidelity's business model does not fit with Branch's imaginings, is not grounds to object. Either it is true, or it is not. The objection should be removed.

**REQUEST FOR ADMISSION NO. 18**

How can Branch claim that it has a "lack of sufficient information" as to its own "direct, first-hand knowledge"? The answer is illogical. Either Branch desires to claim that it does have such "direct, first-hand knowledge" on this point, in which case it would deny the request, or it has no such knowledge on this point, and the request should fairly be admitted. Branch must choose, but its current response is insufficient.

**6.      Branch's Objections**

Fidelity submits that its written discovery requests were carefully crafted, and are targeted at eliciting specific facts that would assist both the trier of fact, as well as this Court in determining the merits of this action. The Court, just like Fidelity, needs to know what Branch provided to the Government pre-suit. This is needed to ascertain the scope of jurisdiction. Similarly, Fidelity's discovery requests seeking Branch's evidence of fraud are clearly pertinent to Judge Vance's central theme of ascertaining whether fraud in fact occurred.

Despite the fact that Fidelity's discovery is clearly legitimate and properly targeted, Branch responds to virtually every discovery request with claims that Fidelity's requests are "overly broad and burdensome," "premature," "irrelevant," and/or "privileged." At this juncture, Fidelity prays that this Honorable Court will test any and all objections that Branch seeks to

raise. Fidelity contends that the Court will see that all of those objections are baseless, and that all of them are interposed as part of Branch's effort to obtain "surprise at trial." Fidelity prays that all of Branch's objections be overruled, and that Branch be ordered to provide full, complete and responsive answers to each of the discovery requests addressed herein.

7.     **Confusion as to What was Produced on January 28, 2010**

As noted earlier, Branch delivered to all defense counsel on Thursday afternoon a flash drive containing several thousand documents. Fidelity's office is currently trying to guess at which documents relate to which properties, and which documents relate to which individual Request for Production of Documents that Branch is actually responding to. There are photographs in the compolation that Fidelity is unclear as to which property those photographs regard. Moreover, and as noted earlier, it does not appear that Branch produced the "detailed report" it claimed to have prepared for each different property.

Fidelity asks that this Court, as part of its Order, direct Branch to specifically identify which Bates numbers apply to which Request for Production of Documents propounded by Fidelity. Further, the Court is asked to direct Branch to identify which Bates-numbered documents constitute the entirety of Branch's documents that are specific to the individual properties pleaded at paragraph 23 of the FAC. Fidelity ought not to have to guess at which of thousands of pieces of paper apply to which properties and document requests.

## CONCLUSION

For all of the reasons assigned herein, Fidelity prays that this Honorable Court will require Branch to provide complete, responsive and non-evasive responses to the discovery requests discussed herein.

Respectfully submitted,

NIELSEN LAW FIRM, LLC
*/s/ Gerald J. Nielsen*
Gerald J. Nielsen (17078)
gjnielsen@aol.com
William T. Treas (26537)
wtreas@nielsenlawfirm.com
3838 North Causeway Blvd, Suite 2850
Metairie, Louisiana 70002
Telephone: (504) 837-2500
**Attorneys for Fidelity National Insurance Company, Fidelity National Property and Casualty Insurance Company**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has this date been served upon all parties to this suit through counsel by filing into the Court's electronic filing system and, for non-participants, by placing same in the U.S. mail, postage prepaid and properly addressed on this 29th day of January, 2010.

*/s/ Gerald J. Nielsen*
Gerald J. Nielsen