IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*EX REL.* BRANCH CONSULTANTS, L.L.C.,<br><br>               *Plaintiff*<br>v.<br><br>ALLSTATE INSURANCE COMPANY, et al.,<br><br>               *Defendants* | Case No. 2:06-cv-4091<br><br>**JURY TRIAL DEMANDED** |

### BRANCH CONSULTANTS, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO COMPEL

Pursuant to the Court's January 20, 2010 order, Plaintiff-Relator Branch Consultants, LLC ("Branch") files this Memorandum in Support of its Motion to Compel Defendants Liberty Mutual Fire Insurance Company, Fidelity National Insurance Company, Fidelity National Property and Casualty Insurance Company, American National Property and Casualty Company, American Reliable Insurance Company of Scottsdale, and Standard Fire Insurance Company ("Insurer Defendants") to provide full and complete responses to Branch's Interrogatories. The information sought by the interrogatories is relevant, and Defendants have not articulated any undue burden associated with providing it. The Motion should be granted.

### I.  PRELIMINARY STATEMENT

Branch served the Interrogatories at issue on the Insurer Defendants on November 20, 2009. The interrogatories ask four straight forward questions:

> 1. What are the total number and dollar amount of Covered Flood Claims submitted by You to the Government?
>
> 2. What are the total number and dollar amount of Covered Wind Claims paid by You?

1

>3. What is the total amount of fees paid to You by the Government for servicing the Covered Flood Claims?
>
>4. Describe in detail all estimates made by You of the total losses You expected to incur as a result of damage caused by Hurricane Katrina, including but not limited to reserves set aside by You for Katrina losses, the date each such estimate was prepared and by whom.

Ex. 1 (Branch's Interrogatories to ANPAC, which are representative of the interrogatories served on all Insurer Defendants; and Insurer Defendants' Responses). The information sought by these interrogatories is relevant to Branch's allegations and Defendants' defenses, and therefore falls within the scope of discovery permitted by Rule 26. *See*, *e.g.*, First Amended Complaint, Dkt. # 49, at ¶ 17 ("In other words, defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves."); Fidelity Answer Dkt. # 247 at ¶ IV ("The truth is that Fidelity had both the homeowners and the flood policies on less than one percent of the properties for which it received Katrina flood claims within Louisiana."). During the Rule 37 conference that the parties held on January 27, 2010, not a single Defendant claimed that producing such information would be burdensome, which is not surprising given that Defendants are required by state and federal law to maintain the exact type of data sought by Branch's interrogatories.[1]

The Court already approved these types of summary-level questions at the January 20, 2010 Discovery Conference:

---

[1] *See, e.g.,* 44 C.F.R. § 62.23(j) (requiring a "detailed biennial audit" of the WYOs' "flood insurance financial statements" and further requiring WYOs to "[m]eet the recording and reporting requirements of the WYO Transaction Record Reporting and Processing Plan and the WYO Accounting Procedures Manual," which require recording and reporting of extensive data elements concerning each covered property, including address, coverage, claims payment, and elevation fields).

> 2 [Mr. Nagy] <u>What we're asking for initially is how many flood</u>
> 3 <u>claims did you adjust? How many wind claims? What are the</u>
> 4 <u>amounts at issue? They have that information at their</u>
> 5 <u>fingertips.</u>
> 6 THE COURT: If it was a sole adjustment of a wind
> 7 claim, why do you care about that?
> 8 MR. NAGY: Because we need the data to do a proper
> 9 stratification, Judge. It's the issue that you brought up. <u>We</u>
> 10 <u>want to know how many wind claims, what percentage of --</u>
> well,
> 11 how many flood claims --
> 12 THE COURT: *Well, I have no problem with asking that*
> 13 *kind of question.*

Ex. 2, at 42:2-13 (01/20/2010 Discovery Conference Transcript) (emphasis added). The Court should order Defendants to provide full and complete responses to Branch's interrogatories.

**II.    LEGAL STANDARD**

Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding <u>any</u> nonprivileged matter that is relevant to any party's claim or defense." (emphasis added). "The courts understand the rule to provide for broad and liberal discovery." *Tango Transport, L.L.C. v. Transport Intern. Pool, Inc.*, 2009 WL 1458223 (W.D. La. May 21, 2009); *see* also *United States ex rel. Woodruff v. Haw. Pac. Health*, 2008 WL 192980, *6 (D. Haw. Jan. 23, 2008) (concluding in *qui tam* False Claims Act case that "[r]elevancy, for purposes of Rule 26(b), is a broad concept that is construed liberally" and "discovery should be allowed unless the information sought has no conceivable bearing on the case") (quotations omitted). "Furthermore, the burden of showing that the requested discovery is not relevant to the issues in this litigation is clearly on the party resisting discovery." *Arinder v. Lee*, 2000 WL 680343, *2 (E.D. La. May 23, 2000). "All discovery requests are a burden on the party who must respond thereto [but] [u]nless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden." *GP Industries, LLC v.*

3

*Bachman*, 2007 WL 4245786, *5-6 (D. Neb. Nov. 29, 2007) (quotation omitted).  The party opposing a motion to compel has "an obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents." *Id.* at *6.

