UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

```
----------------------------------------------------------------x
                                               :
UNITED STATES OF AMERICA,                      :
EX REL. BRANCH CONSULTANTS, L.L.C.,            :        Case No.: 06-cv-4091-SSV-SS
                                               :
                              Plaintiff,       :               Division 1
                                               :
                v.                             :
                                               :
ALLSTATE INS. CO., et al.,                     :
                                               :
                              Defendants.      :
                                               :
----------------------------------------------------------------x
```

**DEFENDANTS' MEMORANDUM IN FURTHER SUPPORT OF THEIR
APPLICATION FOR A PROTECTIVE ORDER AND
<u>RESPONSE TO THE COURT'S JANUARY 28, 2010 ORDER</u>**

## TABLE OF CONTENTS

Page

I.    INTRODUCTION:  DISCOVERY IS APPROPRIATELY LIMITED TO
      PROPERTIES INSPECTED BY BRANCH, AND UNSPECIFIED SAMPLING
      OF EVERY HURRICANE KATRINA CLAIM SHOULD NOT BE ALLOWED ............ 1

      A.    The Fifth Circuit Has Spoken To How Discovery Should Proceed In A
            Case Like This:  "discovery targeted to the claims alleged, avoiding a
            search for new claims." ...................................................................................... 1

      B.    The Fifth Circuit Rejected The Use Of Sampling To *Plead* A False Claims
            Act Violation And Would Not Allow It To *Prove* One ........................................ 2

II.   QUESTIONS POSED BY THIS COURT'S JANUARY 28, 2010 ORDER ...................... 4

III.  CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Aguilar v. Allstate Fire & Cas. Ins. Co.*,
 No. 06-4660, 2007 WL 734809 (E.D. La. Mar. 6, 2007) ..................................... 13

*Arnold v. Garlock, Inc.*,
 278 F.3d 426 (5th Cir. 2001) .................................................................................3, 13, 16

*Borges v. FEMA*,
 1992 WL 425238 (D.P.R. 1992) ........................................................................... 5

*Chaves County Home Health Serv. v. Sullivan*,
 931 F.2d 914 (D.C. Cir. 1991) ................................................................... 8, 9, 17

*Chevron U.S.A., Inc. v. Natural  Res. Def. Council, Inc.*,
 467 U.S. 837 (1984) ............................................................................................... 9

*In re Chevron U.S.A., Inc.*,
 109 F.3d 1016 (5th Cir. 1997) ............................................................................ 12

*Cimino v. Raymark Indus., Inc.*,
 151 F.3d 297 (5th Cir. 1998) ....................................................................... passim

*Cresson v. State Farm Fire & Cas. Co.*,
 No. 06-8788, 2007 WL 1191817 (E.D. La. Apr. 19, 2007) ................................ 13

*Daytona Beach Gen. Hosp., Inc. v. Weinberger*,
 435 F. Supp. 891 (M.D. Fla. 1977) ..................................................................... 12

*Ducree v. Liberty Mut. Ins. Co.*,
 No. 06-8286, 2007 WL 781968 (E.D. La. Mar. 12, 2007) .................................. 13

*In re Fibreboard Corp.*,
 893 F.2d 706 (5th Cir. 1990) .......................................................................... 16, 17

*Gowland v. Aetna*,
 143 F.3d 951 (5th Cir. 1998) ................................................................................. 5

*Guice v. State Farm Fire & Cas. Co.*,
 No. 1:06cv1-LTS-RHW, 2006 WL 2359474 (S.D. Miss. Aug. 14,
 2006) ..................................................................................................................... 13

*Harrison v. Westinghouse Savannah River Co.*,
 176 F.3d 776 (4th Cir. 1999) ........................................................................... 2, 18

*Henry v. Allstate Ins. Co.*,
  No. 07-1738, 2007 WL 2287817 (E.D. La. Aug. 8, 2007) .................................................. 13

*Illinois Physicians Union v. Miller*,
  675 F.2d 151 (7th Cir. 1982) ............................................................................................. 18

*Jacquet v. Westerfield*,
  569 F.2d 1342 (5th Cir. 1978) ............................................................................................. 4

*John v. Nat'l Sec. Fire & Cas. Co.*,
  501 F.3d 443 (5th Cir. 2007) ...................................................................................... 13, 25

*Johnson v. Big Lots Stores, Inc.*,
  No. 2:04-cv-3201-SSV-SS, Dkt. No. 401 (E.D. La. June 20, 2008) ................................... 14

*Jones v. Nat'l Sec. Fire & Cas. Co.*,
  No. 06-1407, 2006 WL 3228409 (W.D. La. Nov. 3, 2006) ................................................ 13

*Lutheran Mut. Life Ins. Co. v. United States*,
  816 F.2d 376 (8th Cir. 1987) ............................................................................................. 12

*Lyng v. Nw. Indian Cemetery Protective Ass'n*,
  485 U.S. 439 (1988) .......................................................................................................... 10

*McFarland v. State Farm Fire & Cas. Co.*,
  No. 1:06CV466-LTS-RHW, 2006 WL 2577852 (S.D. Miss. Sept. 6,
  2006) ................................................................................................................................. 13

*McLaughlin v. Am. Tobacco Co.*,
  522 F.3d 215 (2d Cir. 2008) .............................................................................................. 15

*Merrill v. Republic Fire and Cas. Co.*,
  No. 07-1518 (E.D. La. Apr. 2, 2007) ................................................................................. 23

*Nguyen v. St. Paul Travelers Ins. Co.*,
  No. 2:06-cv-04130-SSV-SS, Dkt. No. 422 (E.D. La. Oct. 22, 2008) .................................. 13

*Ratanasen v. State of California Department of Health Services*,
  11 F.3d 1467 (9th Cir. 1993) .................................................................................. 10, 17, 19

*Rockwell Int'l Corp. v. United States*,
  549 U.S. 457 (2007) ..................................................................................................... 10, 11

*Rohr v. Metro. Ins. & Cas. Co.*,
  No. 06-10511, 2007 WL 163037 (E.D. La. Jan. 17, 2007) ................................................ 13

*Sanders v. Shell Oil Co.*,
  678 F.2d 614 (5th Cir. 1982) ............................................................................................... 1

*Scott v. Monsanto Co.,*
  868 F.2d 786 (5th Cir. 1989) ................................................................................. 1

*Sealed Appellant I v. Sealed Appellee I,*
  156 Fed. Appx. 630 (5th Cir. 2005) .................................................................... 2, 3

*Spiers v. Liberty Mut. Fire Ins. Co.,*
  No. 06-4493, 2006 WL 4764430 (E.D. La. Nov. 21, 2006) ................................ 13

*Stewart v. Winter,*
  669 F.2d 328 (5th Cir. 1982) ................................................................................. 1

*Thibodeaux v. Bordelon,*
  740 F.2d 329 (5th Cir. 1984) ............................................................................... 14

*United States ex rel. Alfatooni v. Kitsap Physicians Serv.,*
  314 F.3d 995, 1003 (9th Cir. 2002) ...................................................................... 3

*United States ex rel. Bledsoe v. Cmty. Health Sys.,*
  501 F.3d 493 (6th Cir. 2007) ................................................................. 19, 20, 24

*United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.,*
  -- F. Supp. 2d ----, 2009 WL 3353314 (E.D. La. Oct. 19, 2009) (Dkt.
  No. 228) .............................................................................................................. 22

*United States ex rel. Carter v. Halliburton Co.,*
  No. 1:08cv1162 (JCC), 2009 WL 2240331 (E.D. Va. July 23, 2009) ............. 2, 16

