# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA


|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA,<br>*EX REL.* BRANCH CONSULTANTS, L.L.C., | )<br>)<br>) |  |
| *Plaintiff* | ) | Case No. 2:06-cv-4091 |
| v. | )<br>) | **JURY TRIAL DEMANDED** |
| ALLSTATE INSURANCE COMPANY, et al., | )<br>) |  |
| *Defendants* | )<br>) |  |

## BRANCH CONSULTANTS, LLC'S RESPONSE IN OPPOSITION TO <u>DEFENDANTS' MOTION FOR PROTECTIVE ORDER</u>

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .......................................................................1

II.    LEGAL STANDARD ...................................................................................4

III.   DEFENDANTS HAVE FAILED TO SHOW THAT THE DISCOVERY BRANCH
       SEEKS IS IRRELEVANT OR UNDULY BURDENSOME TO PRODUCE...................5

       A.     Defendants Have Failed To Make *Any* Showing Of Burden ..................5

       B.     The SSRS Data Is Relevant Even In A Trial Limited To The
              27 Exemplar Properties ........................................................................7

IV.    DEFENDANTS HAVE FAILED TO CITE ANY AUTHORITY THAT
       REQUIRES DEPRIVING BRANCH OF RELEVANT EVIDENCE FOR
       ANY OTHER REASON ................................................................................10

       A.     *Rockwell* Does Not Require Limiting Discovery To The
              Exemplar Properties ............................................................................10

       B.     Rule 9(b) Does Not Require Limiting Discovery To
              The Exemplar Properties ......................................................................14

V.     THE "BELLWETHER TRIAL" POSITED BY DEFENDANTS'
       MOTION IS NOT BELLWETHER, IS CONTRARY TO THE
       NOVEMBER 19, 2009 SCHEDULING ORDER, AND LEAVES
       BASIC TRIAL PROOF AND DISCOVERY ISSUES UNRESOLVED.........................16

VI.    ANSWERS TO THE COURT'S 13 QUESTIONS .............................................18

       1.     What is the authority, both statutory and regulatory, for the
              government to recoup overpayments by it to insurers in the NFIP?.....................19

       2.     What provisions are there (either in the statutes or the regulations)
              for the government to conduct audits of insurers in the NFIP
              regarding overpayments by it to insurers? ............................................24

       3.     What provisions are there (either in the statutes or the regulations)
              for the government to sample and extrapolate to determine the
              amount of overpayments in the NFIP? .................................................26

              a.     Nothing In The NFIP Regulations Suggests That The Use
                     Of Sampling And Extrapolation To Determine The Amount
                     Of Overpayments Is Inappropriate.................................................26

b. Courts Have Approved The Extrapolation Of Damages In
Medicare/Medicaid Cases *In Spite Of* Regulations, Not
Because Of Them.............................................................................28

c. *Chevron* Deference Is Inapplicable Because FEMA Has Not
Adopted Any Policy With Respect To Using Extrapolation
To Determine The Amount Of WYO Overpayments......................................29

4. Is there any provision (either in the statutes or regulations) for
administrative procedures or proceedings to adjudicate alleged
overpayments to NFIP insurers?..............................................................30

5. Is there any provision (either in the statutes or the regulations)
that requires the government to proceed by individualized
claims adjudications for assessments of overpayments by
the government to insures in the NFIP?  See *Chaves County
Home Health Service v. Sullivan*, 931 F.2d  914,  922
(D.C.  Cir.  1991). ................................................................................31

6. Are there any instances where the government (either
administratively or in an FCA action) has employed
sampling and extrapolation to recover overpayments
from an NFIP insurer? .........................................................................32

7. Are there any decisions on whether the government may use
sampling and extrapolation to recover overpayments by the
government from NFIP insurers?..............................................................33

8. Do you agree that whether the use of sampling and extrapolation is
proper is a question of law and whether the sample size and related
issues are appropriate are questions of fact?  See *Ratanasen v. State
of California Department of Health Services*, 11 F.3d 1467, 1469
(9th Cir. 1993)...................................................................................33

a. The Court Should Be Guided By *United States ex rel.
Barron v. Deloitte & Touche LLP*, 2008 WL 7136869
(W.D. Tex. Sept. 26, 2008)...............................................................36

b. The Class Certification Decisions Defendants Rely On Are Irrelevant ...........37

c. Branch Agrees With Defendants That "The Court Need Not Address
Any Constitutional Issues Now"..........................................................38

9. How are the requirements of due process satisfied in a FCA qui tam
action with sampling and extrapolation used to determine the amount
that the government has overpaid to a NFIP insurer?.....................................38

10. Do you agree with the following?...........................................................41

a.  Pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation and the corollary that a complaint is inadequate if it pleads a false scheme with particularity but fails to identify specific false claims. See *United States ex rel. Bledsoe v. Community Health System*, 501 F.3d 493, 504 (6th Cir. 2007)...........................................................................41

b.  Where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides representative samples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme. See *Bledsoe*, 501 F.3d at 510-11...........................42

c.  The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could be produced with a reasonable probability by a random draw from the total pool of all claims. See *Bledsoe*, 510 F.3d at 510-11................43

11.  Is the alleged false scheme described in the first amended complaint different from the alleged false scheme described in the proposed second amended complaint?.........................................................44

12.  Are the examples cited by Branch in the first amended complaint representative samples of the alleged false scheme in the first amended complaint?.................................................47

13.  Are the examples cited by Branch in the proposed second amended complaint representative samples of the alleged scheme in the proposed second amended complaint?........................................................... 47

VII.  CONCLUSION ...........................................................................47

# TABLE OF AUTHORITIES

## FEDERAL CASES

*America Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2nd Cir. 1979) .........35

*Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513 (10th Cir. 1987) ................................35

*C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049 (5th Cir. 1981) ..........35

*Chaves County Home Health Serv. v. Sullivan*, 931 F.2d 914
    (D.C. Cir. 1991) ......................................................................................28, 29, 31, 33

*Dwyer v. Fidelity National Property & Casualty Insurance Co.*, Civil Action No.
    06-04793 (E.D. La.) ....................................................................................................23

*Farmers Ins. Co., Inc. v. Peterson*, 81 P.3d 659 (Okla. 2003) ...........................................8

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997).....................................17, 18. 36

*In re Terra International, Inc.*, 134 F.3d 302 (5th Cir. 1998) ................................1, 4, 5, 7

*Gayton v. McCoy*, __ F.3d __, 2010 WL 308756 (7th Cir. 2010) .....................................34

*General Electric Capital Corp. v. Lear Corp.*, 215 F.R.D 637 (D. Kan. 2003). ................5

*Hartog Foods Intern., Inc. v. United States*, 291 F.3d 789 (Fed. Cir. 2002)...............29, 30

*Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003) ..........................................................11, 12

*Illinois Physicians Union v. Miller*, 675 F.2d 151 (7th Cir. 1982) ..............................33, 39

*Jones v. Park at Lakeside Apartments*, 2008 U.S.Dist. LEXIS 89954 (S.D. Tex.
    2008) ............................................................................................................................43

*Mich. Department of Education v. US Department of Education*, 875 F.2d 1196
    (7th Cir. 1991)........................................................................................................33, 39

*Munoz v. Orr*, 200 F.3d 291 (5th Cir. 2000)....................................................................37

*Nguyen v. St. Paul Travelers Ins. Co.*, 2:06-cv-04130-SSV-SS .......................................37

*Old Republic Insurance Co. v. Federal Crop Insurance Corp.*, 947 F.2d 269 (7th
    Cir. 1991) ...............................................................................................................20, 21

*Ratanasen v. State of Cal. Department of Health Services*, 11 F.3d 1467 (9th Cir. 1993) ................................................................................................33, 34, 39

*Republic Services, Inc. v. Liberty Mutual Insurance Co.*, Civil Action No. 03-494-KSF........................................................................................................35

*Rockwell International Corp. v. United States*, 549 U.S. 457 (2007)............................2, 11

*Runnels v. Texas Children's Hosp. Select Plan,* 167 Fed. Appx. 377 (5th Cir. 2006) ......................................................................................................37

*Sealed Appellant I v. Sealed Appellee I*, 156 Fed. Appx. 630 (5th Cir. 2005) ............14, 15

*Snowden By and Through Victor v. Connaught Laboratories, Inc.*, 137 F.R.D. 325 (D. Kan. 1991) ............................................................................................5

*Stoner v. Santa Clara County Office of Education*, 502 F.3d 1116 (9th Cir. 2007)..........43

*United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002) ...................................................................................................15

*United States ex rel. Bane v. Breathe Easy Pulmonary Services, Inc.*, No. 8:06-CV-40-T-24MAP, 2008 WL 4057549........................................................13

*United States ex rel. Barron v. Deloitte & Touche LLP*, 2008 WL 7136869 (W.D. Tex. 2008) ......................................................................................36, 37

*United States ex rel. Bledsoe v. Community Health System*, 501 F.3d 493 (6th Cir. 2007) .............................................................................................12, 41, 42

*United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162 (JCC), 2009 WL 2240331(E.D. Va. July 23, 2009) ..............................................................15, 16, 47

*United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853 (7th Cir. 2006) ...................................................................................................15

*United States ex rel. Doe v. Degregorio*, 510 F. Supp. 2d 877 (M.D. Fla. 2007) .35, 37, 40

*United States ex rel. El-Amin v. George Washington University*, 533 F. Supp. 2d 12 (D.D.C. 2008) ..................................................................................17, 36, 37, 40

*United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180 (5th Cir. 2009) .............................................................................................41, 42

*United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1 (D.D.C. 2003) ............35, 37, 40

*United States ex rel. Hebert v. Dizney*, 295 Fed. Appx. 717 (5th Cir. 2008) ..............12, 16

*United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743 (9th Cir. 1993)...............................43

*United States ex rel. Landsberg v. Argentis Medical, P.C.*, 2006 WL 1788381
  (W.D. Pa. 2006) ...........................................................................................................16

*United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259 (D.
  Mass. 2009)...................................................................................................35, 40, 47

*United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97 (3d Cir.
  2000) ...........................................................................................................................11

*United States ex rel. Mergent v. Flaherty*, 540 F.3d 89 (2d Cir. 2008).............................43

*United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432 (3d Cir. 2004) ....................15

*United States ex rel. Rigsby v. State Farm Insurance Co., et al.*, Civil Action No.
  06-CV-433 .............................................................................................................12, 13

*United States ex rel. Roby v. Boeing Co.*, 73 F. Supp. 2d 897 (S.D. Ohio 1999)..............31

*United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818 (8th Cir. 2009) .........12

*United States ex rel. Singh v. Bradford Regional Medical Center*, 2006 WL
  2642518 (W.D. Pa. 2006) ..........................................................................................16

*United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d 496 (6th Cir. 1998) ...43, 44

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp.
  2d 1017 (S.D. Tex. 1998)......................................................................................12, 16

*United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d
  899 (5th Cir. 1997).....................................................................................................15

*United States ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308 (W.D. Okla. 1998) ..............35

*United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 23  433 F.3d
  1349 (11th Cir. 2005)..................................................................................................42

*United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450 (5th
  Cir. 2005) ....................................................................................................................43

*United States v. Cabrere-Diaz*, 106 F. Supp. 2d 234 (D.P.R. 2000) ...............33, 35, 37, 39

*United States v. Garrett*, 571 F.2d 1323 (5th Cir. 1978) .....................................................4

*United States v. Gwinn*, 2008 WL 867927 (S.D. W.Va. 2008) .........................................16

*United States v. Manzer*, 69 F.3d 222 (8th Cir. 1995) .....................................................35

*United States v. Rogan*, 517 F.3d 449 (7th Cir. 2008)...........................................17, 35, 47

*United States v. Rosin*, 2008 WL 142037, 2008 U.S.App. LEXIS 1080 (11th Cir. 2008) .................................................................................................................35, 40

*United States v. Sklar*, 920 F.2d 107 (1st Cir. 1990) ......................................33, 34, 35, 40

*United States v. Whiting*, 28 F.3d 1296 (1st Cir. 1994) ........................................33, 35, 40

*United States v. Wurts*, 303 U.S. 414 (1938) .................................................................19

*Wang ex rel. United States v. FMC Corp.*, 975 F.2d 1412 (9th Cir. 1992) ................11, 12

*Williams v. Chrysler Fin. Corp.*, 1999 WL 221119 (E.D. La. 1999) ..................................4

*Williams v. New Orleans S.S. Association*, 673 F.2d 742 (5th Cir. 1982)........................37

*Williams v. WMX Techs., Inc.*, 112 F.3d 175 (5th Cir. 1997).............................................42

*Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84 (2nd Cir. 1991)..................39

## STATE CASES

*Ledden v. Kuzma*, 858 N.E.2d 186 (Ind. App. 2006).......................................................5, 7

## FEDERAL STATUTES

31 C.F.R. Pts. 901-04........................................................................................................20

31 U.S.C. §§ 3729-33 .......................................................................................................19

44 C.F.R. Pt. 62, App. A.................................................................................19, 20, 22, 30

44 C.F.R. Pt. 62, App. B.................................................................................22, 25, 26, 32

44 C.F.R. § 62.23 ............................................................................1, 3, 6, 10, 21, 25, 26, 32

Fed. R. Civ. P. 9...............................................................................................................14

Fed. R. Civ. P. 23(a) ........................................................................................................37

Fed. R. Civ. P. 26 ...................................................................................................................1

Federal Claims Collection Act, 31 U.S.C. §§ 3711-3720 ..................................................19

**MISCELLANEOUS**

December 2009 GAO Report ............................................................................................32

False Claims Act Whistleblower Litigation (5th Ed. 2008) ..................................35, 39, 40

Federal Practice And Procedure § 2035 ............................................................................4

FEMA Call For Issues Status Report ...............................................................................23

*Manual for Complex Litigation* (Fourth) § 11.422 .........................................................36

Office of Inspector General, *Hurricane Katrina: Wind Versus Flood Issues* ..............6, 32

Pursuant to the Court's January 28, 2010 order, Plaintiff-Relator Branch Consultants, LLC ("Branch") files this response in opposition to Defendants' motion for a protective order seeking to limit the scope of discovery in this case to only those properties identified in the First Amended Complaint ("FAC").  Defendants' motion should be denied.

