# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, *EX REL.* BRANCH CONSULTANTS, L.L.C., | ) ) ) | |
| *Plaintiff* | ) ) | Case No. 2:06-cv-4091 |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| ALLSTATE INSURANCE COMPANY, et al., | ) ) | |
| *Defendants* | ) ) | |

### BRANCH CONSULTANTS, LLC'S REPLY IN SUPPORT OF ITS <u>MOTION TO COMPEL</u>

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT .......................................................................... 1

II.     THE DISCOVERY IS CONSISTENT WITH THE
        COURT'S DISCOVERY ORDER ...................................................................... 4

III.    THE ADMISSIBILITY OF THE EVIDENCE IS
        NOT AT ISSUE—SOLELY THE DISCOVERABILITY .............................. 5

IV.     DEFENDANTS RESPONSES VIOLATE RULE 33(D) ................................. 6

V.      INFORMATION ON DEFENDANTS LOSS ESTIMATES AND
        RESERVES IS RELEVANT TO ESTABLISH SCIENTER ........................... 7

VI.     THE REQUESTED DISCOVERY IS RELEVANT EVEN IF
        DEFENDANTS DID NOT ISSUE A HOMEOWNERS POLICY
        ON THE EXEMPLAR PROPERTIES ........................................................... 11

VII.    THE ARREST OF LIBERTY MUTUAL'S INSURED SUPPORTS
        BRANCH'S ARGUMENT ............................................................................... 12

VIII.   THE DISCOVERY IS NOT UNDULY BURDENSOME ............................. 13

        A.      American Reliable and Standard Fire Do Not
                Argue Undue Burden .......................................................................... 13

        B.      ANPAC Failed to Establish Undue Burden ....................................... 14

        C.      Liberty Mutual Does Not Argue Undue Burden
                For Interrogatories Nos. 1-3 and Would Not Face
                an Undue Burden in Responding to Interrogatory No. 4 ................... 14

        D.      Fidelity Does Not Argue Undue Burden For
                Interrogatories Nos. 1-3 and Its Burden Argument
                Concerning Interrogatory No. 4 is Misplaced .................................... 15

IX.     CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arinder v. Lee*, 2000 WL 680343 (E.D. La. 2000)....................................................... 4, 13

*Carey v. Greyhound Lines, Inc.*, 380 F. Supp. 467 (E.D. La. 1973) ............................... 5

*Cliffstar Corp. v. Sunsweet Growers, Inc.*, 218 F.R.D. 65 (W.D.N.Y. 2003)................ 14

*Culbertson v. Shelter Mutual Ins. Co.*, 1998 WL 743592, 1 (E.D. La. 1998) ................ 10

*First Nat. Bank of Louisville v. Lustig*, 1993 WL 411377 (E.D. La. 1993).................. 1, 7

*GP Industries, LLC v. Bachman*, 2007 WL 4245786 (D. Neb. 2007)............................ 13

*Jackson v. Alterman Foods*, No. 83-2341, 1984 WL 178902 (N.D. Ga. 1984)................ 5

*Northlake Assembly of God, Inc. v. State Farm Ins. Co.*, 2009 WL 649913 (E.D. La. 2009)....................................................................................................................... 7

*Stanton v. State Farm Fire and Casualty Co., Inc.*, 169 F. Supp. 2d 1109 (D.S.D. 2001)....................................................................................................................... 3

*Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983) ........................................ 5

*Terrell v. Feldstein Co., Inc.*, 468 F.2d 910 (5th Cir. 1972) ........................................... 5

*United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228 (5th Cir. 2008) ...................... 4

*United States ex rel. Woodruff v. Haw. Pac. Health*, 2008 WL 192980 (D. Haw. 2008)...................................................................................................................... 4

## FEDERAL STATUTES AND RULES

44 C.F.R. § 62.23.................................................................................................3, 11, 12

Fed. R. Civ. P. 26 (b)(1)......................................................................................4, 6, 16

Fed. R. Civ. P. 33(d) .................................................................................................... 6

Fed. R. Evid. 403 ........................................................................................................ 6

Pursuant to the Court's February 1, 2010 order (Dkt. # 333), Branch submits this Reply in support of its Motion to Compel (Dkt. # 327).  The discovery that Branch seeks is relevant to proving that Defendants submitted false claims on the properties identified in the First Amended Complaint and is not unduly burdensome.  Branch's motion should be granted.

