**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *EX REL.* **BRANCH CONSULTANTS, L.L.C.,** | **CIVIL ACTION NO.: 06-4091** |
| **Plaintiff** | **SECTION: "R" (1)** |
| **VERSUS** | |
| | **JUDGE: VANCE** |
| **ALLSTATE INSURANCE COMPANY,** *et al.*, | |
| **Defendants** | **MAGISTRATE: SHUSHAN** |

**FIDLEITY DEFENDANTS SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

At pages 8 and 45 of Branch's Opposition Memorandum (Doc. 378-2) Branch presents its version of Fidelity's handling of a claim at 2625/27 General Pershing in New Orleans as Branch's best example of why sampling and extrapolation should be allowed. In response, Fidelity will quickly make three points: First, Branch raced forward far too quickly; this claim was properly paid.  Second, there is no connection between the facts and circumstances of this claim and the scheme pleaded with particularity in the FAC. Third, this claim is a perfect example of why Branch's sampling plan would involve an incredibly high risk of error.

According to Branch, analysis of claims files such as this one would allow the Court to develop evidence from which a jury could - properly and without speculation - make findings of fact of a "pervasive practice" (Doc. 378.2, p. 7) or a "pattern of conduct," (Id. at FN 12) and, from that foundation, conclude that the WYO carriers had engaged in "fraud."  In response, please consider the following seven points:

1. Branch had possession of what was thought to be Fidelity's entire claims file for this property as of January 29, 2009, a full two weeks before it selected it as Branch's best example for its February 12, 2010 memorandum.  Fidelity provided this file to Branch with Fidelity's Rule 26 Disclosures.  If Fidelity's claims file (independent of Branch's pre-suit knowledge) included evidence that Fidelity made a payment for which it didn't have a basis, (aka, that Fidelity had *scienter* that its payment was fraudulent) Branch obviously would have attached that damming evidence to its memorandum. Nothing from Fidelity's claims file was presented by Branch.

2. Through inadvertence, Fidelity's Rule 26 Disclosures omitted photographs taken during an initial and incomplete adjustment of this loss.  On this claim, there was a

first adjuster who went out to the property in October, 2005, <u>before</u> the house was gutted. He did not complete the assignment, and a new adjuster was sent out in January of 2006. Branch received the photographs for the second adjustment, but not the first. The first set of photographs are clearly referenced in the file material that was sent to Branch. They just were not attached. Supplemental Rule 26 Disclosures were done on Friday, February 19, 2010. The attached photographs taken by the first adjuster show a water line at approximately four feet, as well as a notation from the first adjuster that the owner of the property claimed to have cleaned the exterior. (Exh. 1) This claim was paid properly.

   3. This file was not adjusted via FEMA's expedited claims handling procedure. (FAC, ¶ 17) Rather, an individual adjuster went out to this specific property and worked one-on-one with the person who owned it. For Branch to now claim in its theory *de jour* that it can infer <u>fraudulent</u> patterns of conduct from the countless variables arising from the actions and representations of thousands of different insureds and hundreds of different adjusters, concerning thousands of different properties, definitely gives rise to the "risk of error" issues discussed at Document 300, pp. 5 and 6.

   4. This property was not adjusted by Colonial, the company Branch correctly pleaded was Fidelity's "primary" adjusting company. (FAC, ¶ 33) Fidelity informed Branch in Fidelity's Rule 26 Disclosures that Colonial adjusters handled all but two of the Fidelity properties put at issue in the FAC. Accordingly, Branch selected a claim handled by an adjusting company that handled a tiny fraction of Fidelity's claims, and seeks to extrapolate therefrom without regard to the facts. This would be no different than inferring that all healthcare providers commit fraud if one doctor does so.

5. This claim is not an example of Branch's claim that wind losses were passed off as flood losses. (FAC, ¶¶ 4, 17 and 20)   Branch admitted in its answer to Fidelity's Interrogatory #3 that the homeowner's carrier on this property was Lloyd's of London. (Doc. 323-3)

6. The property owner was directly involved in the adjustment of this loss.  The adjuster met with the insured, and relied upon the veracity of its comments.  This included the owner's contention that mold had reached and covered the ceilings before the interior was gutted. (Exh. 2)  How does Branch propose to sample and extrapolate the involvement, knowledge and veracity of each property owner who submitted a claim?  Direct involvement by the insureds is the rule, not the exception.  Is Branch proposing that all insureds are uniformly honest, or that all are uniformly dishonest, or that each insured must be considered individually?

7. FEMA's position on mold caused by flooding, particularly where insureds are unable to mitigate their damages by promptly airing out and drying their property, destroys Branch's simplistic idea that fraud can be determined solely by looking at a water line.  Please examine the attached FEMA bulletins on mold. (Exh. 3)  Water lines are indeed important.  However, FEMA's position is that where flood water stays inside a property for weeks in sweltering heat, it is far less so. *Id.* The bright line rule Branch hopes for simply does not exist.

At bottom, there are countless factual variables at issue here; a point recognized by the Fifth Circuit in *United States ex. rel. Farmers v. City of Houston*, 523 F.3d 333, 340-341 (5th Cir. 2008).  Just as Judges Feldman, Fallon, Vance and other judges of this Court could find no way to <u>fairly</u> advance 2500 NFIP lawsuits for the individual

3

homeowners/Katrina victims via grouping, there is no fair way to do it just for Branch. Each claim is different. This same point was made in the "risk of error" section of Document 300. Branch has never provided an answer.

This file was paid properly. This file is not an example of the scheme pleaded in the FAC. This file shows that sampling would involve a high risk of error.

Wherefore, for the reasons assigned herein and in all of the Defendants' memoranda, Fidelity prays that the scope of discovery in this case be confined to the 27 pleaded properties.

Respectfully submitted,

NIELSEN LAW FIRM, LLC

*/s/ Gerald J. Nielsen*
Gerald J. Nielsen (17078)
gjnielsen@aol.com
William T. Treas (26537)
wtreas@nielsenlawfirm.com
3838 North Causeway Blvd, Suite 2850
Metairie, Louisiana 70002
Telephone: (504) 837-2500
**Attorneys for Fidelity National Insurance Company, Fidelity National Property and Casualty Insurance Company**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has this date been served upon all parties to this suit through counsel by filing into the Court's electronic filing system and, for non-participants, by placing same in the U.S. mail, postage prepaid and properly addressed on this 19th of February, 2010.

*/s/ Gerald J. Nielsen*
Gerald J. Nielsen