# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *EX REL.*<br>**BRANCH CONSULTANTS, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO:  06-4091-SSV-SS** |
| **ALLSTATE INSURANCE COMPANY, et al** | |

## ORDER

RELATOR'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT
(Rec. doc. 280)

**GRANTED IN PART AND DENIED IN PART**

The relator, Branch Consultants, LLC ("Branch"), seeks leave to file a second amended

complaint.  The motion is opposed.  The motion is granted in part and denied in part.

## BACKGROUND

On August 22, 2006, Branch filed a *qui tam* action, pursuant to the False Claims Act

("FCA"), 31 U.S.C. §§ 3729-33.  Rec. doc. 1.  The United States did not intervene.  On June 22,

2007, Branch filed its first amended complaint (Rec. doc. 49), which was described by the Fifth

Circuit Court of Appeals as follows:

> Branch brought this action against eight insurance companies and six adjusting firms
> on behalf of the United States under the *qui tam* provisions of the FCA.  The insurer
> Defendants are participants in FEMA's Write-Your-Own flood insurance program
> (the WYO program).  This program allows private insurance companies to write and
> service, in their own names, the federally backed Standard Flood Insurance Policy
> (SFIP).  Participants in the WYO program are responsible for determining the extent
> of an insured's flood damage, which in turn determines the amount of benefit
> ultimately paid out by the Federal Treasury.  While the program has rules applicable

to all insurers in the program, the program does not involve coordinated efforts by or joint cooperation among the participating insurers.

To ensure accurate estimates of flood damage, WYO insurers are generally required to comply with certain conditions, such as submitting a proof of loss.  Following Hurricane Katrina, however, FEMA was forced to waive certain of these requirements in order to expedite payments to insureds.  According to Branch, this created a perverse incentive for WYO insurers to understate losses due to wind (which an insurer would be required to pay under the insured's homeowner's policy) and overstate losses due to flood, thereby shifting the loss from the WYO insurers to the federal government.

\*   \*   \*

Branch alleges that the WYO insurer Defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves.

United States ex rel. Branch Consultants v. Allstate Insurance Company, 560 F.3d 371, 374-375 (5th Cir. 2009)(footnote and citations omitted).  In addition to "these general allegations of wind/water fraud," Branch detailed "fifty-seven specific instances where Defendants allegedly overestimated flood damage on Louisiana properties."  Id. at 375.

The defendants moved to dismiss the complaint as amended on the grounds that: (1) the Court was without subject matter jurisdiction; and (2) the first amended complaint did not allege violations of the FCA with the particularity required by Fed. R. Civ. P. 9(b).  Rec. doc. 116.  On October 1, 2007, the United States reported that its interest in the case remained strong and it continued to investigate the allegations.  Rec. doc. 176.  On October 17, 2007, the Court granted defendants' motion to dismiss in favor of the *qui tam* action filed in the Southern District of Mississippi, United States ex rel. Rigsby v. State Farm Insurance Co., No 1:06 cv 433 (S.D. Miss, filed April 26, 2006).  Rec. doc. 191.  On November 14, 2007, a judgment of dismissal was entered.  Rec. doc. 192.  Branch appealed.  Rec. doc. 193.

2

**A.      February 18, 2009 decision by the Fifth Circuit**.

The Court of Appeals: (1) affirmed the dismissal of Branch's claims against State Farm Fire and Casualty Company ("State Farm") and Allstate Insurance Company ("Allstate"); (2) reversed the dismissal of Branch's claims against all other defendants based upon the first-to-file bar; and (3) remanded the case to the district court.  As to Branch's claims against State Farm, the Fifth Circuit held that:

> *Rigsby* specifically alleged that State Farm, in its capacity as a WYO insurer, reallocated claims on two Mississippi properties from wind damage to flood damage in a pernicious attempt to shift its costs to the federal fisc. Branch brought identical allegations against State Farm, except it also alleged facts concerning ten properties in neighboring Louisiana.

560 F.3d at 378.  It affirmed the dismissal of Allstate.  Id. at 379.  It held that the district court erred in dismissing, under the first-to-file rule, the Branch defendants that Rigsby failed to name.  Id. at 380.

The defendants who were not named in Rigsby argued for the dismissal of Branch's claims on the alternative ground of the FCA's public disclosure bar.  The Fifth Circuit held:

> [T]he public disclosure bar is based upon the notion that a *qui tam* suit does not benefit the Government if the information about the fraud is already publicly known, unless the plaintiff is an original source. The district court did not reach this ground. Because the district court should have the opportunity to address the facts underpinning the claim of public disclosure and original source and make any necessary findings in the first instance, we do not reach this ground.  Similarly, analysis of the Rule 9(b) challenge to Branch's complaint is customarily done in the first instance by the district court.

Id. at 381.  The judgment was issued as mandate on April 14, 2009.  Rec. doc. 210.

**B.**    **Proceedings in the District Court since the remand**.

There was a status conference before the District Judge on May 14, 2009.  Rec. docs. 215 and 216.  The parties were unable to agree on a non-destruction order.  Branch argued that the defendants' proposed order was unduly narrow in that they would be permitted to destroy documents that were not directly related to properties identified in Branch's first amended complaint.  The defendants responded that Branch's proposal was too broad and attempted to open discovery prematurely.  Rec. doc. 223.  The District Judge stated:

> This Court will not at this time limit the scope of the pretrial protective order to the fifty-seven properties listed in plaintiff's First Amended Complaint. Plaintiff's First Amended Complaint alleges a much broader, further-reaching fraud than the one allegedly stemming from the listed properties.  Indeed, plaintiff alleges that defendants constructed a wholesale "scheme" to inflate flood claims on properties damaged by Hurricane Katrina.  If this Court were later to find this broader claim sufficient under Rule 9 (b), a protective order limited to the properties identified as examples could allow the destruction of otherwise discoverable documents. Because the relevance of documents not directly related to the fifty-seven properties listed in plaintiff's First Amended Complaint has not been fairly evaluated at this time, the Court adopts a more expansive protective order than the one requested by defendants.  As issues in this case narrow, defendants may request, and the Court may grant, a reduction in the scope of the order.

