UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UNITED STATES OF AMERICA, *EX REL.* BRANCH CONSULTANTS, L.L.C.,** | **CIVIL ACTION NO.: 06-4091** |
| **Plaintiff** | **SECTION: "R" (1)** |
| **VERSUS** | |
| **ALLSTATE INSURANCE COMPANY, *et al.*,** | **JUDGE: VANCE** |
| **Defendants** | **MAGISTRATE: SHUSHAN** |

**FIDELITY'S MEMORANDUM IN OPPOSITION TO
BRANCH'S MOTION FOR A PROTECTIVE ORDER**

MAY IT PLEASE THE COURT:

Defendants, Fidelity National Property and Casualty Insurance Company and Fidelity National Insurance Company, (hereinafter referred to collectively as "Fidelity"), Write-Your-Own ("WYO") Program insurance carriers participating in the United States Government's National Flood Insurance Program ("NFIP"), pursuant to the National Flood Insurance Act of 1968 ("NFIA"), as amended,[1] appearing herein in their "fiduciary"[2] capacity as the "fiscal agent of the United States,"[3] respectfully submit this memorandum in opposition to Branch's Motion for a Protective Order.[4]

Citing only one case,[5] Branch asserts, as an absolute truth, without any exceptions whatsoever, that, "In a False Claims Act ("FCA") *qui tam* action, the credibility, integrity, and personal background of the relator <u>are not relevant</u> to whether the defendants submitted a false

---

[1] 42 U.S.C. § 4001, *et seq.*
[2] 44 C.F.R. § 62.23(f).
[3] 42 U.S.C. § 4071(a)(1); *Gowland v. Aetna,* 143 F.3d 951, 953 (5th Cir.1998).
[4] Fidelity files this memorandum to address issues related to the properties allocated to Fidelity.
[5] *U.S. Ex Rel. Singh v. Bradford Reg. Med. Center*, 2007 WL 1576406 (W.D.Pa. May 32, 2007).

-1-

claim." (emphasis in original) (Doc. 406-1, p. 1) Fidelity disagrees. For a perfect example of a court examining the credibility of the relator, please see *U.S. Ex Rel. Whipple v. Rockwell Space Operations Co.*, 2002 WL 864246 *7-9 (S.D. Tex. Apr. 3, 2002). There, the court rejected the relator's credibility, finding in part that "Relator's changing theories of liability undermine the credibility of his claims." *Id.* at *8. Isn't that exactly what Branch keeps doing?[6]

Within this memorandum, Fidelity will establish that because Branch is itself the manufacturer of the evidence upon which its FCA claim is based, Branch cannot seriously contend that its own credibility cannot be questioned.[7] Working just within evidence regarding the pleaded properties, and working just within the affirmative allegations of Branch's central claim of shifting wind losses to flood losses, Fidelity will show that Branch has already been so misleading with this Court that it would arise to a denial of the due process rights of the Defendants if they were prohibited from further exploring the full extent of Branch's own efforts to manufacture the evidence that predicates its case, and, Branch's method of manufacture.

In examining the facts set forth below, the Court is asked to contrast the situation to be discussed below with a medical FCA case such as *Singh*. In such a case, perhaps it might be possible that the relator's testimony is unimportant. In such cases, the billing records of the defendant can be compared against the Government-imposed pricing or other regulations, to determine, on a wholly objective basis, whether fraud occurred. In such cases - - and this is the critical point - - the relator may be neither (1) the creator of the "method" by which one decides what is or is not appropriate conduct, nor (2) the creator of the evidence showing that inappropriate conduct occurred. That is not the case here.

---

[6] Branch's constant need to change its theories is also one of the reasons why defendants need to see Branch's pre-suit disclosures to the Government.
[7] The credibility of any witness may be attacked by any party. F.R.E. Rule 607.

In addition, please also note that in Judge Vance's denial of the Motion to Sever, she specifically mentioned that the Defendants will need to conduct discovery as to Branch's "method" of determining what it alleges is an appropriate flood claims payment. (Doc. 454, p. 1)

**Branch's Two Hats**

That which Branch most wants this Court to prohibit is discovery by the Defendants of the extent to which Branch has manufactured two different sets of evidence of the amount and value of supposed flood damage at the pleaded properties, depending upon which hat Branch personnel were wearing at the time they manufactured their estimates. In other words, Fidelity is asserting that Branch prepares one estimate of flood damage when it is wearing its "Plaintiff's attorney" hat, and prepares a quite different and much lower estimate of flood damage when it is wearing its "False Claims Act" hat.

