# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* BRANCH CONSULTANTS, LLC | CIVIL ACTION |
| VERSUS | NO:  06-4091-SSV-SS |
| ALLSTATE INSURANCE COMPANY, et al | |

## REPORT AND RECOMMENDATION

In their proposed discovery plan (Rec. doc. 289), the Insurer Defendants[1] contend that, pursuant to <u>Rockwell International Corp., v. United States</u>, 549 U.S. 457, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007), the Court has no subject matter jurisdiction over any claims other than the claims for the exemplar properties identified in the first amended complaint (Rec. doc. 49).  Because the scope of discovery hinges on an issue of subject matter jurisdiction, this ruling is being issued as a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons described below, the undersigned finds that the Court lacks subject matter jurisdiction over claims for properties identified through discovery.  It is therefore recommended that the motion of the Insurer Defendants for a protective order be granted (Rec. docs. 289 and 309) and that Branch be prohibited from discovery of properties other than the exemplar properties.

---

[1]  The defendants include Liberty Mutual Fire Insurance Company ("Liberty Mutual"), American National Property and Casualty Company ("ANPAC"), American Reliable Insurance Company of Scottsdale ("American Reliable"), Standard Fire Insurance Company ("Standard Fire"), Fidelity National Insurance Company and Fidelity National Property and Casualty Insurance Company (collectively referred to as "Fidelity").  They are sometimes referred to as the "Insurer Defendants".

Branch also seeks discovery from Simsol Insurance Services, Inc. ("Simsol") and Colonial Claims Corporation ("Colonial").  They are sometimes referred to as Adjuster Defendants.  On March 1, 2010, Branch was granted leave to amend to add Allstate Insurance Company ("Allstate") and Pilot Catastrophe Services, Inc. ("Pilot"), as defendants.

## BACKGROUND

Branch seeks discovery from the Insurer Defendants.   In its proposed discovery plan, Branch stated:

> The potential spectrum of permissible discovery ranges from limiting discovery to only those examples listed in the complaint (the "Narrow Option") to allowing discovery on each of the tens of thousands of properties for which Defendants performed Katrina-related flood adjustments (the "Broad Option").  Neither of these options is appropriate.  The Narrow Option is unduly narrow:  there is no basis for depriving Branch of discovery to support its duly pled allegations, and as a practical matter this case is not economical if it is limited to only the exemplar properties in the complaint (the "Exemplar Properties").  The Broad Option is too broad: there is no way for either side to feasibly audit tens of thousands of individual flood adjustments.
>
> *     *     *
>
> Branch respectfully suggests that discovery in this case should focus on a statistically significant, randomly selected ("SSRS") sample of properties for each Defendant.
>
> *     *     *
>
> Branch respectfully requests that the Court order Defendants to promptly produce adequate information to allow a SSRS sample to be selected so that, as far as individual properties are concerned, discovery in this case can focus on those properties and the Exemplar Properties.

Rec. doc. 287 at 1-2.[2]  The defendants responded that the Court's subject matter jurisdiction limits discovery to the properties identified in the first amended complaint.  Rec. doc. 289.[3]  After a

---

[2] In support of their request for a protective order, the Insurer Defendants also contend that sampling may not be used to plead or prove a FCA action.  Rec. doc. 344.  Because of the finding that the Court lacks subject matter jurisdiction over claims for properties identified through discovery, the sampling issue was not reached.

[3] The Insurer Defendants do not provide any explanation as to why this issue was not raised in conjunction with their motions to dismiss which were resolved on October 19, 2009.  See United States ex rel Branch Consultants, LLC v. Allstate Insurance Co., 668 F.Supp.2d 780(E.D.La. 2009)(Vance, J.).

On May 14, 2009, the District Judge ordered the parties to submit a consensual non-destruction order for approval.  They could not agree on the terms of the order.  One dispute concerned Branch's objection that defendants' proposed order permitted them to destroy documents not directly related to properties identified in Branch's first amended complaint.  Rec. doc. 223 at 1.  The District Judge refused to limit the scope of the non-destruction order to

conference with the parties on January 20, 2010, the defendants' request was treated as a motion for a protective order.  Rec. doc. 309 at 4-5.  The parties submitted further memoranda.  Rec. docs. 344, 384 and 390.  The issue was referred for a report and recommendation.  Rec. doc. 483.

**STATEMENT OF THE ISSUE**

A.      **Section 3730(e)(4) of the False Claims Act.**

The False Claims Act prohibits false or fraudulent claims for payment to the United States, and authorizes civil actions to remedy such fraud to be brought by the Attorney General or by private individuals in the government's name.[4]  There is a threshold jurisdictional limitation on the scope of the statute.[5]  Pursuant to 31 U.S.C. § 3730(e)(4):

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . ., unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based. . . .

---

the properties listed in the first amended complaint because the relevance of documents not directly related to the exemplar properties had not been fairly evaluated at that time.  Id. at 4.

The Insurer Defendants knew that Branch would seek discovery on additional properties.  In the interest of judicial economy they should have urged in the alternative that the Court's subject matter jurisdiction was limited to the exemplar properties.  This would have permitted the District Judge to resolve this jurisdictional issue with the other issues raised in the motions to dismiss.

[4] 31 U.S.C. § 3729(a) provides that "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval . . . is liable to the United States Government for a civil penalty."

31 U.S.C. § 3730(a) provides that "[t]he Attorney General diligently shall investigate a violation under section 3729.  If the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person."

31 U.S.C. § 3730(b) provides that "[a] person may bring a civil action for a violation of section 3729 for the person and for the United States Government."

[5] Rockwell, 127 S.Ct. at 1405-06.

3

Id.[6]  The Supreme Court has stated that "§ 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to some claim . . . [and] § 3730(e)(4) does not permit such claim smuggling." Rockwell International Corp., v. United States, 549 U.S. 457, 127 S.Ct. 1397, 1410, 167 L.Ed.2d 190 (2007).

The Insurer Defendants argue that:

1.   The Court is without jurisdiction to consider any claims other than the claims for the twenty-seven exemplar properties.[7]

2.   This follows from the Court's determination that the Government was investigating the loss-shifting scheme before Branch filed its complaint.

