IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> *EX REL.* BRANCH CONSULTANTS, L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> FIDELITY NATIONAL INSURANCE COMPANY, *et al.* <br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) Case No. 2:06-cv-4091 <br> ) <br> ) <br> ) <br> ) <br> ) |

**BRANCH CONSULTANTS, LLC'S REPLY TO DEFENDANTS' RESPONSES TO BRANCH CONSULTANTS, LLC'S OBJECTIONS TO MAGISTRATE JUDGE SHUSHAN'S ORDER GRANTING IN PART AND DENYING IN PART ITS MOTION FOR LEAVE TO FILE ITS SECOND AMENDED COMPLAINT**

Plaintiff-Relator Branch Consultants, LLC submits this combined reply to Defendants' briefs. Rather than argue the merits of Branch's motion for leave to amend, Defendants have opted to focus their briefs on the conduct of Branch's counsel. Accordingly, Branch is compelled to address Defendants' accusations here and submits, respectfully, that those accusations are inaccurate and unfounded. In addition, on the merits of Branch's motion for leave to amend, Branch submits that the Federal Rules in their letter and spirit mandate that leave should be granted here. This case should be decided on the merits and not on technicalities of pleading. For that reason, Branch's objections should be sustained, and the Magistrate Judge's Order of March 1, 2010 (Dkt. # 417), should be overruled.

## I. PRELIMINARY STATEMENT

Branch has not changed, nor does it wish to change, its theory or the focus of its allegations. But Branch never intended or indicated that its cause of action is limited to the circumstances in which a single insurer issued both flood and homeowners insurance policies on a single property ("single-insurer properties"). Defendants did not narrowly tailor the systematic fraud that Branch challenges to exclusively those circumstances, and Branch neither pleaded nor

intended to imply that they had. The Magistrate Judge's order is erroneous in construing the pleadings to the contrary.

## II. STANDARD OF REVIEW

This Court should conduct a *de novo* review of the Magistrate Judge's order. *See* Branch's Appeal/Objections at p. 6 (Dkt. # 458). The order has the effect of likely dismissing entire parties to this action such as Colonial and Simsol, who did not issue homeowners policies. It also has the effect of dismissing from the case a large portion of the false claims challenged by Branch on properties where a single defendant did not issue both the wind and the flood policies. Indeed, American Reliable (Dkt. # 466), Standard Fire (Dkt. # 495), and Fidelity (Dkt. # 509) have already filed motions for summary judgment that are premised on the Magistrate Judge's interpretation of the First Amended Complaint ("FAC"). Because the Magistrate Judge's order has the same effect as a dispositive order, it should be reviewed *de novo*. *See, e.g., Bell v. City of Topeka*, 2006 WL 2711754, *1 (D. Kan. Sept. 21, 2006) ("[W]hen the magistrate judge's order denies a motion to amend and has the identical effect of an order dismissing a claim or party, courts consider such a ruling to be dispositive and apply de novo review."); *Covington v. Kid*, 1999 WL 9835, *2 (S.D.N.Y. Jan. 07, 1999) ("A dispositive matter is one that disposes of, or terminates, a claim or defense. In this case, because Magistrate Judge Peck's order denying Plaintiff leave to amend the complaint foreclosed the potential claims against P.O. Lorenzo and Lt. Ahearn, it was dispositive" and "the de novo standard of review applies to this appeal"); *Gossett v. Stewart*, 2009 WL 3379018, *1 (D. Ariz. Oct. 20, 2009) ("A motion to amend generally is nondispositive. In this case, however, denial of the motion would effectively dismiss four of Gossett's proposed causes of action. The Court will treat the motion as dispositive and conduct de novo review."); *cf. Ocelot Oil Corp. v. Sparrow Industries*, 847 F.2d 1458, 1462-63 (10th Cir. 1988) ("[M]otions not designated on their face as one of those excepted

in [28 U.S.C. § 636(b)(1)] subsection (A) are nevertheless to be treated as such a motion when they have an identical effect.").

### III. ARGUMENT

Branch submits that the amendments in its proposed Second Amended Complaint ("SAC") should be allowed for any one of three reasons: (a) the FAC put Defendants on notice that Branch did not intend its allegations to be restricted to single-insurer properties, (b) Branch did not believe its allegations had been interpreted in this way and acted promptly, without delay, when Defendants took the position that the allegations should be so interpreted, and (c) there is no prejudice to Defendants from allowing the proposed amendments, which serve to explain not modify the cause of action Branch had intended to plead and believes it did sufficiently plead in the FAC.