### III.     THE INFORMATION SOUGHT IS RELEVANT

Branch's Interrogatories seek information that falls within the broad and liberal scope of discovery permitted under Rule 26.  Interrogatories Nos. 1 and 2 (*i.e.*, the total number and dollar amount of Covered Flood Claims and Covered Wind Claims) are directly relevant to Branch's allegation that "defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves." First Amended Complaint at ¶ 17.  The information sought by these interrogatories will reveal the extent to which each Defendant attributed damage caused by Hurricane Katrina to wind and to flood, as well as the average size of each wind and flood adjustment.  Similarly, the information called for by Interrogatory No. 3 (*i.e.*, the fees each Defendant earned from the Government on the Covered Flood Claims) is relevant to Branch's allegation in the First Amended Complaint that Defendants "receive a fee from FIA for writing and administering the policies, as well as a fee for adjusting the claims." (¶ 15)  This information is necessary to determine the average revenues and profits Defendants earned by adjusting flood claims as compared to their regular lines of business.  That information is relevant because, among other things, Defendants were required to "adjust [flood] claims in accordance with general Company standards."  *See* 44 C.F.R 62.23(i)(1).  And all three interrogatories are both relevant to *scienter* and also are likely to lead to other admissible evidence.  *See, e.g., United*

*States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008)  ("It also is possible for an FCA relator . . . to establish the scienter element of her claim through circumstantial evidence.").

Notably, at the January 20, 2010 hearing, Judge Vance emphasized the critical importance that *scienter* will play at the trial of this action:

> THE COURT:  I'm not asking a jury is there an overpayment.  I don't think we are even going to get to a question of whether there's an overpayment without fraud.  The first question that a jury is going to be asked is whether or not there's the requisite *scienter* and whether there's fraud.  If there's no fraud, the case is over.  We are not going to ask them is there an overpayment.[2]

It would be entirely unfair and contrary to well established law to tell Branch on the one hand that the *scienter* evidence is critical to proving its allegations at trial, while at the same time on the other hand to deny Branch the opportunity to obtain discovery on *scienter*.

Interrogatory No. 4 seeks discovery as to Insurer Defendants' reserves set aside for damages caused by Hurricane Katrina.  "Reserve information is relevant to show the insurer's state of mind in relation to its claims settlement practices."  *First Nat. Bank of Louisville v. Lustig*, 1993 WL 411377, *1 (E.D. La. Oct. 5, 1993).  As this district concluded in *Lustig*,

> [E]xamination with respect to the reserve may develop evidence on the issue of the defendant's bad faith. Bad faith is a state of mind which must be established by circumstantial evidence. The actions of the defendant in respect to the reserve are relevant. Negligent investigation and uninformed evaluation of the worth of the ... claims goes to the heart of the case since serious and recurring negligence can be indicative of bad faith. Defendant's actions on the reserve may have a direct bearing on the issue.

*Id.* (quotation omitted) (alterations in original).  Therefore, discovery concerning Defendants' reserves is directly relevant to *scienter*, and courts routinely require insurance companies to produce discovery on reserves because it is relevant to the insurer's state of mind. *See, e.g., Culbertson v. Shelter Mutual Ins. Co.*, 1998 WL 743592, *1 (E.D. La. Oct. 21, 1998) ("The

---

[2] 1/20/2010 Transcript (Ex. 3) at 9:9-15.

5

[reserves] information sought may demonstrate or lead to admissible evidence with respect to the thoroughness with which defendant investigated and considered plaintiff's loss of income claim . . . and may be relevant to the good or bad faith of defendant in denying the claim."); *U.S. Fire Ins. Co. v. Bunge North America, Inc.*, 244 F.R.D. 638 (D. Kan. 2007) ("The Court agrees with these courts that the actual amounts of the Insurers' loss reserves- including any changes to those amounts-could, at the least, lead to admissible evidence relating to the Insurers' own beliefs about coverage and their liability, as well as their good or bad faith in handling and investigating [insureds'] claims.") (emphasis added); *Jefferson Davis County School Dist. v. RSUI Indem. Co.*, 2009 WL 1658478 (S.D. Miss. June 11, 2009) ("Although the Fifth Circuit does not appear to have ruled on this issue, district courts in this Circuit have ruled that reserve information is discoverable--especially where a plaintiff has asserted a bad faith claim and, therefore, the insurance company's estimate of the plaintiff's claim may be relevant to a finding of bad faith.") (emphasis added).