*United States ex rel. Crews & Ill. v. Healthcare of Illinois, Inc.,*
  460 F.3d 853 (7th Cir. 2006) ............................................................................ 3, 4

*United States ex rel. Grubbs v. Kanneganti,*
  565 F.3d 180 (5th Cir. 2009) ....................................................................... passim

*United States ex rel. Loughren v. UnumProvident Corp.,*
  604 F. Supp. 2d 259 (D. Mass. 2009) ................................................................ 11

*United States ex rel. Quinn v. Omnicare Inc.,*
  382 F.3d 432 (3d Cir. 2004) ................................................................................. 3

*United States ex rel. Sanders v. N. Am. Bus. Indus., Inc.,*
  546 F.3d 288 (4th Cir. 2008) ............................................................................. 15

*United States ex rel. Snapp, Inc. v. Ford Motor Co.,*
  532 F.3d 496 (6th Cir. 2008) ...................................................................... 20, 24

*United States ex rel. Stevens v. Vt. Agency of Nat. Res.,*
  529 U.S. 765 (2000) ............................................................................... 3, 10, 18

*United States ex rel. Stewart v. Louisiana Clinic*,
   No. Civ.A.99-1767, 2003 WL 21283944 (E.D. La. June 4, 2003) ...................................... 11

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*,
   125 F.3d 899 (5th Cir. 1997) .................................................................................... 3, 19

*United States v. Fowler*,
   913 F.2d 1382 (9th Cir. 1990) ......................................................................................... 5

*United States v. Mackby*,
   261 F.3d 821 (9th Cir. 2001) ........................................................................................ 18

*United States v. Skodnek*,
   933 F. Supp. 1108 (D. Mass. 1996) ............................................................................. 12

*United States v. Wurts*,
   303 U.S. 414 (1938) ......................................................................................................... 4

*Wolff v. McDonnell*,
   418 U.S. 539 (1974) ....................................................................................................... 14

## STATUTES

28 U.S.C. § 2072 ................................................................................................................ 15

31 C.F.R. pts. 901-904 (2000) ........................................................................................... 5

31 U.S.C. § 3729(a)(1)(G) ................................................................................................ 18

31 U.S.C. § 3731 ......................................................................................................... 10, 15

42 U.S.C. § 4017(d) ............................................................................................................ 5

42 U.S.C. § 4071(a)(1) ....................................................................................................... 5

42 U.S.C. § 4084 ................................................................................................................. 5

44 C.F.R. § 62 ..................................................................................................................... 6

44 C.F.R. § 62.23(j) .................................................................................................... 6, 7, 9

44 C.F.R. § 62.23(j)(1) ....................................................................................................... 6

44 C.F.R. § 62.23(j)(2) .................................................................................................... 6, 7

44 C.F.R. § 62.23(j)(3) ....................................................................................................... 6

44 C.F.R. pt. 11 ................................................................................................................... 5

44 C.F.R. Pt. 62, App. A, Art. III(D)(1) ........................................................................... 5

44 C.F.R. Pt. 62.23 ........................................................................................................ 6

Fed. R. Evid. 104(a) ...................................................................................................... 11

Fed. R. Evid. 702 .......................................................................................................... 11

Federal Claims Collection Act (FCCA),
    31 U.S.C. §§ 3711-3720 ........................................................................................... 5

Defendants respectfully submit this memorandum in response to the Court's order of January 28, 2010 and in further support of their application for a protective order.[1]  Part I summarizes previously unaddressed reasons that discovery should be limited at this time to the properties identified in the First Amended Complaint ("FAC" or "Complaint").  Part II addresses the Court's specific questions.  For the reasons set forth herein, and in Defendants' proposed discovery plan, Defendants respectfully submit that the scope of discovery should continue to be limited to the properties identified in the Complaint and Plaintiff should not be permitted to embark on an unspecified exercise in "statistical sampling" and "extrapolation."

## I.   INTRODUCTION:  DISCOVERY IS APPROPRIATELY LIMITED TO PROPERTIES INSPECTED BY BRANCH, AND UNSPECIFIED SAMPLING OF EVERY HURRICANE KATRINA CLAIM SHOULD NOT BE ALLOWED

### A.   The Fifth Circuit Has Spoken To How Discovery Should Proceed In A Case Like This:  "discovery targeted to the claims alleged, avoiding a search for new claims."

In *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), on which Judge Vance relied to deny Defendants' motion to dismiss, the Fifth Circuit said:

> A complaint that includes both particular details of a scheme to present fraudulent bills to the Government and allegations making it likely bills were actually submitted <u>limits any "fishing" to a small pond that is either stocked or dead</u>.  Defendants either have or do not have evidence that the alleged phony services were actually provided; they either have or do not have evidence that recorded, but unprovided or unnecessary, services did not result in bills to the Government.  <u>Discovery can be pointed and efficient</u>, with a summary judgment following on the heels of the complaint if billing records discredit the complaint's particularized allegations.  That is the balance <u>Rule 9(b)</u> attempts to strike.  And it <u>works best when access to discovery does not inevitably include all discovery's powers but is tailored by the district court to the</u>

---

1    Upon a showing of good cause, the decision to enter a protective order is within this Court's broad discretion.  *See* Fed. R. Civ. P. 26(c); *Sanders v. Shell Oil Co.*, 678 F.2d 614, 618 (5th Cir. 1982); *Scott v. Monsanto Co.*, 868 F.2d 786, 792 (5th Cir. 1989); *Stewart v. Winter*, 669 F.2d 328, 331 (5th Cir. 1982).

> <u>case at hand</u>…. We emphasize that we decide only that the
> allegations are sufficient to gain [the relator] access to the
> discovery process. We leave to the able district court to <u>manage</u>
> <u>this access-discovery targeted to the claims alleged, avoiding a</u>
> <u>search for new claims</u>.

*Id.* at 191, 195 (emphases added). The False Claims Act cases in the Fifth Circuit do not throw

open the gates to discovery of every claim without first testing the allegations made with respect

to the particularized claims in the complaint. Based on the Fifth Circuit's holding in *Grubbs*, the

Court's present limitation on discovery to properties identified in the Complaint should remain.

*See also United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162 (JCC), 2009 WL

2240331, at *9 (E.D. Va. July 23, 2009) ("Relator is merely extrapolating from his personal

knowledge about two specific sites in Iraq to obtain discovery regarding all of Defendant's other

sites in Iraq. This is precisely the kind of fishing expedition that the Fourth Circuit sought to

prevent in *Harrison* [*v. Westinghouse Savannah River Co.*], 176 F.3d [776,] 788 [(4th Cir.

1999)]. The Court will not allow these unsupported claims, regarding which Relator possesses

no pre-discovery information, to continue.").

**B.      The Fifth Circuit Rejected The Use Of Sampling To *Plead* A False Claims Act Violation And Would Not Allow It To *Prove* One**

The Fifth Circuit previously rejected the use of statistics to ***plead*** elements of a

FCA cause of action. *Sealed Appellant I v. Sealed Appellee I*, 156 Fed. Appx. 630, 633 (5th Cir.

2005). In *Sealed Appellant I*, the Fifth Circuit affirmed dismissal of the relator's complaint for

failure to plead a claim under the FCA. *Id.* at 634. In relevant part, the relator did not identify

any actual submission of fraud but instead alleged that fraud must exist because an audit showed

that at least thirty-five percent of the claims did not comply with certain requirements. The court

held that the relator failed to adequately allege fraud because the allegations were "based on

Appellant's extrapolations." *Id.* at 633; *see also United States ex rel. Thompson v.*

2

*Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (dismissing complaint where relator "alleged that 'in reasonable probability, based on statistical studies performed by the Government and others' approximately 40 percent of claims submitted by defendants" were false); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004) (same); *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002) (rejecting implication of false claim based on relator's claim that "a quarter of some 30,000 bills submitted to Medicare were altered").