## I.    PRELIMINARY STATEMENT

The party seeking a protective order bears the burden of demonstrating that the discovery sought is unduly burdensome.[1]  Defendants have not met this burden: they have not shown any undue burden associated with producing either the list of properties Branch seeks (a list they already are required to maintain[2]) or the claims files for the sample of properties to be randomly selected from that list (which are stored electronically and can be copied to a disk[3]).  Defendants did not proffer a single affidavit or make a single argument in their briefs concerning burden.

Instead, Defendants seek to limit discovery based on (1) jurisdictional, (2) due process and (3) *Daubert* grounds.  Defendants' due process and *Daubert* arguments are premature: at the present time, Branch has done nothing more than ask for documents which can be produced without any undue burden.  *Producing* these documents does not implicate any due process concerns, nor has any expert yet offered any opinions about them.  *If* Branch uses these

---

[1] *See, e.g.*, *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998); Fed. R. Civ. P. 26(c).

[2] *See, e.g.*, 44 C.F.R. § 62.23(j) (requiring WYOs to "[m]eet the recording and reporting requirements of the WYO Transaction Record Reporting and Processing Plan and the WYO Accounting Procedures Manual," which require recording and reporting of extensive data elements concerning each covered property, including address, coverage, claims payment, and elevation fields); *see also* Defendants' Memorandum In Further Support Of Their Application For A Protective Order And In Response To The Court's January 28, 2010 Order (hereinafter "Defs. Mem.") at 5-6 (describing certain of Defendants' record-keeping requirements).

[3] *See, e.g.*, Ex. 14 at A-1; G-1 (NFIP Accounting Procedures Manual states that the "[m]onthly financial statements are to be transmitted electronically via e-mail" and FEMA's "preferred" form is an Excel spreadsheet).  Despite numerous opportunities to do so, none of the Defendants has yet to deny that its claims files are stored electronically.

documents in a way that implicates Defendants' due process concerns, and *if* Branch proffers expert opinions that Defendants believe are inconsistent with *Daubert*, then those Defendants whose concerns are actually implicated can bring appropriate motions at that time.  None of the authorities cited by Defendants holds that discovery should be denied because it might later be used in a manner that might implicate due process or *Daubert* concerns.

Defendants' jurisdictional argument, which is based on their view of the jurisdictional implications of *Rockwell Int'l Corp. v. United States*, 549 U.S. 457 (2007), is irrelevant because even if the court decides to hold an initial "bellwether trial" limited to the 27 Exemplar Properties in the First Amended Complaint,[4] **the SSRS sample Branch seeks still would be relevant evidence in *that* proceeding**.  Specifically, all Defendants have asserted affirmative defenses contending that they had "no knowledge" of any inflated flood adjustments and that any such adjustments associated with the 27 Exemplar Properties were the result of innocent mistakes.[5]  The SSRS sample Branch seeks directly addresses these affirmative defenses and the issue of *scienter*: a sample could show whether inflated flood adjustments were isolated incidents or a pervasive practice that could not have been a "good faith" mistake.  Defendants apparently agree with this point and intend to rely on sampling themselves, as they repeatedly have pointed to the OIG Report's sampling of 131 Katrina-related properties as evidence exculpating them with respect to Branch's allegations.[6]

---

[4] At the January 20, 2010 hearing, both the Court and certain counsel for Defendants referred to a trial limited to the 27 Exemplar Properties as a "bellwether trial." Ex. 1 at 34-35.  Branch discusses the issue of holding a bellwether trial in this action *infra* at Part V.

[5] *See* Fidelity's Answer to FAC (Dkt. #247) at 11-12; Standard Fire's Answer to FAC (Dkt. #257) at 8-9; ANPAC's Answer to FAC (Dkt. #254) at 15-17, 19; Liberty Mutual's Answer to FAC (Dkt. #250) at 10-11; American Reliable's Answer to FAC (Dkt. #251) at 6, 9; Simsol's Answer to FAC (Dkt. #261) at 10-11; Colonial Claims's Answer to FAC (Dkt. #258) at 12, 14.

[6] *See* Memorandum In Support Of Defendants' Motion For Certification Of Court's October 19, 2009 Order For Interlocutory Appeal (Dkt. #237) at 3-4; Defendants' Response To Branch's Proposed Discovery Plan (Dkt. #298) at 4-5.  Despite their reliance on selective portions of the OIG Report, that

The SSRS sample Branch seeks also is relevant to other issues, such as whether Defendants complied with their obligation to use their "own customary standards" when adjusting flood claims.[7]  Sampling of Covered Flood Claims and Covered Wind Claims will provide highly relevant, objective evidence concerning whether Defendants in fact used the same standards and practices when adjusting flood claims as they did when adjusting wind claims.  As with the issue of *scienter*, this evidence would be relevant even in a trial limited to the 27 Exemplar Properties.

The present motion is far simpler than Defendants portray it: Branch seeks relevant evidence that can be produced without any undue burden.  The motion for protective order therefore should be denied.

Parts II-IV set forth additional arguments and authorities in opposition to Defendants' request to limit discovery.  Part V addresses the separate issue of whether the current March 2011 trial setting should be a complete trial of this action or whether it should be limited to the 27 Exemplar Properties in a fashion modeled after *Rigsby*.  Part VI provides answers to the 13 questions posed in the Court's January 28, 2010 order.

---

report is, at best, inconclusive.  OIG acknowledges, for example, that: "Although nothing came to our attention during our review of the files in our sample to indicate that WYOs attributed wind damage to flooding, *we cannot rule out the possibility that it occurred*." Ex. 2 at 9 (emphasis added).  OIG further acknowledged that: "Our review *shows evidence of duplication of insurance adjustments between flood and wind*, each paying for the same item, *as well as instances of pricing differences on repairs*.  This issue should be of concern to WYOs that issue flood and homeowner policies." *Id.* at 17.   And FEMA itself criticized the report because it failed to "describe the sample selection methodology," so that readers cannot tell whether the sample was randomly selected and, if so, whether it was "large enough to generalize the results." *Id.* at 24.  The sample Branch seeks to obtain will not suffer from these defects.

[7] 44 C.F.R. § 62.23(e) ("In carrying out its functions under this subpart, a WYO Company shall use its own customary standards, staff and independent contractor resources, as it would in the ordinary and necessary conduct of its own business affairs"); see also 44 C.F.R. § 62.23(i)(1) ("WYO Companies will adjust claims in accordance with general Company standards, guided by NFIP Claims manuals").

## II.     LEGAL STANDARD

Protective orders may be issued only upon a showing of good cause by the party requesting the protective order.  "Rule 26(c)'s requirement of a showing of good cause to support the issuance of a protective order indicates that '[t]he burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'"  *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) (quoting *United States v. Garrett*, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978) and citing 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER AND RICHARD L. MARCUS, FEDERAL PRACTICE AND PROCEDURE § 2035, at 483-86 (2d ed. 1994)); *see also Williams v. Chrysler Fin. Corp.*, 1999 WL 221119, *4 (E.D. La. April 9, 1999) (same).  A court abuses its discretion if it enters a protective order on a showing of "nothing more than a conclusory allegation" and where the movant "did not support its motion for protective order with any affidavits or other evidence."  *Terra*, 134 F.3d at 306 (granting petition for writ of mandamus as to the order entering the protective order with instructions to vacate the order where movant failed to provide affidavits or similar evidence).  To carry its burden, the moving party has "an obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents."  *General Elec. Capital Corp. v. Lear Corp.*, 215 F.R.D. 637 (D. Kan. 2003).  "The fact that an unwieldy record keeping system would require heavy expenditures of time and effort to produce requested documents, is not a sufficient reason to prevent disclosure of otherwise discoverable material."  *Snowden By and Through Victor v. Connaught Laboratories, Inc.*, 137 F.R.D. 325, 333 (D. Kan. 1991).  Instead, the moving party must explain why any burden constitutes an *undue* burden.  *See id.*

4

"Issuance of a protective order without 'a particular and specific demonstration of fact' constitutes an abuse of discretion." *Ledden v. Kuzma*, 858 N.E.2d 186 (Ind. App. 2006) (quoting *In re Terra Int'l*, 134 F.3d at 306).

**III.   DEFENDANTS HAVE FAILED TO SHOW THAT THE DISCOVERY BRANCH SEEKS IS IRRELEVANT OR UNDULY BURDENSOME TO PRODUCE**

**A.   Defendants Have Failed To Make *Any* Showing Of Burden**

Although Defendants seek a protective order broadly limiting the scope of discovery in this case, they have not identified any discovery requests served by Branch that are unduly burdensome or proffered a single affidavit concerning burden.  The discovery principally at issue are Branch's requests for interrogatory responses and documents that will allow Branch to obtain a statistically significant, randomly selected ("SSRS") set of claim files from each Defendant. Specifically, Branch seeks the following:

1. The total number of Katrina-related flood claims adjusted by each Defendant in Louisiana ("Covered Flood Claims"); the total dollar amount of those claims submitted to the Government for payment; and the total dollar amount of fees paid to each Defendant by the Government for adjusting and processing the Covered Flood Claims.

2. The total number of Katrina-related wind claims adjusted by each Defendant; the total dollar amount paid to insureds on those claims; the total number of Katrina-related wind claims adjusted by each Defendant that are also Covered Flood Claims ("Covered Wind Claims"); and the total dollar amount of Covered Wind Claims paid to insureds.

3. A list of the Covered Flood Claims including those fields of data that each Defendant has stored electronically, such as property address, flood and wind policy numbers, flood and wind insurance limits, flood and wind amounts paid, the price lists used for the flood and wind adjustments, property elevation, and floodlines assumed for each adjustment.

The Court already has suggested that Branch's interrogatories are proper:

> 2 [Mr. Nagy] <u>What we're asking for initially is how many flood</u>
> 3 <u>claims did you adjust? How many wind claims? What are the</u>
> 4 <u>amounts at issue? They have that information at their</u>
> 5 <u>fingertips.</u>
> 6 THE COURT: If it was a sole adjustment of a wind
> 7 claim, why do you care about that?
> 8 MR. NAGY: Because we need the data to do a proper

> 9 stratification, Judge. It's the issue that you brought up. <u>We</u>
> 10 <u>want to know how many wind claims, what percentage of --</u>
> <u>well,</u>
> 11 <u>how many flood claims --</u>
> 12 THE COURT: <u>*Well, I have no problem with asking that*</u>
> 13 <u>*kind of question*</u>.[8]

And as they acknowledge in their response to Question 2, Defendants already are required to

maintain this information in a format that can be made available to FEMA for audits similar to

the sampling Branch seeks to conduct here.[9]

Once Branch has the above information, it will generate a randomly-selected list of

properties and request that Defendants produce the claims files associated with those properties.

The average size of the 27 claims files Defendants already have produced is 90 pages.  Assuming

the sample size for each Defendant is 150 properties, each Defendant will be asked to produce

only 13,500 additional pages of claims files, which amounts to approximately <u>5 boxes</u> of

additional claims files per Defendant.   Most if not all of those pages already are stored

*electronically*,[10] a fact which Defendants have yet to deny despite numerous opportunities during

the parties' Discovery Plan briefing and at oral argument to do so.

The uncontroverted record before the Court overwhelmingly demonstrates that there is no

undue burden associated with the discovery Branch wants.  Defendants' request for a protective

---

[8] Ex. 1, at 42:2-13 (01/20/2010 Discovery Conference Transcript) (emphasis added).

[9] Defs. Mem. at 5-6.  *See also* 44 C.F.R. § 62.23(j) (requiring a "detailed biennial audit" of the WYOs' "flood insurance financial statements" and further requiring WYOs to "[m]eet the recording and reporting requirements of the WYO Transaction Record Reporting and Processing Plan and the WYO Accounting Procedures Manual," which require recording and reporting of extensive data elements concerning each covered property, including address, coverage, claims payment, and elevation fields); Office of Inspector General, *Hurricane Katrina: Wind Versus Flood Issues* (Ex. 2) at 13 ("FEMA also performs operational reviews of WYOs on a rotating basis.  These reviews typically encompass claim adjusting, underwriting and litigation activities, ***including a sample of claims to determine whether NFIP standard procedures have been followed***.").

[10] *See*, *e.g.*, Ex. 14 at A-1; G-1 (NFIP Accounting Procedures Manual states that the "[m]onthly financial statements are to be transmitted electronically via e-mail" and FEMA's "preferred" form is an Excel spreadsheet).

order should be denied for that reason alone. *See, e.g., In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998) ("'[T]he burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.") (citation omitted); *Ledden v. Kuzma*, 858 N.E.2d 186 (Ind. App. 2006) ("Issuance of a protective order without 'a particular and specific demonstration of fact' constitutes an abuse of discretion.") (*quoting In re Terra Int'l*, 134 F.3d at 306)).