I.    **PRELIMINARY STATEMENT**

The information that Branch seeks in Interrogatories Nos. 1-4 is relevant to showing that Defendants engaged in a scheme to improperly inflate flood claims.[1]  Interrogatories Nos. 1 and 2 seek the total number and dollar amount of Covered Wind Claims and Covered Flood Claims, which will reveal the extent to which each Defendant attributed damage caused by Hurricane Katrina to wind and to flood, as well as the average size of each wind and flood adjustment. Both of which is relevant to Branch's allegation that Defendants shifted wind losses to flood policies.  Interrogatory No. 3 seeks the total amount of fees that each defendants received from the Government for adjusting flood claims, which is directly relevant to explain *why* Defendants were incentivized to engage in a scheme to fraudulently inflate flood claims.   Finally, Interrogatory No. 4 seeks information concerning Defendants' total loss estimates for damages that they expected to incur from Hurricane Katrina.  That information is relevant to *scienter* because, as this district has held, "[r]eserve information is <u>relevant to show the insurer's state of mind</u> in relation to its claims settlement practices." *First Nat. Bank of Louisville v. Lustig*, 1993 WL 411377, *1 (E.D. La. Oct. 5, 1993) (emphasis added).  If Defendants reduced their initial estimates of losses and/or settled wind claims for less than they originally estimated, then that is consistent with Branch's allegation that Defendants engaged in a scheme to improperly shift

---

[1] Branch severed fourteen additional interrogatories on Defendants on February 3, 2010, to which Defendants will respond by February 26, 2010.

wind losses to flood claims.

Defendants argue that evidence relating to a scheme is not relevant to establishing a False Claim Act ("FCA") violation on a *specific* property.  Essentially, Defendants take the position that, even if it is true that they engaged in a scheme to fraudulently inflate flood claims, evidence of the scheme is not *relevant* to whether Defendants submitted a false claim on an individual property.  Certainly this is not so.  It is relevant whether Defendants schemed to commit and repeatedly did commit the same or similar fraud on a significant percentage of the properties they insured.

Judge Vance has emphasized that Branch must do more that prove that there was an overpayment on a flood claim for an individual property.  Branch must also prove that the overpayment was made with *scienter*.  One way that Branch will prove *scienter* is to demonstrate that Defendants were engaged in a broad scheme to fraudulently inflate flood damages.  Stated differently, Branch is entitled to discover and offer evidence showing that Defendants' conduct with regard to any individual property cannot be attributed to neglect, incompetence, or good-faith mistake.  The pattern of Defendants' conduct with regard to other insured properties is certainly relevant to such a showing.

Branch does not contend that the summary information that it seeks will, by itself, demonstrate that a defendant violated the FCA.  Instead, Branch will use that information to, among other things, demonstrate that Defendants (1) had actual knowledge of the overpayments, (2) acted in deliberate ignorance of whether they were submitting inflated flood claims; or (3) acted in reckless disregard of whether they were submitting inflated flood claims.  Establishing any one of those three factors is *sufficient* to prove *scienter*.[2]

---

[2] Order Denying Mot. to Dismiss (Dkt. # 228) at 61 (quoting § 3729(b)(1)(A)).

It is beyond reasonable dispute that Defendants were operating under a system that created an inherent conflict of interest for WYO companies.  Defendants had a clear incentive to inflate flood claims, both to maximize their adjusting fees and to minimize their wind claims.  One court has described the conflict as follows:

> The Program [NFIP] operates almost totally unlike the private insurance market. In the business world in general, private insurance companies, after collecting premiums, pay claims with their own funds. They have a financial incentive to not pay claims or to delay the payment of claims, meanwhile earning interest on investments while the claims go unpaid. If poor underwriting has been done and if too many claims are paid, the insurance company is in financial trouble. It does not work that way for flood insurance. There is no incentive for the insurance company to not pay claims since the payments are coming from the federal treasury. In fact, the incentive is the reverse. While WYO insurance companies are paid processing fees and administrative costs, such companies make the real money, to reverse a well-known advertising claim, "the new fashioned way," by paying claims. They receive a commission of 3.3% of the amount of the claim paid when a claim is paid. [citations] . . .  The higher the amount of claims paid, the more [the WYO company] is paid.[3]

The discovery that Branch seeks is relevant to whether Defendants exploited that conflict of interest and freely paid inflated flood claims to earn record fees while at the same time carefully scrutinizing and underpaying wind claims.  Such a practice violates a number of the regulations governing the NFIP, including the regulations that require that WYO companies use the same policies, procedures, and practices to adjust flood claims as what they do for wind claims.[4]

Accordingly, Branch's Interrogatories Nos. 1-4 seek information that is relevant to whether Defendants acted with *scienter* when they submitted inflated flood claims on the

---

[3] *Stanton v. State Farm Fire and Cas. Co., Inc.*, 169 F. Supp. 2d 1109 (D.S.D. 2001).