Rec. doc. 233 at 4-5.

On October 19, 2009, the District Judge denied in part and granted in part the motion of the defendants to dismiss.  <u>U.S. ex rel. Branch Consultants, LLC v. Allstate Insurance Co., et al</u>, _____ F.Supp.2d ____, 2009 WL 3353314 (E.D.La.)(Vance, J.) Rec. doc. 228.  The District Judge held that:

> Branch has both direct and independent knowledge of the information upon which its allegations are based, and it voluntarily provided the information to the government before filing suit.  It therefore qualifies as an original source for the purposes of the FCA, and the Court is not deprived of jurisdiction.

<u>Id</u>. at *18.

The defendants also challenged the sufficiency of Branch's first amended complaint. The District Judge described Branch's allegations as contained in the first amended complaint as follows:

> (Branch) brought this *qui tam* action on behalf of the United States government under the (FCA). . . . Defendants are WYO insurance companies and adjusters that were involved in the adjustment of NFIP flood claims after Katrina. Branch alleges that the circumstances after Katrina gave defendants complete control over the adjustment and payment of the NFIP policies. Specifically, it contends that when defendants adjusted claims arising from Hurricane Katrina, they systematically and on a massive scale overstated the amount of flood losses to the properties they adjusted. In so doing, defendants exaggerated the amount of money that the government should pay under the individual flood policies, which in turn reduced the amount that the insurance companies would themselves be obligated to pay under wind and rain policies. Stated differently, Branch asserts that defendants "passed off" the costs of paying for wind damage to the government by fraudulently claiming that the damage was caused by flood. Because of the expedited claims-handling process that was put into effect after Katrina, many of these claims were allegedly not scrutinized by the government as they would have been in more typical circumstances. This resulted in the submission of myriad fraudulent insurance claims, which the federal government then paid.

Id. at *1.[1]

---

[1] Related statements are made elsewhere in the order:

> Branch also generally alleges that defendants engaged in a pervasive and systematic scheme in which these fifty-seven properties are but examples, and that this scheme included "hundreds of millions if not billions of dollars in fraudulent insurance claims" submitted to and paid by the government while the defendant insurance companies underpaid for damage caused by wind.

2009 WL 3353314 at *2.

> [T]he public disclosures point to a specific time period that followed a region-wide catastrophic loss. The circumstances following Hurricane Katrina were unusual enough that FEMA suspended its regular proof-of-loss standards. The particular allegations concern only the WYO insurers who submitted proofs of loss during this time period, in this region, and under these extraordinary conditions.

Id. at *10.

> [T]here is no doubt that the allegations in the public disclosures are substantially similar to those in Branch's complaint. Both allege that, after the proof-of-loss standards were temporarily relaxed during the recovery from Hurricane Katrina, WYO insurers overstated flood damage to properties with NFIP policies and understated the amount of damage resulting from causes of loss for which the insurers had to pay themselves.

5

The Court held that Branch pleaded violations of 31 U.S.C. § 3729(a)(1)(A) and (B) with particularity and dismissal was not warranted as to those claims. 2009 WL 3353314 at *26-27. The Court held that: (1) Branch's complaint failed to plead a violation of the prohibition on reverse false claims, 31 U.S.C. § 3729(a)(1)(G); and (2) the allegations against three defendants, Pilot Catastrophe Services ("Pilot"), Crawford & Company and NCA Group, Inc., were insufficient. Branch was granted leave to amend its complaint to allege an adequate factual basis for its allegations against those three defendants. 2009 WL 3353314, *22 and 27.[2]

_____

Id. at *12.

> For the most part, the disclosures identified by the defendants, while sufficient to notify the government of the potential for fraud, consist of unsubstantiated accusations and generalized suspicions of fraud, as well as basic descriptions of the possibility, opportunity, and incentives for the WYO insurers to shift their costs onto the government.

Id. at *13.

> Branch also generally alleges, contrary to defendants' contention, that the defendants had wind policies on the listed properties. Such policies provide a motive to overstate flood damage for which the government is obligated to pay and to understate wind damage for which the insurance companies are responsible.

Id. at *21.

> "...the general allegation that each property was covered by a wind policy provides the incentive for the defendants to engage in the scheme".

Id. at *23.

> Branch alleges that all the complained-of conduct took place during the period when FEMA had suspended the proof-of-loss requirement for the payment of Hurricane Katrina claims, as long as the adjustment of those claims was not disputed by the policyholders. And it has alleged that those claims were actually paid under the policy.

Id. at *25.

> Branch alleges that as part of the fraudulent scheme, defendants overstated flood damage when the actual flood damage was less than the amount the government paid for.

Id. at *26.

[2]  Branch has not sought leave to amend to allege facts to support its claims against Crawford & Company and NCA Group. In its motion it seeks leave to amend to add allegations against Pilot.