As just one example of what Branch has been up to - - the Defendants will not know if this is by any means the "best example" until further discovery is completed - - the Court is asked to consider the following evidence of what Branch was trying to portray to two different judges of the Eastern District of Louisiana, as well as a judge of the 22nd Judicial District in St. Tammany Parish, regarding the property at 109 Lighthouse Point.

**The 109 Lighthouse Point Property**

At paragraph 27(e) of the FAC (Doc. 49), Branch pleads the following as its claim for this property:

> e. 109 Lighthouse Point, Slidell, LA 70458 (ANPAC, Policy No. unknown)
>
> Flood waters eventually rose to approximately 48 inches inside the dwelling, however, it was incidental to the damage caused by the winds and wind-driven rain. The hurricane force winds blew away shingles from the roof, some of the sheathing and turbine roof vents were also blown away. Wind-driven rain in sufficient amounts to totally ruin both floors of this 2 story dwelling penetrated the building through the damaged roof and destroyed the interior long before the arrival of any flood waters.

  Flood Ins. paid:  $130,000
  Flood damage:  $ 27,000[8]

  In <u>this</u> lawsuit, Branch has pleaded, based upon its own supposed "direct, first-hand knowledge," (Doc. 49 ¶ 9) that while the WYO carrier paid $130,000 for flood damage to this particular home, the correct amount of covered flood damage was only $27,000. (Doc. 49, ¶27(e)) However, this is not Branch's first assessment of this property.

  On December 21, 2006, Mr. and Mrs. Nguyen (the owners of this property) filed their own lawsuit (*Nguyen v. Fidelity*, Docket No. 06-11256) against Fidelity under their flood policy in federal court. The case was assigned to Judge Lemmon. Therein, the Nguyens alleged at paragraph 9 of their Complaint that, "The amount tendered by Defendant is insufficient to cover Plaintiffs' covered flood losses." (Ex. 1) The amount that had been tendered by Fidelity as of the date when Mr. and Mrs. Nguyen filed their lawsuit was the same $130,000 that Branch pleaded in the FAC at paragraph 27(e).

  As the Nguyens' flood case proceeded, Fidelity propounded Interrogatories and Requests for Production of Documents to the plaintiffs through their counsel, Halpern & Martin. This is the same plaintiffs' firm to which other Defendants in the *Branch* lawsuit have sent subpoenas. The Nguyens' answers to Fidelity's Interrogatories, as prepared by Halpern & Martin, are attached hereto as Exhibit 2. At the answer to Interrogatory No. 10, which asks for expert witnesses, the Nguyens listed "Max Johnson" as their expert witness in their lawsuit seeking <u>additional</u> federal dollars under their flood policy for the 109 Lighthouse Point address. (Ex. 2) Mr. "Max Johnson" is the very first witness listed by Branch in its Rule 26 Disclosures in Branch's FCA case, and Branch has listed Max Johnson's relevant testimony in that disclosure

---

[8] In this Court's Order of March 10, 2010, at page 25 (Doc. 417), this Court ruled that Branch's "request to shift 109 Lighthouse Point from ANPAC's exemplar properties to Fidelity's is granted." When the March 1, 2010 Order takes effect, Fidelity understands that this address will constitute one of the properties that is the foundation of Branch's claims against Fidelity.

-4-

as, "Adjustment of properties damaged by Hurricane Katrina; adjusting standards and practices." (Ex. 3)

The Nguyens' answer to Fidelity's Interrogatory No. 2 states that they purchased this home in 2002 for $395,000. Compare this to paragraph 27(e) of Branch's FAC, where Branch <u>pleads</u> that there was four feet of water in this house, and that Branch concluded that all covered flood damage could have been repaired for just $27,000. (Doc. 49)

Fidelity also propounded a Request for Production of Documents in the Nguyens' lawsuit. The Nguyens' response is attached hereto as Exhibit 4. As part of the Nguyens' response, they produced a flood estimate prepared by Tony Hall (Ex. 5), who is also listed as a Branch witness in its False Claims Act suit, with the same statement that his testimony is relevant to "Adjustment of properties damaged by Hurricane Katrina; adjusting standards and practices." (Ex. 3) According to Mr. Hall's estimate of the Nguyens' covered flood damage that he prepared while working for the Nguyens and for Halpern & Martin, the total amount of covered flood damage that Mr. Hall believed should have been paid by Fidelity was $196,712.59. (Ex. 5) That's a far cry from the figure of $27,000 that Branch pleaded in its FAC at paragraph 27(e), and regarding which Max Johnson has sworn in his declaration (Doc. 153-3) is supported by a "detailed estimate" that Branch still refuses to produce because of the involvement of its counsel.