3.   Inasmuch as the Court's jurisdiction is limited to the claims for the exemplar properties, the scope of discovery is equally limited.[8]

**B.   Branch is subject to the threshold limitation on the scope of the statute.**

In United States ex rel. Branch Consultants, LLC v. Allstate Insurance Co., 668 F.Supp.2d

---

[6]  In response to the relator's assertion in Rockwell that the defendant conceded his original-source status, the Supreme Court held that the concession would have been irrelevant because Section 3730(e)(4) is jurisdictional.  127 S.Ct. at 1405.  The Court found that the jurisdictional nature of the original-source requirement was clear from the words of the statute themselves.  Id. at 1406.

[7]  The first amended complaint (Rec. doc. 49) lists 57 exemplar properties:

| | | |
|---|---|---|
| 1. | Allstate | 20 properties |
| 2. | Fidelity | 10 properties |
| 3. | State Farm | 10 properties |
| 4. | ANPAC | 9 properties |
| 5. | Liberty Mutual | 2 properties |
| 6. | Am. Reliable | 3 properties |
| 7. | Standard Fire/St. Paul | 3 properties |
| | Total | 57 |

State Farm is no longer a party.  The status of Allstate is not finally resolved.  Thus, for the Insurer Defendants there are twenty-seven exemplar properties.

[8]  This argument was made in the Insurer Defendants' response to Branch's proposed discovery plan.  Rec. doc. 298 at 3-4.  See also Rec. doc. 289 at 1 and 4 and Rec. doc. 344 at 17.

780 (E.D.La. 2009) (Vance, J.), the Court stated:

> There is no dispute that the materials publicly disclose allegations of the *potential* for fraud in the post-Katrina circumstances by a large number of insurance companies. The generalized accusations in the materials outline the nature of the fraudulent scheme that Branch alleges in this action.

Id. at 791 (italics in original). "[T]he public disclosures placed the very essence of the allegations into the public domain, and they are sufficient to identify particular defendants." Id. at 795. Thus the District Judge found that the allegations in Branch's complaint were publicly disclosed for the purpose of the FCA. Id. at 795. The Court stated:

> [T]he Fifth Circuit would require only substantial similarity between the allegations before the jurisdictional bar is invoked. Here, there is no doubt that the allegations in the public disclosures are substantially similar to those in Branch's complaint. Both allege that, after the proof-of-loss standards were temporarily relaxed during the recovery from Hurricane Katrina, WYO insurers overstated flood damage to properties with NFIP policies and understated the amount of damage resulting from causes of loss for which the insurers had to pay themselves. <u>The Court accordingly finds that Branch's suit is based upon the public disclosures, and it will be barred unless Branch qualifies as an "original source."</u>

Id. at 796-97 (emphasis added).

The Court's discussion of whether Branch qualifies as an "original source" is found at 668 F.Supp.2d at 797-803. The Court stated that "the relator must be the original source of every claim it brings," id. at 797, and found that Branch's allegations satisfied the qualifications as an original source:

> Here, Branch has pleaded facts that establish direct knowledge of the fraud because this knowledge was acquired through the relator's own efforts. The First Amended Complaint describes in detail the results of Branch's examinations of fifty-seven properties. [For example,] [e]ach description lists the address of the reexamined property, the insurer, a description of the damage, the amount of flood insurance paid, and Branch's determination of the actual amount of flood damage. . . .
>
> The alleged information Branch gleaned from these reexaminations of WYO-insured property is qualitatively different from the information that had been placed into the

public domain by the disclosures.

668 F.Supp.2d 797-98 (citation omitted).

The foregoing establishes that:

1.      The relator, Branch, alleges a broad far ranging fraudulent scheme.

2.      Public disclosures placed these allegations into the public domain and were sufficient to identify particular defendants.  668 F.Supp.2d at 795.

3.      The allegations in the public disclosures are substantially similar to those in the relator's complaint.  668 F.Supp.2d at 797.

4.      The relator's suit is barred unless it qualified as an original source.  668 F.Supp.2d at 797.

5.      Based on its allegations, Branch is an original source for the examples of the fraudulent scheme found in its complaint.  668 F.Supp.2d at 797-803.

**C.      Questions and Brief Answers**.

The following questions are raised:

1.      Is Branch an original source for the fraudulent scheme?  No.

2.      Does Branch possess original source status for examples of the fraudulent scheme which may be developed through discovery?  No.

3.      Has any court ever interpreted Rockwell in the manner sought by the Insurer Defendants?  No.

4.      Why is Branch not entitled to discovery on the entire fraudulent scheme, when a relator who is not subject to the jurisdictional limitation in Section 3730(e)(4) is entitled to such discovery?  Because Branch is not an original source as to the

6

alleged fraudulent scheme.

## ANALYSIS

**A.      Branch is not an original source for the fraudulent scheme**.

The conclusion that Branch is not an original source of the loss-shifting scheme follows from the findings that: (1) the public disclosures placed the very essence of Branch's allegations into the public domain (668 F.Supp.2d at 795); and (2) Branch's suit is based upon the public disclosures (Id. at 796-97).  There is no contention that Branch was the source of the public disclosures.

**B.      Branch does not possess original source status for examples of the fraudulent scheme which may be developed through discovery**.

Branch does not contend that it possesses original source status for examples of the fraudulent scheme which may be developed through discovery.  Examples produced through discovery will not satisfy the requirement that the relator's knowledge of the additional examples be direct.  Knowledge is direct when it derives from the source without interruption or is gained by the relator's own efforts rather than learned second-hand through the efforts of others.  668 F.Supp.2d at 797.  Information gained from the defendants pursuant to discovery is not derived without interruption and it is not gained by Branch's own efforts.

**C.      No court has interpreted <u>Rockwell</u> in the manner sought by the Insurer Defendants.**

Branch is correct that the Insurer Defendants have not cited any decision which interpreted <u>Rockwell</u> to limit discovery in the manner sought by them.  It is equally true that Branch has not cited any decision in which a relator, whose action is subject Section 3730(e)(4) and who is only an original source as to certain examples of a fraudulent scheme, was granted discovery on additional examples of the scheme.

**D.    The structure of the False Claims Act and its resolution of conflicting goals produces the result in this case.**

Why should there be one result for a relator whose action is subject Section 3730(e)(4), and a different result for a relator whose action is not?  In <u>United States ex rel. Bledsoe v. Community Health Systems</u>, 501 F.3d 493 (6th Cir. 2007), the Court stated:

> [W]e hold that where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme.