**A.   The FAC Provided Defendants With Notice Of The Claim Presented By The Proposed Amendments**

**1.   The FAC And The Proposed SAC Both Plead Loss Shifting As A Significant But Not Exclusive Part Of Branch's Cause Of Action**

The central theme of Defendants' briefing—that Branch's counsel has discovered its allegations are untrue—is completely without merit and distracts from rather than addresses the merits of the issues actually before this Court. All of Defendants' arguments concerning counsel's conduct can be rebutted with a single response: what Defendants and the Magistrate Judge call the "loss-shifting scheme" *is* a significant part of both Branch's FAC and the proposed SAC, but it is not an *essential* part. While loss shifting was and remains important—particularly with respect to the 30 State Farm and Allstate properites in the FAC, which Defendants ignore—it is not and never has been an *element* of Branch's cause of action. Branch believes in and intends to litigate its loss-shifting allegations—but not *only* those allegations.

To say that loss shifting is a significant part of Branch's allegations is emphatically not the same as saying that loss shifting describes the exclusive scope of Branch's cause of action. While Defendants would like to rewrite Branch's pleading, the fact is Branch pleaded a broader scheme than that outlined by the Magistrate:

> The defendants have defrauded the Government through *a practice of grossly overstating flood damages to insured properties damaged by Hurricane Katrina* and then, based on those overstated damages, submitting claims for payment on Government backed flood insurance policies to the National Flood Insurance Program ("NFIP"). By systematically obtaining and submitting false flood insurance claims to NFIP, and by actively concealing these practices from the Government, the defendants have submitted or caused to be submitted to the Government a series of false claims, records, statements, and certifications in violation of the FCA.

FAC ¶ 3 (emphasis added). Even with respect to loss shifting, Branch did not adopt the exclusive language imposed by the Magistrate and espoused by Defendants:

> In other words, defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies *largely* underwritten by themselves.

FAC ¶ 17 (emphasis added); *see also id.* ¶ 4 (using the term "typically" rather than largely to indicate <u>the absence of</u> exclusivity). The Magistrate Judge's order should be reversed—and Defendants' arguments rejected—because it requires construing the term "largely" to mean "exclusively." But that is not what the FAC says.

Because this is a complaint—and the issue therefore is what notice it provides, not how it might best be interpreted—Defendants are not only asking the court to rewrite "largely" to say "exclusively," they also are asking the Court to conclude that they lacked notice that Branch meant "largely" rather than "exclusively." But this conclusion flies in the face of the fact that Branch used the term "largely," the fact that Branch included defendants who were not insurers and who obviously did not underwrite any policies, and the fact that Branch's examples were

known to Defendants to <u>not</u> be exclusively single-insurer properties. Defendants' argument lacks merit.

Finally, Defendants point to the following sentence from this Court's October 19, 2009 order (Dkt. #228, hereinafter "MTD Order"): "Branch also *generally* alleges, contrary to defendants' contention, that the defendants had wind policies on the listed properties" (emphasis added). Defendants' contention that Branch misled the Court takes this sentence out of context, ignores the word "generally," and is entirely without merit. This sentence is from a paragraph in which the Court was addressing Defendants' contention that Branch had provided insufficient detail to survive Rule 9(b), and was part of a paragraph at the beginning of this Court's "how, what, when, where and how" discussion. MTD Order at 51-63. In context, this sentence occurs in the following paragraph:

> What Branch's First Amended Complaint has provided is, for each insurer defendant, a listing of properties that led to the allegedly fraudulent flood claims, the addresses of those properties, the policy numbers of the policy under which flood claims were paid, a brief description of the damage each property suffered, the amount paid under the flood insurance policy, whether or not that amount represented the policy limits, and the amount of flood damage Branch determined the property to have actually suffered. For each insurer defendant, Branch also identifies an adjuster that, upon Branch's information and belief, it believes served as the insurer's adjuster for the listed properties. In addition, for each adjuster discussed in the complaint, Branch alleges that the information listing the particular properties adjusted by that company is within the exclusive control of defendants because it was not provided to the insured or, Branch pleads on information and belief, to the government. <u>Branch also *generally* alleges, contrary to defendants' contention, that the defendants had wind policies on the listed properties. Such policies provide a *motive* to overstate flood damage for which the government is obligated to pay and to understate wind damage for which the insurance companies are responsible.</u>

MTD Order at 52 (emphasis added). The Court properly recognized that Branch's allegations concerning the wind policies were only "general" allegations. And it also recognized that those *general* allegations—again, made in the context of a complaint that involved 30 State Farm and

Allstate properties ignored by Defendants here—were addressed to "motive," which is not an element of a FCA claim.