For example, in *Bernstein et al. v. Travelers Insurance Co. et al.*, 447 F. Supp. 2d 1100 (N.D. Cal. 2006), the court ordered that Travelers (Standard Fire's parent company) produce discovery concerning its reserves. The court concluded that "the requested loss reserve information might reasonably lead to the discovery of evidence admissible with respect to . . . [Travelers's] *state of mind* regarding its claims handling practices." *Id.* at 1107 (emphasis in original) (quotation omitted). The court reasoned that "a carrier's subjective state of mind, i.e., what it actually knew and thought, and what motives animated its conduct, could constitute critical areas of inquiry in bad faith cases, and thus could be fully fair game for discovery." *Id.* (citation omitted). The court further explained,

6

> Critical to [plaintiff's] theory of the case is a posited self-conscious disconnect (a large, unbridgeable gap) between, on the one hand, what Travelers was communicating to, demanding of, and paying its insured and, on the other, what Travelers actually thought it owed and would owe under the claims. Under this theory, what Travelers' "internal assessment of the subject claim" [FN] actually was at various junctures is the critical factual issue in the litigation.

*Id.* at 1108.

The same is true here. Discovery concerning Defendants' reserves is relevant to proving *scienter*. The discovery will show whether Defendants' initial assessment of Katrina wind damages was contrary to how they adjusted and paid wind claims, which is relevant to whether Defendants shifted wind losses over to flood claims. For example, Standard Fire's parent company, Travelers, filed a 2006 Form 10-K with the Securities and Exchange Commission in which it <u>reduced</u> the amount of its 2005 reserves by <u>$100 million</u>, primarily because it experienced lower than expected losses on the 2005 hurricanes:

> Approximately $100 million of net favorable prior year reserve development in 2006 resulted from a reduction in loss estimates for catastrophes incurred in 2005, primarily due to lower than expected additional living expense losses related to Hurricane Katrina."[3]

Yet at the same time, Defendants were cheerfully announcing record fees from adjusting flood claims under the NFIP—fees which are calculated as a percentage of the flood claims submitted to the government. *See, e.g.*, Assurant (American Reliable's parent company) 2005 Q3 Earnings Conf. Call, Ex. 5 at p. 15, 5 ("We are going to get some fees that are unprecedented. We've been writing several government flood programs for quite a long while. We've never really had fees of that magnitude come through."); Fidelity 2005 Form 10-K, Ex. 6 at p. 68 ("Our specialty insurance revenues in 2005 were significantly increased [from $239.3 million in 2004 to $428.9 million in 2005] due to fee revenues we earned from settling claims related to the year's major

---

[3] Ex. 4 at p. 91 (Travelers 2006 Form 10-K).

hurricanes, including Katrina, Rita and Wilma."). Therefore, at the same time that Defendants were <u>substantially reducing</u> their reserves for Katrina wind damages, they were receiving <u>record fees</u> for adjusting flood claims. Branch should be permitted to obtain discovery concerning Defendants' reserves to explore why and when defendants adjusted their estimates of wind damage.

In addition to being relevant to Branch's claim, the discovery is also relevant to refuting Defendants' defenses. All Defendants have asserted affirmative defenses contending that they had "no knowledge" of any inflated flood adjustments and that any such adjustments associated with the 27 Exemplar Properties were the result of innocent mistakes.[4] The discovery Branch seeks through its four interrogatories addresses these affirmative defenses by showing that Defendants systematically adjusted wind claims differently from flood claims, despite the fact that the regulations provide that "WYO companies will adjust [flood] claims in accordance with general Company standards." *See* 44 C.F.R 62.23(i)(1).