Given that the relator in *Sealed Appellant I* was prohibited from using statistical extrapolation to **plead** a case, Branch cannot be permitted to attempt to **prove** its case using statistical extrapolation in this essentially quasi-criminal proceeding.  *See Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000) (explaining the FCA as "essentially punitive in nature").  Furthermore, the Fifth Circuit has resoundingly rejected the use of sampling in lieu of individualized proof on the merits based on fairness, due process, and other constitutional concerns that apply equally here.  *See, e.g., Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319-22 (5th Cir. 1998) (individual jury determinations of liability, injury, and damages are required by the Seventh Amendment); *Arnold v. Garlock, Inc.*, 278 F.3d 426, 443 (5th Cir. 2001) (court's longstanding adversity to creating and trying representative case "sounds in our concern that no one be deprived the right to a full and fair opportunity to litigate their claims").

Indeed, other circuit courts have rejected the use of statistics to bridge a gap between allegations of a fraudulent scheme and proof of submission of a false claim.  In *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, for example, the court upheld the grant of summary judgment for defendants where the relators sought to infer false claims using statistics.  460 F.3d 853, 856 (7th Cir. 2006).  The relator brought an FCA suit against a

pharmacist, alleging that by submitting claims for recycled and repackaged medications, the pharmacist was seeking double payment from Medicaid for medications already paid for.  The relator argued that 60% of prescriptions provided went to recipients on Medicaid, and 10% to 20% of the medications were returned unused and subsequently recycled.  *Id.*  Therefore, the relator concluded that 6% to 12% of recycled medications would have been redistributed to Medicaid patients and falsely rebilled.  *Id.*  The Seventh Circuit agreed with the Third, Eleventh, and Ninth Circuits that "relators' claims failed because each relator did not provide a single false claim that was actually submitted."  *Id.* (citations omitted).  Branch cannot search for new claims or skip over its burden of proof through sampling and statistical extrapolation.

Defendants respectfully submit that the most productive way, and the way the Fifth Circuit requires, to move this case forward is for Branch to attempt to prove its allegations against Defendants concerning the properties Branch actually inspected and identified in the Complaint without delving into other claims Branch knows nothing about.

## II.   QUESTIONS POSED BY THIS COURT'S JANUARY 28, 2010 ORDER

### 1.   What is the authority, both statutory and regulatory, for the government to recoup overpayments by it to insurers in the NFIP?

There are no provisions specific to the NFIP.  However, the Government has a common law right to recover any funds that its agents have wrongfully, erroneously, or illegally paid.  *See, e.g.*, *United States v. Wurts*, 303 U.S. 414, 415 (1938); *Jacquet v. Westerfield*, 569 F.2d 1339, 1342 (5th Cir. 1978) (Government has common law right of recoupment; no statutory authorization is required for recoupment).  The Government need not establish negligence or fault to recoup mistakenly paid monies.  It has no need to invoke the False Claims Act to recover

overpayments either.[2]  Federal collection efforts are regulated by the Federal Claims Collection

Act (FCCA), 31 U.S.C. §§ 3711-3720, the collecting agency's regulations—in the case of

FEMA, 44 C.F.R. pt. 11— and the standards prescribed by the Attorney General and the

Secretary of the Treasury.  *See* 31 C.F.R. Pts. 901-904 (2000).

　　　　　While few pertinent cases have involved the NFIP, the United States has a right to

reimbursement for payments made erroneously to a claimant under a Standard Flood Insurance

Policy.  In *United States v. Fowler*, 913 F.2d 1382, 1385-1387 (9th Cir. 1990), the court held that

the federal government did not waive its right to reimbursement of benefits paid to the insured

under the NFIP simply due to adjuster error because the adjuster could not expand coverage

beyond that mandated by Congress.  At bottom, questions of adjuster "negligence," or

considerations of "fault," are immaterial to the Government's ability to recover overpayments

from anyone holding federal funds to which they are not entitled.  *See id.*; *Borges v. FEMA*, No.

89-1373HL, 1992 WL 425238, at *3 (D.P.R. 1992) (citing *Fowler*).[3]

**2.   What provisions are there (either in the statutes or the regulations) for the government to conduct audits of insurers in the NFIP regarding overpayments by it to insurers?**

　　　　　Pursuant to 42 U.S.C. § 4084, NFIP participants maintain records.  The

Government has access to records for "audit" and examination purposes.  *Id.*; *see also* 44 C.F.R.

---

[2]　　　Furthermore, FEMA has long held that it need not recover every NFIP overpayment in the first instance. As discussed in Response to Question 3, FEMA differentiates between judgmental errors and non-judgmental errors in claims handling and sets forth different procedures with respect to recovery of overpayments.

[3]　　　Contrary to Branch's allegations, the individual policyholders—not the NFIP participants—are the claimants of the federal funds under the NFIP.  Claims payments are made directly to the policyholder from a segregated account that holds only U.S. Treasury funds.  *See* 42 U.S.C. § 4017(d), 42 U.S.C. § 4071(a)(1), 44 C.F.R. Pt. 62, App. A, Art. III(D)(1).  Payments to policyholders constitute a "direct" charge upon the Federal Treasury.  *Gowland v. Aetna*, 143 F.3d 951, 955 (5th Cir. 1998).  Branch's allegation that WYO carriers first pay NFIP claims out of their own private funds, and then later are "reimbursed" by the Federal Government after the claims payment is already made is wrong.  FAC ¶ 15. The applicable claims presentment procedures are found at 44 C.F.R. Pt. 61, App. A(1), Art. VII(J).

§ 62, App. A, Art. XIV (stating, *inter alia*, that the Government shall have access to policyholder and claim records at all times).  "Audit" provisions are set forth in 44 C.F.R. § 62.23(j), which establish financial controls.  The Government conducts a review of each NFIP insurer-participant's flood insurance claims, underwriting, customer service, marketing, and litigation activities at least once every three years.  As part of these reviews, the Government reconciles *specific files* with a listing of transactions submitted by the company and files a report of the results.  44 C.F.R. § 62.23(j)(2) (emphasis added).  The Government calculates overpayments, if any, on the individual files reviewed.

Each company also participates in a biennial audit of flood insurance financial statements by an independent accounting firm to ensure that the financial data reported to the Government accurately represents flood insurance activities.  Reports of the biennial audit are filed with the Government.  44 C.F.R. § 62.23(j)(1).  Additionally, there are certain recording and reporting requirements set forth in the Transaction Record Reporting and Processing Plan and the Accounting Procedures Manual.  *See* 44 C.F.R. § 62.23(j)(3).  The Government analyzes transactions reported to it and provides periodic reports to the companies regarding the timeliness of submissions, the dispositions of transactions that do not pass systems edits, and reconciliations.  *Id.*

3. **What provisions are there (either in the statutes or regulations) for the government to sample and <u>extrapolate</u> to determine the amount of overpayments in the NFIP?**

There are *no* provisions for the Government to sample *and extrapolate* to determine the amount of overpayments in the NFIP.