**B.     The SSRS Data Is Relevant Even In A Trial Limited To The 27 Exemplar Properties**

Even if the Court decides to hold a "bellwether" trial limited to the 27 Exemplar Properties, Branch still should be allowed to obtain discovery concerning a SSRS sample of properties because that discovery would be relevant in such a trial.  For example, all Defendants have asserted affirmative defenses contending that they had "no knowledge" of any inflated flood adjustments and that any such adjustments associated with the 27 Exemplar Properties were the result of innocent mistakes.[11]  The SSRS sample Branch seeks directly addresses these affirmative defenses and the issue of *scienter*: a sample will show whether inflated flood adjustments were isolated incidents or a pervasive practice that could not have been a "good faith" mistake.[12]  At the January 20, 2010 hearing, Judge Vance herself emphasized the critical importance that *scienter* will play at the trial of this action:

---

[11] *See* Fidelity's Answer to FAC (Dkt. #247) at 11-12; Standard Fire's Answer to FAC (Dkt. #257) at 8-9; ANPAC's Answer to FAC (Dkt. #254) at 15-17, 19; Liberty Mutual's Answer to FAC (Dkt. #250) at 10-11; American Reliable's Answer to FAC (Dkt. #251) at 6, 9; Simsol's Answer to FAC (Dkt. #261) at 10-11; Colonial Claims's Answer to FAC (Dkt. #258) at 12, 14.

[12] *See, e.g., United States v. Cabrera-Diaz*, 106 F. Supp.2d 234, 238 & 240 (D.P.R. 2000) (finding that audit sample demonstrated intent to defraud or reckless disregard under FCA and supported damages finding); *United States ex rel. Trim v. McKean*, 31 F. Supp.2d 1308, 1314 (W.D. Okla. 1998) (noting that the use of statistical audits "contain persuasive evidence of false claims"); *Farmers Ins. Co., Inc. v. Peterson*, 81 P. 3d 659, 660-61 (Okla. 2003) ("Plaintiffs assert that the material is sought for the purpose of their theory that Farmers engaged in a pattern of conduct that was wrongful as it relates to med-pay claims. <u>Statistical sampling is a common technique used to determine a pattern of conduct</u>.").

THE COURT:  I'm not asking a jury is there an overpayment.  I don't think we are even going to get to a question of whether there's an overpayment without fraud.  The first question that a jury is going to be asked is whether or not there's the requisite *scienter* and whether there's fraud.  If there's no fraud, the case is over.  We are not going to ask them is there an overpayment.[13]

An example will help put the importance of the sampling evidence in context.  The elevated property at 2625 & 2627 General Pershing in New Orleans had a floodline of 3 inches and extensive damage that obviously was caused predominantly by wind:[14]



---

[13] 1/20/2010 Transcript (Ex. 3) at 9:9-15.

[14] The above photographs were included in this brief in color, and Branch encourages the Court to print this page in color.  High-resolution color copies of these photographs also are attached as Exhibit 15, and can be viewed electronically.

Fidelity caused the Government to pay the policy limits of $250,000 on this property for purported *flood* damage.[15]   At trial, Fidelity intends to assert as affirmative defenses that it acted in "Good Faith" and that it had no "contemporaneous knowledge of the fact of the overpayment (a.k.a. *scienter*)."[16]   The SSRS sample Branch seeks directly addresses these affirmative defenses and the issue of Fidelity's *scienter*.   Defendants apparently agree with this point and intend to rely on sampling themselves, as they repeatedly have pointed to the OIG Report's sampling of 131 Katrina-related properties as evidence exculpating them with respect to Branch's allegations.[17]   No Defendant has taken the position that it intends to forego the right to rely on sampling evidence or evidence concerning properties other than the 27 Exemplar Properties at trial.

Branch also intends to prove at trial that Defendants failed to comply with their obligation to use their "own customary standards" when adjusting Katrina-related flood claims.[18] Even if trial were limited to the 27 Exemplar Properties, sampling of Covered Flood Claims and

---

[15] Fidelity's Answer to FAC (Dkt. #247) at 11-12.

[16] *Id.* at 16-17.

[17] *See* Memorandum In Support Of Defendants' Motion For Certification Of Court's October 19, 2009 Order For Interlocutory Appeal (Dkt. #237) at 3-4; Defendants' Response To Branch's Proposed Discovery Plan (Dkt. #298) at 4-5.   Despite their reliance on selective portions of the OIG Report, that report is, at best, inconclusive.   OIG acknowledges, for example, that: "Although nothing came to our attention during our review of the files in our sample to indicate that WYOs attributed wind damage to flooding, *we cannot rule out the possibility that it occurred*." Ex. 2 at 9 (emphasis added).   OIG further acknowledged that: "Our review *shows evidence of duplication of insurance adjustments between flood and wind*, each paying for the same item, *as well as instances of pricing differences on repairs*.   This issue should be of concern to WYOs that issue flood and homeowner policies." *Id.* at 17.   And FEMA itself criticized the report because it failed to "describe the sample selection methodology," so that readers cannot tell whether the sample was randomly selected and, if so, whether it was "large enough to generalize the results." *Id.* at 24.   The sample Branch seeks to obtain will not suffer from these defects.

[18] 44 C.F.R. § 62.23(e) ("In carrying out its functions under this subpart, a WYO Company shall use its own customary standards, staff and independent contractor resources, as it would in the ordinary and necessary conduct of its own business affairs"); *see also* 44 C.F.R. § 62.23(i)(1) ("WYO Companies will adjust claims in accordance with general Company standards, guided by NFIP Claims manuals").

Covered Wind Claims is critically relevant, objective evidence concerning whether Defendants in fact used the same standards and practices when adjusting flood claims as they did when adjusting wind claims.  Furthermore, depending on the fields contained in Defendants' electronic databases, <u>sampling may not be necessary for some of this evidence</u>.  For example, if Defendants' databases contain fields for the price lists and/or depreciation rates used in each adjustment, then it is possible to electronically determine how frequently Defendants used different price lists and depreciation rates for the flood and wind adjustments of the same properties—without engaging in any sampling.

Because the discovery Branch seeks is relevant and Defendants have failed to demonstrate any undue burden associated with its production, the motion for a protective order should be denied.

## IV.  DEFENDANTS HAVE FAILED TO CITE ANY AUTHORITY THAT REQUIRES DEPRIVING BRANCH OF RELEVANT EVIDENCE FOR ANY OTHER REASON

Having failed to establish that the discovery Branch seeks is irrelevant or unduly burdensome, Defendants instead rely on two other arguments to support their protective order. First, Defendants argue that the Court should adopt Judge Senter's interpretation of *Rockwell* and require Branch to prevail at a trial limited to the 27 Exemplar Properties before allowing Branch to obtain discovery concerning other properties.  Second, Defendants argue that Rule 9(b) requires this same limitation on discovery.  Each of these arguments lacks merit.

### A.  *Rockwell* Does Not Require Limiting Discovery To The Exemplar Properties

Defendants argue that the "claim smuggling" language in *Rockwell* requires that discovery be limited to the 27 Exemplar Properties, at least until Branch prevails in a trial limited to those properties.  Defendants are wrong.  *Rockwell* involved three different *types* of alleged FCA violations—violations associated with "pondcrete," "saltcrete," and "spray irrigation"—

that occurred at different *times*.[19]   The "claim smuggling" passage Defendants rely on refers to

those different <u>claims</u>, not to different <u>examples</u> of the same claim:

> Stone counters that his original-source status with respect to his **spray-irrigation** claim (which related to a time period different from that for his pondcrete claim, App. 492) provided jurisdiction with respect to **all** of his claims. We disagree. Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim. We, along with every court to have addressed the question, conclude that § 3730(e)(4) does not permit such claim smuggling. *See United States ex rel. Merena v. SmithKline Beecham Corp.,* 205 F.3d 97, 102 (3d Cir. 2000); *Hays v. Hoffman,* 325 F.3d 982, 990 (8th Cir. 2003); *Wang ex rel. United States v. FMC Corp.,* 975 F.2d 1412, 1415-1416, 1420 (9th Cir. 1992).[20]

Like *Rockwell*, the *Merena*, *Hays* and *Wang* cases each also involved different *claims* and not

different *instances* of the same claim. *See United States ex rel. Merena v. SmithKline Beecham*

*Corp.,* 205 F.3d 97, 98-100, 102 (3d Cir. 2000) (using "claims" to refer to *types* of claims and

not individual instances of the same fraudulent scheme, and holding that "in applying section

(e)(4) [the public disclosure bar], it seems clear that each claim in a multi-claim complaint must

be treated as if it stood alone"); *Hays v. Hoffman,* 325 F.3d 982, 990-91, 992 (8th Cir. 2003)

(using the term "claim-by-claim" to refer to the "eleven *types* of false claims" and not to the 336

*instances* of the eleven types of claims); *Wang ex rel. United States v. FMC Corp.,* 975 F.2d

1412, 1416, 1420-21 (9th Cir. 1992) (referring to different "claims" as "four separate projects"

that allegedly defrauded the government).

   No court has ever interpreted *Rockwell* to mean that a relator who alleges a long-running

scheme has to have direct and independent knowledge of every individual instance of that

scheme.[21]   Despite their heavy reliance on *Rigsby*, <u>Judge Senter never rejected a Rule 9(b)</u>

---

[19] *Rockwell*, 549 U.S. at 465, 476.

[20] *Id.* at 476.

[21] Such a ruling would be contrary to well-established precedent. *See Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1049 (S.D. Tex. 1998) (holding, in FCA case, that "Plaintiffs are

challenge to the scheme alleged in the *Rigsby* complaint—here, Judge Vance did precisely that. And even Judge Senter, in a case involving a single exemplar property, recognized the *Rigsby* relators' legitimate "interest in identifying these other allegedly false claims" related to the "vast conspiracy" alleged in the *Rigsby* complaint, and is still "consider[ing] whether additional discovery and further proceedings are warranted."[22]  As part of that consideration, Judge Senter ordered State Farm to produce discovery concerning the thousands of properties related to the allegations in the *Rigsby* complaint for *in camera* review so that he could "know the outer limits of the potential claims involved in this action."[23]

The only case apart from *Rigsby* which Defendants cite in support of their construction of *Rockwell* is *United States ex rel. Bane v. Breathe Easy Pulmonary Servs., Inc.*, No. 8:06-CV-40-T-24MAP, 2008 WL 4057549 (M.D. Fla. Aug. 27, 2008).[24]  *Bane* is inapposite: it did not impose the extreme limitations on discovery that Defendants seek here, nor did it even mention *Rockwell*.  The relator in *Bane* alleged that the defendants violated the FCA by submitting false Medicare reimbursement claims to the Government.  While the relator alleged a long-running scheme involving multiple defendants, his complaint identified only a single patient's file as an

---

entitled to discovery before being required to list every false claim."); *United States ex rel. Hebert v. Dizney*, 295 Fed. Appx. 717, 723 (5th Cir. 2008) ("Rule 9(b) does not require a qui tam plaintiff alleging a long-running scheme involving many false claims to list every false claim, its dates, [and] the individuals responsible") (quoting *Thompson*, 20 F. Supp. 2d at 1049); *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. Tenn. 2007) ("[W]ere a court to construe the concept of a fraudulent scheme in an excessively narrow fashion, the policies promoted by the rule allowing a relator to plead examples, rather than every false claim, would be undermined."); *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) ("If it alleges a systematic practice of submitting fraudulent claims, the FCA complaint 'must provide *some* representative examples of [the] alleged fraudulent conduct'") (emphasis in original) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556-57 (8th Cir. 2006)).

[22] *U.S. ex rel. Rigsby v. State Farm Ins. Co., et al.*, Civil Action No. 06-CV-433, Memorandum Opinion dated 8/10/2009 at 10.

[23] *Id.* at 10-11.

[24] Defendants' Response To Branch's Proposed Discovery Plan (Dkt. # 298) at 3.

example of this scheme.[25]   After the relator sought discovery concerning a *different time period* and *different doctors and medical facilities* than those identified in the complaint, one of the defendants moved for a protective order.[26]   The court, citing Rule 9(b), granted the motion and held that discovery was limited to the 4 doctors and 5 facilities identified in the complaint.[27]

    <u>Critically, the *Bane* court did **not** limit the relator to the **single exemplar patient** identified in the complaint</u>.   While the relator identified only one patient in his complaint as an example of the alleged fraudulent scheme, he was allowed to obtain discovery concerning **all** patients related to the Defendants during the relevant time period.[28]   That is precisely analogous to what Branch seeks to do here: just as Bane was allowed to obtain discovery concerning all of the patients of the medical providers identified in his complaint, Branch seeks discovery concerning the properties adjusted by the WYO carriers identified in its complaint.   The only difference is that Branch's requests are *narrower* than Bane's because Branch seeks to focus on a SSRS sample of claims.[29]

    Defendants' "claim smuggling" argument misconstrues *Rockwell* and is contradicted rather than supported by *Bane*.

---

[25] *See* Ex. 4 at ¶¶ 34-38.

[26] *Bane*, 2008 WL 4057549 at *1.

[27] *Id.*

[28] See Ex. 5 (motion *in limine* in which one of the *Bane* defendants criticizes the relator for not using statistical sampling of the patient files) and Ex. 6 (Bane responds to this motion *in limine* by, *inter alia*, referencing 170 patient files he obtained through discovery).

[29] Indeed, the *Bane* defendants criticized Bane for *not* using the sampling techniques that Branch desires to use here. *See* Ex. 5.

**B.**     **Rule 9(b) Does Not Require Limiting Discovery To The Exemplar Properties**

Defendants rely on a series of cases addressing Rule 9(b) dismissals in support of their

protective order.[30]   These cases are either inapposite or, as with *Bane*, they actually support

Branch's position.

For example, Defendants rely on *Sealed Appellant I v. Sealed Appellee I*, 156 Fed.Appx.