[4] 44 C.F.R. § 62.23(e) ("In carrying out its functions under this subpart, a WYO Company shall use its own customary standards, staff and independent contractor resources, as it would in the ordinary and necessary conduct of its own business affairs"); see also 44 C.F.R. § 62.23(i)(1) ("WYO Companies will adjust claims in accordance with general Company standards, guided by NFIP Claims manuals").

exemplar properties and to rebut Defendants' defenses that any overpayments were innocuous. Defendants bear the burden of demonstrating that the requested discovery is not relevant.[5]  They have failed to carry that burden.

## II.   THE DISCOVERY IS CONSISTENT WITH THE COURT'S DISCOVERY ORDER[6]

The discovery Branch is seeking is in no way inconsistent with or precluded by the Court's prior ruling on discovery.  That Order certainly contemplated that Branch would seek evidence of scienter.  Fidelity's suggestion to the contrary is baseless.  *See* Opp. at 2.[7]

Defendants have asserted affirmative defenses contending that they had "no knowledge" of any inflated flood adjustments and that any such adjustments associated with the 27 Exemplar

_____

[5] *Arinder v. Lee*, 2000 WL 680343, *2 (E.D. La. May 23, 2000) ("Furthermore, the burden of showing that the requested discovery is not relevant to the issues in this litigation is clearly on the party resisting discovery."); *United States ex rel. Woodruff v. Haw. Pac. Health*, 2008 WL 192980, *6 (D. Haw. Jan. 23, 2008) (concluding in *qui tam* False Claims Act case that "[r]elevancy, for purposes of Rule 26(b), is a broad concept that is construed liberally" and "discovery should be allowed unless the information sought has no conceivable bearing on the case") (quotations omitted).

[6] Contrary to ANPAC's argument, the Court has jurisdiction to order the requested discovery.  ANPAC argues that discovery is inappropriate because "Branch has not alleged that it is the 'original source' of any factual details that would support any discovery of aggregate claim information; therefore, there is no jurisdictional basis to support such discovery."  Opp. at 5.  ANPAC then discusses the standard "to properly plead a broad fraudulent scheme."  *Id.*  It is unclear why ANPAC is still discussing the pleading standards because that issue has already been resolved.  Judge Vance concluded that "[t]here is no question that [Branch] has pleaded the existence of <u>a broad scheme</u> to defraud the government, as well as provided numerous individual examples that are allegedly part of the scheme."[6]  Having stated a claim for the existence of a broad scheme involving the exemplar properties, Branch is entitled to discovery on that scheme.  *See* Rule 26(b).  To the extent that ANPAC suggests that proof that it engaged in a broad scheme to defraud the government is not relevant to whether it acted with *scienter* in inflating a flood claim on a particular property, it is wrong.  Branch may carry its burden of proving *scienter* via circumstantial evidence.  *See, e.g., United States ex rel. Taylor-Vick v. Smith*, 513 F.3d 228, 231 (5th Cir. 2008) ("It also is possible for an FCA relator . . . to establish the scienter element of her claim through circumstantial evidence.").

[7] Fidelity's argument that Branch "disavowed" allegations of Fidelity shifting wind damages to flood claims is similarly baseless.  Branch *never* disavowed those allegations.  And as discussed in Branch's Opposition to Fidelity's Motion to Compel, Branch agreed to supplement the interrogatories *before* Fidelity filed its original motion to compel.  Branch Opp. to Mot. to Compel, Dkt. # 373 at 20-23.  In fact, Fidelity's argument is not even internally consistent: "Upon that disavowal, [Branch] <u>refused to provide Fidelity any information</u> upon these topics at all, and <u>agreed to provide</u> only what Branch believed was non-privileged information only as to the pleaded properties."  Opp. at 3. In other words, Branch agreed to produce the responsive non-privileged documents.

Properties were the result of innocent mistakes.[8]  Branch must be allowed to refute that naked assertion with evidence.  Defendants cannot assert innocence as a defense and then block discovery of the truth about what they knew and what their practices actually were.