6

On November 19, 2009, a scheduling order was issued setting the following dates:   The discovery deadline is October 1, 2010; the deadline for amendments to pleadings was January 4, 2010; the pretrial conference is set for February 24, 2011; and the trial is set for March 7, 2011.   Rec. doc. 246.   On December 30, 2010, Branch filed its motion for leave to file a second amended complaint.   Rec. doc. 280.

## ARGUMENTS OF THE PARTIES

Branch contends that, pursuant to Fed. R. Civ. P. 15(a), it should be granted leave to amend.  It reports that with the dismissal of Allstate in Rigsby, it should be permitted to assert claims against Allstate in this action.   It describes Pilot as Allstate's primary adjuster and seeks leave to identify a specific exemplar property which Pilot adjusted to provide the factual basis as to it.   It contends that the proposed second amended complaint corrects simple mistakes made in the first amended complaint, deletes two specific properties, and describes "in greater detail the fees that WYO companies received from FEMA."   Rec. doc. 280 at 6.   It reports that the amendment does not refer to State Farm, NCA Group, Allied, and Crawford & Company as defendants.

Several of the defendants joined in opposing the motion.   Rec. doc. 296.   They contend that: (1) the proposed amendment purports to add new theories and allegations that were not alleged previously;  (2) the new theories are based on the fact that fees earned by the NFIP insurer participants are based on the value of the claim;  (3) the new theories are untimely and prejudicial; (4) the proposed amendment with the addition of Allstate and Pilot jeopardizes the scheduling order; and (5) the proposed amendment prejudices the defendants because it supersedes the first amended complaint and leaves it without legal effect.   Fidelity filed a separate opposition.   Rec. doc. 297.   It contends that: (1) the proposed amendment does much more than provide clarification; (2) it fails

to comply with Fed. R. Civ. P. 9(b); (3) if Branch's motion is granted, the parties will not be able to comply with the scheduling order; and (4) the amendment is prohibited by <u>Rockwell International Corp. v. United States</u>, 549 U.S. 457, 127 S.Ct. 1397, 1404, 167 L.Ed.2d 190 (2007).  Branch replies that: (1) the only issues before the court are whether leave should be denied on account of undue delay or prejudice; (2) the motion was timely; (3) the defendants will not experience undue prejudice with the amendment; and (4) Fidelity's arguments are without merit.  Rec. doc. 305.

## LEGAL STANDARD

The November 19, 2009 scheduling order provides that amendments to pleadings were to be filed by January 4, 2010.  Rec. doc. 246.  Branch's motion, filed on December 30, 2009, is timely. Thus, it is not necessary for Branch to demonstrate good cause for a modification of the scheduling order.  Instead, the more liberal standard of Rule 15(a) applies to the decision to grant or deny leave. <u>S&W Enterprises, L.L.C. v. Southtrust Bank of Alabama, NA</u>, 315 F.3d 533, 536 (5th Cir. 2003).

The policy of the federal rules is to permit liberal amendments to facilitate determination of claims on the merits.  <u>Dussouy v. Gulf Coast Investment Corporation</u>, 660 F.2d 594, 597-98 (5th Cir. 1981).  In <u>Dussouy</u>, the Fifth Circuit stated:

> In our review of the trial court's exercise of discretion, rule 15(a), of course, provides the starting point.  "Discretion" may be a misleading term, for rule 15(a) severely restricts the judge's freedom, directing that leave to amend "shall be freely given when justice so requires".  It evinces a bias in favor of granting leave to amend.  The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading.  Thus, unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.

> The types of reasons that might justify denial of permission to amend a pleading include undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, and undue prejudice to the opposing party.  A court may weigh in the movant's favor any

prejudice that will arise from denial of leave to amend. That consideration arises only if there are substantial reasons to deny the amendment. Otherwise, rule 15(a) requires the trial judge to grant leave to amend whether or not the movant shows prejudice. Finally, it is appropriate for the court to consider judicial economy and the most expeditious way to dispose of the merits of the litigation.

660 F.2d at 597-98 (citations omitted).

## PROPOSED SECOND AMENDED COMPLAINT

The defendants contend that the key changes in the proposed amendment occur in paragraph 4 of Part I and paragraphs 14-20 of Part V, in which Branch describes the alleged false claims in terms applicable to all defendants.

Paragraph 4 of the proposed amendment states:

[T]he defendants have put into effect a fraudulent scheme to defraud the Government and thereby reap the profits of the fraud. Although the proceeds of the flood claim payments purportedly go to reimburse defendants for their administrative services and for flood claim payments they have already advanced to the insureds, the gross overstating of flood damages benefits the defendants because it substantially increased the amount of fees that defendants received and the damages that are misattributed to flooding should instead have been attributed to wind or similar causes that are covered by homeowners insurance policies–policies that many of the insurer defendants have typically issued themselves.

Rec. doc. 280-Attachment at 2. The emphasized language is new and does not appear in the original or first amended complaint. In Paragraph 15, Branch describes the contractual arrangements between the United States and the WYO insurers.

When a private insurer becomes a WYO insurer, it agrees to what is known as the Financial Assistance/Subsidy Arrangement ("Arrangement") with the Federal Insurance Administration ("FIA"), which administers NFIP. FIA requires the WYO insurers to adjust flood claims and to settle, pay and defend all claims arising from the flood policies they write. Then, pursuant to the Arrangement, the WYO insurers submit what are effectively reimbursement requests for the flood claims they have paid. They also receive a fee from FIA for writing and administering the policies, as well as a fee for adjusting and processing claims, the amount of which is based on the amount of the claim. Nearly all of the flood insurance policies issued in the United States today are written through WYO policies and administered in this way.