The Nguyens also filed a wind lawsuit against ANPAC in state court. Max Johnson was apparently their expert in that case too. While Tony Hall was providing estimates claiming flood damages of $196,712.59, (Ex. 5) Max Johnson was writing estimates of wind damage in the amount of $334,388.61. (Ex. 6)[9] Again, the Nguyens bought this property (house <u>and</u> land) in

---

[9] Both of these estimates are dated June 20, 2006. (Exs. 5, 6) That is little more than one month before Branch filed its FCA lawsuit.

2002 for $395,000.00 (Ex. 2) According to Max Johnson and Tony Hall, the legitimate cost of repairing all of the damages was $531,101.20. (Exs. 5, 6)

Branch literally manufactured one estimate for the purpose of persuading Judge Lemmon in the Nguyens' own flood lawsuit that it would be appropriate to order a total payment of $196,712.59 in federal funds under the Fidelity flood policy, and then later, in this case, manufactured a completely separate estimate of just $27,000 (that it won't produce due to the alleged involvement of counsel) to convince Judge Vance that she should order Fidelity to pay back to the Government an alleged overpayment on that exact same claim. (Ex. 5; Doc. 49 ¶ 27(e)) Branch can hardly object to the term "manufacture." Its estimate that was prepared for submission to Judge Lemmon is over seven times the estimate Max Johnson now swears to Judge Vance is "the" truth. (Doc. 153-3) It is this same manufacturer of evidence that tells this Court that its "credibility, integrity and personal background" are irrelevant. (Doc. 406-1, p. 1)

By what "method" did Branch prepare the Nguyens' flood estimate? By what "method" did Branch prepare the second estimate pleaded at paragraph 27(e) of the FAC that it won't produce? These are legitimate areas for discovery.

**The Rest of the Pleaded Properties**

Discovery as to <u>both</u> of the methods employed by Branch's personnel is key to Fidelity's ability to defend itself. Consider that for the Nguyens, and utilizing Branch's "Plaintiff's attorney" hat method, four feet of water in the structure (Doc. 49, ¶ 27(e)) translated into a flood estimate prepared by Branch's Tony Hall of almost $200,000. (Ex. 5) Now look at the results of Branch's "FCA" hat method employed in his case.

It is <u>only</u> when Branch uses its "Plaintiff's attorney" hat method, that its methodology produces a flood estimate exceeding six figures. (Ex. 5) Otherwise, regardless of water height, Branch's "FCA" hat method <u>cannot</u> achieve a flood estimate that exceeds just five figures.

Fidelity asks this Court to look at <u>every</u> allegedly proper flood claim payment pleaded as to <u>every</u> Defendant in the FAC. (Doc. 49) Regardless of water height, not <u>one</u> of Branch's estimates reaches six figures, not <u>one</u>. There are no exceptions. The <u>only</u> six-figure flood estimate from Branch's personnel of which this Court is currently aware is the one attached hereto as Exhibit 5, which was prepared for submission to Judge Lemmon to seek <u>more</u> federal dollars under the NFIP.

**Branch's Other False Allegations**

Branch has admitted in discovery that at the time it filed its First Amended Complaint accusing Fidelity of passing off its own wind losses to its own flood policies, it already knew <u>at that time</u> that Fidelity was not the issuer of the wind policy on <u>any</u> of the properties pleaded against Fidelity at paragraph 23 of the FAC. (Doc. 323, Ex. 1) Indeed, in Branch's answer to Fidelity's Interrogatory No. 3, Branch admitted that at the time it filed the FAC, it <u>knew</u> the name of each issuer of the homeowners policy on each of those properties. (Doc. 323, Ex. 1) Branch named each one! *Id*.

Further, it is now known via Branch's Rule 26 Disclosures that it <u>knew</u> pre-suit, based on information from the Insurance Information Institute ("III") and from Louisiana Citizens Fair Plan that Fidelity wrote only a tiny fraction of the homeowner's policies issued in Louisiana prior to Katrina. Please see Exhibit 7 which sets forth market share information from both the III and from Louisiana Citizens that Branch produced to the Defendants on January 29, 2010, as part of its Rule 26 Disclosures. Branch knew this information, yet still included Fidelity in its

wind/water loss shifting scheme wherein it asserted that each Defendant had each issued a wind and a flood policy on each of the pleaded properties.