<u>Id</u>. at 510.  In <u>Bledsoe</u>, the action was not based on public disclosure of allegations or transactions and therefore the suit was not subject to the threshold limitation in Section 3730(e)(4).

In <u>Rockwell</u>, the Supreme Court stated:

> The False Claims Act contemplates <u>two types of actions</u>.  <u>First</u>, under § 3730(a), if the Attorney General finds that a person has violated or is violating section 3729, the Attorney General may bring a civil action under this section against the person. <u>Second</u>, under § 3730(b), a person may bring an action for a violation of section 3729 for the person and for the United States Government.  When a private person brings an action under § 3730(b), the Government may elect to proceed with the action, § 3730(b)(4)(A), or it may decline to take over the action, in which case the person bringing the action shall have the right to conduct the action, § 3730(b)(4)(B). The statute thus draws a sharp distinction between actions brought by the Attorney General under § 3730(a) and actions brought by a private person under § 3730(b).

127 S.Ct. at 1411 (emphasis added and quotation marks and brackets omitted).  Section 3730(e)(4)(A) defines a situation where the second type of action (the *qui tam* action) may be barred:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions . . . , unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

<u>Id</u>.  Section 3730(e)(4) divides *qui tam* actions into those that are subject to its jurisdictional

limitation and those that are not.  On one side are *qui tam* actions, like <u>Bledsoe</u>, that are not based

upon public disclosure of the allegations.[9]  On the other are *qui tam* actions that are based upon

public disclosure but the relator possesses original source-status.  For the latter *qui tam* actions, a

court's subject matter jurisdiction is limited to those claims for which the relator possesses original-

source status and jurisdiction in gross is prohibited.

Inasmuch as Branch is not an original source for the allegations of the loss-shifting scheme,

the Court's subject matter jurisdiction is limited to the claims for the exemplar properties; that is,

those properties on which Branch is an original source.  Because Branch is prohibited from asserting

jurisdiction in gross, the Court's subject matter jurisdiction cannot expand to examples of the loss-

shifting scheme developed through discovery.

The legislative history offers further explanation:

> Section 3730 attempts to reconcile two conflicting goals, specifically, preventing opportunistic suits, on the one hand, while encouraging citizens to act as whistleblowers, on the other.  When first enacted, the False Claims Act allowed relators to file suits and receive a share of the government's recovery even if they personally did nothing to help expose the alleged fraud.  In the period preceding Congress's first amendment to the Act in 1943, *qui tam* litigation surged as opportunistic private litigants chased after generous cash bounties and, unhindered by any effective restrictions under the Act, often brought parasitic lawsuits copied from preexisting indictments or based upon congressional investigations.   In response, Congress amended the False Claims Act in 1943 to do away with such parasitic suits.

> Following a decline in *qui tam* litigation after the 1943 amendment, the legislature again amended the Act in 1986.  The primary purpose of this change was to "shift the advantage back to the government in the fight against fraud.  The 1986 amendment, which introduced the current version of section 3730(b)(5), sought to achieve the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs

---

[9]  "Where there has been no 'public disclosure' within the meaning of section 3730(e)(4)(A), there is no need for a *qui tam* plaintiff to show that he is the 'original source' of the information."  <u>Wang ex rel. United States v. FMC Corp.</u>, 975 F.2d 1412, 1416 and 1420 (9th Cir. 1992).

who have no significant information to contribute of their own.  In construing section 3730, we are mindful of the need to preserve a balance between the amendment's two competing goals.

United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab., 149 F.3d 227, 233-34 (3rd Cir. 1998)(citations and quotation marks omitted).  Because Branch's allegations were the subject of public disclosure, its cause of action is limited to the claims on the exemplar properties where it possesses original-source status and it can contribute significant information of its own.

Branch may argue that if it is not permitted to discover additional examples of the fraudulent scheme, there will be an injustice in that the Insurer Defendants will not face a day of reckoning on whether there are other properties within the fraudulent scheme.  The original source requirement only applies to a person who brings a *qui tam* action based upon the public disclosure of allegations or transactions.  The requirement does not apply to an action by the United States. 31 U.S.C. 3730(e)(4).

In Rockwell, the relator filed the *qui tam* action in 1989.  The United States declined to intervene but "later reversed course, and in November 1996, the District Court granted the Government's intervention."  127 S.Ct. at 1404.  After determining that the relator was not an original source, the Supreme Court held that the elimination of the relator left "in place an action pursued only by the Attorney General, that can reasonably be regarded as being 'brought' by him for purposes of 3730(e)(4)(A)."  Id. at 1411-1412.  Thus, the United States would not be barred from pursuing claims on which Branch lacks original source status.

**E.    The Result Is Not Contrary To Precedent.**

Branch contends that the result sought by the Insurer Defendants is contrary to well-established precedent.  In addition to Bledsoe, it cites United States ex rel. Thompson v.

Columbia/HCA HealthCare Corporation, 20 F.Supp.2d 1017 (S.D. Tex. 1998); United States ex rel. Herbert v. Dizney, 295 Fed. Appx. 717, 2008 WL 4538308 (5th Cir. 2008); United States ex rel. Roop v. Hypoguard USA, Inc., 559 F.3d 818 (8th Cir. 2009); and United States ex rel. Joshi v. St. Luke's Hospital, Inc., 441 F.3d 552 (8th Cir. 2006).

From 1995 to 1999, the relator in Bledsoe worked at a hospital owned by Community Health System ("CHS").  During his employment he became aware of billing irregularities, including upcoding.  He reported the results of his investigation to the OIG-HHS,[10] but was told the government would not take the case without substantial evidence.  In February 1998, he filed a *qui tam* FCA action and alleged that CHS knowingly presented false claims by miscoding and upcoding items billed to Medicare and Medicaid.  The United States declined to intervene.

In the fall of 1997, the government contacted CHS about upcoding at two hospitals.  In December 1997, CHS reported coding irregularities.  In March of 2000, OIG-HHS and CHS settled with an agreement by CHS to pay more than $30 million.  The settlement agreement provided that relator's claims were excluded from the agreement.

In July 2000, the relator filed an amended complaint with additional defendants and new allegations of a scheme to defraud the government.  He no longer alleged upcoding or miscoding.[11] On the first appeal, the court of appeals held that the relator should be allowed to amend to attempt to satisfy Rule 9(b).  The relator filed a seconded amended complaint, including renewed coding allegations.  The district court dismissed the complaint and there was a second appeal.