Continuing this same discussion, after addressing the "who," "what," "when," and "where" factors this Court stated the following in relevant part with respect to the "how":

> Defendants, however, challenge the "how" of the fraud, specifically by noting that Branch makes no mention of actual false claims made to the government.... There is no question that [Branch] has pleaded the existence of a broad scheme to defraud the government, as well as provided numerous individual examples that are allegedly part of the scheme. <u>In so doing, it has pointed to particular flood policies on particular properties, demonstrated how much was paid under the policy, and provided its determination of how much *should* have been paid out under the policy. Taking all Branch's well-pleaded facts as true...that the government allegedly made payment under an existing flood policy necessarily presupposes the submission of a claim for payment. By showing the existence of an insurance arrangement and a paid claim, Branch has provided reliable indicia that a claim was actually presented to the government, and that the defendants either presented that claim or, specifically with respect to the adjuster defendants, caused it to be presented to the government. Branch's particular allegations that the amount paid differs from the damage incurred provides from the well-pleaded facts the inference that the claim was false.</u> Furthermore, the ***general*** allegation that each property was covered by a wind policy provides the ***incentive*** for the defendants to engage in the scheme.

*Id.* at 57-58 (emphasis added). The underlined portion of the foregoing passage plainly states what the Court considered to be the "how"—namely, that "how much was paid under the policy" was significantly higher than "how much *should* have been paid out under the policy." The only significance to what the Court again refers to as "the ***general*** allegation that each property was covered by a wind policy" is "incentive"—which, again, is not an element of a FCA claim. If Defendants—who obviously have known all along whether or not they issued the homeowners' policies on the exemplars—truly believed that Branch's general allegations concerning wind policies were an essential element of Branch's claims, ***why did none of them raise that argument when they filed their motions to dismiss three years ago?*** They did not do so then,

and their attempt to do so now based on the Magistrate Judge's erroneous construction of Branch's pleading should be rejected.

In addition to failing to explain why their newfound wind-policies arguments were not raised before, Defendants also ignore the point raised in Branch's Objections concerning the inherent inconsistency between this Court's conclusion that the FAC stated a claim against the Colonial and Simsol—who indisputably did not issue any wind policies—and the Magistrate Judge's conclusion limiting the FAC to properties on which a defendant issued both the wind and the flood policies. *See* Branch's Objections at p. 17. Defendants ignore this point because it inescapably demonstrates that the Magistrate's straight-jacketed construction of Branch's complaint is flawed.[1]

### 2. The Proposed Amendments To The SAC Clarify That Loss Shifting Is A Significant But Not Exclusive Part Of Branch's Cause Of Action

After erroneously construing the FAC as pleading fraud that <u>exclusively</u> rather than "largely" involved loss shifting, the Magistrate Judge disallowed amendments that Branch had proposed for the purpose of clarifying that loss shifting was not Defendants' exclusive motive for the fraud. To be plain, Branch is not asking to add counts or even add to the scope of Count 1 unless it is determined that Count 1 applies exclusively, not largely, to loss shifting and thus

---

[1] Defendants also fail to rebut the fact that they remain indirectly responsible for numerous properties whose homeowners policies were issued by Louisiana Citizens, as was the case with several of the Fidelity properties and all of the ANPAC exemplars. Similarly, on two other Fidelity examples, Fidelity issued the flood policies and other defendants (or their affiliates) issued the homeowners policies. This includes the property at 9135 W Judge Perez Drive, insured by a Travelers/Standard Fire affiliate, and the property at 109 Lighthouse Point, insured by ANPAC Louisiana. This type of relationship is among those contemplated by paragraph 17 of the FAC in stating that the "homeowners policies [were] largely underwritten by [Defendants] <u>themselves</u>" rather than stating "by the insurer <u>itself</u>." This type of loss shifting is a sort of mutual back scratching. And finally, as detailed in the proposed amendments, Fidelity received significant (and inflated) fees for administering the (inflated) flood claims. All of the foregoing facts are precisely the type of evidence that Branch can and should be allowed to develop through discovery, which is of course a part of every FCA case.

exclusively, not largely, to single-insurer properties. Because the FAC did sufficiently provide notice to Defendants that the fraud alleged was broader than only single-insurer properties, the entire premise of the Magistrate Judge's ruling is faulty. The FAC plainly pleads a broad scheme, and it plainly put Defendants on notice that Branch aimed "largely" but not exclusively at single-insurer properties.