Finally, Defendants contend that they could not have profited from the alleged fraudulent scheme because they did not generally issue wind policies and therefore could not have shifted wind losses over to the flood claims. *See, e.g.*, Fidelity Answer (Dkt. # 247) at ¶ IV ("The truth is that Fidelity had both the homeowners and the flood policies on less than one percent of the properties for which it received Katrina flood claims within Louisiana."). Interrogatory Nos. 1-3 seek information directly relevant to whether Defendants had the opportunity to shift wind losses to flood claims. The discovery will disclose (a) how many wind claims Defendants processed, (b) how much was paid out on those claims, (c) how many flood claims Defendants processed,

---

[4] *See* Fidelity's Answer to FAC (Dkt. #247) at 11-12; Standard Fire's Answer to FAC (Dkt. #257) at 8-9; ANPAC's Answer to FAC (Dkt. #254) at 15-17, 19; Liberty Mutual's Answer to FAC (Dkt. #250) at 10-11; American Reliable's Answer to FAC (Dkt. #251) at 6, 9; Simsol's Answer to FAC (Dkt. #261) at 10-11; Colonial Claims's Answer to FAC (Dkt. #258) at 12, 14.

and (d) how much was paid out on the flood claims. Without this discovery, Branch is handicapped in its ability to disprove Defendants' defenses.

## IV.   THE INTERROGATORIES DO NOT IMPOSE AN UNDUE BURDEN

At the Rule 37 conference, Defendants made no attempt to argue that providing full and complete responses to the interrogatories would be unduly burdensome. Nor could they because ***Defendants already are required to maintain this information in a format that can be made available to federal and state regulators***.[5] For example, the Louisiana State Department of Insurance conducted a market conduct examination of Standard Fire for the period August 28, 2005 through April 30, 2006, which includes Hurricane Katrina.[6] According to the Examination Report, Standard Fire produced the following data concerning homeowners policies to the Department of Insurance: (a) Number of claims incurred; (b) number of claims paid and closed; (c) number of claims closed without payment; (d) number of claims remaining open; (e) dollar amount of claims incurred; (f) dollar amount of claims paid and closed; and (g) dollar amount of claims unpaid (reserve).[7] That is the precise type of data that Branch seeks in Interrogatory Nos. 1-3 (except limited to Katrina claims). Therefore, in addition to collecting and maintaining this data pursuant to state and federal regulations, Standard Fire already has produced the same type of information to the Department of Insurance. The absence of any undue burden strongly weighs in favor of providing the discovery Branch seeks.

---

[5] *See, e.g.,* 44 C.F.R. § 62.23(j) (requiring a "detailed biennial audit" of the WYOs' "flood insurance financial statements" and further requiring WYOs to "[m]eet the recording and reporting requirements of the WYO Transaction Record Reporting and Processing Plan and the WYO Accounting Procedures Manual," which require recording and reporting of extensive data elements concerning each covered property, including address, coverage, claims payment, and elevation fields).

[6] Ex. 7 at p. 7-8 (5/10/2007 Market Conduct Examination of Standard Fire).
[7] *Id.* at p. 8.

9

## V. CONCLUSION

This Court has already stated that it had "no problem" with Branch asking the exact types of questions that are included in its interrogatories. Additionally, the information sought falls within the permissible bounds of Rule 26, and Defendants have made no showing of undue burden. Branch's Motion to Compel should be granted.

DATED:  January 29, 2010                                    Respectfully submitted,

SUSMAN GODFREY LLP

By: /s/ Matthew R. Berry
    Jonathan Bridges (TX #24028835)
    jbridges@SusmanGodfrey.com
    901 Main Street, Suite 5100
    Dallas, Texas  75202-3775

    Tibor L. Nagy, Jr. (NY #4508271)
    tnagy@SusmanGodfrey.com
    654 Madison Ave., 5th Flr
    New York, NY 10065

    Matthew R. Berry (WA #37364)
    mberry@susmangodfrey.com
    1201 Third Avenue, Suite 3800
    Seattle, WA 98101

        and

KANNER & WHITELEY L.L.C.

Allan Kanner (LA #20580)
a.kanner@kanner-law.com
701 Camp Street
New Orleans, LA  70130

        and

HERMAN, HERMAN, KATZ & COTLAR, LLP

        Stephen J. Herman (LA #23129)
        sherman@hhkc.com
         Soren E. Gisleson (LA #26302)
        sgisleson@hhkc.com
        820 O'Keefe Avenue
         New Orleans, Louisiana 70113

        ***Attorneys for Plaintiff/Relator***

## **CERTIFICATE OF SERVICE**

      I hereby certify that on January 29, 2010, a copy of the foregoing was served upon Defendants via electronic mail, pursuant to the parties' agreement on e-mail service. I further certify that a true and correct copy of the above also was sent via electronic mail (pursuant to agreement) to Assistant United States Attorney, Jay D. Majors.

                                          /s/ Matthew R. Berry