Congress delegated authority to FEMA to achieve its goals for the NFIP.  FEMA created the current WYO Program operating system, along with its implementing regulations and procedures, in 1983, *see* 44 C.F.R. Pt. 62.23, *et seq.*, and now has had twenty-seven years of

experience implementing them.  Not once in all this time has FEMA ever implemented a plan of extrapolation to recover overpayments.  FEMA has devised various financial controls, auditing procedures, and reinspection programs.  *See, e.g.*, 44 C.F.R. Pt. 62.23(j)(1), (2), and (5).  While some of these audit and examination programs provide for review of a sampling of files, *none* of them mention extrapolation, let alone extrapolation as a basis for recovery of overpayments.[4] Indeed, none of these programs, nor any of the other statutes and regulations controlling the NFIP, indicate that such extrapolation would be permissible or appropriate.

To the contrary, such an extrapolation is inappropriate because FEMA's review processes are highly individualized to specific files.  First, the regulations state that "specific files" will be reviewed.  *See* 44 C.F.R. Pt. 62.23(j)(2).  Second, the nature of FEMA's reviews demonstrates the specificity with which findings are made as to particular claims files.  For example, since at least 1993, FEMA has differentiated between "judgmental" and "non-judgmental" errors regarding claims handling.  *See NFIP Reinspection Report*, Ex. 1, pp. 3-4 through 3-5.  FEMA provides:

> Judgmental matters where there may be a difference of opinion between WYO claims management and FIA as to whether a claim payment involved an excessive, or inadequate, loss payment (e.g., differing views on the amount of depreciation taken, whether a general condition of flooding existed, whether sufficient verification of damages was obtained, etc.) are governed by Article II(F) of the Arrangement, which provides that "The Compan[ies] shall investigate, adjust, settle, and defend all claims or losses arising from policies issued under this Arrangement. Payment of flood insurance claims by the Company shall be binding upon the FIA." Such matters will be the subject of claims operational

---

[4]     Attached hereto as Exhibit 1 is the National Flood Insurance Program "Write-Your-Own Program Financial Control Plan Requirements and Procedures" (FCPRP) as found on the website of the NFIP Bureau and Statistical Agent at http://bsa.nfipstat.com/manuals/fcp99jc/pdf. The FCPRP is promulgated by FEMA via its Bureau and Statistical Agent, and has been in place with only minor changes since June 1, 1984.  The FCPRP's provisions regarding sampling of files for purposes of biennial audits and the claims reinspection programs make clear that the only type of "sampling" envisioned by FEMA is distinct in nature and purpose from the type of "sampling" Branch suggests using in this case.  *See* Ex. 1, pp. 1-1 through 1-4, 3.1 *et seq.*

reviews and special meetings between WYO and FIA managements.

Nonjudgmental matters involving inadvertent error (e.g., payment of a loss under a policy issued in an ineligible community or as to an ineligible risk, payment of a loss, twice, for the same item of damage, payment for nonexistent items of damage, payment of a loss in respect to which the damages are unverified, such as where an adjuster might scope the damage as to one building, then settle multiple, similar buildings on the same basis without actually verifying the damage, etc.) are governed by Article IX of the Arrangement dealing with errors and omissions, in which it is provided that the responsible party (FIA or the WYO Company) will rectify the error as soon as possible after discovery. FIA management, in such cases, will resolve the manner in which the error is to be rectified with the WYO Company management. In such cases, redress may be sought, for example, from the policyholder or adjusting firm responsible for the error, either by the company, in a claim for reimbursement, or FIA, in a federal claims collection effort, as is appropriate. NFIP and WYO Company joint reinspection representatives are encouraged to highlight the above situations in their reports, thereby calling such instances to the attention of WYO Company and FIA management.

*Id.* As this description shows, a high degree of sophistication and training is required to differentiate between various types of errors and the Government's response, and all of this must be done on an individual claim-by-claim basis. Not only does FEMA *not* extrapolate from individually-reviewed files to determine the amounts of overpayments that will be required of the WYO carriers on non-reviewed files, but also, FEMA has taken the position that not all overpayments are to be reimbursed in the first place.

The Court should give deference to FEMA's procedures regarding the NFIP, including its decision not to adopt extrapolation procedures. A number of courts have allowed sampling and extrapolation in the Medicare and Medicaid context because the U.S. Department of Health and Human Services ("HHS"), the agency managing that federal program, adopted such procedures in its regulations. *Chaves County Home Health Serv. v. Sullivan*, 931 F.2d 914, 923 (D.C. Cir. 1991). Just as HHS is given *Chevron* deference as to its decision to adopt

extrapolation procedures, FEMA's decision not to is entitled to equal respect. *See Chevron*

*U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

**4.     Is there any provision (either in the statute or regulations) for administrative procedure s or proceedings to adjudicate alleged overpayments to NFIP insurers?**

Yes.  If a dispute between a WYO carrier and FEMA concerning the amount of a

particular claim payment cannot be resolved informally, it is to be resolved via the arbitration

provision found in the Arrangement at 44 C.F.R. Pt. 62, App. A, Art. VIII.

**5.     Is there any provision (either in the statues or regulations) that requires the government to proceed by individualized claims adjudications for assessments of overpayments by the government to insure[r]s in the NFIP? *See Chaves County Home Health Service v. Sullivan*, 931 F.2d 914, 022 (D.C. Cir. 1991).**

Yes.  The regulations state that audits will be of "specific files."  44 C.F.R. Pt.

62.23(j)(2); *see also* Ex. 1, pp. 7-1, *et seq.*

**6.     Are there any instances where the government (either administratively or in an FCA action) has employed sampling and extrapolation to recover overpayments from an NFIP insurer?**

We are aware of no instance where the Government has employed sampling and

extrapolation to recover overpayments from an NFIP insurer.  As discussed above, the

Government conducts periodic reviews of WYO Companies' flood insurance claims and

reconciles specific files.  *See* 44 C.F.R. § 62.23(j).  As part of this reconciliation, the

Government calculates overpayments made, if any, on the specific individual files it reviewed.

**7.     Are there any decisions on whether the government may use sampling and extrapolation to recover overpayments by the government from NFIP insurers?**

We are not aware of any such decision.

8.     Do you agree that whether the use of sampling and extrapolation is proper is a question of law and whether the sample size and related issues are appropriate are questions of fact?  *See Ratanasen v. State of California Department of Health Services*, 11 F.3d 1467, 1469 (9th Cir. 1993).

Whether the use of sampling and extrapolation is proper raises both legal and factual questions.  For example, whether the False Claims Act permits sampling and extrapolation is a legal question implicating the original source rule and the scope of this Court's jurisdiction.  As discussed in earlier briefing, under the original source rule, the Court is without jurisdiction to order discovery into anything other than the specific properties identified in the Complaint.  *See* Def's Proposed Disc. Plan, Dkt. No. 289; *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007).  Similarly, whether sampling and extrapolation would violate due process is a legal question for the Court to decide.  As discussed in Response to Question 9, the answer to that question depends on both legal and factual matters, including, among other things, the "essentially punitive" nature of damages and penalties under the FCA, *see Stevens*, 529 U.S. at 784, the fact that the FCA places the burden of proof on *relators* to establish fraud, *see* 31 U.S.C. § 3731, the highly individualized and subjective nature of the claims adjustment process, and the unique facts relative to each property damaged by Hurricane Katrina.  Sampling and extrapolation to prove a violation of the FCA is inconsistent with the language and purpose of the FCA and, if utilized, would be unconstitutional as a matter of law.

However, the Court need not address any constitutional issues now for two important reasons.  *See also Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").

First, in *Grubbs*, the Fifth Circuit instructed district courts to manage False Claim Act discovery targeted to claims—not schemes—pled with specificity in the complaint and to

deny discovery of other non-particularized claims in the first instance.  565 F.3d at 191, 195.

The Fifth Circuit's direction to confine discovery to the particular claims alleged in the

complaint is consistent with this Court's approach in this case to date and in *United States ex rel.*

*Stewart v. Louisiana Clinic*, No. Civ.A. 99-1767, 2003 WL 21283944 (E.D. La. June 4, 2003).