630 (5th Cir. 2005) to make the following argument:

> Given that the relator in *Sealed Appellant I* was prohibited from using statistical
> extrapolation to **plead** a case, Branch cannot be permitted to attempt to prove its
> case using statistical extrapolation to prove its case using statistical extrapolation
> in this essentially quasi-criminal proceeding.[31]

Both the premise and the conclusion of this argument are flawed.  The Fifth Circuit affirmed the

dismissal of the *Sealed Appellant* relator's complaint because the relator failed to identify even a

single false claim in his pleading:

> The complaint does not identify a single false claim that was actually submitted to
> the government….the complaint does not identify particular invoices containing
> false statements by number, date, or otherwise…it defies credulity that he is
> unable to identify any details of a single false claim submitted to the
> government.[32]

The court's opinion says <u>nothing</u> about the use of statistical extrapolation as evidence in FCA

cases, nor does it imply that the use of such evidence is improper.[33]

The other Rule 9(b) cases Defendants rely on are similarly inapposite. *See United States*

*ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)

(affirming dismissal of certain of relator's claims because relator "provided no factual basis for

his belief that defendants submitted claims for medically unnecessary services other than his

---

[30] Defs. Mem. 1-4.

[31] *Id.* at 3.

[32] 156 Fed.Appx. at 633-34.

[33] As discussed below in Branch's response to Question 8, statistical sampling routinely is used as evidence of both liability and damages in FCA cases, as well as in federal criminal prosecutions and numerous other types of cases.

reference to statistical studies," and "[t]here is no indication, however, that these studies directly implicate defendants"; and saying nothing about the use of statistical evidence in FCA cases); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 440 (3d Cir. 2004) (affirming summary judgment in favor of defendant because relator "did not come forward with a single claim that [defendant] actually submitted to Medicaid" that could have been fraudulent, and saying nothing about the use of statistical evidence in FCA cases); *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002) (same); *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (same).

The final Rule 9(b) case Defendants rely on, *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162 (JCC), 2009 WL 2240331 (E.D. Va. July 23, 2009), supports Branch's position and not that of Defendants.  The relator in *Carter* worked for the defendants at two facilities in Iraq (the "Two Facilities") and alleged that the defendants engaged in a scheme to bill the Government for work that was not actually performed at these facilities. *Id.* at *6.  As Branch has done here, the relator included examples of fraudulent conduct in his complaint, but did not allege every individual instance of the fraudulent scheme. *Id.* at *8-9.  The relator also alleged that, on information and belief, the same conduct was occurring at *other* facilities in Iraq that he had never visited. *Id.* at 9.

The district court granted the motion to dismiss the claims related to the *other* facilities, but it denied the motion to dismiss the relator's claims as to the Two Facilities.  The court rejected the defendants' arguments that the relator's reliance on several illustrative incidents of the fraudulent scheme at the Two Facilities was insufficient under Rule 9(b):

> Defendants' argument that 9(b) requires such specificity is without merit….It is generally recognized that, particularly in the context of federal FCA cases, it is impractical to require a plaintiff to plead the facts of each individual claim, particularly where the claims are numerous and extend over the course of several

years….***Plaintiffs are entitled to discovery before being required to list every false claim***.[34]

Although Carter could not identify and did not plead every individual false claim submitted in connection with the ongoing scheme at the Two Properties, he was allowed to obtain discovery to support his allegation of a broad scheme.[35]   *Carter* is persuasive authority, and its holding that "Plaintiffs are entitled to discovery before being required to list every false claim" should be followed here.[36]

## V.     THE "BELLWETHER TRIAL" POSITED BY DEFENDANTS' MOTION IS NOT BELLWETHER, IS CONTRARY TO THE NOVEMBER 19, 2009 SCHEDULING ORDER, AND LEAVES BASIC TRIAL PROOF AND DISCOVERY ISSUES UNRESOLVED

Putting aside the issue of whether Branch should be precluded from obtaining the documents it has requested, Defendants' motion for a protective order also requires the Court to decide whether it wants to have a single trial or multiple trials modeled after the bifurcation procedure adopted by Judge Senter.   If the Court decides on multiple trials, it needs to then decide what exactly will be at issue in each trial.

---

[34] *Id.* at 8-9 (quoting *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1049 (S.D. Tex. 1998)).

[35] *See* Order Dated January 6, 2010 in *Carter*, 08-cv-1162 (E.D. Va.) (after magistrate judge granted-in-part and denied-in-part defendants' motion for a protective order limiting discovery, district court ***reversed*** that portion of the magistrate judge's order limiting the type of discovery relator could take concerning the ongoing scheme at the Two Properties), attached hereto as Ex. 12.

[36] Several courts, including the Fifth Circuit, have echoed *Carter's* espousal of the holding in *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017, 1049 (S.D. Tex. 1998). *See United States ex rel. Hebert v. Dizney*, 295 Fed. Appx. 717, 723 (5th Cir. 2008) ("Rule 9(b) does not require a qui tam plaintiff alleging a long-running scheme involving many false claims to list every false claim, its dates, [and] the individuals responsible") (quoting *Thompson*, 20 F.Supp.2d at 1049); *United States v. Gwinn*, 2008 WL 867927 at *13 (S.D.W.Va. Mar. 31, 2008) (citing *Thompson* for the proposition that "Plaintiffs are entitled to discovery before being required to list every false claim" and stating that "[t]he Court finds this rationale persuasive"); *U.S. ex rel. Singh v. Bradford Regional Medical Center*, 2006 WL 2642518 at *4 (W.D. Pa. Sept. 13, 2006) (same); *U.S. ex rel. Landsberg v. Argentis Medical, P.C.*, 2006 WL 1788381 (W.D. Pa. June 27, 2006 (same).

The fact that Branch identified exemplar properties in its complaint and intends to use statistical evidence to address certain issues at trial does not in any way suggest that the Court needs multiple trials.  Cases utilizing statistical evidence, including FCA cases, routinely proceed to trial without bifurcation.[37]  This case was filed in <u>2006</u>, and discovery has yet to really get underway.  Depriving Branch of highly relevant discovery until after a trial in March 2011 would mean that, at the earliest, the final trial of this action could not begin until <u>2012</u>.

It also is unclear what, exactly, will be at issue in Defendants' version of the March 2011 trial.  At the January 20, 2010 hearing, both Judge Shushan and certain counsel for Defendants referred to Defendants' discovery plan as including a "bellwether trial" in March 2011.[38]  It is well established, and Branch agrees, that "[c]ommon issues or even general liability may also be resolved in a bellwether context in appropriate cases."[39]  However, the Fifth Circuit has made clear that bellwether trials should utilize precisely the type of sampling that Branch is seeking here:

> A bellwether trial designed to achieve its value ascertainment function for settlement purposes or to answer troubling causation or liability issues common to the universe of claimants has as a core element representativeness—that is, the

---

[37] *See, e.g.*, *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (in FCA case, affirming district court's opinion after non-bifurcated trial and noting that defendant's "argument that the district judge had to address each of the 1,812 claim forms is a formula for paralysis. Statistical analysis should suffice."); *United States v. Rosin,* 2008 WL 142037, 2008 U.S.App. LEXIS 1080 (11th Cir. 2008) (affirming criminal healthcare fraud conviction, rejecting defendant's argument that Government's use of statistical sampling evidence at trial to prove liability and damages was unfairly prejudicial, and stating that "The purpose of statistical sampling is to provide a means of determining the likelihood that a large sample shares characteristics of a smaller sample."); *see also U.S. ex rel. El-Amin v. George Washington University*, 533 F.Supp.2d 12, 50 (D.D.C. 2008) (denying relators' motion for trial by representative sample but indicating that such a trial would have been appropriate if relators had "taken the preparatory steps that would give them the proper foundation to try this case by statistical sample," such as "defin[ing]" the total universe of Medicare claims from which their sample will be drawn" and "consult[ing]" an expert statistician to assist them in defining this universe," and noting that "the sample that is ultimately presented to the jury should be randomly selected and representative of the universe of claims") (citing *Rosin*, 2008 WL 142037).

[38] Ex. 1 at 34:20-35:18 (1/20/2010 Discovery Conference).

[39] *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

> sample must be a randomly selected one of sufficient size so as to achieve statistical significance to the desired level of confidence in the result obtained. Such samples are selected by the application of the science of inferential statistics. The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole. The applicability of inferential statistics has long been recognized by the courts.[40]

Despite their eagerness to limit discovery, no Defendant is willing to stipulate that a trial limited to the 27 Exemplar Properties would have sufficient representativeness to be statistically significant. Defendants' protective order will prevent rather than allow for a bellwether trial.

Finally, when Judge Vance's clerk conducted the November 19, 2009 scheduling conference that resulted in the present scheduling order,[41] no party suggested that this action should be bifurcated, and nothing in the scheduling order suggests that the March 2011 trial might leave numerous issues in this case unresolved. By requiring that there be multiple trials, Defendants' proposed protective order creates basic trial proof issues that Defendants' briefs leave unresolved. What exactly does Branch have to prove at Defendants' version of the March 2011 trial in order to be able to obtain the discovery that Defendants seek to curtail now? What discovery concerning *scienter* do Defendants agree Branch should be allowed to take now? How will Branch's success at Defendants' version of the March 2011 trial create subject matter jurisdiction that Defendants, relying on *Rockwell*, argue is lacking now? Defendants' failure to address these basic questions demonstrates that their protective order is premised on a one-sided, unworkable, and inefficient trial plan that is inconsistent with the governing scheduling order.

## VI.   ANSWERS TO THE COURT'S 13 QUESTIONS

In its January 28, 2010 order, the Court posed 13 questions to the parties. Branch responds to each of these questions in turn.

---

[40] *Id.*; *see generally* Reference Guide On Statistics, Federal Judicial Center (2d ed. 2000).
[41] *See* Dkt. #246.

18

1.      **What is the authority, both statutory and regulatory, for the government to recoup overpayments by it to insurers in the NFIP?**

The relationship between WYO companies and FEMA is governed by a provider agreement that each WYO company enters each year, which is codified at 44 C.F.R. Pt. 62, App. A.  By intentionally submitting inflated flood claims, Defendants breached several sections of the provider agreement and would be liable to the government for damages.[42]  For example, Article II(G)(I) provides, "The Company shall comply with written standards, procedures, and guidance issued by FEMA or FIA relating to the NFIP and applicable to the Company."  In addition, Article IX provides, "Further, (i) if the claim against the Company is grounded in actions significantly outside the scope of this Arrangement or (ii) if there is negligence by the agent, FEMA will not reimburse any costs incurred due to that negligence."  By improperly inflating flood claims, Defendants violated those provisions of the contract and are liable for damages.

In addition, the government has a number of other options to recover overpayments, including (1) a common law right to recover overpayments,[43] (2) a statutory right under the Federal Claims Collection Act to recoup money that was improperly paid,[44] and (3) a statutory right under the False Claims Act to recover funds paid based on false claims.[45]  The government also has a contractual right to collect overpayments made to WYO companies.  The WYO Provider Agreement does not contain an express clause addressing overpayments, but it does grant the government the right to conduct reinspection audits.  As has been held in other cases,

---

[42] *See, e.g.*, 44 C.F.R. Pt. 62, App. A.

[43] *See, e.g.*, *United States v. Wurts*, 303 U.S. 414, 415 (1938).

[44] *See, e.g.*, Federal Claims Collection Act, 31 U.S.C. §§ 3711-3720; 44 C.F.R. pt. 11; 31 C.F.R. Pts. 901-04 (2000).

[45] 31 U.S.C. §§ 3729-33.

the right to audit payments implies the right to recover amounts that the audit shows were overpaid.[46]

Defendants' response conflates overpayments made to the *insured* with overpayments made to the *insurer*. The government has the right to collect overpayments directly from the WYO companies, both for adjusting errors and for the erroneous fees paid on the inflated flood claims. For example, the Seventh Circuit addressed a nearly identical situation in *Old Republic Insurance Company v. Federal Crop Insurance Corporation*, 947 F.2d 269 (7th Cir. 1991). The Seventh Circuit held that a governmental agency had the right to recover overpayments made to *insurers* under the Federal Crop Insurance Program that were caused by the insurers' erroneous adjustments. Like the NFIA, the Federal Crop Insurance Act directed the Federal Crop Insurance Corporation ("FCIC"), a corporation owned by the United States under the jurisdiction of the Department of Agriculture, "to enlist private insurance companies in the Federal Crop Insurance Program." *Id.* at 272. Under the program, the agency's role was to reinsure crop loss insurance policies that were issued by the private insurers. The private insurance companies and the government entered a standard reinsurance agreement that required the insurers to follow "sound reinsurance principles" and to follow FCIC procedures to adjust losses on all reinsured policies. *Id.*

Old Republic participated in the program by selling crop insurance to farmers that was then reinsured by the government. In 1986 and 1987, the General Accounting Office ("GAO") and USDA's Office of the Inspector General ("OIG") completed an audit of claims paid by FCIC to Old Republic, and concluded that the FCIC had overpaid some claims to Old Republic based on inflated adjustments. *Id.* at 273. The agency notified Old Republic of the overpayment and

---

[46] *See*, *e.g.*, *Old Republic Ins. Co. v. Fed. Crop Ins. Corp.*, 947 F.2d 269 (7th Cir. 1991), which is discussed below.

"asserted a right to recover overpayments directly from Old Republic (without involving the farmer-insureds)."  *Id.*  After a three-day "informal" hearing, the FCIC determined that of the fifty claims audited, it had overpaid on 38 of them and demanded repayment directly from Old Republic.  *Id.*  Old Republic filed a declaratory judgment action, arguing that the FCIC lacked authority to readjust claims and that the overpayments should be collected from the insureds, not Old Republic.

The Seventh Circuit concluded that the FCIC had a contractual right to readjust the claims and to recover overpayments directly from the insurers.  Although the contract did not expressly grant those rights, the court relied on the FCIC's right to audit finally paid claims.  It reasoned, "If the FCIC had no authority to correct payments made on the basis of inaccurate records, why would it reserve the right to audit Old Republic's records?"  *Id.*  Here, the provider agreements between the government and the WYO companies grant the government the right to audit and readjust finally paid claims.[47]  Accordingly, the contract grants to the government the right to recover any overpayments directly from the insurer.