Courts routinely permit discovery into the policies and practices of defendants where a plaintiff must show that the defendant acted with *scienter*.  For example, in cases alleging intentional discrimination, courts permit the plaintiff to obtain summary level data concerning a defendant's general policies and practices in order to prove *individual* discrimination.  *See, e.g., Terrell v. Feldstein Co., Inc.*, 468 F.2d 910, 911 (5th Cir. 1972) (recognizing that "statistical evidence of a pattern or practice of discrimination is of probative value in an individual discrimination case for the purpose of showing motive, intent, or purpose"); *Carey v. Greyhound Lines, Inc.*, 380 F. Supp. 467, 472 (E.D. La. 1973) *rev'd in part on other grounds*, 500 F.2d 1372 (5th Cir. 1974) (same); *Jackson v. Alterman Foods*, No. 83-2341, 1984 WL 178902, *1 (N.D. Ga. Sept. 19, 1984) (granting motion to compel because "[s]tatistical information concerning an employer's general policy and practice concerning minority employment may be relevant to a showing of pretext even in a case alleging an individual instance of discrimination" (*quoting Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983)).

## III.   THE ADMISSIBILITY OF THE EVIDENCE IS NOT AT ISSUE—SOLELY THE DISCOVERABILITY

Defendants are apparently concerned about what full and complete responses would reveal.  ANPAC argues that the evidence would only enflame the jury.[9]  Fidelity analogizes the discovery to "dropping bombs" during the trial.[10]  These arguments go to the admissibility of the

---

[8] *See* Defendants' Answers:  Fidelity (Dkt. #247) at 11-12; Standard Fire (Dkt. #257) at 8-9; ANPAC (Dkt. #254) at 15-17, 19; Liberty Mutual (Dkt. #250) at 10-11; ARIC (Dkt. #251) at 6, 9.
[9] ANPAC Opp. at 9.
[10] Fidelity Opp. at 5.

evidence at trial under Rule 403 and are <u>not</u> legitimate bases for denying discovery.  *See* Rule 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").  Here, not only would the information be relevant, but it also is reasonably calculated to lead to the discovery of other admissible evidence.

## IV.    DEFENDANTS RESPONSES VIOLATE RULE 33(D)

Instead of responding to Branch's interrogatories with narratives, Defendants simply referred Branch to documents that they had produced.  In doing so, Defendants have implicitly invoked Rule 33(d), which provides:

> (d) Option to Produce Business Records.
>
> <u>If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records</u> (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:
>
> (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and
>
> (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

Rule 33(d) is not proper here because the claims files on individual flood claims do not provide the information called for in Interrogatories Nos. 1-4.  For example, a flood claim file on a particular property does not reveal anything about the total number and amount of wind claims. Frankly, these responses are in blatant disregard of Defendants' obligations under Rule 33, and Defendants have refused to rectify the problem after Branch's counsel identified the error and requested amended responses.

## V.   INFORMATION ON DEFENDANTS LOSS ESTIMATES AND RESERVES IS RELEVANT TO ESTABLISH SCIENTER

Interrogatory No. 4 seeks information relating to Defendants' estimates for Hurricane Katrina losses.  Defendants do not dispute that the Eastern District of Louisiana has concluded that reserve information is relevant and discoverable in bad faith cases: "Reserve information is relevant to show the insurer's state of mind in relation to its claims settlement practices." *First Nat. Bank of Louisville v. Lustig*, 1993 WL 411377, *1 (E.D. La. Oct. 5, 1993) (emphasis added).

ANPAC unsuccessfully attempts to distinguish this authority, suggesting that, because this is not a bad faith case, the standard is entirely different.[11]  But it is not enough to distinguish a case to point out a distinction without a difference.  To prevail in an action alleging a claim for bad faith, a plaintiff must prove that the insurer's actions were "arbitrary, capricious, or without probable cause."  *Northlake Assembly of God, Inc. v. State Farm Ins. Co.*, 2009 WL 649913, at *2 (E.D. La. March 06, 2009).  Similarly Branch must prove here that Defendants acted with *scienter*, which Judge Vance described as follows:

> As to the scienter requirement, § 3729(a)(1)(A) requires that the acts be taken **"knowingly,"** which in turn means that a person either "**has actual knowledge of the information**," "**acts in deliberate ignorance of the truth or falsity of the information**," or "**acts in reckless disregard of the truth or falsity of the information**."[12]

Defendants have failed to explain why reserve information is relevant under a bad faith claim to show that an insurer's actions were "arbitrary, capricious, or without probable cause" and yet the same information would not be relevant in a False Claims Act case to show that an insurer acted

---

[11] *See* ANPAC Opp. at 7-8.
[12] Order Denying Mot. to Dismiss (Dkt. # 228) at 61 (quoting § 3729(b)(1)(A)) (emphasis added).