9

> The defendants are WYO insurers and their adjusters.  There are approximately 95 WYO insurers operating in the Gulf Coast area.

Rec. doc.  280-Attachment at 6 (footnote omitted).  The emphasized language is also new.

In Paragraph 17, Branch describes the alleged fraudulent scheme.   After citing the unprecedented volume of claims produced by Hurricane Katrina, Branch reports that "FEMA waived the requirements that insureds file a Proof of Loss in connection with Katrina-related claims under NFIP's Standard Flood Insurance Policy. . . ." and it "announced an expedited claim handling process for Katrina-related flood claims."[3]  In the first amended complaint, Branch alleged that:

> Defendants were thus put in the position of having essentially total control over the Standard Flood Insurance Policy claims they were handling, and their adjustments alone have served as the basis for many thousands of claims submitted to NFIP. Rather than follow in good faith the streamlined procedures that FEMA set up, defendants systematically adjusted, paid and submitted reimbursement claims to NFIP regarding losses that obviously should not be fully covered by the policies. They did so in massive quantities.

Rec. doc. 49 at 7.  That provision is altered in the proposed amendment by deletions and additions.

In its place, Branch alleges:

> These circumstances, in part, and a host of others, including the absence of effective monitoring or supervision by FEMA, created an opportunity for defendants to take improper advantage of the Program.  Rather than follow in good faith the claims policies and flood adjusting guidelines issued by FEMA, defendants systematically adjusted, paid and submitted reimbursement claims to NFIP regarding losses that obviously should not be fully covered by the policies.  They did so in massive quantities.

Rec. doc. 280 - Attachment at 7.

In the first amended complaint, Branch summarizes and concludes the allegations in paragraph 17 by stating that:

---

[3]  This language is common to the first amended complaint (Rec. doc. 49 at 7) and the proposed amendment (Rec. doc. 280-Attachment at 7).

> In other words, defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves.

Rec. doc. 49 at 7-8.  In the proposed amendment that statement is changed substantially by: (a) making it an example of the defendants' fraudulent conduct rather than a concise statement of the fraudulent scheme; (b) by changing the word the "largely" to "often"; and (c) by adding an additional fraudulent scheme.  The final portion of paragraph 17 in the proposed amendment is as follows:

> For example, defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies often underwritten by themselves.  Defendants also defrauded NFIP by grossly exaggerating losses by using inflated prices in the adjustments and by including items in the adjustment that did not need to be replaced.  Additionally, by overstating flood damages, defendants were able to significantly increase the amount of fees that they received from FIA for processing and adjusting claims.

Rec. doc. 280 - Attachment at 7.

In paragraph 20 of the first amended complaint and the proposed amendment, Branch alleges that based on its inspection of properties, "defendants have maxed out or nearly maxed out the insured's flood policy limits (underwritten by NFIP), irrespective of the actual damage conceivably attributed to flood."  Rec. doc 49 at 8-9 and Rec. doc. 280 - Attachment at 8.  The final part of paragraph 20 in the proposed amendment is modified by the addition of the word "often."  It reads:

> At the same time, defendants substantially underpaid for the damage that should have been attributed to wind (often underwritten by the insurer defendants) on these same claims.

Rec. doc. 280 - Attachment at 8 (emphasis added).

When the defendants' request for certification of the Court's October 19, 2009 order was

denied, the Court stated:

> Branch alleges that, in the aftermath of Hurricane Katrina when numerous insured homes in southeastern Louisiana were damaged by both wind and flood, defendants fraudulently shifted the costs of policy payments to the government by systematically overstating flood damage and understating wind damage.

2009 WL 3353314 at *29.  Rec. doc. 278.  In addition to this fraudulent scheme, the defendants now allege a new fraudulent scheme:

> Defendants also defrauded NFIP by grossly exaggerating losses by using inflated prices in the adjustments and by including items in the adjustment that did not need to be replaced.  Additionally, by overstating flood damages, defendants were able to significantly increase the amount of fees that they received from FIA for processing and adjusting claims.

Rec. doc. 280 - Attachment at 7.  In the first alleged scheme, Hurricane Katrina caused FEMA to waive certain requirements for the WYO insurers to expedite payments to insureds which created:

> [A] a perverse incentive for WYO insurers to understate losses due to wind (which an insurer would be required to pay under the insured's homeowner's policy) and overstate losses due to flood, thereby shifting the loss from the WYO insurers to the federal government.

560 F.3d at 374.  In the second alleged scheme, Hurricane Katrina caused FEMA to expedite the claim handling process and failed to supervise the program which created an opportunity for the WYO insurers to increase their revenues by overstating flood damages.  Rec. doc. 280 - Attachment at 7.

The first amended complaint is limited to the loss-shifting scheme.  The proposed amendment includes both the loss-shifting scheme and the "inflated-revenue scheme".

The other changes sought in the proposed amendment include:

1.      The deletion of all reference to State Farm Fire and Casualty Company  (compare paragraph 10 in First Amended Complaint with paragraph 10 in proposed amendment and the deletion

of paragraph 25 from the First Amended Complaint).

2.        The substitution of The Standard Fire Insurance, a wholly-owned subsidiary of the Travelers Insurance Group, for St. Paul Travelers Cos. (compare paragraphs 10 and 31 in First Amended Complaint with paragraphs 10 and 30 in proposed amendment).

3.        The deletion of all reference to Crawford & Company (compare paragraph 11 in First Amended Complaint with paragraph 11 in proposed amendment and the deletion of paragraph 26 from the First Amended Complaint).