Fidelity submits that it is difficult to discern how Branch did anything other than engage in a "bate and switch" tactic with Judge Vance. How is it not the case that Branch <u>knowingly</u> filed claims that it literally and unequivocally <u>knew</u> to be untrue for the purpose of overcoming the Defendants' anticipated Rule 12 motions, with the intent of switching to some other type of claim just after the Rule 12 motions were denied? Fidelity is certainly entitled to learn, via discovery, just how much of the allegations Branch pleaded in the FAC is factually true. In addition, Fidelity is entitled to discovery concerning what were Branch's pre-suit disclosures to the Government.[10]

Fidelity submits that in this case, where Branch's claims are constantly changing; where Branch is the manufacturer of the evidence that it intends to rely upon at trial; where it is making itself the declarant of whether a claim was properly paid or not; and where it obviously uses two different methods to create "the" truth depending on what serves its purpose of the moment, Branch has made its own credibility a central fixture of this litigation.

The test that is at the heart of Branch's motion seems to arise from the following sentence found on page 3 of Branch's Memorandum in Support of Its Motion for Protective Order: "The integrity and past conduct of the *relator* are simply not relevant to whether a *defendant* submitted a false claim." (emphasis in original) (Doc. 406-1, p. 3)

If Branch has been preparing estimates on the pleaded properties for submission to one federal judge to obtain additional federal dollars, and then manufactures a completely separate flood estimate (via a different method) to submit to another federal judge claiming that federal

---

[10] The contemporaneously filed Memorandum in Opposition by all defendants extensively briefs the discovery of pre-suit disclosures to the Government and will not be set forth again herein. Fidelity adopts said briefing as if fully asserted.

dollars were overpaid on the same property, is that not relevant? If Branch is listing the persons who prepared both sets of estimates as its own key witnesses to prove up its claims, and states in its Rule 26 Disclosures that their testimony will regard "adjusting standards," is this not relevant? If Branch is the party deciding what is the standard of care (a.k.a. the method) to be employed in preparing these estimates, and if Branch is using different standards and methods depending on what hat it is wearing at the time, is this not relevant?

It is now known that Branch has kept two sets of books. One set of books involves a "method" that was utilized for plaintiffs' lawyers suing WYO carriers. Another "method" was used for Branch itself, when it and its lawyers wanted to sue WYO carriers claiming overpayments. As Judge Vance has squarely recognized, the Defendants clearly need to be able to determine the "method" used by Branch to determine what Branch says[11] should have been paid at the pleaded properties. (Doc. 454, p. 1) As such, Fidelity submits that it is entitled to discovery from Branch as to <u>all</u> methods that Branch has employed to determine the value of covered flood damage at the pleaded properties.

This information regarding Branch's "method" would include all of its information gathering methods through any interactions it had with the property owners. As Fidelity demonstrated in its Supplemental Reply Memorandum in Support of Motion for Protective Order on the sampling issue (Doc. 393), information provided by the property owners can definitely impact claim evaluation. It would also include any and all of Branch's retainer agreements and marketing materials regarding at least the pleaded properties, particularly given Branch's decision to affirmatively plead its financial relationships and involvements with the property owners at paragraph 19 of the FAC.

---

[11] Branch cannot escape the fact that <u>it</u> has made <u>itself</u> the declarant.

**CONCLUSION**

For all of the reasons assigned herein, as well as all of the reasons assigned in the other Defendants' opposition memoranda to Branch's Motion for Protective Order, which are adopted herein by reference, Fidelity prays that Branch's Motion for Protective Order be denied.

        Respectfully submitted,

        NIELSEN LAW FIRM, LLC

        */s/ Gerald J. Nielsen*
        Gerald J. Nielsen (17078)
        gjnielsen@aol.com
        William T. Treas (26537)
        wtreas@nielsenlawfirm.com
        3838 N. Causeway Blvd., Suite 2850
        Metairie, Louisiana 70002
        P: (504) 837-2500
        F: (504) 832-9165
        Attorneys for Fidelity National Insurance Company
        and Fidelity National Property and Casualty
        Insurance Company

**CERTIFICATE OF SERVICE**

        I hereby certify that a copy of the above and foregoing has this date been served upon all parties to this suit through counsel via electronic mail and/or by placing same in the United States mail, postage prepaid and properly addressed on this 16th day of March, 2010.

        */s/ Gerald J. Nielsen*
        Gerald J. Nielsen