---

[10] Office of Inspector General - Department of Health and Human Services.

[11] The relator also sought a share of the settlement.  The district court rejected the claim.  On the first appeal, the issue was remanded.  After an evidentiary hearing, the district court concluded that the relator could not recover any part of the OIG-HHS settlement.  On the second appeal, the court of appeals held that the relator was not entitled to a share of the settlement.  501 F.3d at 522.

11

As to the dismissal of the second amended complaint, the first issue concerned the necessity of pleading specific false claims. The court stated:

> The first point of contention is whether Rule 9(b) requires a relator to identify specific false claims with particularity. Relator argues that it is unnecessary that the allegations in his SAC [second amended complaint] identify *specific false claims;* rather, according to Relator, his complaint is adequate if it instead pleads a *false scheme* with particularity. We disagree with this analysis because it is inconsistent with the FCA and our case law interpreting it. We hold that pleading an actual false claim with particularity is an indispensable element of a complaint that alleges a FCA violation in compliance with Rule 9(b).

501 F.3d at 504 (italics in original). In reference to discovery, the court stated:

> [W]e hold that where a relator pleads a complex and far-reaching fraudulent scheme with particularity, and provides examples of specific false claims submitted to the government pursuant to that scheme, a relator may proceed to discovery on the entire fraudulent scheme.

501 F.3d at 510.

Bledsoe is not precedent for Branch because CHS did not contend that the relator's fraudulent scheme was subject to the threshold limitation in Section 3730(e)(4). There was no argument that the allegations in relator's complaint, as amended, were publicly disclosed for the purpose of the FCA and that his suit was based upon these public disclosures. There was no inquiry as to whether the relator was an original source for any of his claims.

In Thompson, a physician engaged in private practice filed a *qui tam* action alleging Medicare and Medicaid fraud. He alleged that the defendants controlled healthcare providers in Corpus Christi. Among the allegations was the claim that the defendants violated an anti-kickback statute by offering physicians preferential opportunities not available to the general public.[12] Unlike

---

[12] The first Thompson decision was United States ex rel. Thompson v. Columbia/HCA Healthcare Corporation, 938 F.Supp. 399 (S.D. Tex. 1996). The district judge granted the defendants' motion to dismiss. The Court of Appeals affirmed in part and remanded in part. 125 F.3d 899 (5th Cir. 1998). On remand, the district judge denied the defendants' motion to dismiss or summary judgment and granted the relator's motion to amend. 20 F.Supp.2d 1017 (S.D. Tex. 1998).

Branch, the allegations of the relator in <u>Thompson</u> were not based upon publicly disclosed information.

The circumstances in <u>Dizney</u> were similar to <u>Thompson</u>. Two individuals filed a *qui tam* action against St. Claude Medical Center, LLC and other entities alleging Medicare/Medicaid fraud. The trial judge dismissed the complaint for failure to state a claim, and the Fifth Circuit affirmed. The relators' allegations were not based upon public disclosure.

In <u>Roop</u>, a former employee filed a *qui tam* action against his former employer alleging Medicare fraud. He conceded that his initial complaint failed to plead a FCA claim but contended that the trial court should have permitted him to amend. In <u>Joshi</u>, an anesthesiologist at a hospital brought a *qui tam* action against the hospital and the chief of anesthesiology for Medicare fraud. The trial court dismissed the action for failure to plead fraud with particularity. The Eighth Circuit affirmed both dismissals. The relators' allegations were not based upon public disclosures.

In <u>Bledsoe</u>, <u>Thompson</u>, <u>Dizney</u>, <u>Roop</u> and <u>Joshi</u>, the relators gained knowledge of the alleged false claims through their employment with the defendants or because of particular knowledge of the operations of the defendant. These decisions are not precedent for the issue raised by the Insurer Defendants. Unlike Branch, none of the claims in these cases were based upon publicly disclosed information and therefore subject to the jurisdictional requirement in Section 3730(e)(4) and the threshold limitation on the scope of the statute. Thus, these decisions are representative of a type of *qui tam* action different from Branch's *qui tam* action.

**F.    Types of Claims and Examples of Claims.**

Branch contends that <u>Rockwell</u> and the three cases cited by it refer to a type of claim rather

Branch cites the decision on remand. The first decision contains a more complete statement of the background of the litigation.

13

than examples of a claim.  The three cases are:  United States ex rel. Merena v. SmithKline Beacham Corporation, 205 F.3d 97 (3rd Cir. 2000) (Alito, J.); Hays v. Hoffman, 325 F.3d 982 (8th Cir. 2003); and Wang ex rel. United States v. FMC Corp., 975 F.2d 1412, 1415-16 and 1420 (9th Cir. 1992).

Branch is correct that when Rockwell and the three decisions use the word "claim" in reference to Section 3730(e)(4) prohibiting jurisdiction in gross, they are referring to a type of claim or types of claims.  Branch argues that because the decisions are referring to types of claims or schemes, the prohibition on jurisdiction in gross does not apply to additional examples of a type of claim.  This ignores the fact that Branch lacks original source status for a type of scheme.  Rather, it only possesses such status for 57 examples of a type of scheme.

An illustration of the effect of this distinction is found in Hays.  The relator, a former employee of one of the defendants, filed a *qui tam* FCA action which was based upon public disclosures.  325 F.3d at 986-88. The court of appeals stated:

> [W]e must resolve the original source issue on a claim-by-claim basis.  The jury found that defendants committed eleven types of false claims.  On appeal, defendants concede that Hays was the original source of one allegation that was then confirmed by the DHS audit-defendants falsely claimed that apples given as gifts to SFHS employees were a Medicaid-reimbursable food expense.  However, Hays has failed to establish that he was an original source as to the other ten claims.

325 F.3d at 990 (emphasis added).  The relator was an original source as to only one type of claim. He lacked such status for the other ten types of false claims.  The court of appeals found that within the one type of claim for which relator was the original source, there were eight instances or examples of false claims.  325 F.3d at 993-94.  Thus, he was awarded a penalty of $10,000 for each of the eight instances of false claims in the apple scheme for a total of $80,000.  Id. at 994.  The court held that it lacked jurisdiction over the other ten types of claims.  Id. at 991.

Branch's first amended complaint describes only one type of claim, the loss-shifting scheme,

14

but it is not an original source as to this scheme.  It is an original source only for the claims on the exemplar properties.