In the FAC, as in the original Complaint that preceded it, Branch attempted to plead one cause of action and to state that cause of action against each Defendant. Under the heading "Count I," starting with paragraph 36, Branch set forth what it viewed as the allegations necessary to assert that cause of action. Repeatedly, in paragraphs 36-38, Branch referenced that Defendants had met the elements of this cause of action "[t]hrough the acts described above and otherwise." Notably, it is the <u>acts</u> described above that Count I references as opposed to the motivations described above. In other words, the reference is to the act of overstating the amount of flood damages as opposed to the insurer defendants' loss-shifting incentive to do so. And again, the examples pleaded with specificity put Defendants on notice of transactions that exemplify the alleged fraud and the contents of their own files, demonstrating that single-insurer properties are the focus but not the exclusive focus of the allegations.

Branch's FAC challenges Defendants' Hurricane Katrina flood claims—all of them—because it has uncovered and alleged circumstances evidencing a systematic fraud as to those claims. This Court recognized that in ordering Defendants to preserve all documents that any party had requested, which included all Katrina flood claim files. *See* Order And Reasons of July 7, 2009 (Dkt. # 223). In fact, the Court stated in that Order that Branch's request, "in its broadest form, is limited to those properties damaged by Hurricane Katrina." *Id.* at 5. Certainly

Defendants were on notice of the scope of Branch's broad allegations no later than the date of this Order.

The Magistrate Judge, as well as the Defendants in arguing to the contrary, focused primarily on paragraph 17 of the FAC. But that paragraph neither states nor implies that loss shifting is an essential component of the false claims at issue. Rather, paragraph 17 further explains some of the circumstances that lend support to the conclusions Branch has drawn from the facts it had observed. First, paragraph 17 describes FEMA's waiver of the proof-of-loss requirement. Next, it mentions FEMA's expedited claim handling process. The following sentence lumps these two together, calling them "the streamlined procedures that FEMA set up" and alleging that they combined to give Defendants unprecedented control. Finally, paragraph 17 describes loss shifting and concludes with the previously mentioned sentence:

> In other words, defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves.

FAC ¶ 17. As a whole, the clear import of the paragraph is that these circumstances enhanced Defendants' opportunity and incentive to engage in fraud. Neither as a whole nor sentence by sentence does this paragraph or any other part of the FAC say that the alleged false claims exclusively or necessarily involved (a) the absence of a proof of loss form, (b) use of the expedited claim handling process, or (c) a single-insurer property. To the contrary, the FAC pleads a "pervasive," "massive," and "systematic" fraud, meaning fraud by utilizing a system that was fraudulent. FAC ¶¶ 3, 5, 17, 21, 23, 25, 27, 29, 30, 31. That system applied to Hurricane Katrina flood claims, not a subset thereof.

Of course, the fraudulent system need not always have resulted in a fraudulent outcome. For example, some Katrina flood claims involved properties that were indeed damaged by flood

to the extent that the policies should have been maxed out. But the allegation of the FAC is that the system, the process utilized by Defendants, involved fraud. The FAC gave Defendants ample notice of this.[2]

The proposed amendments in the SAC that were disallowed by the Magistrate Judge are those in paragraphs 4, 15, 17, and 20. Each change is redlined in a document that was provided to Defendants in December and to the Magistrate Judge with Branch's reply brief below.[3] (Dkt. # 417) The disallowed amendments can be grouped into three categories:

    a.    <u>Allegations clarifying that Branch did not intend to plead a fraud encompassing exclusively loss shifting and exclusively single-insurer properties.</u> *See* FAC ¶ 4 ("many" of the insurer defendants typically issued issued the homeowners policies); *id.* ¶ 17 ("These circumstances in part and a host of others . . ."); *id.* ("often" underwritten by themselves); *id.* ¶ 20 ("often" underwritten by the insurer defendants).