In *Stewart*, Magistrate Judge Knowles refused to expand the scope of discovery beyond the few

claims pled with particularity, and rejected sampling.  *Id.* at *9-10.  Second, the issues of

sampling and extrapolation are premature because under the original source rule, the Court's

jurisdiction is limited to the specific properties identified in the Complaint.  *See* Def's Proposed

Disc. Plan, Dkt. No. 289 at 3-5; *Rockwell*, 549 U.S. at 476.

          If, however, the Court chooses to reach the question of whether the use of

sampling and extrapolation is appropriate here, that would raise a number of legal and factual

issues and, if sampling and extrapolation is adopted, an unconstitutional outcome—*see*

Responses to Questions 9 and 10.  Before any sampling can occur, the Court must first address,

as a question of law, whether the relator's proposed sampling and extrapolation is reliable and

methodologically sound.  Fed. R. Evid. 104(a) ("Preliminary questions concerning the

qualification of a person to be a witness . . . or the admissibility of evidence shall be determined

by the court . . . ."); *see also* Fed. R. Evid. 702 (expert testimony must be proffered by a

"qualified" expert, must be "based upon sufficient facts or data," and must be "the product of

reliable principles and methods" that have been "applied [by the witness] . . . reliably to the facts

of the case").  This necessitates hearing testimony proffered by the parties' dueling expert

witnesses on the issue of mathematics and statistical sampling.  *See United States ex rel.*

*Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269 (D. Mass. 2009) (excluding

sampling evidence in an FCA case where methodology was insufficiently reliable); *United States*

11

*v. Skodnek*, 933 F. Supp. 1108, 1117 (D. Mass. 1996) (rejecting use of extrapolation to calculate losses in a Medicare fraud case after liability was established because the sample was not random or representative of the claims, but rather a "convenience sample" cherry-picked by the government); *Lutheran Mut. Life Ins. Co. v. United States*, 816 F.2d 376, 378-79 (8th Cir. 1987) (rejecting sampling and extrapolation of investment expenses to establish a tax reduction where sample was neither representative nor randomly chosen).

The Court must also inquire into the purportedly "representative" sample. Even if the Court concludes that the use of statistical extrapolation to prove FCA liability is permissible *generally*, due process requirements will not be satisfied if the sample is inadequate—either because it is not representative of the universe of claims, too small in size, or otherwise. *See, e.g.*, *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020-21 (5th Cir. 1997) (rejecting sampling as "inherently unfair" and violative of due process where 30 selected cases were not representative of the universe of 3000 claims); *Daytona Beach Gen. Hosp., Inc. v. Weinberger*, 435 F. Supp. 891, 900 (M.D. Fla. 1977) (finding sampling method, where less than ten percent of total claims were used, violated right to due process). The propriety of the sample size, the statistical expert's qualifications, whether the sample is representative of what it is supposed to represent, and related issues are questions of fact.

Here, the many issues unique to each property make it virtually impossible to identify a "representative" sample or to draw any broader conclusions from such a sample. Indeed, virtually every effort to address issues related to Hurricane Katrina damage through extrapolation or on anything other than an individualized basis has been rejected by this Court

and the Fifth Circuit.[5]  Judge Vance has recognized that individual issues predominate when the issue is whether Hurricane Katrina claims were adjusted properly.  *See, e.g.*, *Nguyen v. St. Paul Travelers Ins. Co.*, No. 2:06-cv-04130-SSV-SS, Dkt. No. 422 at 21 & n.10 (E.D. La. Oct. 22, 2008).  In this case, like in every Hurricane Katrina case, damaged properties differ in age and size, have different floor plans, and are built of different materials; all are located in geographically different areas, and each suffered a different level of flooding; and all were undoubtedly affected differently by Hurricane Katrina.  The adjustment process is subjective— indeed the Government labels differences of opinion over scope and damage caused by flooding as "judgmental errors"—and for that reason alone does not lend itself to the kind of objective, mathematical analysis required to draw broad conclusions about groups of Katrina-related NFIP claims from a sample of any size.  Sampling and extrapolation cannot be used to gloss over these differences or to prove liability and damages.  Plaintiff does not cite a single case where it has been done outside the statutorily authorized Medicare/Medicaid (not False Claims) context.

Given the highly individualized nature of insurance claims relative to each property, any extrapolation from a sample would be highly arbitrary and inaccurate, and would violate due process.  *Cimino*, 151 F.3d at 319-22; *Arnold*, 278 F.3d at 443; *see also Johnson v.*

---

[5]     *See, e.g., Jones v. Nat'l Sec. Fire & Cas. Co.*, No. 06-1407, 2006 WL 3228409, at *5 (W.D. La. Nov. 3, 2006) (rejecting Hurricane Rita class action regarding property damage), *aff'd, John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443 (5th Cir. 2007); *Aguilar v. Allstate Fire & Cas. Ins. Co.*, No. 06-4660, 2007 WL 734809, at *1, 3 (E.D. La. Mar. 6, 2007) (rejecting Hurricane Katrina class action regarding property damage)); *Spiers v. Liberty Mut. Fire Ins. Co.*, No. 06-4493, 2006 WL 4764430, at *2 (E.D. La. Nov. 21, 2006) (same); *Guice v. State Farm Fire & Cas. Co.*, No. 1:06cv1-LTS-RHW, 2006 WL 2359474, at *5 (S.D. Miss. Aug. 14, 2006) (same); *Henry v. Allstate Ins. Co.*, No. 07-1738, 2007 WL 2287817, at *4 (E.D. La. Aug. 8, 2007) (same); *Cresson v. State Farm Fire & Cas. Co.*, No. 06-8788, 2007 WL 1191817, at *2 (E.D. La. Apr. 19, 2007) (rejecting joinder of Hurricane Katrina losses at multiple properties because "entirely different factual and legal issues" involved)); *McFarland v. State Farm Fire & Cas. Co.*, No. 1:06CV466-LTS-RHW, 2006 WL 2577852, at *1 (S.D. Miss. Sept. 6, 2006) (same), *aff'd*, 2006 WL 3071988 (S.D. Miss. Oct. 25, 2006); *Ducree v. Liberty Mut. Ins. Co.*, No. 06-8286, 2007 WL 781968, at *2 (E.D. La. Mar. 12, 2007) (same); *Rohr v. Metro. Ins. & Cas. Co.*, No. 06-10511, 2007 WL 163037, at *1 (E.D. La. Jan. 17, 2007) (same).

*Big Lots Stores, Inc.*, No. 2:04-cv-3201-SSV-SS, Dkt. No. 401 (E.D. La. June 20, 2008) (J.

Vance) (decertifying class action and recognizing that group treatment of highly individualized

claims is inappropriate).  Indeed, in every case cited by Branch in which sampling was used it

was pursuant to congressional or administrative authorization and the procedures were set up by

statute or regulation prior to the suit.  In no case was the sampling invented after the fact by the

relator, which is what Branch is trying to do here.  To allow after-the-fact sampling and

extrapolation would be highly arbitrary, causing a significant due process violation.  *See*

*Thibodeaux v. Bordelon*, 740 F.2d 329, 336 (5th Cir. 1984) ("The 'touchstone' of procedural due

process is 'protection of the individual against arbitrary action of government.'") (quoting *Wolff*

*v. McDonnell*, 418 U.S. 539, 558 (1974)).  *See also* Fidelity's Resp. to Branch Consultant's Disc.

Control Plan., Dkt. No. 300 at 8.