The *Old Republic* court also concluded that in addition to the contractual right to recover overpayments directly from the insurer, the government also had statutory and common law rights to do the same.  Although no statutory or regulatory provision directly addressed the recovery of overpayments, the court relied on the Federal Claims Collection Act, which gives agencies "the authority to collect monetary claims of the United States arising out of activities of the agency."  *Id.*  Citing the same case that Defendants identified in their response to this question, the court concluded that "[a] government agency is entitled to recover improperly paid

---

[47] *See*, *e.g.*, 44 C.F.R. 62.23(j); 44 C.F.R. Pt. 62, App. A, Art. XIV Access to Books and Records; 44 C.F.R. Pt. 62, App. A, Art. XIV Access to Books and Records;   44 C.F.R. Pt. 62, App. B(d)(3) (incorporating Section III of The Write Your Own Program Financial Control Plan Requirements and Procedures, which is incorporated into the regulations) (Ex. 1 to Defs. Mem., Dkt. # 344-1).

funds unless there is an explicit statutory bar." *Id.* at 275 (citing *United States v. Wurts*, 303 U.S. 414 (1938)).   The court rejected Old Republic's argument that it did not need to refund the overpayments:

> Old Republic appears to be suggesting that regardless of an insurer's negligent or deficient claims adjustment process, it is entitled to keep whatever monies it receives from the FCIC.  This argument is analogous to a taxpayer claiming that he is entitled to his tax refund, even though the Internal Revenue Service determines through an audit procedure that the taxpayer made mistakes in his return.  The FCIC audited Old Republic's records and found errors.  <u>Requiring that Old Republic refund the moneys paid on the basis of these errors, as the district court found, "will only serve to discourage such potentially wrongful or negligent adjustment practices by insurance companies participating in the federal program.  This is a goal which the FCIC *should* pursue to efficiently administer its resources."</u>[48]

The court further explained, "Old Republic cannot require the FCIC and the insureds to sort out the morass created by its own inadequate adjustment process."  *Id.* at 276.   The court also rejected Old Republic's argument that the government had to collect the overpayments directly from the insureds because Old Republic was an "agent" of the federal government in the crop insurance program:   "The FCIC is seeking immediate repayment only of those overpayments caused by Old Republic's negligent or wrongful conduct.  . . . Old Republic's failure to fulfill contractual obligations to the FCIC is the basis of the refunds now demanded by the FCIC."  *Id.* As the court explained, "The government also has a strong interest in the prompt return of erroneously paid funds in order to ensure the viability of the Federal Crop Insurance Program." *Id.* at 282.

Applying the same reasoning to the NFIP, the government has the right to obtain the overpayments directly from Defendants and has a strong interest in the prompt return of

---

[48] *Id.* at 275 (italics in original, underline added).

erroneously paid funds to ensure the viability of the NFIP.  Indeed, the interest is even stronger here where the overpayments were based on a fraudulent scheme to inflate the flood claims.

The NFIP Bureau and Statistical Agent has also issued a notice making clear that WYO companies are to reimburse FEMA for claim overpayments.  On June 18, 2003, the NFIP Bureau circulated a memorandum to all WYO companies in which it provided "two options for WYO Companies to use in resolving" certain overpayments.[49]  Both options require that the WYO company reimburse FEMA for the overpayment.  The first option instructs the WYO company to "[c]ut a manual check in the amount of the overpayment.  Record the manual check as a disbursement to the U.S. Treasury. . ., [and] [s]ubmit the manual check and supporting documents" to the NFIP Bureau & Statistical Agent.  Alternatively, WYO companies could "[s]end a disbursement for the overpayment amount to the U.S. Treasury via ACH, Internet, or Wire Transfer." *Id.*

Additionally, in a June 2000 memorandum FEMA indicated that its understanding is that the WYO carrier, not the homeowner, is responsible for paying for negligent overpayments:

> Write Your Own (WYO) companies are held accountable for claims. The companies sign an agreement with FIA, stating that if they overpay a claim and the overpayment is discovered, the company is responsible to refund the overpayment to the fund.[50]

The sworn deposition testimony that Deborah Price gave as Fidelity's 30(b)(6) witness in January 2007 in *Dwyer v. Fidelity National Property & Casualty Insurance Co.*, Civil Action No. 06-04793 (E.D. La.), is consistent with FEMA's understanding:

> Q:  Has Fidelity ever had to pay FEMA back for funds that were wrongly disbursed?

---

[49] Ex. 16 (6/18/2003 Memo re Financial Process for Claims Overpayments).

[50] FEMA'S NFIP June 2000 Call For Issues Status Report at I-1-3.  A copy of the relevant pages of this report is attached as Exhibit 11.

A: We have had occasions where they've notified us of a claim error after a re-inspection they've determined something wasn't covered or wasn't flood damaged and required us to pay it back.

Q: What do you mean "pay it back"? Out of your own pocket?

A: Yes, we have to pay the actual damages back out of our own pocket.

* * *

Q: Any mistakes that the independent adjuster makes is going to be borne by Fidelity, correct?

A: If we haven't caught it and corrected it beforehand, yes.

Q: And so Fidelity will be liable for anything that the adjuster does—or any mistake that the adjuster makes that Fidelity hadn't corrected?

A: We would be liable to FEMA and we would probably go back against the adjuster to see if we can recover.[51]

**2.     What provisions are there (either in the statutes or the regulations) for the government to conduct audits of insurers in the NFIP regarding overpayments by it to insurers?**

Defendants correctly state in their response to this question that they are required to maintain records and that the government has the right to audit the records.[52]   Defendants mention the Transaction Record Reporting and Processing ("TRRP") Plan as a source for "certain recording and reporting requirements."[53]   The TRRP Plan is a 644 page document that describes in detail the types of information that Defendants must maintain and make available to the NFIP.[54]   Specifically,

- "The TRRP Plan defines the reporting requirements applicable to the writing and servicing of policies issued by the property and casualty companies participating in the Write Your Own (WYO) Program."  TRRP Plan at 1-1.

---

[51] January 25, 2007 Depo. Trans. of Deborah Price at 112:11-21, 114:21-115:8.  A copy of the relevant excerpts of Price's deposition is attached as Exhibit 9.

[52] Defs. Mem. at 5-6.

[53] Defs. Mem. at 6.

[54] A copy of the TRRP is available at http://bsa.nfipstat.com/manuals/may2006trrp.pdf.

- "This Plan contains detailed specifications for the recording and compiling of insurance application data; Elevation Certificate data; recertification data; reinspection data; endorsements; cancellations; claims data; allocated loss adjustment expenses; and community flood insurance study data." TRRP Plan at 1-1.
- "The WYO company must adopt the requirements outlined in this Plan to ensure accuracy in the recording and compilation of data. Every reporting unit shall record its data, in the detail required, on forms or other media approved for such reporting." TRRP Plan at 1-2.

In addition to the audit provisions mentioned by Defendants, 44 C.F.R. § 63.23(j)(5) requires WYO companies to "[c]ooperate with FIA in the implementation of a claims reinspection program." And subsection (j)(7) requires WYO companies to "[c]ooperate with DHS's Office of the Inspector General on matters pertaining to fraud."

The regulations specify in detail the procedures the Federal Insurance Administration ("FIA") is to follow for the Claims Reinspection Program.[55] The Claims Reinspection Program in intended to assist FEMA in the overall claims operation and to provide assurance in the claims submitted by WYO companies. The Claims Reinspection Program *requires* the use of sampling. In fact, section III(C) of The Write Your Own Program Financial Control Plan Requirements and Procedures ("FCPRP") is devoted solely to sampling procedures used by the FIA to reinspect and readjust claims.[56] In addition, the FCPRP also requires a File Review, which uses random sampling to test the quality of adjustments:

> It provides for a thorough examination of **a random sampling of claim files** to measure the quality of investigations, adjustments, and supervision.[57]

---

[55] *See* Ex. 1 to Defs. Mem., Dkt. # 344-1 (Section III of The Write Your Own Program Financial Control Plan Requirements and Procedures, which is incorporated into the regulations by 44 C.F.R. Pt. 62, App. B(d)(3)).

[56] *See* Ex. 1 to Defs. Mem., at 3-2 (Dkt. # 344-1).

[57] *Id.* at 7-11 (emphasis added).

In their response to this question, Defendants contend that "[t]he Government calculates overpayments, if any, on the individual files reviewed."[58]   But Defendants cite no authority for that statement—neither case law nor any regulatory authority.

**3.    What provisions are there (either in the statutes or the regulations) for the government to sample and extrapolate to determine the amount of overpayments in the NFIP?**

The same provisions described in response to Question 2 support the use of sampling and extrapolation to determine the *amount* of overpayments.   Although none of those provisions expressly say the government can "use extrapolation to determine the amount of overpayments," the fact that sampling and extrapolation are used to conduct the audits in the first place strongly suggests that those same techniques will be used to measure any damages.[59]

Defendants make three arguments in their response to Question 3.   First, Defendants argue that the NFIP regulations suggest that the use of sampling and extrapolation to determine the amount of overpayments is "inappropriate."   Second, Defendants argue that courts have approved the use of sampling and extrapolation in the Medicare and Medicaid context only "because the U.S. Department of Health and Human Services ("HHS"), the agency managing that federal program, adopted such procedures in its regulations."   Finally, Defendants argue that FEMA's silence as to the use of extrapolation to measure overpayments is entitled to *Chevron* deference.   Each of these arguments lacks merit.

**a.    Nothing In The NFIP Regulations Suggests That The Use Of Sampling And Extrapolation To Determine The Amount Of Overpayments Is Inappropriate**

Defendants argue that the regulations establish that extrapolating overpayments is inappropriate because they "state that 'specific files' will be reviewed."[60]   The subsection

---

[58] Defs. Mem. at 6.

[59] *See Chaves*, 931 F.2d at 917  ("[T]he Ruling was not the source of administrative authority in these cases but merely explained and reaffirmed the Department's long-standing and well-established practice of conducting sample audits.").

containing this language, however, does not at all suggest that extrapolation cannot be used to determine the amount of overpayments:

> (2) Participate in a WYO Company/FIA <u>Operation review</u>. We will conduct a review of the WYO Company's flood insurance claims, underwriting, customer service, marketing, and litigation activities at least once every three (3) years. <u>As part of these reviews, we will reconcile specific files</u> with a listing of transactions submitted by the Company under the Transaction Record Reporting and Processing (TRPP) Plan (Part 5). We will file a report of the Operation Review with the Standards Committee.[61]

This provision is consistent with sampling, which evaluates the specific files of the claims randomly selected from the population.[62]   Additionally, the next subsection in the regulation shows that some aspects of the review will be based on aggregated numbers—not a file by file review.[63]   Finally, the phrase "specific files" refers to the reconciliation for an *operational review*—it does not even relate to the Claims Reinspection Program.

Defendants also argue that using extrapolation to determine the amount of overpayments is inappropriate because "FEMA differentiates between 'judgmental' and 'non-judgmental' errors regarding claims handling." Defs. Mem. at 8.  "Judgmental" errors include, for example, "differing views on the amount of depreciation taken," while "non-judgmental" errors include such things as "payment for nonexistent items of damages."  This distinction does not at all suggest that extrapolating the amount of overpayments is improper.  Medicare and Medicaid cases also involve both non-judgmental errors (*e.g.*, billing for a medical service that was never

---

[60] Defs. Mem. at 7.

[61] 44 C.F.R. § 62.23(j)(2) (emphasis added).

[62] *See generally* Reference Guide On Statistics, Federal Judicial Center (2d ed. 2000).

[63] *See*, *e.g.*, 44 C.F.R. §62.23(j)(3) ("The analysis will cover . . . the reconciliation of <u>the totals</u> generated from transaction reports with those submitted on WYO Company reconciliation reports.") (emphasis added).

provided) and errors that involve medical judgment (*e.g.*, upcoding).[64]   Yet sampling and extrapolation routinely are used to determine overpayments of both of these types of errors in the Medicare and Medicaid context.[65]

     **b.**    **Courts Have Approved The Extrapolation Of Damages In Medicare/Medicaid Cases *In Spite Of* Regulations, Not Because Of Them**

Defendants attempt to explain away the use of extrapolation to measure damages in Medicare and Medicaid cases by representing that the Department of Health and Human Services ("HHS") has "adopted such procedures in its regulations."[66]   For support, Defendants cite to *Chaves County Home Health Serv. v. Sullivan*, 931 F.2d 914 (D.C. Cir. 1991). Defendants' argument lacks merit: *Chaves* stands for the <u>opposite</u> proposition, namely that the government properly could use extrapolation to measure damages even though the regulations do *not* expressly allow it.

The regulation at issue in *Chaves* was HCFA Ruling 86-1.   That Ruling did not *establish* the procedure of sampling and extrapolation, but instead "the agency simply reiterated its belief that it had the latitude to employ sample audits on post-payment review to efficiently recoup overpayments for non-covered services."   *Chaves*, 931 F.2d at 917.   Critically, Ruling 86-1 was not issued when the overpayments were made in *Chaves*, and therefore could not have served as the basis for the sampling and extrapolation:

> If Ruling 86-1 changed HHS procedures, then its use here indeed would be impermissibly retroactive.   However, <u>the Ruling was not the source of administrative authority in these cases</u> but merely explained and reaffirmed the

---

[64] *See*, *e.g.*, *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8 (D.D.C. 2003) (FCA action alleging overpayments via upcoding in which "the government used a statistical sample obtained by the HHS-OIG to determine damages to be $318.77 per patient, for 1,649 patients, totaling $525,651."); *Chaves County Home Health Service, Inc.*, 931 F.2d at 916 (using sampling in a case that "involved payment for non-covered services that the providers should have known were not covered, and then extrapolated that figure to all claims in assessing repayment liabilities .").