"in reckless disregard of the truth or falsity of the information."[13]   As courts have recognized, claim reserve information is relevant to show an insurer's state of mind.  And state of mind is precisely what is at issue here.  The reserve information is therefore relevant and discoverable.

Defendants also argue, disingenuously, that they fully responded to this interrogatory by producing the claims files on the exemplar properties, which include flood reserve information on the *specific flood claim*.  But this is a hopelessly narrow interpretation of an interrogatory that calls for *total* loss information:   "Describe in detail all estimates made by You of the **total losses** You expected to incur as a result of damage caused by Hurricane Katrina. . . ."

In addition, some Defendants contend they were uncertain as to whether the interrogatory sought loss estimates about *homeowners* claims or *flood* claims.[14]   The plain meaning of the interrogatory limits itself to losses that Defendants expected to incur on homeowners policies because Defendants do not incur losses on flood claims, the government does.   Branch also would have resolved any confusion had Defendants raised that issue at the Rule 37.1 conference. Indeed, this kind of issue is the whole point of Rule 37.1 conferences.

In a similar vein, Defendants attempt to characterize the interrogatory as seeking only reserve information.  The interrogatory seeks *all estimates* of total losses, which includes but is not limited to loss reserves.  For example, attached as Exhibit 1 to this Reply is a Form 8-K that Standard Fire's parent company (St. Paul Travelers) filed with the Securities and Exchange Commission in which it disclosed its "preliminary estimate for losses relating to Hurricane Katrina."  That is the exact type of information that Branch seeks.  Travelers disclosed that its

---

[13] *See* ANPAC Opp. at 8 (failing to explain why *scienter* analysis under the FCA is "completely distinct" from determining whether an insurer's actions are "arbitrary, capricious, or without provable cause").

[14] *See* ANPAC Opp. at 7; Fidelity Opp. at 6.  Also, it is not clear why Fidelity attached a FEMA memorandum as Exhibit A to its Opposition.  First, the interrogatory is directed at homeowners estimates not flood estimates.  Second, the memorandum is dated February 4, 2010 and was an update to a bulletin issued on December 22, 2008, over three years *after* Hurricane Katrina.

"preliminary estimate for losses relating to Hurricane Katrina is approximately $800 million." It explained,

> This preliminary estimate was developed through an analysis of claims reported and anticipated to be reported, the values of properties in the affected areas, <u>damage projections estimated by wind force and the presence of other perils</u>, anticipated costs for demand surge and other factors of considerable judgment.[15]

If Standard Fire later substantially reduced the loss estimate, then Branch is entitled to inquire as to the source of the change in estimates and determine whether the estimate was substantially reduced because Standard Fire shifted anticipated wind losses to NFIP-insured flood claims.

Standard Fire contends that "reserve information is irrelevant" because "[i]nurers are required by statute to set reserves, and reserves can reflect countless factors, including the advice and judgment of counsel."[16]  First, that argument is directed solely at reserves and would not cover *estimates of losses* developed for internal business planning.  Second, each of the cases cited in Branch's Motion explains why reserves are relevant to determine an insurer's state of mind.[17]  Just because Defendants were required to set reserves for anticipated Hurricane Katrina losses does <u>not</u> indicate that reserves are meaningless and have no bearing on an insurer's anticipated liability.  In fact, Travelers' Form 8-K makes clear that the total estimates are based on factors relevant to this case, including damages caused by wind and other perils.  In addition, Traveler's 2006 Form 10-K provides a good overview of its process for setting reserves:

> <u>Management continually refines its reserve estimates in a regular ongoing process that includes review of key assumptions, underlying variables and historical loss experience.</u>
> ***
> Complex factors include, but are not limited to: <u>determining whether damage was caused by flooding versus wind</u>; evaluating

---

[15] Ex. 1 at p. 7 (emphasis added).

[16] Opp. at 9.

[17] Branch Mot. to Compel, Dkt. # 327 at p. 5-8.

9

> general liability and pollution exposures; estimating additional
> living expenses; the impact of demand surge; infrastructure
> disruption; fraud; the effect of mold damage and business
> interruption costs; and reinsurance collectability. . . . We
> continually refine our loss reserve estimates in a regular ongoing
> process as historical loss experience develops and additional
> claims are reported and settled.
>
> ***
>
> We rigorously attempt to consider all significant facts and
> circumstances known at the time loss reserves are established.[18]

Estimates of total losses and claims reserves are not meaningless numbers.  If Defendants settled wind claims at an aggregate amount that was substantially less then estimated while at the same time settled flood claims at an aggregate amount that was greater than anticipated, that information is relevant to Branch's allegation of an overall scheme to defraud.