4.        The deletion of all reference to NCA Group, Inc. (compare paragraph 11 in First Amended Complaint with paragraph 11 in proposed amendment and the deletion of paragraph 32 from the First Amended Complaint).

5.        The deletion of all reference to Allied American Adjusting Company, LLC. (compare paragraph 11 in proposed amendment and the deletion of paragraph 24 from the First Amended Complaint).

6.        The addition of allegations regarding Allstate (compare paragraph 21 in First Amended Complaint with paragraphs 21, 22 and 23 in proposed amendment).

7.        The addition of allegations regarding Pilot (compare paragraph 22 in First Amended Complaint with paragraph 24 in the proposed amendment).

8.        The property at 109 Lighthouse Point is deleted from the exemplar list for ANPAC and added to the exemplar list for Fidelity (compare paragraph 27(e) in the First Amended Complaint regarding ANPAC with paragraph 25(j) in the proposed amendment regarding Fidelity).

9.        The property at 2117-2119 S. Lopez Street is deleted from the exemplar list for Fidelity

(compare paragraph 23(e) in First Amended Complaint with paragraph 25 in the proposed amendment).

10.     The property at 7562 Horizon Drive is deleted from the exemplar list for ANPAC (compare paragraph 27(i) in First Amended Complaint with paragraph 26 in proposed amendment).

## THE INFLATED-REVENUE SCHEME

The defendants raise the following objections to the addition of the inflated-revenue scheme: (1) the motion is not timely; (2) the proposed amendment is prejudicial to the defendants; (3) the addition of the inflated-revenue scheme is prohibited by <u>Rockwell</u>; and (4) the proposed amendment fails to comply with Rule 9(b).

### A.     Is the proposed addition of the inflated-revenue scheme timely?

One commentator states:

> The policy of allowing amendments to be made at any time during the litigation is sound.  It would be unreasonable to restrict a party's ability to amend to a particular stage of the action inasmuch as the need to amend may not appear until after discovery has been completed or testimony has been taken at trial.  Nonetheless, in keeping with the purpose of Rule 15(a), which is to facilitate a determination of the action on its merits, <u>a motion to amend should be made as soon as the necessity for altering the pleadings becomes apparent</u>.  A party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time.  In most cases, delay alone is not a sufficient reason for denying leave.  However, an amendment clearly will not be allowed when the moving party has been guilty of delay in requesting leave to amend and, as a result of the delay, the proposed amendment, if permitted, would have the effect of prejudicing another party to the action.  If no prejudice is found, the amendment will be allowed.

6 Wright, Miller and Kane, Federal Practice and Procedure ("Wright and Miller") §1488 (2d ed. 1990), pp. 659-62 (emphasis added).  Has Branch acted as soon as the necessity for altering the pleadings became apparent?

In its original complaint as well as in the first amended complaint, Branch alleged that:

14

> NFIP's average flood claim payment increased from approximately $32,000 or less per claim in 2004 and all preceding years to approximately $100,000 per claim on Hurricane Katrina flood claims. Having never before exceeded $1.3 billion in flood claims in a single year, current estimates put 2005 NFIP claims at $10 to 30 billions.

Rec. doc. 1 at 8 and Rec. doc. 49 at 8. Since the filing of its original complaint in August, 2006, Branch was aware of estimates of NFIP claims for Hurricane Katrina in the billions of dollars. The fact that the WYO insurers earn fees based on the value of the claim is part of the regulations applicable to the NFIP. See 44 C.F.R. § 62.23, et seq. Branch cannot say that it only became aware of this information in December 2009. All of the information required to allege the inflated-revenue scheme was available to Branch when it filed its original complaint.

Branch has had the opportunity to employ this information to assert a timely amendment. Until the Court granted the defendants' motion to dismiss on October 17, 2007, there was nothing preventing Branch from seeking to assert the inflated-revenue scheme. After the Fifth Circuit issued its mandate on April 4, 2009, Branch was at liberty to seek leave to amend to assert the scheme. It did not act until after the Court ruled on the remaining issues in the motions to dismiss and the defendants answered. Branch offers no explanation as to what prompted it to be asserted in December 2009 rather than an earlier time.

In its memorandum in support of its motion to amend, Branch merely states that it "described in greater detail the fees that WYO companies received from FEMA." Rec. doc. 280 at 3. In its reply memorandum, Branch strongly disagrees with the defendants "characterization of both the First Amended Complaint and the Second Amended Complaint. . . ." Rec. doc. 305 at 3.[4] It contends it is not adding a new a theory of recovery. Id. at 6. It urges that the defendants are

---

[4] The defendants' characterization of the first amended complaint is consistent with the characterization by the Fifth Circuit and the District Judge.

15

focused on the alleged motive for filing false claims, when the dispositive issue is whether they knowingly submitted false claims.  It argues that the defendants' motive for filing false claims is not dispositive.  Rec. doc. 305 at 5.

In United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180 (5th Cir. 2009), the Fifth Circuit stated:

> We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by <u>alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted</u>.

Id. at 190 (emphasis added).  The District Judge concluded that Branch's first amended complaint met this standard.  2009 WL 3353314, at *23.  The Sixth Circuit reached a similar result in United States ex rel. Bledsoe v. Community Health Systems, Inc., 501 F.3d 493 (6th Cir. 2008).

> [W]e hold that where a relator pleads a <u>complex and far-reaching fraudulent scheme with particularity</u>, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme.