In <u>Wang</u>, the relator, a former FMC employee, filed a *qui tam* action, in which he alleged that FMC defrauded the government on four separate projects: (1) a vehicle horsepower estimation project; (2) a submarine weapon system; (3) a towed howitzer; and (4) a multiple launch rocket system ("MLRS") for the Bradley vehicle.  975 F.2d at 1415-16.  There had been no public disclosure of the allegations for the first three projects, so there was no original source issue on these projects.  <u>Id</u>. at 1415-16.  There was public disclosure of the allegations for the fourth project.  <u>Id</u>. at 1417.  "Because [the relator] . . . had no hand in the original public disclosure of the Bradley's troubles, [his] . . . claim regarding the MLRS is blocked by the jurisdictional bar of section 3730(e)(4)(A)."  975 F.2d at 1420.

The four projects in <u>Wang</u> are different types of claims and not examples of the same claim. This does not assist Branch.  The only project in <u>Wang</u> pertinent to Branch was the fourth.  The relator in <u>Wang</u> could not demonstrate that he was responsible for the public disclosures on the fourth project, so his *qui tam* action for that project was barred by Section 3730(e)(4).  <u>Wang</u> is the other side of the coin in <u>Hays</u>.  In <u>Hays</u>, the relator was an original source on only one type of claim. His recovery was limited to the eight instances of that type of claim.  The relator in <u>Wang</u> was not an original source on the fourth project or type of claim, so he was barred from pursuing the fourth project.[13]

---

[13]  After the suit was filed, the parties engaged in a significant amount of discovery.  After this discovery and at the request of the court, FMC addressed whether the relator was an original source.  975 F.2d at 1415.  A massive number of documents were made available to him during discovery.  <u>Id</u>. at 1416.  Some of these documents were made available on the first three projects, where the allegations were not publicly disclosed.  <u>Id</u>. at 1415-16.  Discovery on these projects does not assist Branch as the claims were not subject to the jurisdictional limitation in Section 3730(e)(4). The fact of discovery on the fourth project does not assist Branch because the issue of whether the relator was an original

Merena and a related decision, United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab., 149 F.3d 227 (3rd Cir. 1998), began with a 1992 government investigation into a fraudulent scheme which was employed by SmithKline Beacham ("SmithKline") to bill the federal government for unauthorized and unnecessary laboratory work.[14]  It was referred to as the automated chemistry scheme.  In December 1992, there was national attention when one of the contractors that had engaged in the automated chemistry scheme settled a FCA action for $111 million.  Robert Merena and others filed three *qui tam* actions (sometimes referred as to the "original *qui tam* actions" and "original relators").  Three other *qui tam* actions were filed (sometimes referred to as the "later *qui tam* actions" and "later relators").  In 1996, the government and SmithKline agreed to a $325 million settlement which was intended to cover the automated chemistry claims along with claims in the *qui tam* actions.  The Merena and LeCorte decisions are concerned with the rights of the original and later relators to share in the settlement.

In LaCorte, the issue was whether the claims of the later relators were barred by Section 3730(b)(5)'s first-to-file rule as duplicative of the claims of the original relators.  The application of Section 3730(e)(4) was not an issue in LaCorte.  The district judge determined that all but one

---

source was raised after the completion of discovery.

[14]  Pursuant to the scheme:

The laboratories had "bundled" a standard grouping of blood tests with some additional tests and had then marketed this grouping to doctors by leading them to believe that the additional tests would not increase costs to Medicare and other government-sponsored health programs.  After the tests were ordered, the laboratories "unbundled" the additional tests from the standard grouping for purposes of billing. In many instances, treating physicians had made no determination that the additional tests were medically necessary for the diagnosis or treatment of patients; instead, the physicians had ordered the tests solely because they were sold as a package with other tests that they had deemed necessary.  As a result, the laboratories submitted bills and received payment for tests that were medically unnecessary.

205 F.3d at 98-99.

of the claims brought by the later relators were barred under the first-to-file rule.  This decision was affirmed.  The court of appeals reviewed the district judge's claim-by-claim analysis to "determine whether each claim was barred under the 'first-to-file' rule . . . ."  205 F.3d at 100.  In the analysis of one of the claims, the court stated:

> Claim 2 alleges that SmithKline substituted its more expensive tradename blood profiles when doctors ordered certain standard blood chemistry panels (known as "SMAC," . . . and "SMA" . . .).  LaCorte's complaint listed several tests included in the SmithKline tradename profiles, but not in the SMAC, and SMA actually ordered by physicians.  He now argues that section 3730(b)(5) does not bar Claim 2 with regard to two of these tests. . . .

> We disagree.  Merena and the Grossenbacher parties pleaded that SmithKline fraudulently billed and marketed blood chemistry profiles.  These allegations clearly encompass Claim 2.  For instance, Merena alleged that by expanding and manipulating its test profiles, performing tests that are not medically necessary, and improperly billing for tests that should have been part of an automated test profile, <u>SmithKline has knowingly presented numerous false and fraudulent claims for payment by the government.</u>

149 F.3d at 235 (emphasis added).  In its discussion of the automated chemistry scheme, the court stated:

> Clausen's attempt to distinguish his claims is misguided.  First, as noted above, Merena and the Grossenbacher parties alleged that SmithKline used a separate billing scheme for a wide variety of blood chemistry tests.  We see no meaningful distinction between Clausen's allegation that SmithKline secretly added tests to its profiles to confuse doctors about what they ordered, on the one hand, and Merena's allegations that the company "improperly bill[ed] for tests that should have been part of an automated test profile," on the other.  We therefore hold that these earlier allegations encompass Clausen's first claim.  Accordingly, that claim is barred by § 3730(b)(5).

<u>Id</u>. at 237(citations omitted).  <u>LaCorte</u>'s review of the claim-by-claim analysis demonstrates that Claim 2 and the automated chemistry scheme were types of a claim which included the presentment of numerous false and fraudulent claims for payment by the government.

In <u>Merena</u>, the issue was the application of Section 3730(e)(4) to the claims of the original

17

relators.  The government argued that the original relators could not receive any part of the settlement attributed to the automated chemistry scheme because their automated chemistry claims were jurisdictionally barred under the public-disclosure provision of Section 3730(e)(4).  205 F.3d at 100.  On appeal there were two issues: the first concerned the application of the *qui tam* statute to a multi-count complaint; and the second concerned the interpretation of Section 3730(e)(4).  205 F.3d at 101.