    b.    <u>Allegations explaining that Defendants had additional motivations—not exclusively loss shifting—for engaging in the alleged fraud.</u> *See id.* ¶ 4 ("substantially increased the amount of fees"); *id.* ¶ 15 (fees "the amount of which is based on the amount of the claim"); *id.* ¶ 17 ("for example" replacing "in other words"); *id.* ("defendants were able to significantly increase the amount of fees that they received from FIA").

    c.    <u>Allegations reemphasizing the central allegation already contained in paragraph 2 of both the FAC and SAC that "[t]he defendants have defrauded the Government through a practice of grossly overstating flood damages to insured properties damaged by Hurricane Katrina."</u> *See id.* ¶ 17 ("opportunity for defendants to take improper advantage of the [NFIP]"); *id.* ("Defendants also defrauded NFIP by grossly exaggerating losses by using inflated prices in the adjustments and by including items in the adjustment that did not need to be replace.").[4]

---

[2] Branch submits that the Government declined to intervene because it had not finished its investigation of the broad scheme that Branch had disclosed—not because it had not yet finished sorting through the few dozen files concerning the examples in the FAC.

[3] This fact alone should be sufficient to rebut Defendants' accusations of bad faith. Providing a redline is going above and beyond Branch's duty and demonstrates full disclosure and the absence of any intent to deceive.

[4] This central allegation is also pleaded within the detailed examples of the FAC and SAC.

Because Defendants were already on notice of each of these categories of facts and the transactions implicated by them, the allegations are not "new" in a pleading sense. The same cause of action concerning the same false claims is put at issue by the FAC and the SAC.

### 3. The Proposed Amendments To The SAC Include Nothing That Defendants Were Not Already On Notice Of

With regard to the three categories identified above—(a) the non-exclusive nature of Branch's loss-shifting allegations, (b) Defendants' additional, non-loss-shifting motivations, and (c) reemphasis of Branch's central allegation—not one of these categories represents anything that that the Defendants lacked notice of from the allegations of the FAC.

As previously explained, Branch never indicated that its loss-shifting allegations limited the fraud to single-insurer properties. The words it chose ("largely," "typically") illustrate that the allegations were not so limited. This Court's Order And Reasons of July 7, 2009, requiring the preservation of documents, provided further notice to Defendants of the scope of the FAC. (Dkt. # 223) There, the Court ordered Defendants to preserve all documents that any party had requested, which included all Katrina flood claim files. Further, the Court explained that "plaintiff alleges that defendants constructed a wholesale 'scheme' to inflate flood claims on properties damaged by Hurricane Katrina." *Id.* at 4.

The same is equally true as to the second category: Defendants' motivations. That they had financial motives for the fraudulent scheme is certainly alleged in the FAC. Although the FAC is not specific as to the motive created by the FIA fees, Rule 9(b) does not require specificity as to motive or state of mind. And FIA fees certainly are mentioned. FAC ¶ 15 ("They also receive a fee from FIA for writing and administering the policies, as well as a fee for adjusting the claims."). As is true of the first category, Branch never indicated that loss shifting was Defendants' sole and exclusive motivation for engaging in the fraud. That this category of

allegations describes an additional motivation (FIA fees)—one that had already been mentioned in the FAC—does not put it outside the scope of the notice provided by the FAC.

As to the third category, reemphasis of a previous allegation simply cannot constitute a new allegation outside the scope of a prior pleading.

Also, even if the FAC is construed to be limited to loss shifting and single-insured properties, which it should not be, it would nonetheless be the case that Defendants were on notice of the information contained in the proposed amendments. The transactions at issue, the widespread nature of the allegations, the hundreds of millions of dollars put at issue by the FAC, *see* ¶ 40, Branch's discovery requests, the Court's document preservation order—all of these indicate that the scope of the FAC was Katrina-wide. Defendants were on notice. To ignore this is to disregard a major component of the Federal Rules and the system of notice pleading they put into effect. The Magistrate Judge's ruling, in this sense, harkens back to the days of code pleading and treats loss shifting and inflated revenue as if they were "ultimate facts" under that former regime. *Cf. Kiln Underwriting Ltd. v. Jesuit High School of New Orleans*, 2008 WL 4724390, *10 (E.D. La. Oct. 24, 2008) (quoting *Swierkiewicz v. Sorema*, 534 U.S. 506, 514 (2002), for the proposition that "the purpose of pleading is to facilitate a proper decision on the merits").