At this stage of the litigation, when jurisdiction remains at issue, Branch must be

required to prove its original source status with regard to the allegations in the Complaint.  The

Court need not hold a mini-trial on complex factual and constitutional issues involving dueling

experts addressing whether statistical sampling and extrapolation is possible in this case that

presents infinite individualized issues.  This is especially true because Branch has done nothing

more than hold up "sampling" without any explanation of what that means or what it would

address.

9.     **How are the requirements of due process satisfied in a FCA *qui tam* action
       with sampling and extrapolation used to determine the amount that the
       government has overpaid to a NFIP insurer?**

The requirements of due process cannot be satisfied if sampling and extrapolation

are used to determine liability in an FCA action.[6]   Initially, the Court need not address the constitutionality of sampling and extrapolation because neither the language nor purpose of the FCA permits the use of sampling to prove liability.   Further, sampling and extrapolation would deprive Defendants of the right to trial by jury required by the Seventh Amendment to the United States Constitution and could deprive Defendants of property without notice and a fair opportunity to be heard as required by the Fifth Amendment to the United States Constitution.   Finally, sampling cannot be used because of the predominance of individualized issues, including each unique property and each insurer's unique practices.   *See* Response to Question 8.

First, the False Claims Act requires proof of all essential elements of the cause of action, including falsity and damages.   *See* 31 U.S.C. § 3731; *United States ex rel. Sanders v. N. Am. Bus. Indus., Inc.*, 546 F.3d 288, 297 (4th Cir. 2008) (citation omitted).   If sampling and extrapolation were allowed in lieu of an actual showing of the elements, it would absolve Branch of its burden of proof and unfairly shift the burden to Defendants.   It is not Defendants' duty to disprove fraud implied by a statistical methodology.   The statistical approach and resultant burden-shifting would deny Defendants the fair opportunity to be heard and a right to trial by jury on each element of a False Claims Act cause of action.   *See Cimino*, 151 F.3d at 319-22 (holding that individual jury determinations of liability, injury, and damages are required).   It would also violate the Rules Enabling Act, 28 U.S.C. § 2072.   *See, e.g.*, *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008).

Second, the Fifth Circuit has not allowed sampling in the FCA context and has expressly disallowed it in other contexts.   The Fifth Circuit's misgivings regarding statistical

---

[6]      *See* Response to Question 8, addressing the required inquiry into an adequate "representative" sample, and the individualized issues relating to each property precluding the ability to draw any class-wide conclusions from such a sample.

proof are explained in detail in the asbestos-related cases *Cimino v. Raymark Industries*, 151 F.3d 297 (5th Cir. 1998), and *In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990).  In *In re Fibreboard Corp.*, the Fifth Circuit disallowed the district court's plan to try 41 claims and extrapolate the results to 2990 other claims.  The *Fibreboard* court's concern focused on the fact that defendants' liability in the 2990 extrapolated claims would not actually be tried and proven. 893 F.2d at 711-12.  After remand and subsequent appeal, the Fifth Circuit again addressed the issue of statistical sampling in *Cimino*.  The Fifth Circuit disallowed the extrapolation of the results of 160 sample cases to 2128 remaining claims because the sampling and extrapolation process utilized by the trial court denied defendants the right to a trial by jury on the issues of liability and damages.  *Cimino*, 151 F.3d at 319-20.  The court held that the importance and settled principles of requiring plaintiffs to meet their burden in front of a jury was not diminished by the enormity of the task.  *Id.* at 312-13.  The court found that "in the extrapolation cases there was neither any sort of trial determination, let alone a jury determination, nor even any evidence, of damages."  *Id.* at 319.  The enormity of the task "does not alter the required elements that must be found to impose liability and fix damages (or the burden of proof thereon)."  *Id.* at 312. As a result, the Fifth Circuit refused to allow the parties to use the results of the sample trials with respect to any claims not actually tried.  *Id.* at 318-21.  The Fifth Circuit's concerns regarding statistical proof were grounded partly in constitutional principles.  A statistical approach to proving essential elements of claims would deny "[defendants'] Seventh Amendment rights to have a jury determine, the distinct and separable issues of the actual damages of each of the extrapolation [claims]."  *Id* at 320-21; *see also Arnold*, 278 F.3d at 443 (court's longstanding adversity to creating and trying representative case "sounds in our concern that no one be deprived the right to a full and fair opportunity to litigate their claims").  The

plaintiffs in *Fibreboard* and *Cimino* sought only ordinary tort damages.  *See e.g., Cimino*, 151

F.3d at 313.  Where, as in the quasi-criminal case at bar, relators seek treble damages plus

penalties under the FCA, the Fifth Circuit would certainly find a sampling and extrapolation

method as "fatally flawed" as it has in other contexts.  *Id.* at 321.  It would be inappropriate to

apply a sampling technique in a judicial proceeding where the defendants are exposed to punitive

penalties.

       Further, there are several key differences between the Medicare recoupment cases

exemplified by *Ratanasen* and the FCA allegations at issue in *Branch*.  First, the regulations at

issue in the Medicare cases specifically allow statistical extrapolation as a method of measuring

overpayment prior to litigation.  *See Chaves*, 931 F.2d at 915-16 (describing regulations and

written Medicare policy providing for post-payment sampling audits to recoup suspected

overpayments).  In contrast, the FCA and the NFIP provide no such statutory authority for

sampling and extrapolation to prove liability or damages.  Moreover, under the Medicare

scheme, the Government "has not, in fact, suspended individualized determinations and

substituted sample adjudication on initial review of payment claims . . . ; instead, the Department

[of Health and Human Services] has *supplemented individualized* pre-payment review of claims

with a sampling procedure on post-payment review of providers suspected of overbilling."

*Chaves*, 931 F.2d at 917 (emphasis added).  Here, in contrast, Branch is asking the Court to

substitute an individualized, claim-by-claim determination under the FCA with a sampling and

extrapolation procedure that is nowhere authorized in the statute (or in the NFIP) and, indeed, is

contrary to its mandate.  *See* Response to Question 3.

       Second, in the recoupment cases, the Government's recovery is limited to the

amount of overpayment, *see Chaves*, 931 F.2d at 915 ("the full amount of the provider's

overpayment liability is calculated from the percentage of claims denied in the sample"),

whereas in the FCA context, penalties of up to $10,000 per false claim may be imposed, and

damages may be trebled, upon a finding of liability.  31 U.S.C. § 3729(a)(1)(G).  The

consequence of false positives resulting from sampling and extrapolation is therefore

constitutionally unacceptable in the FCA context because, among other things, the damages and

penalties imposed by the FCA are "essentially punitive" in nature.  *Stevens*, 529 U.S. at 784; *see

also United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) (analyzing whether award under

FCA was excessive under the Eighth Amendment).

        Third, in the context of Medicare recoupment cases, the burden is on the provider

to prove entitlement to the public monies received.  *Illinois Physicians Union v. Miller*, 675 F.2d

151, 154 (7th Cir. 1982) ("At all times the burden is on the physician to prove entitlement to

public welfare monies.  Thus, the Department's presumption that the percentage of error in the

total number of cases is the same as the percentage of error in the audited cases does not have the

procedural effect of shifting any burden.").  In contrast, in the FCA context courts have rejected

arguments that the difficulty of quantifying damages justifies shifting the burden of proof to the

defendant—even where the relator claims that the defendant's fraudulent conduct made

quantifying damages virtually impossible.  *United States ex rel. Harrison v. Westinghouse

Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003).