[65] *See id.*

[66] Defs. Mem. at 8.

Department's long-standing and well-established practice of conducting sample audits.

*Id.* (emphasis added).

Contrary to Defendants' suggestion, there is no statute or regulation that expressly permits HHS to sample and extrapolate.  HHS "*relie[d] instead on its general (and uncontested) authority to recoup overpayments from providers*."  *Id.* at 917.  The government similarly has a general (and uncontested) authority to recoup overpayments caused by WYO carriers, as Defendants concede in their response to this question.

> **c.    *Chevron* Deference Is Inapplicable Because FEMA Has Not Adopted Any Policy With Respect To Using Extrapolation To Determine The Amount Of WYO Overpayments**

Finally, the Court should reject Defendants' invitation to commit error by granting *Chevron* deference to FEMA's silence on extrapolation.  *Chevron* deference is inappropriate where the agency has not officially interpreted the relevant statutory language.  *See*, *e.g.*, *Hartog Foods Intern., Inc. v. United States*, 291 F.3d 789 (Fed. Cir. 2002) ("In this case Customs has not officially interpreted the relevant statutory language. Therefore, this court need not extend any *Chevron* deference.").  Here, FEMA has construed the relevant statutes to *require* that sampling be used in various aspects of the NFIP, including the claims reinspection program, the operational review, and the biennial audit, as discussed above.

Defendants claim that "[n]ot once in all this time has FEMA ever implemented a plan of extrapolation to recover overpayments."[67]  Defendants cite no authority in support of that assertion.  They also claim that FEMA has made a "decision not to adopt extrapolation procedures."[68]  Again, they cite absolutely no authority for that statement.  FEMA's silence

---

[67] Defs. Mem. at 7.
[68] *Id.*

should not be construed as an intent to restrict the method by which overpayments may be calculated through sampling and extrapolation.

**4.** **Is there any provision (either in the statutes or regulations) for administrative procedures or proceedings to adjudicate alleged overpayments to NFIP insurers?**

No, there is no provision for administrative procedures or proceedings to adjudicate alleged overpayments to NFIP insurers.

Defendants' reference to the arbitration provision found in the Arrangement at 44 C.F.R. Pt. 62, App. A, Art. VIII in connection with this question is misplaced.  That provision is a *non-binding* arbitration provision in the WYO carriers' agreement with the government:

> Article VIII—Arbitration
>
> If any misunderstanding or dispute arises between the Company and the FIA with reference to any factual issue under any provisions of this Arrangement or with respect to the FIA's non-renewal of the Company's participation, other than as to legal liability under or interpretation of the standard flood insurance policy, such misunderstanding or dispute <u>may be</u> submitted to arbitration for a determination that <u>shall be binding upon approval by the FIA</u>. The Company and the FIA may agree on and appoint an arbitrator who shall investigate the subject of the misunderstanding or dispute and make a determination. If the Company and the FIA cannot agree on the appointment of an arbitrator, then two arbitrators shall be appointed, one to be chosen by the Company and one by the FIA.
>
> The two arbitrators so chosen, if they are unable to reach an agreement, shall select a third arbitrator who shall act as umpire, and <u>such umpire's determination shall become final only upon approval by the FIA</u>.
>
> The Company and the FIA shall bear in equal shares all expenses of the arbitration. Findings, proposed awards, and determinations resulting from arbitration proceedings carried out under this section, upon objection by FIA or the Company, shall be inadmissible as evidence in any subsequent proceedings in any court of competent jurisdiction.

This Article shall indefinitely succeed the term of this Arrangement.[69]

Arbitration is neither required nor binding absent FIA's express approval of the arbitrators' decision. And where, as here, the dispute is not a breach of contract but instead an action under the False Claim Act, this non-binding arbitration provision is not applicable at all.[70] Finally, no party has invoked the arbitration clause here.

5.     **Is there any provision (either in the statutes or the regulations) that requires the government to proceed by individualized claims adjudications for assessments of overpayments by the government to insures in the NFIP?** *See Chaves County Home Health Service v. Sullivan*, **931 F.2d 914, 922 (D.C. Cir. 1991).**

No, there is nothing in the statutes or regulations that require the government to proceed by individualized claims adjudications for assessments of overpayments to the insurers in the NFIP. As discussed above in response to Question 3, the regulations (1) *require* that *sampling* be used in the Claims Reinspection Program and (2) neither require nor prohibit the use of extrapolation to determine the amount of overpayments.[71]

Defendants' terse response to this question is flat wrong and borders on the frivolous. First, 44 C.F.R. 62.23(j)(2) governs audits and does not establish any administrative procedures or proceedings to adjudicate alleged overpayments to NFIP insurers.

Second, *all* audits are audits of "specific files"—*i.e.*, the files that are randomly selected for inclusion in the sample. That fact does not suggest that the government is required to proceed by individualized claims adjudication for assessments of overpayments. And, for the

---

[69] 44 C.F.R. Pt 62, App. A, Art. VIII (emphasis added).

[70] *See United States ex rel. Roby v. Boeing Co.*, 73 F. Supp. 2d 897, 910-11 (S.D. Ohio 1999) (holding that claims under the FCA do not arise pursuant to a contract); *see also* Branch's Opposition to Motion to Dismiss (Dkt. # 154) and Government's Position Paper on the Motion to Dismiss (Dkt. # 167), both of which discuss the arbitration provision. Branch incorporates those briefs by reference herein.

[71] *See* Section III of The Write Your Own Program Financial Control Plan Requirements and Procedures, which is incorporated into the regulations by 44 C.F.R. Pt. 62, App. B (d)(3).

reasons discussed in Branch's response to Question 3, the provision from which Defendants selectively draw the "specific files" language is itself perfectly consistent with sampling.

Third, Defendants' response is inconsistent with the Claims Reinspection Program, which *requires* the use of sampling to reinspect the adjusting of claims.[72]

Finally, Defendants refer the Court to "Ex. 1, pp. 7-1, *et seq.*" But item #4 on page 7-1 requires sampling: "The review provides for a sampling of policy files." It even identifies the sample sizes to use.[73]

**6.      Are there any instances where the government (either administratively or in an FCA action) has employed sampling and extrapolation to recover overpayments from an NFIP insurer?**

Branch is not aware of an instance where the government employed sampling and extrapolation to recover an overpayment from an NFIP insurer. However, as discussed above, the OIG report is an example where the government used sampling and extrapolation in its effort to answer the question of whether and to what extent there was fraud in the NFIP[74] and the December 2009 GAO report is an example of where the government used sampling and extrapolation to evaluate the NFIP.[75]

---

[72] *See* Ex. 1 to Defs. Mem. (Dkt. # 344-1) at § III.

[73] *Id.*

[74] *See* Office of Inspector General, *Hurricane Katrina: Wind Versus Flood Issues* (Ex. 2) at 21 (noting that OIG used a "sample" of "131 flood claim and homeowner claim records" in its attempt "to determine whether damages from wind were improperly attributed to flooding"); *Id.* at 13 ("FEMA also performs operational reviews of WYOs on a rotating basis. These reviews typically encompass claim adjusting, underwriting and litigation activities, *including a sample of claims to determine whether NFIP standard procedures have been followed*.").

[75] Ex. 10 at Intro. p. 2 (concluding that "at the WYO level, our internal control testing of a statistical sample determined that almost 71 percent of WYO company claims loss files did not have the necessary documents to support the claims, or reports were filed late."); p. 18 (criticizing FEMA for not using a statistically valid sample because "[w]ithout a statistically valid sampling methodology that represents the population, the agency cannot project the results of these reinspection oversight activities to confidently determine the overall accuracy of claims settled for specific flood events or assess the overall performance of insurance companies and their adjusters in fulfilling their NFIP responsibilities."); p. 28 ("Results from the statistical samples were projected by fiscal year both individually and combined."); p.

As discussed in more detail in response to Question #8, the government has used sampling and extrapolation to measure and recover damages in a wide array of cases, including FCA cases, various Medicare and Medicaid proceedings, action to recover overpayment to a state department of education, fraud criminal prosecutions, and drug trafficking sentencings.[76] Sampling is also routinely used in market conduct examinations of insurance companies, both in Louisiana and throughout the United States, and is included in the National Association of Insurance Commissioners' Market Regulation Handbook.[77]  In fact, the Handbook encourages the use of sampling in market conduct investigations of insurance companies because "sampling permits valid generalizations or inferences about a wider population…[t]he principles of sampling are not conceptually difficult; indeed, they are very nearly intuitive."[78]

7.     **Are there any decisions on whether the government may use sampling and extrapolation to recover overpayments by the government from NFIP insurers?**

As discussed throughout this brief, Branch is aware of numerous decisions in which the Government uses sampling and extrapolation to recover overpayments from entities other than NFIP insurers.  Branch believes those decisions can and should be applied here, and is aware of no special statutory or other authority that exempts NFIP insurers from the holdings of those cases.  Based on Branch's research, there does not appear to be any published decision that addresses this same question where the defendant is a NFIP insurer.

8.     **Do you agree that whether the use of sampling and extrapolation is proper is a question of law and whether the sample size and related issues are appropriate are**

---

[36] ("Because we used a statistical sample from the insurance claim losses paid databases, our sample allows us to make generalizations about the population.").

[76] See footnotes 80-86.

[77] *See* National Association of Insurance Commissioners Market Regulation Handbook (2009) (Ex. 8) at 281 (encouraging the use of sampling in market conduct investigations of insurance companies and noting that "sampling permits valid generalizations or inferences about a wider population…[t]he principles of sampling are not conceptually difficult; indeed, they are very nearly intuitive.").

[78] *Id.*

**questions of fact?**   *See Ratanasen v. State of California Department of Health Services*, **11 F.3d 1467, 1469 (9th Cir. 1993).**

The answer to the first prong of this question is yes: Branch agrees that whether sampling and extrapolation should be categorically barred as evidence (regardless of sample size and related issues) is a question of law.   As to the second prong of the Court's question, issues such as whether a particular sample size is appropriate are *Daubert* issues.   The decision to apply *Daubert* is a legal issue, while the decision to admit or exclude expert testimony under *Daubert* is a fact issue.[79]

Every court that has addressed the question of whether sampling and extrapolation are appropriate methods of proof in FCA cases has held that they are, so long as *Daubert* standards are satisfied.[80]   Courts also have approved the use of sampling and extrapolation in numerous other contexts, such as drug trafficking sentencings,[81] criminal healthcare fraud prosecutions,[82]

---

[79] *See Gayton v. McCoy*, __ F.3d __, 2010 WL 308756, *4 (7th Cir. Jan. 28, 2010).

[80] *See, e.g., United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (in FCA case, noting that "[s]tatistical analysis should suffice" for factual findings in cases involving large number of claims); *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269 (D. Mass. 2009) (concluding, in FCA case, "that extrapolation is a reasonable method for determining the number of false claims so long as the statistical methodology is appropriate"); *United States ex rel. Doe v. Degregorio*, 510 F. Supp.2d 877, 890 (M.D. Fla. 2007) (using sampling data to support damages finding in FCA case); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8-9 (D.D.C. 2003) (denying motion to dismiss in FCA case where complaint identified 12 exemplar patient files but used a statistical sample to calculate damages for all 1,649 patients); *United States v. Cabrera-Diaz*, 106 F. Supp.2d 234, 238 & 240 (D.P.R. 2000) (finding that audit sample demonstrated intent to defraud or reckless disregard under False Claims Act and supported damages finding); *United States ex rel. Trim v. McKean*, 31 F. Supp.2d 1308, 1314 (W.D. Okla. 1998) (noting that the use of statistical audits "contain persuasive evidence of false claims"); Helmer, FALSE CLAIMS ACT WHISTLEBLOWER LITIGATION (5th ed. 2008) ("Statistical sampling is a well-accepted basis for extrapolation of damages and false claims, particularly in healthcare cases where the volume of Medicare claims processed by the Government is staggering.").

[81] *See, e.g., United States v. Whiting*, 28 F.3d 1296, 1304-06 (1st Cir. 1994) (statistically extrapolating based upon the quantity of drugs found, evidence of volume in distribution, and an estimate of time period engaged in the distribution); *United States v. Sklar*, 920 F.2d 107, 112-14 (1st Cir. 1990) (weighing the illegal drugs contained in some postal envelopes and extrapolating the volume that would likely have been contained by many more received by the defendant).

[82] *United States v. Rosin,* 2008 WL 142037, 2008 U.S.App. LEXIS 1080 (11th Cir. 2008) (affirming criminal healthcare fraud conviction, rejecting defendant's argument that Government's use of statistical sampling evidence at trial to prove liability and damages was unfairly prejudicial, and stating that "[t]he

trademark and advertising cases,[83] action to recover overpayment to a state department of education,[84] copyright infringement and software piracy litigation,[85] and a breach of contract action alleging that an insurer properly administered a workers' compensation program.[86]

Although particular litigants have attempted to proffer obviously flawed statistics that ran afoul of *Daubert*,[87] the use of sampling and extrapolation (*i.e.*, the science of inferential

---

purpose of statistical sampling is to provide a means of determining the likelihood that a large sample shares characteristics of a smaller sample."); *See, e.g., United States v. Cabrere-Diaz*, 106 F. Supp. 2d 234, 240 (D.P.R. 2000) (concluding in FCA action to recover damages for false claims submitted to Medicare that "[n]umerous cases involving Medicaid and Medicare overpayments have endorsed proof of damages through use of statistics and statistical sampling."); *see also Ratanasen v. State of Cal. Dept. of Health Services*, 11 F.3d 1467, 1471 (9th Cir. 1993) ("We now join other circuits in approving the use of sampling and extrapolation as part of audits in connection with Medicare and other similar programs, provided the aggrieved party has an opportunity to rebut such evidence. To deny public agencies the use of statistical and mathematical audit methods would be to deny them an effective means of detecting abuses in the use of public funds."); *Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914, 919 (D.C. Cir. 1991) (noting that "courts have routinely permitted the use of statistical sampling to determine whether there has been a pattern of overpayments spanning a large number of claims where case-by-case review would be too costly."); *Illinois Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir. 1982) (concluding that the Illinois Department of Public Aid's use of sampling and extrapolation was permissible in an action seeking recoupment of Medicaid funds).