Finally, Standard Fire states that "Branch has cited an insurance coverage case from this District in which the Court said the discovery of reserve information . . . was 'debatable'" and "Branch believes the issue is 'debatable.'"[19]  That selective quote is wholly misleading.  In the very next sentence, the court concluded,

> Although this Court recognizes that Shelter's refusal to pay under
> the loss of income portion of its policy is not dispositive of its
> good or bad faith, this court chooses to follow that line of cases
> which hold that reserve information is discoverable where a claim
> of bad faith is asserted.[20]

Before the Court issued this decision in 1998, the issue of whether reserve information is discoverable may have been "debatable."  But the question has been settled, at least in this district, ever since.  Moreover, none of the cases cited by Standard Fire or Liberty Mutual are from this district or even the Fifth Circuit.[21]  No defendant cites a case concluding that estimates

---

[18] Ex. 3 (Travelers 2006 10-K at 23, 46, 47 (emphasis added)).

[19] Standard Fire Opp. at 4, 11.

[20] *Culbertson v. Shelter Mutual Ins. Co.*, 1998 WL 743592, *1 (E.D. La. Oct. 21, 1998) (emphasis added).

[21] Standard Fire Opp. at 10; Liberty Mutual Opp. at 5-6.

of total losses or reserves are not relevant to proving *scienter* in a FCA case.

**VI.    THE REQUESTED DISCOVERY IS RELEVANT EVEN IF DEFENDANTS DID NOT ISSUE A HOMEOWNERS POLICY ON THE EXEMPLAR PROPERTIES**

Some of the Defendants argue that because they did not issue a homeowners policy on the exemplar properties, then any information concerning wind damages is irrelevant.[22]  Not true. First, NFIP regulations require that Defendants adjust flood claims consistent with their policies and practices of adjusting wind claims.[23]  Consequently, information about a Defendant's wind claims is relevant to determine whether the Defendant violated that regulation.  Second, Branch alleges that Defendants engaged in an *overall* scheme to shift wind losses to flood claims. Branch does not contend that Defendants identified every property on which they issued both the wind and the flood policies and then singled out those properties to understate wind damages and overstate flood damages.  To the contrary, Defendants engaged in a broad scheme to understate their wind claims and overstated their flood claims so that it would have the overall effect of shifting wind losses to flood claims.

In addition, Liberty Mutual and ANPAC argue that they could not have shifted wind losses to flood claims because they engaged a contractor to handle the servicing and processing of flood claims.[24]  That argument lacks merit for at least three reasons.  First, Liberty Mutual had the option to use its own staff adjusters, and it is not clear whether Liberty Mutual used their own adjusters or why it chose not to do so.  *See* Ex. 1 to LM Opp. at 2 (Branch-LM 0439) ("NCSI will utilize local independent insurance adjusters unless Liberty Mutual Insurance Group elects

---

[22] Standard Fire Opp. at 7; ANPAC Opp. at 3; Fidelity Opp. at 2-4.

[23] 44 C.F.R. § 62.23(e) ("In carrying out its functions under this subpart, a WYO Company shall use its own customary standards, staff and independent contractor resources, as it would in the ordinary and necessary conduct of its own business affairs"); see also 44 C.F.R. § 62.23(i)(1) ("WYO Companies will adjust claims in accordance with general Company standards, guided by NFIP Claims manuals").

[24] *See* Liberty Mutual Opp. at 2; ANPAC Opp. at 6.

to use its own staff adjusters."). Second Liberty Mutual and ANPAC's argument ignores the fact that the contractors are adjusting claims on *their* behalf and pretends that there were no communication between the insurers and their contractors concerning adjusting. Discovery will bring the truth of this relationship to light. Third and finally, the regulations governing the NFIP require that Liberty Mutual and ANPAC adjust flood claims consistent with their policies and procedures for adjusting wind claims, which strongly suggests that Liberty Mutual and ANPAC communicated with their contractors to discuss their policies and practices for adjusting wind claims.[25] Tellingly, these insurers have not denied giving instructions to their contractors.