501 F.3d at 510 (emphasis added).  Branch is attempting to have the court construe its fraudulent scheme in its first amended complaint at a high level of generality; that is the WYO insurers submitted false claims to the government.  This type of pleading does not meet the requirements of Rule 9(b).  Bledsoe, 501 F.3d at 510 ("[w]e conclude that the concept of a false or fraudulent scheme should be construed narrowly as it is necessary to protect the policies promoted by Rule 9(b).").

In the scheme described in the first amended complaint the "WYO insurers overstated flood damage to properties with NFIP policies and understated the amount of damage resulting from causes of loss for which the insurers had to pay themselves."  2009 WL 3353314 at *12.  As Branch put it:

16

> [D]efendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves.

Rec. doc. 49 at 7-8.  Pursuant to the alleged loss-shifting scheme, the focus is on those properties where a defendant insurer issued both the flood and homeowners policies.  In those circumstances, the WYO insurer had an incentive to shift its cost onto the government.  2009 WL 3353314 at *13.  In cases where a WYO insurer did not also issue the homeowners insurance on the same property, it did not possess an incentive to shift its costs onto the government.

Pursuant to the alleged inflated-revenue scheme, all properties where the defendant insurers were WYO insurers are at issue.  With the addition of the inflated-revenue scheme, there is a significant increase in the number of properties at issue.

The loss-shifting and inflated-revenue motives create two entirely different schemes.  If there was no distinction between the two schemes, then the outcomes for each scheme would be the same.  This is not true.  With the inflated-revenue scheme, a WYO insurer may be found liable for overstating a flood loss even though the insurer did not issue a homeowners policy on the property.  With the loss-shifting scheme, there would be no inquiry into such a property because the WYO insurer did not issue a homeowners policy on that property.[5]

Branch is not contending that each Insurer Defendant submitted a single false claim or a group of false claims which it identifies with particularity.  If it were, the dispositive issue would be limited to whether the Insurer Defendants knowingly submitted the false claims identified with particularity.  Instead, Branch alleges the existence of a fraudulent scheme in which the fifty-seven

---

[5] "[T]he general allegation that each property was covered by a wind policy provides the incentive for the defendants to engage in the scheme."  2009 WL 3353314, at * 23.

properties are examples.  The motive is a critical element for the loss-shifting scheme.

All of the information required to allege the inflated-revenue scheme was available to Branch when it filed its original complaint.  Its attempt to add the inflated-revenue scheme is not timely.

## B.   Will the addition of the inflated-revenue scheme cause undue prejudice to the defendants?

The presence of undue prejudice to the opposing party is one of the reasons that might justify denial of permission to amend a pleading.  Dussouy, 660 F.2d at 597-98.  The defendants urge that they will be unduly prejudiced if the proposed amendment supersedes and renders the previous complaint without legal effect.  The defendants urge that Branch is attempting to "amend away" the allegations set forth in the first amended complaint which have proven false to avoid being bound by these allegations.  Rec. doc. 296 at 8.  This argument is a variation of the contention that there has been undue delay.  Id. ("Branch seeks to 'amend away' these allegations without any explanation as to why it has taken over two years and a third attempt at trying to plead a cause of action against Defendants.").[6]

The parties are at an early stage of discovery.  No depositions have been taken.  If Branch is not permitted to amend, discovery will limited to the loss-shifting scheme.  If Branch's request for discovery of representative samples is granted, there will be discovery from the defendants on the exemplar properties, properties included in samples for each defendant, and information related to the requisite *scienter*.  If Branch is permitted to allege the inflated-revenue scheme and there is discovery of samples, the scope of discovery from the defendants expands significantly.  Under the loss-shifting scheme, the claims from which a sample will be selected are limited to properties where

---

[6]  From December 14, 2007 until April 14, 2009, the case was on appeal to the Fifth Circuit.  Thus, for more than half of the time cited by the defendants, Branch was not at liberty to file pleadings in this Court.

a defendant insurer issued both the flood and homeowners policies.  With the inflated-revenue scheme all NFIP claims processed by a defendant insurer are at issue.  The motivation is different for each scheme, so additional discovery will be required for the requisite *scienter* for the inflated-revenue scheme.

In United States ex rel. Schumer v. Hughes Aircraft Corporation, 63 F.3d 1512 (9th Cir. 1995), the relator moved to amend a *qui tam* FCA action to include claims under the whistleblower provision of FCA and a similar state law.  The district court denied the motion.  The Court of Appeals found no abuse of discretion because the motion was made after undue delay and the amendment would have required extensive additional discovery which would have been prejudicial. Id. at 1527.  The undue delay and the need for extensive additional discovery are both present with Branch's request for leave to amend to assert the inflated-revenue scheme.  The defendants will be prejudiced by the addition of the inflated-revenue scheme.

**C.      Is the addition of the inflated-revenue scheme barred by *Rockwell*?**

The defendants state that in Rockwell, the Supreme Court "rejected the practice Branch is employing here of pleading one scheme in initial filings, and then switching to new theories once the initial scheme has been proven baseless in an effort to recover as a *qui tam* relator."  Rec. doc. 296 at 5.  The defendants cite to 127 S.Ct. at 1404-1405 and 1409-1410.  There has been no finding by the Court that the loss-shifting scheme is baseless, nor has there been any discovery on this scheme.

Assuming there is some defect in the loss-shifting scheme, Rockwell does not prevent an amendment pursuant to Rule 15(a).  The Supreme Court held that: (1) the original source requirement in 31 U.S.C. § 3730(e)(4) was jurisdictional; and (2) the relator was not an original

source.  It rejected the relator's contention that his original-source status with respect to one claim provided jurisdiction to all of his claims.  127 S.Ct. at 1410.  This does not bar Branch's request to amend to assert the inflated-revenue scheme.