As to the first issue, the court of appeals held:

> [I]n applying section (e)(4), it seems clear that each claim in a multi-claim complaint must be treated as if it stood alone.  It follows, therefore, that in determining whether the relators in this case are entitled to a share of any proceeds that are attributable to the "automated chemistry" claims, we must consider whether they would have been entitled to such a share had their complaints asserted those claims alone.

205 F.3d at 102.  In reaching this conclusion, the court of appeals began by noting that one of the quirks in the *qui tam* statute is that it is based on the model of a single-claim complaint.  Id. at 101.  It agreed, however, with the district court that in most *qui tam* actions there could be allegations of multiple false claims in a complaint.  Id. at 101-02.  It determined that where the government decided to take over only certain claims in a multi-claim action, there was no reason why the government could not settle or dismiss only some of the claims.  Id. at 102.  The court of appeals stated:

> [A]s the District Court's prior rulings in this case illustrate, when it is asserted that a later-filed complaint contains claims that are based on the facts underlying certain claims in a pending multi-count complaint, the court must conduct a claim-by-claim analysis in order to determine if section 3730(b)(5) applies.

Id. at 102.  The claim-by-claim analysis refers to the analysis reviewed in LaCorte.  The word "claim" refers to a type of claim which included numerous examples.  The court of appeals considered the issue of joinder of a claim in a multi-claim suit.

18

> What happens under these provisions if a relator files a multi-claim suit and some, but not all, of the claims fall into one of these categories?  The plaintiff's decision to join all of his or her claims in a single lawsuit should not rescue claims that would have been doomed by section (e)(4) if they had been asserted in a separate action. And likewise, this joinder should not result in the dismissal of claims that would have otherwise survived.

205 F.3d at 102 (emphasis added).[15]  The emphasized language is cited by the Supreme Court as demonstrating that every court which has addressed the question has concluded that Section 3730(e)(4) does not permit jurisdiction in gross or claim smuggling.  Rockwell, 127 S.Ct. at 1410.

In Rockwell, it was conceded that the claims on which the relator prevailed were based upon publicly disclosed allegations within the meaning of Section 3730(e)(4)(A).  127 S.Ct. at 1405.  The Supreme Court was required to determine whether the relator met the jurisdictional requirement of being an original source.  Id. at 1406-07.  It found that:

> Stone's knowledge falls short.  The only false claims ultimately found by the jury (and hence the only ones to which our jurisdictional inquiry is pertinent to the outcome) involved false statements with respect to environmental, safety, and health compliance over a one-and-a-half-year period between April 1, 1987, and September 30, 1988.  As described by Stone and the Government in the final pretrial order, the only pertinent problem with respect to this period of time for which Stone claimed to have direct and independent knowledge was insolid pondcrete.  Because Stone was no longer employed by Rockwell at the time, he did not know that the pondcrete was insolid; he did not know that pondcrete storage was even subject to RCRA; he did not know that Rockwell would fail to remedy the defect; he did not know that the insolid pondcrete leaked while being stored onsite; and, of course, he did not know that Rockwell made false statements to the Government regarding pondcrete storage.

---

[15]   The remaining part of Merena was concerned with the interpretation of Section 3730(e)(4) and the entitlement of the original relators to a share of the settlement.  205 F.3d at 102-06.  The court of appeals concluded that a relator whose claim was subject to dismissal under Section 2730(e)(4) may not receive any share of the proceeds attributable to the claim.  Id. at 106.  The action was remanded for a determination as whether the original relators were original sources of information, as defined by Section 3730(e)(4)(B), with respect to the automated chemistry claims. Id. at 107-08.

<u>Id</u>. at 1409-10.[16]   He did not possess original-source status as to the insolid concrete claim.

> Stone counter[ed] that his original-source status with respect to his spray-irrigation <u>claim</u> (which related to a time period different from that for his pondcrete <u>claim</u>) provided jurisdiction with respect to all of his claims. We disagree. Section 3730(e)(4) does not permit jurisdiction in gross just because a relator is an original source with respect to <u>some</u> <u>claim</u>.  We, along with every court to have addressed the question, conclude that § 3730(e)(4) does not permit such claim smuggling.

<u>Id</u>. at 1410 (emphasis added).  The reference to "claim" refers to types of claims (spray-irrigation claim or pondcrete claim) rather than instances or examples of a spray irrigation claim or pondcrete claim.

Therefore, Branch is correct in stating that <u>Rockwell</u> did involve different types of claims. Subject matter jurisdiction over one type of claim, the spray-irrigation claim, did not provide subject matter jurisdiction for another type of claim, the pondcrete claim, because Stone lacked original source status for the pondcrete type of claim.  But while Stone possessed original-source status as to a type of claim, the spray-irrigation claim, Branch does not possess such status for the loss-shifting scheme.  Rather, the claim is based upon publicly disclosed information.  Branch only possesses original source status for claims involving the exemplar properties.

Branch contends that <u>Rockwell</u> and Section 3730(e)(4) do not bar its discovery of additional examples of the loss-shifting scheme.  <u>It bears repeating that Branch does not contend that it possesses now or will posses original source status for any examples of the loss-shifting scheme developed through discovery</u>.  Thus, Branch contends because there is subject matter jurisdiction for the examples of the loss-shifting scheme described in the first amended complaint, the Court has

---

[16]  In <u>Rockwell</u>, the relator was James Stone.  The problem referred to a procedure for mixing toxic pond sludge with cement.  The mixture was poured into large rectangular boxes where it would solidify into concrete hard blocks referred to as pondcrete blocks.  These could be stored or transported for disposal. 127 S.Ct. at 1401.  Thousands of the pondcrete blocks leaked.  These were referred to as insolid blocks.  <u>Id</u>. at 1402.

subject matter jurisdiction over additional examples developed through discovery.  Because Branch

lacks original source status for these additional examples, Branch is making the same argument

which was rejected by the Supreme Court in <u>Rockwell</u>.  Branch's original source status for the

examples in the first amended complaint does not provide the Court with subject matter jurisdiction

for additional examples obtained through discovery because Section 2730(e)(4) does not permit such

jurisdiction in gross.