### B. Branch Did Not Delay In Filing The Proposed Amendments Once It Became Aware Of Defendants' Interpretation Of The FAC

Candidly, at the time of the FAC, Branch did not know, nationwide or hurricane wide, what percentage of flood policies issued by Fidelity were accompanied by Fidelity homeowners policies. The same is true as to each of the other insurer defendants. Branch did know from experience that it is typical that flood and homeowners policies are issued by the same insurer. This is often the case, and it was the case as to most of the examples identified in the FAC.

In the initial responsive pleading filed in this case, Fidelity's Answer To First Amended Complaint And Third-Party Demand (Dkt. # 247), Fidelity first indicated its interpretation of Branch's allegations—stating that Branch falsely pleaded that Fidelity itself (rather than Defendants generally) typically issues both flood and homeowners policies on a single property. *Id.* ¶ IV ("Branch asserts Fidelity was 'typically' the issuer of both the homeowners and flood policies purchased by its insureds. This is a false claim."). And similarly, Fidelity's Answer accused Branch of falsely pleading that Fidelity had submitted claims via the expedited claims handling process in massive quantities. *Id.* ¶ XVII ("Branch falsely asserts as to Fidelity's implementation of FEMA's post-Katrina 'expedited claims handling process' that Fidelity's adjustments made under that process 'served as the basis for many thousands of claims submitted to the NFIP,' and that through this process false claims were submitted to the NFIP 'in massive quantities.'").

This is not at all, at least in Branch's view, what the FAC pleads. The FAC states that Defendants typically issued homeowners policies as well as flood policies (true), that they used FEMA's streamlined procedures, meaning the expedited claims handling process <u>or</u> its waiver of the proof of loss requirement (true), and that they submitted false claims in massive quantities (Branch contends that this is true). FAC ¶¶ 4, 17. But rather than debating with Fidelity over the wording of the FAC, at that time Branch and its counsel instead elected to make clarifications in the SAC—the SAC that this Court had already indicated that it would afford Branch an opportunity to file. *See* Order And Reasons of October 19, 2009, at 69 (Dkt. # 228). The amendments addressing Fidelity's accusations were principally contained in paragraphs 4 and

17, the very ones that Fidelity had misconstrued in its Answer. But Branch also made related minor edits to paragraphs 15 and 20.[5]

Branch respectfully submits that this is precisely the use of amendments that is encouraged by liberal treatment of amendments in Rule 15 and its affirmation that leave be freely granted when justice requires. *Cf. Dussouy v. v. Gulf Coast Invst. Cor.*, 660 F.2d 594, 597-98 (5th Cir. 1981) ("The policy of the federal rules is to permit liberal amendment to facilitate determination of claims on the merits and to prevent litigation from becoming a technical exercise in the fine points of pleading."). Branch submits that it was not untimely in seeking to amend, having done so weeks, not years, after the impetus for these amendments became apparent. Branch respectfully submits that the Magistrate Judge and Defendants are flat out wrong in assessing Branch's conduct as undue, unexplained, or in bad faith. To the contrary, Branch acted promptly. The issue, Branch submits, is whether to adjudicate the fraudulent or non-fraudulent nature of Defendants' NFIP claims on the merits or instead on the basis of Defendants' interpretation of the pleadings. *Cf. Richards' Realty Co., L.L.C. v. Paramount Disaster Recovery, Inc.*, 2008 WL 440325, *2 (E.D. La. Feb. 8, 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962), for the proposition that, "[i]f the underlying acts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits.").

### C. The Timing Of The Proposed Amendments Cause No Prejudice To Defendants

Even if the proposed amendments had been late, the Magistrate Judge's ruling would still be erroneous because there is no prejudice to Defendants as a result. Defendants principally

---

[5] Branch also amended one of its examples which, due to a transposition error, it had mistakenly attributed to the wrong insurer defendant. The Magistrate Judge allowed this amendment.

argue that leave can be denied even in the absence of prejudice. But that is not what the Magistrate Judge has done. The Magistrate Judge did not decide whether leave to amend should be denied even if there has been no prejudice. The Magistrate Judge explicitly found prejudice in what she perceived to be the expanded scope of discovery if the amendment were allowed. Order of March 1, 2010 at 19. And the Magistrate Judge relied on her conclusion that there was prejudice in denying leave to amend. *Id.* at 20.