        These crucial differences explain why sampling and extrapolation may be

appropriate in the Medicare recoupment context, and at the same time result in a violation of

Defendants' due process rights in the FCA context.  It would be highly inappropriate to apply the

kind of sampling used to calculate *remedies* under an *administrative* framework that places the

burden of proof on the *provider*, to a *judicial proceeding* that is *punitive* rather than remedial,

and where the burden of proof rests squarely with the *relator.*  The requirements of due process are more demanding in a quasi-criminal context like the FCA where the relator bears the burden of proof, *see Ratanasen*, 11 F.3d at 1472 ("the process due varies with the circumstances," including "the private interest affected by the official action"), and cannot under any circumstances be satisfied where a necessarily arbitrary sampling and extrapolation process is employed.  *See also* Dkt. No. 300 at 8.

> **10.    Do you agree with the following:**
>
> > **(a)    Pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation and the corollary that a complaint is inadequate if it pleads a false scheme with particularity but fails to identify specific false claims.  *See United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 504 (6th Cir. 2007)**

Yes.  The Fifth Circuit has "traditionally required that a [FCA] complaint include the time, place and contents of the false representation, as well as the identity of the person making the representation and what that person obtained thereby."  *Grubbs*, 565 F.3d at 188 (citation and internal punctuation omitted).  The Fifth Circuit has also held that FCA violations cannot be pled by relying on statistical studies to assert that false claims were submitted to the Government.  *See, e.g.*, *Thompson*, 125 F.3d at 903 (allegations of FCA violations based on statistical studies failed to comply with Rule 9(b) because relator "did not identify any specific physicians who referred patients for medically unnecessary services or any specific claims for medically unnecessary services that were submitted by defendants").

**(b)** **Where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides *representative samples* of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme.  See *Bledsoe*, 501 F.3d at 510-11.**

No, this is not the law in the Fifth Circuit for the initial phase of discovery.

Rather, the law is set forth in *Grubbs*, 565 F.3d 180, discussed above—discovery directed to particularized claims in the complaint only.  Here, that means discovery related only to the properties Branch identified in the Complaint.

**(c)** **The examples of false claims pled with specificity should, in a all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could be produced with a reasonable probability by a random draw from the total pool of all claims.  See *Bledsoe*, 510 F.3d at 510-11.**

Branch's allegations, which Judge Vance accepted as true for purposes of the motion to dismiss, do not set forth representative samples of fraud.  It is time for these claims to be tested.  Surviving a motion to dismiss does not open up the initial phase of discovery to a "random draw," nor would such a draw be possible here for the reasons set forth herein.  Further, *Bledsoe* must be read with the Sixth Circuit's subsequent decision in *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496 (6th Cir. 2008).  *Snapp* explained that "[i]n order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme." *Id.* at 506.  Here, as explained in the Response to Question 12, the claims pled in the Complaint are *not* characteristic examples of the alleged wind/water fraudulent scheme and therefore discovery should not proceed on other claims until the claims pled in the Complaint are litigated.

11. **Is the alleged false scheme described in the first amended complaint different than the alleged false scheme described in the proposed second amended complaint?**

Yes, but the particularized allegations with respect to properties are exactly the same. *See* Fidelity's Mem. in Opp. to Mot. for Leave to File Second Am. Compl., Dkt. No. 297 at 3-12, and particularly page 7. In short, the alleged false scheme described in the FAC involves: (1) matching flood and wind policies; (2) utilization of FEMA's expedited claims handling process; (3) destruction of the property by wind before the levees breached; (4) payment of non-covered damages; and (5) WYO carrier possession of the overpaid funds. The alleged false scheme described in the proposed SAC does not involve the same elements of the scheme in the FAC. The elements of the new scheme alleged in the SAC are that the Defendants are alleged to have overpaid covered claims by either "inflat[ing] prices" or by "including items in the adjustment that did not need to be replaced," and that this was done to earn higher "fees." SAC ¶ 17.

12. **Are the examples cited by Branch in the first amended complaint representative samples of the alleged false scheme in the first amended complaint?**

No. The claims pled in the Complaint are *not* characteristic examples of the alleged wind/water fraudulent scheme and therefore discovery should not proceed on other claims until the claims pled in the Complaint are litigated. The allegations against Standard Fire, Liberty Mutual, Fidelity, and ANPAC are illustrative. The "scheme" Branch alleges is that Defendants passed off flood losses to the Government to save itself payments on wind policies. Therefore, the Order denying Defendants' motion to dismiss relies heavily on Branch's knowingly false statements that it had ***direct knowledge*** that Defendants issued both the flood and wind policies at the "representative" properties identified in the Complaint:

- "Branch asserts that defendants 'passed off' the costs of paying for wind damage to the government by fraudulent claiming that the damage was caused by flood." *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, -- F. Supp. 2d ----, 2009 WL 3353314, at *1 (E.D. La. Oct. 19, 2009) (Dkt. No. 228).

- Branch "alleges, contrary to defendants' contention, that the defendants had wind polices on the listed properties.  Such policies provide a motive to overstate flood damage for which the government is obligated to pay and to understate wind damage for which the insurance companies are responsible." *Id*. at *21.

- Branch alleges "that each property [described in the complaint] was covered by a wind policy provides the incentive for the defendants to engage in the scheme." *Id*. at *23.

This specifically identified and only properties associated with Standard Fire and Liberty Mutual are not representative of this scheme.

     ***Branch's allegations about Standard Fire are not representative of any scheme by Standard Fire or of other claims***.  Standard Fire did not issue either the wind or flood policy for 7311 Beauvoir Court, New Orleans, LA.  *See* FAC ¶ 31; Dkt. Nos. 328-8, 328-9.  Standard Fire also did not issue the wind policy for 7732 Edward Street, New Orleans, LA.  *See* Standard Fire's Resp. to Interrog. No. 2, Dkt. No. 327-3 at 6.  Branch's own documents show that Louisiana Citizens, not Standard Fire, issued the wind policy.  See Branch_W000064 (attached as Exhibit 2).  An entity other than Standard Fire adjusted the flood claim on this property.

     Finally, Standard Fire did not issue the wind policy for 7568 Horizon Drive, New Orleans, LA.  *See* Standard Fire's Resp. to Interrog. No. 2, Dkt. No. 327-3.  The homeowner says Republic, not Standard Fire, issued the wind policy.  *See* Compl., *Merrill v. Republic Fire & Cas. Co.*, No. 2:07-cv-1518-MVL-SS, at 2 (E.D. La. Apr. 2, 2007).  An entity other than Standard Fire adjusted the flood claim on this property.  Thus, these properties/claims are not representative of some broader wind/flood shifting fraud by Standard Fire or of any other claims.

***Branch's allegations about Liberty Mutual and 13656 N. Cavelier Drive, New
Orleans, LA are not representative of any scheme by Liberty Mutual or of other claims.***  At the
time of Hurricane Katrina, Liberty Mutual did not insure 13656 N. Cavelier Drive for losses due
to wind because the homeowner policy was cancelled in 2003 due to non-payment of premium.
Therefore, Branch could not have "examined the insurer's wind adjustment."  Opening Appellate
Brief, 2008 WL 6082655 (5th Cir. Mar. 24, 2005) at 6.  Further, as Branch knows, the flood
claim for 13656 N. Cavelier Drive was not adjusted by Liberty Mutual; rather, a third party
vendor had authority to and did decide the amount to pay on the flood claim for 13656 N.
Cavelier Drive.  *See* LM 438-446 (filed separately under seal as Exhibit 3).  Accordingly, this
property/claim is not representative of some broader wind/flood shifting fraud by Liberty Mutual
or of any other claims.