[83] *See, e.g., Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987) (utilizing a survey to determine the likelihood of confusion due to similar trademark); *C.A. May Marine Supply Co. v. Brunswick Corp.*, 649 F.2d 1049, 1054-55 (5th Cir. 1981) (employing a statistical sample of data related to outboard motor sales to establish a range of possible damages when dealership was revoked); *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979) (using a national probability sample to determine the possibility of a secondary meaning to the word "Bionic").

[84] *Mich. Dept. of Educ. v. US Dept. of Educ.*, 875 F. 2d 1196, 1198, 1205 (6th Cir. 1989).

[85] *See, e.g., United States v. Manzer*, 69 F.3d 222, 227 (8th Cir. 1995) (describing an examination of a sample of program code to determine copyright infringement).

[86] *Republic Services, Inc. v. Liberty Mutual Insurance Co.*, Civil Action No. 03-494-KSF, Order dated 10/2/2006 (Ex. 7 at p. 4) (noting that "[t]he applicability of inferential statistics have long been recognized by the courts," finding that "some form of statistical sampling will be necessary to resolve issues related to the Liberty Companies' liability and damages incurred by Republic," and citing cases).

[87] *See, e.g., U.S. ex rel. El-Amin v. George Washington University*, 533 F. Supp. 2d 12, 50 (D.D.C. 2008) (denying relators' motion for trial by representative sample where relators had failed to hire a statistician or even define the relevant universe of claims, but indicating that such a trial would have been appropriate if relators had "taken the preparatory steps that would give them the proper foundation to try this case by statistical sample," such as "defin[ing] the total universe of Medicare claims from which their sample will be drawn" and "consult[ing] an expert statistician to assist them in defining this universe," and noting that "the sample that is ultimately presented to the jury should be randomly selected and representative of the universe of claims").

statistics) is as well established and accepted by the courts as any scientific method of proof used in litigation today.  As the Fifth Circuit has put it:

> The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole. The applicability of inferential statistics has long been recognized by the courts.[88]

### a. The Court Should Be Guided By *United States ex rel. Barron v. Deloitte & Touche LLP*, 2008 WL 7136869 (W.D. Tex. Sept. 26, 2008)

One case that is particularly instructive with respect to this Question 8 is *United States ex rel. Barron v. Deloitte & Touche LLP*, 2008 WL 7136869 (W.D. Tex. Sept. 26, 2008).  In that case, the relator alleged that several defendants had engaged in a fraudulent Medicaid-billing scheme.  The relator hired a statistician to offer expert testimony concerning damages.  The defendants moved to exclude the statistician's testimony.

The district court approached the motion in two steps.  First, it determined that there was no bar to the use of statistical sampling and extrapolation in FCA cases:

> Although the Fifth Circuit has not addressed the use of statistical sampling and extrapolation to determine damages in a False Claims Act case, it has recognized the relevance of statistical evidence in cases primarily involving discrimination. Only a few circuits, however, have specifically addressed the use of statistics and statistical sampling as an acceptable method for determining damages in False Claims Act cases. The underlying focus continues to be the Supreme Court's ruling in *Daubert* which permits the use of statistical methods of scientific research and proof pursuant to Rule 702 of the Federal Rules of Evidence provided the evidence is based upon sufficient facts or data, the product of reliable principles and methods, and the expert applied the principles and methods reliably to the facts of the case.[89]

---

[88] *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997); *see also Manual for Complex Litigation* (Fourth) § 11.422 ("When limits are placed on discovery of voluminous transactions or other events, consider using statistical sampling techniques to measure whether the results of the discovery fairly represent what unrestricted discovery would have been expected to produce").

[89] *Barron*, 2008 WL 7136869 at *2.  The Barron court's internal citations were omitted in the above quote but included: *Runnels v. Texas Children's Hosp. Select Plan,* 167 Fed. Appx. 377, 381 (5th Cir. 2006) (expert's statistical evidence was relevant in proving and disproving employment discrimination); *Munoz v. Orr,* 200 F.3d 291, 300 (5th Cir. 2000) (claims of disparate impact under Title VII necessarily relied heavily on statistical proof); *Williams v. New Orleans S.S. Ass'n,* 673 F.2d 742, 747 (5th Cir. 1982)

Next, the district court analyzed each of the challenged expert opinions under *Daubert*, and it granted-in-part and denied-in-part the defendants' motion to exclude the relator's expert's testimony.[90]  *Barron* exemplifies the correct answer to Question 8 by a district court in the Fifth Circuit.[91]

###   b.   The Class Certification Decisions Defendants Rely On Are Irrelevant

Defendants cite several denials of motions to certify putative class actions as evidence that sampling and extrapolation are inappropriate in this case.[92]  But the question of whether to certify a class action is entirely different from the question of whether sampling can be used for any purpose in this case.  The class actions relied on by Defendants involved thousands of plaintiffs who suffered individualized damages, and the issue before the courts in those cases was whether the plaintiffs could satisfy the specific standards in Rule 23.  Here, only the government has been harmed, and Rule 23 is inapplicable.

Rather than class actions, the Court should be guided by the dozens of cases addressing whether the government properly could use sampling in other FCA actions involving thousands of claims.  As discussed above, all of those cases approve the use of sampling, and none of them ask whether class actions have been or could be certified in analogous contexts—that question is irrelevant.

---

(statistical evidence established a prima facie case of discrimination); *U.S. ex rel. El-Amin v. George Washington Univ.,* 533 F.Supp.2d 12, 50 (D.D.C.2008); *U.S. ex rel. Doe v. DeGregorio,* 510 F.Supp.2d 877, 890 (M.D.Fla.2007); *U.S. ex rel. Harris v. Bernad,* 275 F.Supp.2d 1, 8 (D.D.C. 2003); and *U.S. v. Cabrera-Diaz,* 106 F.Supp.2d 234, 240 (D.P.R. 2000).

[90] *Id*. at 3-5.

[91] Notably, the relator in *Barron* alleged a long-running scheme but included only a single example in his complaint. Ex. 17 at ¶ 64.  Just as in *Bane*, and contrary to Defendants' position here, the *Barron* relator was not limited to discovery on that single example but, instead, was allowed to take discovery concerning the *scheme* alleged in his complaint. *Barron*,  2008 WL 7136869 at *3 (describing sample size of 1600 claims).

[92] Mot. at p. 13 and n.5.

**c.    Branch Agrees With Defendants That "The Court Need Not Address Any Constitutional Issues Now"**

Defendants acknowledge that "the Court need not address any constitutional issues now." Defs. Mem. at 10.   Branch agrees, but for a simpler reason than the ones identified by Defendants: the only issue before the Court is whether it should grant a motion for a protective order limiting discovery, principally the production of certain electronically-stored documents. Defendants' constitutional arguments are premature because the *production* of those documents does not implicate any due process or other constitutional issues.

**9.    How are the requirements of due process satisfied in a FCA qui tam action with sampling and extrapolation used to determine the amount that the government has overpaid to a NFIP insurer?**

The answer to this question involves both legal and factual issues.  The legal issues have been addressed by numerous courts and are well established: to be consistent with due process, sampling and extrapolation may be used to determine the amount of damages a FCA defendant owes the Government so long as (1) the sampling and extrapolation techniques are consistent with *Daubert* and (2) the defendant has an adequate opportunity to challenge the proffered evidence.[93]

The fact issues related to this question are specific to (1) the type of evidence to be used and (2) the purpose(s) for which the evidence is to be offered.  These fact issues have yet to be developed in this case and will depend on the particular circumstances surrounding what

---

[93] *See United States v. Cabrere-Diaz*, 106 F. Supp. 2d 234, 240 (D.P.R. 2000) (concluding that statistical extrapolation does not violate due process and citing cases); *Ratanasen v. State of California*, 11 F.3d 1467 (9th Cir. 1993) (same); *Yorktown Medical Laboratory, Inc. v. Perales*, 948 F.2d 84, 89-90 (2d Cir. 1991) (same); *Illinois  Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir. 1982) (same); *Michigan Dept. of Educ. v. US Dept. of Educ.*, 875 F. 2d 1196, 1205 (6th Cir.) (holding that sampling and extrapolation are not arbitrary and capricious); *United States ex rel. Barron v. Deloitte & Touche LLP*, 2008 WL 7136869 (W.D. Tex. Sept. 26, 2008) (holding that there is no bar to using sampling in FCA cases, noting that the Fifth Circuit has approved the use of sampling in racial discrimination cases, and citing authorities).

evidence Branch intends to use and for what purpose.   Generally speaking, sampling and extrapolation can be used to determine the amount that the government has overpaid by (1) identifying the relevant universe of claims, (2) randomly selecting a statistically significant (*i.e.*, sufficiently large) sample from among those claims, and (3) using inferential statistics to extrapolate the total measure of damages for the entire pool from the results of the sample.[94]

Defendants' assertion that the requirements of due process "cannot under any circumstances be satisfied" in "a quasi-criminal context like the FCA" is contrary to the overwhelming body of law on this issue.[95]   Sampling routinely is used to measure damages in FCA actions,[96] and it is even regularly used in *criminal* cases.[97]   No court has held that sampling and extrapolation can never satisfy due process in the FCA context.

Because no FCA cases support their extreme position, Defendants rely on mass tort cases and try to make new law by analogy.   Defendants' mass tort cases are inapposite.   First, Defendants principally rely on *In re Fibreboard Corp.* and *Cimino v. Raymark Industries*.   Both

---

[94] *See, e.g., United States ex rel. Doe v. Degregorio*, 510 F. Supp.2d 877, 890 (M.D. Fla. 2007) (using sampling data to support damages finding in FCA case); *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269 (D. Mass. 2009) (concluding, in FCA case, "that extrapolation is a reasonable method for determining the number of false claims so long as the statistical methodology is appropriate"); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 8-9 (D.D.C. 2003) (denying motion to dismiss in FCA case where complaint identified 12 exemplar patient files but used a statistical sample to calculate damages for all 1,649 patients); Helmer, FALSE CLAIMS ACT WHISTLEBLOWER LITIGATION (5th   ed. 2008) ("Statistical sampling is a well-accepted basis for extrapolation of damages and false claims, particularly in healthcare cases where the volume of Medicare claims processed by the Government is staggering."); *see also U.S. ex rel. El-Amin v. George Washington University*, 533 F.Supp.2d 12, 50 (D.D.C. 2008) (denying relators' motion for trial by representative sample but indicating that such a trial would have been appropriate if relators had "taken the preparatory steps that would give them the proper foundation to try this case by statistical sample," such as "defin[ing] the total universe of Medicare claims from which their sample will be drawn" and "consult[ing] an expert statistician to assist them in defining this universe," and noting that "the sample that is ultimately presented to the jury should be randomly selected and representative of the universe of claims").

[95] Defs. Mem. at 19.

[96] *See* footnote 94 above.

[97] *See* footnotes 81-82 above.

of those cases arose from the district court's attempt to find a method to resolve over 3,000 separate asbestos cases.  The district court suggested a phased approach where the second phase would be a trial of thirty of the 3,000 cases.  The plan was then to extrapolate the results from that trial to all 3,000 cases.  The Fifth Circuit rejected that approach because it would permit thousands of plaintiffs to recover on *separate actions* even though those plaintiffs never set foot in the courtroom to prove their cases against the defendants in front of a jury.  In fact, *Cimino's* holding was grounded on the Seventh Amendment right to a trial by jury, not on due process. *See Camino*, 151 F.3d at 320-21 ("we do not separately address the due process contention"). Additionally, the defendants in *Cimino* had no opportunity to assert defenses against those *individual cases* that were not actually tried.

Those circumstances are not present here.  Branch's proposed sampling involves only two parties—the United States and the particular defendant whose claims are sampled.  There will not be any absent plaintiffs who are permitted to recover without proving their case. Additionally, Defendants will have the opportunity to present whatever defenses they believe are meritorious.  Defendants will also have the opportunity to challenge Branch's sample and extrapolation, including by presenting evidence on *each* of their claims in an attempt to discredit the sample and/or extrapolation.

Second, both cases upon which Defendants rely were based largely on Texas state law governing product liability and personal injury actions.[98]  Consequently, the Fifth Circuit was constrained by the Rules Enabling Act and *Erie*, which do not apply here.[99]

---

[98] *See Cimino*, 151 F.3d at 313 (describing the conclusion of *In re Fibreboard* as "under Texas personal injury products liability law[,] causation and damages are determined respecting plaintiffs as 'individuals, not groups.'").

[99] *See, e.g.*, *Cimino*, 151 F.3d at 318; 319 ("In the second place, *Pettway* involved only federal law, and hence this Court was not constrained by the Rules of Decision Act and Erie, as it is here."); *In re Fibreboard*, 893 F.2d at 712 (concluding that the proposed extrapolation "infringes upon the dictates of

Finally, the Fifth Circuit expressed concern over the diverse characteristics of the asbestos plaintiffs and their claims.[100] The court noted that the total population involved "widely different times and places" and that the expert charged with testifying about the sampling methodology "was even not sure just what some of the variables meant." *Id.* Here, Branch's proposed sample will be narrowly focused on a Defendant's Hurricane Katrina flood claims. And until Branch has the opportunity to select a sample, it is premature for Defendants to speculate as to any criticisms that they might have.