## VII.   THE ARREST OF LIBERTY MUTUAL'S INSURED SUPPORTS BRANCH'S ARGUMENT

Liberty Mutual argues that it could not have been engaged in a fraudulent scheme to shift wind losses to flood claims because the insured in ¶ 29(a) of the FAC was arrested for insurance fraud. Although the charges against the insured were dismissed for lack of evidence, the details behind the insured's arrest demonstrate a sharp contrast between, on the one hand, how Liberty Mutual carefully protected its own interests on the wind claim and, on the other, how it was all too willing to pay on the flood claim, and pay quickly without question. Liberty Mutual aggressively avoided making *any* payments on the homeowner policy by directing its employees that no payments were to be made on the claim under the homeowners policy, and referred the matter to law enforcement, who arrested the insured on suspected insurance fraud. *Only days later, Liberty Mutual paid the insured's flood claim for policy limits.* It does not appear that

---

[25] 44 C.F.R. § 62.23(e) ("In carrying out its functions under this subpart, a WYO Company shall use its own customary standards, staff and independent contractor resources, as it would in the ordinary and necessary conduct of its own business affairs"); see also 44 C.F.R. § 62.23(i)(1) ("WYO Companies will adjust claims in accordance with general Company standards, guided by NFIP Claims manuals"). To date, no defendant has produced its guidelines for adjusters. If Defendants do not provide those guidelines in response to Branch's second round of document requests, Branch intends to move to compel the production of the guidelines.

Liberty Mutual conducted further investigation of whether the insured's flood claim was legitimate or disclosed to FEMA its suspicions of fraudulent behavior by the homeowner. In sum, Liberty Mutual had the insured arrested for insurance fraud on the wind policy, yet it paid policy limits on the flood policy. This despite the fact of clear, undisputed evidence of wind damage at this property, which Liberty Mutual identified in its claims files (*See* Ex. 3 to LM Opp. at Branch-LM 0035) and which is apparent from Branch's photographs of this property, attached as Exhibit 2.

## VIII.   THE DISCOVERY IS NOT UNDULY BURDENSOME

Defendants have the burden of demonstrating that the requested discovery is unduly burdensome.[26] The party opposing a motion to compel has "an obligation to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents."[27] Defendants have failed to carry that burden. For the most part, they have not even attempted to do so.

### A.   American Reliable and Standard Fire Do Not Argue Undue Burden

Neither Standard Fire nor American Reliable submitted a declaration or affidavit concerning any purported burden in responding to Interrogatories Nos. 1-4. And they do not contend that responding to Branch's interrogatories would be unduly burdensome. Instead, they rely solely on their argument that the information sought is not relevant.[28]

---

[26] *Arinder v. Lee*, 2000 WL 680343, *2 (E.D. La. May 23, 2000) ("[T]he burden of showing that the requested discovery is not relevant to the issues in this litigation is clearly on the party resisting discovery."); *GP Industries, LLC v. Bachman*, 2007 WL 4245786, *5-6 (D. Neb. Nov. 29, 2007) ("All discovery requests are a burden on the party who must respond thereto [but] [u]nless the task of producing or answering is unusual, undue or extraordinary, the general rule requires the entity answering or producing the documents to bear that burden.") (quotation omitted).

[27] *Bachman*, 2007 WL 4245786 at *6.

[28] *See* Standard Fire Opp. at 4; ARIC Opp. at 2.

### B.      ANPAC Failed to Establish Undue Burden

ANPAC failed to submit a declaration or an affidavit explaining any purported burden. Instead, ANPAC mentions burden only in passing and cites to an unsworn *letter* from counsel. The letter does not carry ANPAC's burden of demonstrating an undue burden for three independently dispositive reasons.  First, the letter is neither a declaration nor an affidavit and was written by outside counsel who has no personal knowledge of the operative facts.  *Cf. Cliffstar Corp. v. Sunsweet Growers, Inc.*, 218 F.R.D. 65, 69-70 (W.D.N.Y 2003) (in response to a motion to compel, a party asserting a burdensomeness objection must provide "an affidavit of a person with knowledge of the record keeping system with the requested party explaining in reasonable detail the factual basis for such an objection").  Second, the letter never even mentions ANPAC or discusses any burden that ANPAC would face.  Third, the letter was directed at *document requests* that were served as part of a non-party subpoena.  It does <u>not</u> address Interrogatories Nos. 1-4 and therefore could not establish any purported burden in responding to those interrogatories.