**D.      Judicial economy.**

It is appropriate to consider judicial economy and the most expeditious way to dispose of the merits of the litigation.  <u>Dussouy</u>, 660 F.2d at 598.  If Branch is granted leave to amend to add the inflated-revenue scheme, there will be a new round of motions from the defendants.  In <u>Rockwell</u>, the Supreme Court stated that "new allegations regarding a fundamentally different fraudulent scheme require reevaluation of the court's jurisdiction."  127 S.Ct. at 1408; and <u>see</u> <u>United States ex rel Branch v. Allstate Insurance Company</u>, 560 F.3d 371, 375 n.5 (5th Cir. 2009).  The defendants indicate that if Branch's motion is granted, they may file Rule 12 motions.  Rec. doc. 296 at 2.  In the interest of judicial economy, Branch should have filed its motion for leave to amend prior to the Court's October 19, 2009 order so that all of the Rule 12 motions could be considered at one time. The issue of judicial economy weighs against an amendment to add the inflated-revenue scheme.

**E.      Conclusion.**

Because of Branch's very clear undue delay in bringing the amendment, the prejudice to the defendants, and considerations of judicial economy, there are substantial reasons for denying Branch's motion to amend to add the inflated-revenue scheme.  Branch's motion for leave to amend is denied as to the changes sought in paragraph nos. 4, 15, 17 and 20.[7]

---

[7]  The argument that the proposed amendment does not satisfy Rule 9(b) will not be considered as that would be raised by the defendants as a Rule 12 motion.

The issue of whether the proposed amendment prevents the parties from completing discovery in accord with

## ALLSTATE

Branch's request for leave to add Allstate as a defendant raises two issues: (1) what is the effect of the dismissal of Allstate from Rigsby; and (2) is Branch's request to add Allstate timely?

**A.      Effect of the dismissal of Allstate from Rigsby.**

On April 2, 2006, the complaint in Rigsby was filed and Allstate was named as a defendant. 560 F.3d at 374.[8]  The United States granted the relators in Rigsby permission to dismiss Allstate and two other insurers from that action.  Rigsby - Rec. doc. 63.  The relators in Rigsby moved to dismiss their action against Allstate and the other two insurers without prejudice.  Rigsby - Rec. doc. 58.[9]  On June 16, 2008, Judge Senter granted the motion of the relators and the claims against Allstate were dismissed.  The order does not specify whether the dismissal was with or without prejudice.  Rigsby - Rec. doc. 192.

On February 18, 2009, more than eight months after the dismissal of Allstate in Rigsby, the Fifth Circuit issued its decision in United States ex rel. Branch v. Allstate Insurance Company, 560 F.3d 371 (5th Cir. 2009), in which it stated:

For this same reason, we affirm the dismissal of Allstate, named in the *Rigsby*

---

the scheduling order cannot be given any weight.  If the defendants' motion for a protective order to limit Branch's discovery to the exemplar properties is denied, it is unlikely that the parties will be able to complete discovery on the current schedule.  This statement is not made to prejudge the motion for a protective order, but in recognition of factors other than the proposed amendment which may cause the continuance of the trial.

[8]  Branch filed its complaint on August 2, 2006.  Rec. doc. 1.

[9]  The relators in Rigsby were required to secure the consent of the United States for the voluntary dismissal of Allstate.  In Searcy v. Phillips Electronics North America Corporation, 117 F.3d 154 (5th Cir. 1997), the Fifth Circuit held that the United States had an absolute veto power over voluntary settlements in *qui tam* FCA suits.  117 F.3d at 158-160.  In applying 31 U.S.C. § 3730(b)(1), the Fifth Circuit found that the statute protects the government's ability to prosecute matters in the future.  Id. at 160; and see also United States ex rel. Globe Composite Solutions, Inc. v. Solar Constructions, Inc., 528 F.Supp.2d 1, 3-4 (D. Mass. 2007).  While the order in Rigsby is silent about whether it is without prejudice, it will be treated as without prejudice.  If not, the ability of the United States to pursue Allstate in the future would not be protected.

21

complaint. We recognize that only skeletal allegations are raised against Allstate in that case. We express no opinion on the as-yet-unpresented question of whether a dismissal for lack of any factual basis or on Rule 9(b) grounds in the *Rigsby* case would then permit a suit by Branch or any other person with knowledge of facts from suing Allstate without facing the first-to-file bar. In other words, if the "first-filed" case is essentially a sham, does it continue to be "first" after the court in that case dismisses it? The answer to that question should await a case in which it is squarely presented.

560 F.3d at 379.[10]

On Branch's appeal the Fifth Circuit held that Branch's action against State Farm and Allstate was barred by the first-to-file jurisdictional bar in 31 U.S.C. § 3730(b)(5). 560 F.3d at 378-79. Dismissals for lack of jurisdiction are not decisions on the merits, but even a case dismissed without prejudice has preclusive effect on the jurisdictional issue litigated. Kaspar v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1248, 334 U.S.App.D.C. 280 (D.C. Cir. 1999).

Branch contends that: (1) the dismissal of Allstate from Rigsby constitutes an implicit if not explicit recognition that the skeletal allegations did not provide any factual basis for proceeding against Allstate; (2) the "as-yet-unpresented question" identified by the Fifth Circuit in the Branch appeal is now raised in this case; (3) because Allstate was dismissed for lack of any factual basis on which to base a claim in Rigsby, Branch is not precluded from asserting claims against Allstate in this action;[11] (4) it is the sole source of any specific information connecting Allstate to allegations concerning a scheme to overstate flood damages to insured properties damaged by Hurricane Katrina; and (5) Rigsby was a sham suit as to Allstate. Rec. doc. 280 at 3-5. Branch urges that

---

[10] Thus, some eight months after the mandate issued from the Fifth Circuit, Branch moved to re-assert claims against Allstate.