**G.     Other Authorities Cited By The Parties.**

Both the Insurer Defendants and Branch cite <u>United States ex rel. Rigsby v. State Farm</u>

<u>Insurance Company</u>, 2009 WL 2461733 (S.D.Miss), <u>United States ex rel. Bane v. Breathe Easy</u>

<u>Pulmonary</u>, 2008 WL 4057549 (M.D. Fla.), and <u>United States ex rel. Grubbs v. Kanneganti</u>, 565

F.3d 180 (5th Cir. 2009), regarding the scope of discovery.

**1.     Does <u>Rigsby</u> support the result sought by the Insurer Defendants?**

The Insurer Defendants rely on the statement in <u>Rigsby</u> that <u>Rockwell</u> "indicates any relator

in an FCA case is limited to pursuing claims of which he has first hand knowledge, and each claim

must be considered on its own merits. . . ."  <u>Id</u>. at *9.  Branch cites the order requiring State Farm

to produce, *in camera*, a list of properties meeting certain criteria.  <u>Id</u>. at *10.

In <u>Rigsby</u>, State Farm sought dismissal of the action for lack of subject matter jurisdiction

pursuant to Section 3730(e)(4).  The court stated:

> I will assume, without deciding, these statutory provisions are applicable to Kerri
> Rigsby, the relator who has taken the lead in this action. I take this provisional
> approach because I am by no means certain this action is "based upon" the
> allegations made public by the Relators in the wake of Hurricane Katrina. While
> these public disclosures undoubtedly involved the same basic allegations made in the
> Amended Complaint, it is the Realtors who made the public disclosures. Thus the
> public disclosures are based upon the Relators' allegations and not the other way
> around.

2009 WL 2461733 at *2.  After Hurricane Katrina, the relators publicly charged that State Farm deliberately overpaid flood insurance claims in order to reduce its own exposure for wind damage. The court said, "[t]hese public allegations have the potential to bring the provisions of 31 U.S.C. § 3730(e)(4) into play."  Id. at *3.  It assumed that Section 3730(e)(4) applied.  Id. at *3.  It reported that if the relator prevailed on the merits of the one exemplar claim, it would "consider whether additional discovery and further proceedings are warranted."  Id. at *10.

Rigsby only assumed the applicability of Section 3730(e)(4).  It raised but did not resolve the issue of whether the relator was the source of the public disclosures.  For these reasons it provides little, if any, guidance to the issue raised by the Insurer Defendants.  Unlike Rigsby, here there are findings that: (a) the allegations in Branch's complaint were publicly disclosed for the purpose of the FCA; and (b) its suit is based upon the public disclosures.  Unlike Rigsby, here there is no contention that Branch was the source of the public disclosures.

### 2. Does Bane impose the limitations on discovery sought by the Insurer Defendants?

In Bane, the court ruled on defendants' motion for a protective order to limit discovery in a *qui tam* action.  Discovery was limited to four physicians and five facilities identified in the complaint.  It was alleged that the defendants schemed to defraud the government by submitting fraudulent claims for medically unnecessary and redundant services performed in conjunction with pulse oximetry testing. There is no discussion about whether the allegations were publicly disclosed or whether the relator was an original source.  The defendants did not argue that relator's suit was subject to the threshold limitation in Section 3730(e)(4) and discovery was limited by the scope of the court's subject matter jurisdiction.  The issue presented by the Insurer Defendants is not present in Bane.

3.      The action in <u>Grubbs</u> was not subject to Section 3730(e)(4).

In <u>Grubbs</u>, the relator, a psychiatrist, learned of a fraudulent billing scheme at a hospital just before he began his employment with the hospital.  The Fifth Circuit reversed the dismissal of the relator's *qui tam* FCA claims.  It described Rule 9(b) as performing a screening function and standing as a gatekeeper to discovery.  565 F.3d 185.  Although Branch overcame the defendants' Rule 9(b) challenge, <u>Grubbs</u> does not assist Branch in opening the gate to discovery.  The action in <u>Grubbs</u> was not based upon the public disclosure of allegations or transactions and therefore it was not subject to the threshold limitation in Section 3730(e)(4).

**H.      Cases Discussing Similar Investigations.**

When the District Judge determined that Branch was an original source, some cases were described as discussing similar investigations with similar results.  The Court found that these cases provided support for the determination that Branch was an original source for the claims on the exemplar properties.  668 F.3d at 799-801.  The parties did not cite these cases on the issue of whether the Court's subject matter jurisdiction is limited to the exemplar properties.  Because the cases discussed similar investigations, their applicability to the issue raised by the Insurer Defendants will be considered.[17]

1.      <u>Cooper v. Blue Cross and Blue Shield of Florida, Inc.</u>, 19 F.3d 562 (11th Cir. 1994).

<u>Cooper</u> was concerned with Medicare Secondary Payer fraud.  The Fifth Circuit stated:

> On August 17, 1990, Cooper instituted this *qui tam* action under the FCA alleging BCBSF committed fraud against the government by submitting <u>his claims</u>

---

[17] The Court cited <u>United States ex rel. Fried v. West Independent School District</u>, 527 F.3d 439 (5th Cir. 2008); and <u>Grayson v. Advance Mgmt. Tech., Inc.</u>, 221 F.3d 580 (4th Cir. 2000), as investigations that were found wanting. 668 F.Supp. 2d at 800-801.  Because the relators' investigations in these two cases were found wanting, <u>Fried</u> and <u>Grayson</u> are not discussed.

to Medicare when BCBSF knew it was required to pay primary.

19 F.3d at 564 (emphasis added). The description of the complaint does not refer to a broad ranging scheme where the relator's claims were examples of the scheme. Instead it indicates that the only claims were the relator's own health insurance claims. The relator was an original source as to his claims. 19 F.3d at 568. The decision does not refer to any attempt by the relator to discover whether BCBSF submitted false claims on behalf of other persons, who like him were over 65, employed, and insured by BCBSF. The decision does not support Branch's claim for discovery on additional properties.

       2.    **Kennard v. Comstock Resources, Inc., 363 F.3d 1039 (10th Cir. 2004), cert. den. 545 U.S. 1139, 125 S.Ct. 2957, 162 L.Ed.2d 887 (2005).**

The relators conducted their own investigation and concluded that Comstock, an oil field operator, was underpaying royalties to an Indian Tribe. They alleged that Comstock submitted false reports to the Mineral Management Services to avoid its obligations. Comstock responded that the relators' action was barred by Section 3730(e)(4). The relators qualified as an original source regarding the scheme. 363 F.3d at 1406. Unlike Branch, who is not an original source as to the loss-shifting scheme, the relators in Kennard were original sources of Comstock's scheme to submit false reports to the Mineral Management Services.