Defendants' secondary prejudice argument is that the allegations at issue—those in paragraphs 4, 15, 17, and 20 of the SAC—"radically expand the scope of the case, and force Defendants to alter their litigation strategy." Joint Response at 21. Similarly, they argue that they would suffer an "unfair burden and prejudice . . . from the enlargement of the case." *Id.*

Setting aside Branch's contention that these amendments do no such thing—that the FAC pleaded a broad scheme that already encompassed the allegations in paragraphs 4, 15, 17, and 20 of the SAC—even if these allegations were deemed to be new and untimely, they still would not <u>cause</u> any prejudice. Neither the scope of discovery, nor the enlargement of the case, nor Defendant's corresponding change in litigation strategy constitutes prejudice <u>caused by</u> lateness. Instead, it is merely a necessary part of mounting a defense, regardless of the timing.[6]

Defendants attempt to circumvent this flaw in their argument by contending that the last three years of litigation will have been wasted if Branch is allowed to amend. But this contention is equally flawed. Branch has not abandoned or conceded any claim, so there is no waste of prior efforts. Moreover, the bulk of three years Defendants reference was devoted to their first-to-file motion and the ensuing appeal. Defendants cannot seriously contend that they

---

[6] It is inexplicable that the Magistrate Judge denied leave to amend based on the potentially broad scope of discovery and then, subsequently, limited the scope of discovery to the examples pleaded in the complaint on a jurisdictional basis. *See* March 26, 2010, Report And Recommendation (Dkt. # 484).

need to relitigate preemption by the *Rigsby* case due to the proposed amendments to paragraphs 4, 15, 17, and 20.

Finally, had Defendants truly been confused about the scope of Branch's FAC, they certainly could have filed a motion for a more definite statement. The FAC included more than exclusively single-insurer properties. Branch's discovery targeted all Katrina claims. The Court's Order And Reasons requiring the preservation of documents provided further notice of the potential breadth of the FAC. The proposed amendments have not been sprung on Defendants out of the blue. If there is any prejudice at all, it is from their exceedingly narrow interpretation of Branch's pleading. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (U.S. 2007) (stating that the one part of the pleading test from *Conley v. Gibson*, 355 U.S. 41, 47 (1957), that is still "accepted" as a pleading standard is that, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint"); *see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (quoted by *Twombly*, 550 U.S. at 563, for the same proposition that "once a claim for relief has been stated, a plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint'").

## IV. CONCLUSION

Rule 8(e) states that "[p]leadings must be construed so as to do justice." Branch submits that the Magistrate Judge has not so construed the FAC. Rule 15 states that leave to amend shall be freely given when justice requires. Branch submits that the Magistrate Judge has not done justice. Branch asks the Court to reverse the Magistrate Judge's Order of March 1, 2010, and to grant its motion for leave to amend.

DATED:  April 13, 2010

Respectfully submitted,

SUSMAN GODFREY LLP

By: /s/ Jonathan Bridges
Jonathan Bridges (TX #24028835)
jbridges@SusmanGodfrey.com
901 Main Street, Suite 5100
Dallas, Texas  75202-3775

Tibor L. Nagy, Jr. (NY #4508271)
tnagy@SusmanGodfrey.com
654 Madison Ave., 5th Flr
New York, NY 10065

Matthew R. Berry (WA #37364)
mberry@susmangodfrey.com
1201 Third Avenue, Suite 3800
Seattle, WA 98101

*and*

KANNER & WHITELY L.L.C.

Allan Kanner (LA #20580)
a.kanner@kanner-law.com
701 Camp Street
New Orleans, LA  70130

*and*

HERMAN, HERMAN, KATZ & COTLAR, LLP

Stephen J. Herman (LA #23129)
sherman@hhkc.com
Soren E. Gisleson (LA #26302)
sgisleson@hhkc.com
820 O'Keefe Avenue
New Orleans, Louisiana 70113

***Attorneys for Plaintiff/Relator***

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2010, a copy of the above and foregoing has been served on Defendants and Assistant United States Attorney, Jay D. Majors via email (by agreement).

/s/ Jonathan Bridges
Jonathan Bridges (TX #24028835)