***Branch's allegations about Liberty Mutual and 7441 Fieldstone Road, New
Orleans, LA are not representative of any scheme by Liberty Mutual or of other claims.***  The
Fieldstone Road claim involved a one-story house that sat in more than six feet of water for
weeks.  According to aerial photographs taken right after the storm, the roof was not damaged.
Upon a subsequent inspection of the roof in November, 2005, the outside adjuster retained by an
adjusting company with which Liberty Mutual had contracted determined that the so-called roof
damage was man-made.  *See* LM 35 (filed separately under seal as Exhibit 4).  Subsequently, the
insured was arrested for insurance fraud by the Louisiana State Police Insurance Fraud Unit (*see*
LM 28 (filed separately under seal as Exhibit 5)) and the claim was denied because "it is
questionable that the loss occurred as reported to the Company."  *See* LM 236 (filed separately
under seal as Exhibit 6).  Accordingly, this property/claim where the roof damage was man-made

is not representative of some broader wind/flood shifting fraud by Liberty Mutual or of any other claims.

**Branch's allegation about Fidelity National Property and Casualty Insurance Company and Fidelity National Insurance Compny are not representative of any scheme by Fidelity or of any claim.**   As per the affidavit already of record at Dkt. No. 267-2, as well as Branch's admissions in its discovery responses that other companies issued the homeowners policy on every single property pleaded as to Fidelity (Dkt. No. 323-3, 323-5), it is already established in the record that (1) Fidelity did not have the wind policy on any of these properties; and (2) Fidelity did not engage in expedited claims handling on any of these properties.  Fidelity maintains that Branch's motive for filing the SAC was its realization, via all of the Defendants' Answers and Affirmative Defenses, that the scheme Branch contends was pleaded with particularity alleged in the FAC cannot possibly succeed as to any of the current Defendants.

**Branch's allegation about ANPAC are not representative of any scheme by ANPAC or of any claim.**   Branch alleges that ANPAC overpaid and submitted false claims to the federal government for 109 Lighthouse Point, Slidell, LA and 7562 Horizon Drive, New Orleans, LA.  FAC ¶ 27.  ANPAC, however, neither issued flood insurance policies nor made flood payments for these properties.  For the remaining properties in ¶ 27, ANPAC relied upon and contracted with a full-service third party vendor ("TPV") to administer, handle, and/or oversee any claims made under the applicable ANPAC flood policies.  The TPV engaged independent flood adjusters who worked separately from those adjusting claims under the homeowners' insurance policy.  The FAC does not mention ANPAC's reliance and use of the TPV.  These properties, therefore, cannot be "representative samples" of the scheme alleged in the FAC.  Accordingly, the purported "exemplar" properties are not representative claims of

some broader wind/water shifting scheme by ANPAC and they do not even exemplify in any way the scheme as alleged by Branch in the FAC.

In other words, none of the properties presented as "exemplar" properties by Branch actually exemplifies (in any way) the scheme alleged in the Complaint.

13. **Are the examples cited by Branch in the proposed second amended complaint representative samples of the alleged scheme in the proposed second amended complaint?**

No. To the extent the proposed SAC simply "clarifies" the scheme alleged the FAC (as Branch claims), the examples cited by Branch are not representative of the *clarified* scheme for the reasons noted in Response to Question 12, and because the property specific pleading by Branch is the same. The examples in the SAC are not representative of the new theory advanced in the SAC that Defendants committed fraud by "inflat[ing] prices" and by "including items in the adjustment that did not need to be replaced," in order to increase their fees. SAC ¶ 17. Nowhere within the proposed SAC does Branch plead a single item of damage on any of the pleaded properties utilizing a price that was too high, or plead a single item of damage on any property that a carrier paid to replace, when such was unnecessary. Setting aside the obvious Rule 9(b) problems raised by the SAC, it is apparent from the face of the SAC that the basic prerequisites under *Bledsoe* and *Snapp* to opening up discovery on the entire fraudulent scheme are not met (assuming such a procedure is even authorized under the law of this Circuit).

## III. CONCLUSION

For the foregoing reasons, and the reasons set forth in Defendants' proposed discovery plan and response to Plaintiff's proposed discovery plan, Defendants respectfully submit that discovery should proceed only as to the properties identified in the Complaint.

Dated:  February 5, 2010

Respectfully submitted,

BARRASSO USDIN KUPPERMAN
FREEMAN & SARVER, LLC

NIELSEN LAW FIRM, LLC

/s/ Judy Y. Barrasso
Judy Y. Barrasso (2814)
jbarrasso@barrassousdin.com
John W. Joyce (27525)
jjoyce@barrassousdin.com
LL&E Tower
909 Poydras Street, Suite 2400
New Orleans, Louisiana 70112
Telephone:  (504) 589-9700

/s/ Gerald J. Nielsen
Gerald J. Nielsen (17078)
gjnielsen@aol.com
William T. Treas (26537)
wtreas@nielsenlawfirm.com
3838 North Causeway Boulevard, Suite 2850
Metairie, Louisiana 70002
Telephone:  (504) 837-2500

**Attorneys for Liberty Mutual Insurance
Company**

**Attorneys Fidelity National Insurance
Company, Fidelity National Property and
Casualty Insurance Company**

LAW OFFICES OF GORDON P. SEROU, JR.,
L.L.C.

MCCRANIE, SISTRUNK, ANZELMO,
HARDY, MAXWELL AND MCDANIEL PC

/s/ Gordon P. Serou, Jr.
Gordon P. Serou, Jr. (14432)
gps@seroulaw.com
Poydras Center, Suite 1420
650 Poydras Street
New Orleans, Louisiana 70130
Telephone:  (504) 299-3421

/s/ James C. Rather
James C. Rather (25839)
jrather@mcsalaw.com
195 Greenbriar Blvd., Suite 200
Covington, Louisiana 70433
(504) 831-0946

**Attorneys for American Reliable Insurance
Company**

**Attorneys for Simsol Insurance Services,
Inc.**

BEST KOEPPEL

/s/ Peter S. Koeppel
Peter S. Koeppel
Michael L. Martin
2030 St. Charles Ave.
New Orleans, Louisiana 70130
Telephone:  (504) 598-1000
**Attorneys for Colonial Claims Corporation**

PHELPS DUNBAR LLP

/s/ Harry Rosenberg
Harry Rosenberg (11465)
rosenbeh@phelps.com
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130
Telephone:  (504) 566-1311

SIMPSON THACHER AND BARTLETT LLP
Bryce L. Friedman  (*pro hac vice*)
bfriedman@stblaw.com
425 Lexington Avenue
New York, New York 10017
Telephone:  (212) 455-2000

Deborah L. Stein (*pro hac vice*)
dstein@stblaw.com
1999 Avenue of the Stars, 29th Floor
Los Angeles, California 90067
Telephone:  (310) 407-7500

**Attorneys for The Standard Fire Insurance
Company (*erroneously named as St. Paul
Travelers Co.*)**

LARZELERE PICOU WELLS SIMPSON
LONERO, LLC

/s/ Jay M. Lonero
Jay M. Lonero, T.A. (20642)
jlonero@lpw-law.com
Christopher R. Pennison (22584)
cpennison@lpw-law.com
Angie A. Akers (26786)
aakers@lpw-law.com
3850 N. Causeway Boulevard, Ste 1100
Metairie, Louisiana 70002
Telephone:  (504) 834-6500

**Attorneys for American National Property
And Casualty Company**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the above and foregoing has this date been served upon all parties to this suit through counsel by filing into the Court's electronic filing system and, for non-participants, by placing same in the United States mail, postage prepaid and properly addressed on this 5th day of February, 2010.


<u>/s/ Harry Rosenberg</u>
Harry Rosenberg