Sampling and extrapolation can be applied to WYO carriers and their adjusters consistent with due process, just as they have been applied to other FCA and even criminal defendants.

**10.**   **Do you agree with the following:**

> **a.**   **Pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation and the corollary that a complaint is inadequate if it pleads a false scheme with particularity but fails to identify specific false claims. See United States ex rel. Bledsoe v. Community Health System, 501 F.3d 493, 504 (6th Cir. 2007).**

Branch generally agrees, but the details of a false claim are not an essential ingredient. What is essential is <u>either</u> the details of a false claim <u>or</u> "reliable indicia that lead to a strong inference that claims were actually submitted." *United States ex rel. Grubbs v. Ravikumar Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."); *id.* at 188 (quoting

---

Erie that we remain faithful to the law of Texas, and upon the separation of powers between the judicial and legislative branches.") ("Texas has made its policy choices in defining the duty owed by manufacturers and suppliers of products to consumers. These choices are reflected in the requirement that a plaintiff prove both causation and damage.").

[100] *See Cimino*, 151 F.3d at 309-11 (criticizing the method by which the sample was selected).

*Williams v. WMX Techs., Inc*., 112 F.3d 175, 178 (5th Cir. 1997), for the proposition that "a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand."); *United States ex rel. Walker v. R&F Properties of Lake County, Inc.*, 23 433 F.3d 1349, 1360 (11th Cir. 2005) (holding FCA complaint sufficient based on nurse's description of a fraudulent scheme to bill nursing and administrator services as if performed by a doctor plus an allegation that she "believed" the scheme resulted in the hospital submitting false claims.).  In fact, even the *Bledsoe* court referred to its holding as enunciating the "general rule" and declined to address whether or not there were exceptions.  *Bledsoe*, 501 F.3d at 504 n.12 (citing to Eleventh Circuit case law supporting the existence of exceptions to the general rule).

This issue is largely irrelevant here, however, because Branch has sufficiently pleaded a scheme and identified specific, detailed examples.[101]  In addition, Branch's allegations that the false claims have been paid in specific amounts is the kind of reliable indicia that leads to a strong inference that claims were actually submitted."  *Grubbs*, 565 F.3d at 190.

> **b.  Where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides representative samples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme. See Bledsoe, 501 F.3d at 510-11.**

Yes.  Where, as here, a relator successfully pleads a fraudulent scheme, that necessarily means that the existence of that scheme is an issue for trial.  The pleadings also frame the scope of claim and issue preclusion, <u>and prevent the scheme from being relitigated, even by the</u>

---

[101] Order dated 10/19/2009 (Dkt. # 228) at 57-58 ("There is no question that [Branch] *has pleaded the existence of a broad scheme to defraud the government*, as well as provided numerous individual examples that are allegedly part of the scheme.") (emphasis added).

government.  *See Jones v. Park at Lakeside Apartments*, 2008 U.S. Dist. LEXIS 89954 (S.D.

Tex. Nov. 5) (quoting *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 748 (9th Cir. 1993),

for the proposition that "relators are not prosecuting only their 'own case' but also representing

the United States and binding it to any adverse judgment the relators may obtain . . . ."); *see also*

*Stoner v. Santa Clara County Office of Education*, 502 F.3d 1116, 1126-27 (9th Cir. 2007)

(same); *United States ex rel. Mergent v. Flaherty*, 540 F.3d 89, 93-94 (2d Cir. 2008) ("[T]he

United States might become bound by res judicata or collateral estoppel as a result of the actions

of a pro se in bringing and losing a qui tam action."); *see also United States ex rel. Williams v.*

*Bell Helicopter Textron, Inc.*, 417 F.3d 450, 455 (5th Cir. 2005) (citing Ninth Circuit authority

for same proposition but distinguishing circumstances where relator's complaint is deficient and

is dismissed under Rule 9(b) rather than on the merits).

Because the fraudulent scheme—not the representative samples—constitutes the relator's

claim in the case, Rule 26(b)(1) answers the question as to the scope of discovery.  The relator is

entitled to "discovery regarding any nonprivileged matter that is relevant to any party's claim or

defense."

    **c.**    **The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could be produced with a reasonable probability by a random draw from the total pool of all claims. See Bledsoe, 510 F.3d at 510-11.**

Yes, in all material respects.  Defendants' attempt to infer a more demanding requirement

from the Sixth Circuit's decision in *United States ex rel. Snapp, Inc. v. Ford Motor Co.*, 532 F.3d

496 (6th Cir. 2008), is unavailing.  In *Snapp*, the court reiterated and explained the rule from

*Bledsoe*:

> So long as a relator pleads sufficient detail—in terms of time, place and
> content, the nature of a defendant's fraudulent scheme, and the injury

43

> resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met. While additional detail may be "relevant to the inquiry of whether a relator had pled the circumstances constituting fraud with particularity, it is not mandatory."

*Snapp*, 532 F.3d at 504 (quoting *Bledsoe*, 501 F.3d at 506).

## 11.    Is the alleged false scheme described in the first amended complaint different from the alleged false scheme described in the proposed second amended complaint?

No, the scheme is the same.  Both the FAC and the SAC allege the same broad scheme to defraud the government:

> The defendants have defrauded the Government through a practice of grossly overstating flood damages to insured properties damaged by Hurricane Katrina and then, based on those overstated damages, submitting claims for payment on Government-backed flood insurance policies to the National Flood Insurance Program ("NFIP").[102]

It is undisputed that Defendants are not permitted to grossly overstate flood damages: Defendants admit that they owe fiduciary duties to the government,[103] and under the Agreement Defendants were required to use their "own customary standards" when adjusting flood claims.[104] The scheme alleged in both the FAC and the SAC is that Defendants instead employed a practice of grossly overstating flood damages.   Whether a Defendant was both the homeowner's carrier and the WYO carrier in any one particular instance is irrelevant: WYO carriers who issued *any* homeowner's policies triggered by Katrina wind damage, including all of the Defendants here, had a motive to treat Katrina as a "flood event," not a wind event.

---

[102] FAC ¶ 3, SAC ¶ 3.

[103] *See, e.g.*, Fidelity Memo. In Opposition to Branch's Motion to Strike Third Party Complaint (Dkt. # 269 at p. 1).

[104] 44 C.F.R. § 62.23(e) ("In carrying out its functions under this subpart, a WYO Company shall use its own customary standards, staff and independent contractor resources, as it would in the ordinary and necessary conduct of its own business affairs"); see also 44 C.F.R. § 62.23(i)(1) ("WYO Companies will adjust claims in accordance with general Company standards, guided by NFIP Claims manuals").

All Defendants also had the additional motive of earning inflated adjusting fees from the Government, which are based as a percentage of the claim amount.  As Fidelity's corporate representative testified at her deposition:

> Q:  If Fidelity is paid three and a half [sic] percent of all the—the payouts on loss, isn't it in the best interests of Fidelity to pay as much as possible on a claim?
>
> A:  Absolutely.[105]

As illustrated by the color photos on page 8 above and Exhibit 15, even though Fidelity was not the homeowner's carrier for the property at 2625 & 2627 General Pershing in New Orleans, it still employed flood adjusting practices that fraudulently caused the Government to pay the policy limits of $250,000.00 on a house that had only a 3" floodline.  The dozens of other exemplar properties in the FAC and SAC contain similarly inflated flood adjustments.  The fraudulent scheme in the two complaints and the trial contemplated by each of them is the same: Branch will prove at trial that the flood adjusting practices employed by Defendants were not consistent with their "own customary standards" and fraudulently inflated flood damages.

Defendants' response to Question 11 makes two arguments about the "scheme" alleged by Branch, each of which lacks merit.  First, Defendants argue that the "scheme" in the FAC has five "elements," including "utilization of FEMA's expedited claims handling process" and "destruction of the property by wind before the levees breached." Defs. Mem. at 21.  While Branch mentioned the expedited claims handling process as part of the background narrative in Paragraph 17 of the FAC, it never alleged that utilization of that process was an "element" of Defendants' scheme.  And the FAC does not mention "levees" ***at all***.  Defendants' attempt to rewrite the scheme alleged by Branch is frivolous: every Defendant argued both to Judge Vance and to the Fifth Circuit that the complaint in *Rigsby*, which did not mention FEMA's expedited

---

[105] Id. at 119-16-21 (Ex. 9).

claims handling process and had nothing to do with levees, constituted a public disclosure of the scheme alleged by Branch in *this* case.[106]   It is Defendants and not Branch who are changing their story.

Defendants' second argument is that the scheme alleged in the SAC contains the following additional "elements":

> The elements of the new scheme alleged in the SAC are that the Defendants are alleged to have overpaid covered claims by either "inflat[ing] prices" or by "including items in the adjustment that did not need to be replaced," and that this was done to earn higher "fees." SAC ¶ 17.[107]

That Defendants either inflated prices or included items in their flood adjustments that they should not have is nothing new in this case—Branch's original complaint and its FAC repeatedly allege that Defendants defrauded the government by "overstating" flood damages and gives numerous examples to that effect.[108]   Nor is there anything "new" about the allegation that Defendants were motivated by a desire to earn higher "fees"—for example, Paragraph 4 of the FAC already mentions that "the proceeds of the flood claim payments *purportedly* go to reimburse defendants for their *administrative* services."   And, in any case, motive is not an element of a FCA claim.[109]

---

[106] *See* 5th Cir. Brief for Appellees at 5, 18-19; 8/28/2007 Supplemental Brief on Motion to Dismiss (Dkt. # 148) at §II; Reply Brief in Support of Motion to Dismiss (Dkt. # 183) at 1-2.  *See also Rigsby* complaint, attached as Ex. 13.

[107] Defs. Mot. at 21.

[108] See the following paragraphs in the original Complaint (Dkt. # 1):  3, 4, 17, 19, 20, and 21. See the following paragraphs in the FAC (Dkt. # 49): 3, 4, 17, 19, and 21-33.

[109] *See, e.g.*, *United States ex rel. Doe v. DeGregorio*, 510 F. Supp. 2d 877 (M.D. Fld. 2007) ("[Defendant] argues that he did not benefit individually by the alleged overpayments. This argument has no bearing, however, on the probable validity of the Government's claim for a debt pursuant to the False Claims Act."); *See Scolnick v. United States*, 331 F.2d 598, 599 (1st Cir. 1964) (concluding that direct personal benefits to the defendant are not required in a claim brought under the False Claims Act).

12.   **Are the examples cited by Branch in the first amended complaint representative samples of the alleged false scheme in the first amended complaint?**

Yes, for the reasons discussed in Branch's response to Question 11.

13.   **Are the examples cited by Branch in the proposed second amended complaint representative samples of the alleged scheme in the proposed second amended complaint?**

Yes, for the reasons discussed in Branch's response to Question 11.

## VII.   CONCLUSION

Even if there was rampant fraud on the Treasury following Katrina, Defendants' view is that the courts are incapable of addressing it because sampling and extrapolation can "never" be used consistent with due process to recoup damages from WYO carriers and their adjusters. This "formula for paralysis" has been rejected in other FCA cases[110] and should be rejected here. The cases *Defendants themselves rely on* hold that, in FCA actions, "Plaintiffs are entitled to discovery before being required to list every false claim"[111] and "extrapolation is a reasonable method for determining the number of false claims so long as the statistical methodology is appropriate."[112] Producing the electronically-stored documents Branch seeks imposes no undue burden on Defendants. If Branch decides to proffer statistical evidence based on these documents, Defendants can raise their due process and *Daubert* objections at that time. The motion for a protective order should be denied.

---

[110] *See United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (in FCA case, affirming district court's opinion after non-bifurcated trial and noting that defendant's "argument that the district judge had to address each of the 1,812 claim forms is a formula for paralysis. Statistical analysis should suffice.").

[111] *United States ex rel. Carter v. Halliburton Co.*, No. 1:08cv1162 (JCC), 2009 WL 2240331 at 8-9 (E.D. Va. July 23, 2009), cited by Defendants at Defs. Mem. 2, 16.

[112] *United States ex rel. Loughren v. UnumProvident Corp.*, 604 F. Supp. 2d 259, 269 (D. Mass. 2009), cited by Defendants at Defs. Mem. 11.

DATED:  February 12, 2010                    Respectfully submitted,


                                             SUSMAN GODFREY LLP


                                      By: /s/ Tibor L. Nagy, Jr.
                                             Tibor L. Nagy, Jr. (NY #4508271)
                                             tnagy@SusmanGodfrey.com
                                             654 Madison Ave., 5th Flr
                                             New York, NY 10065

                                             Jonathan Bridges (TX #24028835)
                                             jbridges@SusmanGodfrey.com
                                             901 Main Street, Suite 5100
                                             Dallas, Texas  75202-3775

                                             Matthew R. Berry (WA #37364)
                                             mberry@susmangodfrey.com
                                             1201 Third Avenue, Suite 3800
                                             Seattle, WA 98101

                                                    *and*

                                             KANNER & WHITELEY L.L.C.

                                             Allan Kanner (LA #20580)
                                             a.kanner@kanner-law.com
                                             701 Camp Street
                                             New Orleans, LA  70130

                                                    *and*

                                             HERMAN, HERMAN, KATZ & COTLAR, LLP

                                             Stephen J. Herman (LA #23129)
                                             sherman@hhkc.com
                                             Soren E. Gisleson (LA #26302)
                                             sgisleson@hhkc.com
                                             820 O'Keefe Avenue
                                             New Orleans, Louisiana 70113

                                             ***Attorneys for Plaintiff/Relator***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 12, 2010, a copy of the foregoing was served upon Defendants via electronic mail, pursuant to the parties' agreement on e-mail service.  I further certify that a true and correct copy of the above also was sent via electronic mail (pursuant to agreement) to Assistant United States Attorney, Jay D. Majors.

<u>/s/ Bianca Nealious</u>