### C.      Liberty Mutual Does Not Argue Undue Burden For Interrogatories Nos. 1-3 and Would Not Face an Undue Burden in Responding to Interrogatory No. 4

Liberty Mutual submitted an affidavit addressing the purported burden with respect to responding to Interrogatory No. 4.  It does <u>not</u> claim any undue burden in responding to Interrogatories Nos. 1-3.  The affidavit states, "To calculate the total amount of reserves set for Hurricane Katrina <u>on a given date</u> would require review and analysis of each of thousands of Hurricane Katrina homeowners insurance claims files on an individual basis."[29]

Liberty Mutual's affidavit does not address the information that Branch seeks.  Branch is <u>not</u> asking for Liberty Mutual to prepare a discussion of the daily changes in its loss estimates.

---

[29] Ex. 2 to LM Opp. at ¶ 7 (emphasis added).

Instead, Interrogatory 4 asks that Liberty Mutual "[d]escribe in detail <u>all estimates made by You of the total losses</u> You expected to incur as a result of damage caused by Hurricane Katrina. . . ." (emphasis added).  Therefore, the interrogatory seeks a discussion of estimates of *total* losses not *individual* losses.  It also seeks information about loss estimates that were *already* prepared—it is not requesting Liberty Mutual to do something that it has not already done.  Liberty Mutual presumptively prepared estimates of total losses for business reasons or to satisfy reporting obligations (similar to the Form 8-K that Standard Fire's parent company prepared).  However, were Liberty Mutual contending that it *never* prepared an estimate of the total losses that it expected to incur as a result of Hurricane Katrina, then its response would be very short and certainly would not be burdensome.

### D.    Fidelity Does Not Argue Undue Burden For Interrogatories Nos. 1-3 and Its Burden Argument Concerning Interrogatory No. 4 is Misplaced

Fidelity's only argument concerning burden relates to having "to examine each and every different file individually" to identify the *flood* reserves on NFIP claims.  Opp. at 6-7.  As discussed above, the Interrogatory does not seek that information.  Instead, it seeks information concerning estimates for Fidelity's expected losses on homeowners policies from Hurricane Katrina.  In addition, Branch is seeking information on the total estimates of expected losses for Hurricane Katrina that Fidelity *already* prepared.  Therefore, Fidelity has not argued that responding to Interrogatories Nos. 1-3 would impose an undue burden, and it has presented no evidence on what burden, if any, it would face in responding to Interrogatory No. 4.

## IX.    CONCLUSION

Branch's FAC states a claim for a broad fraudulent scheme through which Defendants submitted improperly inflated flood claims.  Having defeated Defendants' Rule 12 motions, Branch is entitled to obtain discovery on the scheme it has pleaded.  This discovery is essential to

Branch's proof of scienter.   Each of Branch's interrogatories seeks information relevant to demonstrating that Defendants knowingly submitted false claims on the exemplar properties identified in the FAC.  Because the discovery falls within the permissible bounds of Rule 26, and Defendants have made no showing of undue burden, Branch's Motion to Compel should be granted.

DATED:  February 19, 2010                 Respectfully submitted,

                                          SUSMAN GODFREY LLP


                                  By: /s/ Matthew R. Berry_____
                                      Jonathan Bridges (TX #24028835)
                                      jbridges@SusmanGodfrey.com
                                      901 Main Street, Suite 5100
                                      Dallas, Texas  75202-3775

                                      Tibor L. Nagy, Jr. (NY #4508271)
                                      tnagy@SusmanGodfrey.com
                                      654 Madison Ave., 5th Flr
                                      New York, NY 10065

                                      Matthew R. Berry (WA #37364)
                                      mberry@susmangodfrey.com
                                      1201 Third Avenue, Suite 3800
                                      Seattle, WA 98101

                                          *and*

                                      KANNER & WHITELEY L.L.C.

                                      Allan Kanner (LA #20580)
                                      a.kanner@kanner-law.com
                                      701 Camp Street
                                      New Orleans, LA  70130

                                          *and*

                                      HERMAN, HERMAN, KATZ & COTLAR, LLP

                                      Stephen J. Herman (LA #23129)
                                      sherman@hhkc.com

Soren E. Gisleson (LA #26302)
sgisleson@hhkc.com
820 O'Keefe Avenue
New Orleans, Louisiana 70113

***Attorneys for Plaintiff/Relator***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 19, 2010, a copy of the foregoing was served upon Defendants via electronic mail, pursuant to the parties' agreement on e-mail service.  I further certify that a true and correct copy of the above also was sent via electronic mail (pursuant to agreement) to Assistant United States Attorney, Jay D. Majors.

<u>/s/ Bianca Nealious          </u>