[11] Branch cites Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972-73 (6th Cir. 2005) (holding that a complaint that fails Rule 9(b) is rendered legally infirm from its inception, and thus cannot preempt a later-filed complaint under the first-to-file bar). See also Branch, 560 F.3d at 378, n. 10.

whether Allstate is entitled to immunity under the first-to-file provision of the FCA is not an issue as to this motion.  Id. at 5.

In this case, the Fifth Circuit affirmed the dismissal of Allstate for the same reason as it affirmed the dismissal of State Farm; that is Branch could not avoid the preclusive effect of Rigsby by focusing on additional instances of fraud occurring in other geographic locations.  560 F.3d at 378-79.  The Fifth Circuit recognized that only skeletal allegations were raised against Allstate in Rigsby.  Id. at 379.  But Allstate was not dismissed from Rigsby on Rule 9(b) grounds and it was not dismissed for lack of any factual basis.  Although Branch attempts to equate the voluntary dismissal of Allstate in Rigsby as a dismissal for lack of any factual basis on which to base a claim, the order of dismissal does not state that was the reason.  The Court cannot reach a conclusion based on the Rigsby record.  Thus, the undersigned concludes that the dismissal in Rigsby is non-determinative of Branch's right to sue Allstate in this case.  The dismissal without prejudice in Rigsby certainly is not preclusive.

**B.      Is Branch's attempt to add Allstate timely?**

Allstate was dismissed from Rigsby on June 16, 2008.  This is the event which Branch contends triggered its right to add Allstate as a defendant.  Branch does not allege that it did not find out about the dismissal of Allstate from Rigsby until just prior to filing its motion for leave to amend in December 2009.  There was nothing preventing Branch from seeking leave to amend to add Allstate after the Fifth Circuit issued its mandate on April 14, 2009.  Instead, it waited more than eight months.

The presence of undue delay is one of the reasons that might justify denial of permission to amend.  Dussouy, 660 F.2d. at 597-98.  A motion to amend should be made as soon as the necessity

of altering the pleadings becomes apparent.  Wright and Miller, § 1488, p. 659.  Branch should have moved to amend to add Allstate shortly after the issuance of the mandate.

The issue of judicial economy weighs in favor of Branch.  It acknowledges the presence of substantive issues regarding Allstate.[12]  If Branch had sought leave to amend shortly after the mandate and the motion was granted, the substantive issues concerning Allstate would have been resolved by October 19, 2009 when Judge Vance ruled on the defendants' motions to dismiss.  The activity by the Court, demonstrates its intention to move the case forward as promptly as possible.  In these circumstances, Branch's failure to act to add Allstate shortly after the issuance of the mandate is inexplicable.  That being said, Allstate could be sued in this district in a newly filed suit.  Rather than have a new suit transferred and consolidated  with this suit, judicial economy would be served by allowing Branch to amend to sue Allstate in this proceeding.

---

[12]  In support of it motion for leave to amend, Branch states:

> To be clear, whether Allstate is entitled to immunity under the first-to-file provision of the False Claims Act is not at issue in this motion (for leave to amend), and Branch has not attempted to fully brief the issue here.  Rather, what is at issue is merely whether Branch may amend its complaint to attempt to state a claim against Allstate.

Rec. doc. 280 at 5 (emphasis in original).

C.     **Conclusion.**

Branch's motion for leave to amend to add Allstate as a defendant is granted solely as to the alleged loss-shifting scheme.

## PILOT

In the October 19, 2009 order, the District Judge dismissed Pilot without prejudice and granted Branch leave to amend to assert adequate allegations against Pilot.  2009 WL 3353314 at *28.  Branch seeks leave to add allegations that Pilot adjusted one of the claims for one of the properties identified as an exemplar for Allstate.  Branch also alleges that Pilot was Allstate's exclusive or near-exclusive provider of adjusters.  See paragraph 24 of the proposed amendment. Branch's motion for leave to add allegations as to Pilot is granted.  If the court later dismisses Allstate from these proceedings, then the issue of Pilot's viability as a defendant can be re-examined.

## OTHER PARTIES

The Fifth Circuit affirmed the dismissal of State Farm.  560 F.3d at 381.  The District Judge dismissed NCA Group and Crawford & Company without prejudice.  2009 WL 3353314 at *28. Allied American Adjusting Company was voluntarily dismissed.  Rec. doc. 178.  The request to amend to delete State Farm, Crawford & Company, NCA Group and Allied American Adjusting is granted.

The request for leave to amend to substitute Standard Fire for St. Paul is granted.

## EXEMPLAR PROPERTIES

The request to amend to delete the properties at 2117-2119 S. Lopez and 7562 Horizon Drive as exemplar properties is granted.  The request to shift 109 Lighthouse Point from ANPAC's exemplar properties to Fidelities is granted.

IT IS ORDERED that: (1) Branch's motion for leave to amend (Rec. doc. 280) is GRANTED in PART and DENIED in PART; (2) **within ten (10) working days of the entry of this order**, Branch shall amend and supplement its first amended complaint as provided herein; and (3) this order is stayed until the District Judge resolves any appeal of the order.

New Orleans, Louisiana, this 1st day of March, 2010.

**SALLY SHUSHAN**
**United States Magistrate Judge**

26