       3.    **United States ex rel. Durcholz v. FKW Inc., 997 F.Supp. 1159 (S.D. Ind. 1998), aff'd 189 F.3d 542 (7th Cir. 1999).**

The relator and losing bidder on a government subcontract brought a *qui tam* action against Jeffrey Strange, the government's contracting specialist. The relator claimed that Strange violated the FCA when he knowingly submitted a fraudulent delivery order for the project. 997 F.Supp. at 1168. The district court described the heart of the litigation as relator's contention that "Strange

engaged in a fraudulent course of conduct that caused the government to approve the delivery order." Id. at 1168. There was a finding that the relator was an original source based on information it unearthed in an investigation following an unsuccessful bid on a public project. Id. at 1166. Unlike Branch, who is not the original source of the loss-shifting scheme, the relator in Durcholz was an original source of Strange's fraudulent scheme to defraud the government.

       **4.**       **United States ex rel. Springfield Terminal Railway Company v. Quinn, 14 F.3d 645 (D.C. Cir. 1994).**

In its *qui tam* action, the relator alleged that the arbitrator fraudulently billed the government for days on which he had not worked on the relator's arbitration dispute. 14 F.3d at 648. The arbitrator responded that the suit was barred by Section 3730(e)(4). The court held that the relator was an original source. 14 F.3d at 657. Unlike Branch, the relator in Springfield did not allege a broad ranging scheme but instead alleged that the arbitrator defrauded the government in connection with a single arbitration dispute.

       **5.**       **United States ex rel. Farmer v. City of Houston, 2005 WL 1155111(S.D. Tex.).**

In Farmer, the public disclosure issue arose because much of the relator's action was based on responses received from requests for public information. The relator was found to be an original source because "her entire investigation began as a result of her independent knowledge that HAUL overestimated materials to repair her own roof." 2005 WL 1155111 at *5. From that knowledge, she investigated defendants' conduct over a several year period. The relator alleged fraud on more than seventy projects. 2005 WL 1155111 at *1. Unlike Branch, the relator in Farmer was an original source as to not only the scheme, but also the examples of the scheme included in her complaint.

25

6.     **United States ex rel. Reagan v. East Texas Medical Center Regional Health Care System, 384 F.3d 168 (5th Cir. 2004).**

In connection with the discussion of the <u>Cooper</u>, <u>Kennard</u>, <u>Springfield</u>, and <u>Farmer</u>, the District Judge cited the statement in <u>Reagan</u> that a relator must do more than apply his expertise to publicly-disclosed information.  668 F.Supp.2d at 800.  In <u>Reagan</u>, the Fifth Circuit affirmed the dismissal of the relator's claims because it concluded that the relator was not the original source of the information underlying her claims.  384 F.3d at 179-80.  In its consideration of the issue of whether the relator was an original source, the Fifth Circuit stated:

> Under this standard [Section 3730(e)(4)], the relator is not required to "have 'direct' and 'independent' knowledge of each false claim alleged in his complaint".  *Laird,* 336 F.3d at 352-53.  Instead, the relator is simply required to possess direct and independent knowledge of the "information on which the publicly disclosed allegations are based".  *Laird,* 336 F.3d at 355.

384 F.3d at 177 (footnote omitted).  In <u>United States ex rel. Laird v. Lockheed Martin Eng'g & Sci. Servs., Co.</u>, 336 F.3d 346 (5th Cir. 2003), the Fifth Circuit stated:

> [W]e read the term "information" in subsection (B) of the "original source" definition to refer to the information on which the publicly disclosed allegations are based rather than the information contained in the relator's *qui tam* complaint.

<u>Id</u>. at 355.  This holding was overruled in <u>Rockwell</u>.  127 S.Ct. at 1407-08.  <u>Rockwell</u> held that, "the phrase 'information on which the allegations are based' refers to the relator's allegations and not publicly disclosed allegations."  127 S.Ct. at 1408.

7.     **Federal Recovery Services, Inc. v. United States, 72 F.3d 447 (5th Cir. 1996).**

In this case, the relator argued that the United States' intervention cured any jurisdictional defect and that Section 3730(e)(4) barred *qui tam* actions based on publicly disclosed information unless the relator was an original source or unless the United States intervened.  The Fifth Circuit rejected this argument and stated:

> The United States may properly intervene in a suit by a putative source regardless of jurisdictional failures in the underlying suit.  Such intervention does not, however, confer subject matter jurisdiction over the relator's claims.  Such a reading of the jurisdictional bar of 31 U.S.C. § 3730(e)(4) ignores the False Claims Act's goal of preventing parasitic suits based on information discovered by others.

72 F.3d at 452.  See also Rockwell, 127 S.Ct. at 1410-11.  While this is not directly applicable to the argument raised by the Insurer Defendants, it is a further example of how "Section 3730(e) circumscribes the power of courts to hear *qui tam* suits." Wang v. FMC Corporation, 975 F.2d 1412, 1415 (9th Cir. 1992)

## CONCLUSION

Unlike the facts relator in Bledsoe and other *qui tam* actions which are not subject to Section 3730(e)(4), Branch's action is subject to the threshold limitation of the statute.  Unlike the relator in Hays, who was an original source for a type of claim and recovered for eight instances of the type of claim, Branch is not an original source of the loss-shifting scheme.  It is only an original source of the exemplar properties itemized in the first amended complaint.  Pursuant to Section 3730(e)(4) and Rockwell, Branch's *qui tam* action is limited to the claims on the exemplar properties, which are the only claims where Branch possesses original source status.

## RECOMMENDATION

IT IS RECOMMENDED that the motion of the Insurer Defendants for a protective order (Rec. doc. 289 and Rec. doc. 309 at 4-5) be granted and Branch be prohibited from discovery of properties other than the exemplar properties.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar

days after being served with a copy shall bar that party, except upon grounds of plain error, from

attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will

result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir.

1996) (*en banc*).

New Orleans, Louisiana, this 26th day of March, 2010.

**SALLY SHUSHAN**
**United States Magistrate Judge**