UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA *EX REL.*          CIVIL ACTION
BRANCH CONSULTANTS, L.L.C.

VERSUS                                      NO: 06-4091

ALLSTATE INSURANCE. CO., ET AL.             SECTION: R(1)

## ORDER AND REASONS

Before the Court are two challenges to the decisions of the Magistrate Judge.  First, relator Branch Consultants appeals the Magistrate Judge's decision granting in part and denying in part its Motion for Leave to File a Second Amended Complaint.[1]  Branch also opposes the Magistrate Judge's Report and Recommendation regarding the scope of discovery.[2]  For the following reasons, the Magistrate Judge's denial of Branch's motion for leave to amend is REVERSED.  The Court, after a *de novo* review, declines to accept the Magistrate Judge's Report and Recommendation as detailed in this Order.

## I. Introduction

---

[1] Branch's appeal is R. Doc. 458; the Magistrate Judge's decision is R. Doc. 417.

[2] Branch's objections may be found in R. Doc. 546; the Report and Recommendation is R. Doc. 484.

The Court has issued a number of decisions in this matter;[3] the relevant background will therefore be covered briefly.  This case arises out of the aftermath of Hurricane Katrina.  The storm struck southern Louisiana and Mississippi in late August of 2005, causing damage in the billions of dollars.  In numerous places, particularly within New Orleans, homes and commercial property were damaged by the wind and rain generated from the hurricane, as well as by flooding that inundated the area after the storm had passed through the region.

Although insurance against wind and rain is available from private insurance companies, flood insurance generally is not.  "It is uneconomical for private insurance companies to provide flood insurance with reasonable terms and conditions to those in flood prone areas."[4]  In 1968, the federal government established the National Flood Insurance Program, which provides flood-insurance coverage "at or below actuarial rates," and payments on these insurance policies are made with federal money.[5]  The NFIP is in turn administered by the Federal Emergency Management

---

[3] *See United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 668 F. Supp. 2d 780 (E.D. La. 2009) (R. Doc. 228); *United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 265 F.R.D. 266 (E.D. La. 2010) (R. Doc. 376); *see also United States ex rel. Branch Consultants, L.L.C. v. Allstate Ins. Co.*, 560 F.3d 371 (5th Cir. 2009).

[4] *Gowland v. Aetna*, 143 F.3d 951, 953 (5th Cir. 1998).

[5] *Id.*

Agency.  In 1983, FEMA established a program within the NFIP known as "Write Your Own," which allowed certain private insurers to issue standard, government-guaranteed flood insurance policies in their own names.[6]  FEMA drafts the policies and the insurers cannot alter them without governmental approval.[7]  The private companies under WYO act as "fiscal agents" of the United States and are responsible for adjustment, settlement, payment, and defense of claims under the policies.[8]  Payments under the policies, however, "ultimately come[] from the United States treasury."[9]

The damage caused by Hurricane Katrina resulted in a tremendous number of NFIP claims.  On account of this strain, FEMA relaxed the requirements for submitting proofs of loss to claim flood damage.  Specifically, when policyholders did not dispute the insurance company's adjustment, FEMA waived the proof-of-loss requirement and allowed the claim to be paid on the basis of adjuster's reports.[10]

---

[6] *See generally* 44 C.F.R. § 62.23.

[7] *Id.* §§ 61.4(b), 61.13(d); *see also Dwyer v. Fidelity Nat. Prop. & Cas. Co.*, 565 F.3d 284, 285 (5th Cir. 2009).

[8] 44 C.F.R. § 62.23(d)-(g).

[9] *Dwyer*, 565 F.3d at 285.

[10] *See Monistere v. State Farm Fire & Cas. Co.*, 559 F.3d 390, 394-95 (5th Cir. 2009); *Eckstein v. Fidelity Nat. Prop. & Cas. Ins. Co.*, 07-4567, 2009 WL 1870558, at *4 (E.D. La. June 29, 2009).

Branch Consultants brought this *qui tam* action in 2006 on behalf of the United States government under the False Claims Act ("FCA"). Branch accuses certain WYO insurance companies and adjusters that were involved in the adjustment of NFIP flood claims after Katrina of fraud in the administration of the flood insurance program. It alleges that the circumstances after Katrina gave defendants complete control over adjustments and payments under NFIP policies. Specifically, Branch alleges that defendants fraudulently adjusted properties covered by NFIP policies by systematically overstating the amount of flood damage sustained by each property. This in turn increased the amount of money that the government would be obligated to pay under the individual flood policies, and accordingly reduced the amount that the insurance companies would be obliged to pay under wind and rain policies. Put differently, Branch alleges that defendants shifted the costs of paying for wind damage to the government by fraudulently claiming that the damage was caused by flood. And the government allegedly subjected these claims to less scrutiny than it would have in typical circumstances because of the expedited claims-handling process that was put in place after Katrina. In its First Amended Complaint, Branch provides numerous examples of properties that it alleges were the subject

of this fraud.[11]  For each, it identifies a corresponding insurance company that allegedly issued the policy covering the property.  It alleges, however, the existence of a broad fraudulent scheme that extends far beyond these named properties.

In October of 2007, the section of this court previously assigned to this case granted one of defendants' motions to dismiss and dismissed this case entirely.  Specifically, it found that a pending case in the Southern District of Mississippi included a similar FCA claim against then-defendants State Farm Insurance Company and Allstate Insurance Company, that the Mississippi case had been filed first, and that this suit was barred by the "first to file" bar in the FCA.[12]  Branch appealed this decision to the Fifth Circuit, which held that the first-to-

---

[11] The First Amended Complaint contained fifty-seven examples.  These include properties that were allegedly adjusted by Allstate and State Farm, which, as explained below, were dismissed from this suit.  Branch now seeks to bring Allstate back into this lawsuit.

[12] 31 U.S.C. § 3730(b)(5).  Certain provisions of the False Claims Act were amended in March of 2010 by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 10104, 124 Stat. 119, 901-02 (2010).  The Supreme Court has intimated that the changes do not apply retroactively. *See Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S.Ct. 1396, 1400 n.1 (2010).  In addition, the subsections of § 3729 of the FCA were reorganized by statute in 2009 as part of the Fraud Enforcement and Recovery Act of 2009.  *See* Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-22 (2009).  The Court, in its order ruling on the motion to dismiss, referred to the post-amendment statutory numbering, as the substantive changes of the 2009 amendments did not affect that order.  *See* R. Doc. 228 at 48 n.4.  Here, unless otherwise specified, all citations to the provisions of the FCA are to the pre-2009 version of the statute.

file bar barred only Branch's claims against State Farm and Allstate.  It affirmed the dismissal with respect to those two defendants, reversed the dismissal of all of the other defendants, and remanded the case.[13]

After remand, the case was reassigned to this Court, and defendants reurged the motions to dismiss that had been filed earlier.  In general, they argued that the Court lacked jurisdiction over the matter because Branch was not an "original source" of the allegations in the complaint, which had been publicly disclosed, and that Branch had failed to plead its claims with sufficient particularity under Rule 9(b) of the Federal Rules of Civil Procedure.  In October of 2009, the Court held that, based on the allegations in the First Amended Complaint, Branch was an original source for FCA purposes, and the Court thus retained jurisdiction over the matter.  It also determined that, with respect to the majority of the defendants, Branch had met its Rule 9(b) requirements.[14]

Branch moved for leave to file a Second Amended Complaint in December of 2009.  This motion was referred to the Magistrate Judge, who denied the motion in part and granted in part.  Only

---

[13] *Branch Consultants*, 560 F.3d at 381.

[14] The parties' briefs on the motion to dismiss did not explicitly address the issue of whether the Court had jurisdiction as to properties beyond those listed in the First Amended Complaint, and the Court therefore did not rule on the matter.

the denial is involved in this Order.  The Magistrate Judge held that Branch's Second Amended Complaint sought to add a new theory of recovery, and because Branch delayed in adding this theory, defendants suffered prejudice.  Accordingly, the amendment should not be allowed.[15]  Branch now appeals this aspect of the decision.

In addition, the parties are embroiled in a number of discovery disputes.  In one dispute, Branch sought discovery on claims beyond the specific examples listed in the First Amended Complaint.  The Magistrate Judge held that because Branch was an original source of only those examples in the complaint, the Court had jurisdiction over only those allegations, and Branch would not be permitted discovery as to any properties beyond the ones listed as examples in the First Amended Complaint.

The Court has reviewed the Magistrate Judge's decisions and the parties' briefs, and it rules as follows.

## II. Discussion

*A. Branch's Motion for Leave to File a Second Amended Complaint*

### 1. The Magistrate Judge's Order

The Magistrate Judge denied Branch's motion to amend in part and granted it in part.  Again, Branch appeals only the denial.

---

[15] As explained, this is not the only holding the Magistrate Judge made.  The other holdings, however, appear to be uncontested.

In her Order, the Magistrate Judge reviewed in great detail both the opinion of the Fifth Circuit and this Court's Order ruling on defendants' motion to dismiss, and she determined that Branch sought to add a new theory of recovery to its case. Specifically, the Magistrate Judge determined, the language of Branch's First Amended Complaint alleged the existence of one fraudulent scheme, which she dubbed the "loss-shifting scheme."[16] Under this scheme, Branch alleged that when defendants adjusted Hurricane Katrina claims, they systematically and on a massive scale overstated the amount of flood losses to the properties they adjusted.  In so doing, defendants allegedly exaggerated the amount of money that the government would pay under the individual flood policies, which in turn reduced the amount that the insurance companies would themselves be obliged to pay under wind and rain policies.  Stated differently, Branch asserted that defendants "passed off" the costs of paying for wind damage to the government by fraudulently claiming that the damage was caused by flood.  Because of the expedited claims-handling process that was put into effect after Katrina, the government allegedly subjected these claims to less scrutiny than it would have in typical circumstances.  Branch alleges that this resulted in the submission of myriad fraudulent insurance claims, which the federal government then paid.

---

[16] R. Doc. 417 at 12.

8

Such a scheme, however, requires the WYO insurer to have a wind policy on the property that it fraudulently adjusted.  Only when an insurer has a wind policy on a particular property may it "pass off" its loss by understating the wind damage for which it is responsible and exaggerating the flood damage for which the government is responsible.  Its incentive under this theory is to minimize its own losses and shift them to the government.

The Magistrate Judge found that Branch's Second Amended Complaint sought to add a scheme different from this one. Specifically, she determined that the Second Amended Complaint added an "inflated-revenue scheme," under which the defendants overstated the amount of flood damage sustained by each property without necessarily understating the amount of wind damage.[17] Defendants' incentive to do so — as explained in the Second Amended Complaint, but not the First — is that exaggerated flood losses increase the fees that the insurer defendants receive under the program.  This theory, unlike the loss-shifting theory, does not require that the insurer have a wind policy on the property at all.  A WYO insurer's incentive under this theory is not to pass off its losses, but to maximize the fees it is paid for participation in the program.

Having found that Branch sought to add a new theory of recovery to its lawsuit, the Magistrate Judge, applying Rule 15

---

[17] *Id.* at 11-12.

of the Federal Rules of Civil Procedure, determined that Branch should not be granted leave to file its amendment.  Specifically, she found that the inflated-revenue scheme was not one that Branch recently discovered; in fact, Branch had sufficient information to include this claim at the outset of its case.  But it did not add the claim at any earlier time.  It waited until years after the case had been filed and until after the Court had determined that its First Amended Complaint largely survived a motion to dismiss.  Relying on *United States ex rel. Schumer v. Hughes Aircraft Company*,[18] the Magistrate Judge determined that Branch unduly delayed in amending its complaint and that defendants would suffer prejudice as a result.  In addition, the Magistrate Judge determined that judicial economy weighed in favor of disallowing the amendment, as jurisdiction over this case would have to be reevaluated, and defendants would likely file a new barrage of motions to dismiss.  Accordingly, the Magistrate Judge held that Branch was not allowed to amend its complaint.[19]

---

[18] 63 F.3d 1512 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 939 (1997).

[19] The Magistrate Judge also held that Branch could amend its complaint to add Allstate Insurance Company and Pilot Catastrophe Services as defendants, that certain defendants could be dismissed or substituted, and that certain alterations be made to the list of exemplar properties.  She also determined that Branch's attempt to add the inflated-revenue scheme was not barred by *Rockwell Int'l Corp. v United States*, 549 U.S. 457 (2007).  None of these holdings are challenged on this appeal.

<u>2. Standard of Review</u>

Branch styles its motion as an appeal from the Magistrate Judge's Order.  Magistrate judges are empowered by the United States Code to "hear and determine" certain non-dispositive pretrial motions.[20]  If a party is dissatisfied with a magistrate judge's ruling, it may appeal to the district judge, who may reconsider the ruling and reverse it "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."[21]  A finding is clearly erroneous when a reviewing court is "left with the definite and firm conviction that a mistake has been committed."[22]

Magistrate judges may also conduct hearings and make determinations of first impression with respect to certain dispositive matters.[23]  In so doing, the magistrate judge issues

---

[20] 28 U.S.C. § 636(b)(1)(A).

[21] *Id.; see also* FED. R. CIV. P. 72(a); *Castillo v. Frank*, 70 F.3d 382, 385 (5th Cir. 1995).

[22] *United States v. Stevens*, 487 F.3d 232, 240 (5th Cir. 2007) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[23] Under statute, these motions include "motion[s] for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action."  28 U.S.C. § 636(b)(1)(A)-(B).

proposed findings of fact and recommendations for the Court.  If any party objects to the magistrate judge's report and recommendation, the Court reviews *de novo* the portions of the report to which the party objects.  "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendation made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions."[24]

The parties disagree about the proper standard of review that the Court should apply to the Magistrate Judge's ruling. Branch argues that the Magistrate Judge's decision was effectively a dispositive order because it "has the effect of dismissing the adjuster defendants, as well as a broad swath of Branch's claims."[25]  It therefore contends that the Court should review it *de novo*.  Defendants, on the other hand, argue that the Order was a non-dispositive pretrial order that is reviewed under the "clearly erroneous" standard.

The relevant statute provides a list of dispositive motions that, when a magistrate judge hears and determines them, the district court reviews *de novo*.  They are "motion[s] for

---

[24] *Id.* § 636(b)(1); *see also Freeman v. County of Bexar*, 142 F.3d 848, 852 (5th Cir. 1998) ("it is clear that the district court has wide discretion to consider and reconsider the magistrate judge's recommendation"); FED. R. CIV. P. 72(b).

[25] R. Doc. 458-1 at 6.

injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action."[26]  Motions to amend are not among the listed motions.  But some courts have determined that, when a magistrate judge decides a motion that does not appear on this list but the determination has a dispositive effect, the district court should undertake *de novo* review.[27] Branch cites to a number of out-of-circuit cases that support its argument that the Court should review the Magistrate Judge's Order *de novo*.[28]

Most of the cases upon which Branch relies are distinguishable because the magistrate judge's denial of the

---

[26] 28 U.S.C. § 636(b)(1)(A)-(B).

[27] *See, e.g., Woods v. Dahlberg*, 894 F.2d 187, 187-88 (6th Cir. 1990) (per curiam); *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1462-63 (10th Cir. 1988); *see also* FED. R. CIV. P. 72(b) (referring only to "a pretrial matter dispositive of a claim or defense"); 12 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3068.2 (2d ed. 1994 & Supp. 2010) (noting that an approach that looks to the effect of the magistrate judge's decision "permits a more sensible determination when de novo review should be required than does a jurisprudence of labels").

[28] *See Bell v. City of Topeka, Kan.*, No. 06-4026, 2006 WL 2711754, at *1 (D. Kan. Sept. 21, 2006); *Covington v. Kid*, No. 94-4234, 1999 WL 9835, at *2 (S.D.N.Y. Jan. 7, 1999); *Gossett v. Stewart*, No. 08-2120, 2009 WL 3379018, at *1 (D. Ariz. Oct. 20, 2009).

amendment had the effect of dismissing parties named in the *original* complaint, and they thus operated like motions "to involuntarily dismiss an action."[29]  In any case, the Fifth Circuit has held that denial of a motion to amend is a nondispositive motion, even when the amendment seeks to add new claims.[30]  At least one other circuit, as well as numerous judges in courts in this state, have held similarly.[31]  In addition, Branch has not adequately explained how the Magistrate Judge's order would *automatically* result in the dismissal of the adjuster defendants.  For example, even under the First Amended Complaint, the adjuster defendants still could have made a false record or

---

[29] *See Bell*, 2006 WL 2711754, at *1 (magistrate denied motion to amend when amendment provided actual names of officers named in original complaint as unknown police officers); *Covington*, 1999 WL 9835, at *1-2 (same).  Branch's contention would be proper had it alleged an inflated-revenue scheme in its First Amended Complaint, because the Magistrate Judge's determination would thus dispose of claims already pleaded.  But, as explained below, it did not.

[30] *See PYCA Indus., Inc. v. Harrison County Waste Water Mgmt. Dist.*, 81 F.3d 1412, 1421 & n.11 (5th Cir. 1996) (holding that district court's denial of motion to amend answer to add crossclaims and counterclaims was not a dispositive order and thus was not a final order that could be certified for interlocutory appeal).

[31] *See Hall v. Norfolk So. Ry. Co.*, 469 F.3d 590, 594-95 (7th Cir. 2006) (magistrate judge's denial of motion to amend is nondispositive motion subject to review for clear error); *see also, e.g., Cargo v. Kan. City So.*, No. 05-2010, 2009 WL 541318, at *2 (W.D. La. Mar. 4, 2009); *Ordemann v. Unidentified Party*, No. 06-4896, 2008 WL 695253, at *1 (E.D. La. Mar. 12, 2008); *Holland v. Questar Exploration & Prod. Co.*, No. 03-2087, 2006 WL 461227, at *2 (W.D. La. Feb. 23, 2006).

statement to get a fraudulent claim paid or approved by the government under the loss-shifting theory.[32]  The Court therefore reviews the Magistrate Judge's Order under the clearly-erroneous standard.

### 3. Legal Standard for Amendments

Because Branch moved to amend its complaint within the time that the Court explicitly allowed it to, its amendment is governed by Rule 15 of the Federal Rules of Civil Procedure.[33] That Rule specifies that, in circumstances such as these, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."[34]  The decision to grant leave is committed to the sound discretion of the district court, but "discretion," courts have held, "may be a misleading term" because Rule 15 demonstrates a policy of granting leave freely.[35] "It evinces a bias in favor of granting leave to amend."[36]

---

[32] *See* 31 U.S.C. § 3729(a)(2); *see also* R. Doc. 228 at 64-65.

[33] *See S&W Enters., L.L.C. v. Southtrust Bank of Ala.*, 315 F.3d 533, 535-36 (5th Cir. 2003).

[34] Fed. R. Civ. P. 15(a)(2).

[35] *Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 597 (Former 5th Cir. 1981)

[36] *Id.; see also Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004) ("Stated differently, district

Accordingly, a motion for leave to amend should not be denied in the absence of a substantial reason for denial.[37] These substantial reasons include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc."[38]  It is also appropriate for the Court to consider judicial economy.[39]

### 4. Branch's Proposed Amended Complaint Seeks to Add a New Claim

Branch argues that its Second Amended Complaint does not seek to add a new theory of recovery.  In its view, the inflated-revenue scheme was fully contained in the First Amended Complaint.  Defendants contend that the inflated-revenue scheme is decidedly new and has not been asserted before in this suit.

Branch's position is not supported by the actual complaints themselves.  As the Magistrate Judge correctly determined, the inflated-revenue theory is new.

---

courts must entertain a presumption in favor of granting parties leave to amend.").

[37] *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998); *Dussouy*, 660 F.2d at 598.

[38] *Foman v. Davis*, 371 U.S. 178, 182 (1962).

[39] *Dussouy*, 660 F.2d at 598.

16

This is confirmed by an examination of the language that was added to the Second Amended Complaint.  A side-by-side comparison of the complaints makes clear that Branch intended to alter its complaint to assert an inflated-revenue theory that it had not asserted before.  For example, in describing the NFIP program, the First Amended Complaint states that WYO insurers "receive a fee from [the Federal Insurance Administration] for writing and administering the policies, as well as a fee for adjusting the claims."[40]  This section in the Second Amended Complaint, however, states that WYO insurers "receive a fee from [the Federal Insurance Administration] for writing and administering the policies, as well as a fee for adjusting and processing claims, *the amount of which is based on the amount of the claim*."[41]

Branch's First Amended Complaint does not contain any allegation as to what incentive the defendants would have for exaggerating the amount of flood damage on properties for which they did not have wind policies.  The Second Amended Complaint, however, makes this quite clear.  The First Amended Complaint's discussion of the fraudulent scheme includes the following paragraph:

In the aftermath of Hurricane Katrina and unprecedented

---

[40] R. Doc. 49 at 6-7.

[41] R. Doc. 280-8 at 6.

17

volumes of claims following the 2005 hurricane season, FEMA waived the requirement that insureds file a Proof of Loss in connection with Katrina-related claims under NFIP's Standard Flood Insurance Policy. Shortly thereafter, FEMA announced an expedited claim handling process for Katrina-related flood claims. Defendants were thus put in the position of having essentially total control over the Standard Flood Insurance Policy claims they were handling, and their adjustments alone have served as the basis for many thousands of claims submitted to NFIP. Rather than follow in good faith the streamlined procedures that FEMA set up, defendants instead systematically adjusted, paid and submitted reimbursement claims to NFIP regarding losses that obviously should not be fully covered by the flood policies. They did so in massive quantities. In other words, defendants defrauded NFIP by misattributing wind damage and other non-flood losses to the flood policies subsidized or underwritten by the Government rather than correctly attributing such losses to causes that are covered by homeowners policies largely underwritten by themselves.[42]

In the First Amended Complaint, the paragraph ends after this final sentence. Only the loss-shifting theory is described in this paragraph. In contrast, the corresponding excerpt in the Second Amended Complaint reads as follows, with differences from the First Amended Complaint in italics.

In the aftermath of Hurricane Katrina and unprecedented volumes of claims following the 2005 hurricane season, FEMA waived the requirement that insureds file a Proof of Loss in connection with Katrina-related claims under NFIP's Standard Flood Insurance Policy. Shortly thereafter, FEMA announced an expedited claim handling process for Katrina-related flood claims. *These circumstances, in part, and a host of others, including the absence of effective monitoring or supervision by FEMA, created an opportunity for defendants to take improper advantage of the Program.* Rather than follow in good faith *the claim policies and flood adjusting*

---

[42] R. Doc. 49 at 7-8.

> *guidelines issued by FEMA*, defendants instead
> systematically adjusted, paid and submitted
> reimbursement claims to NFIP regarding losses that
> obviously should not be fully covered by the flood
> policies.  They did so in massive quantities.  *For
> example*, defendants defrauded NFIP by misattributing
> wind damage and other non-flood losses to the flood
> policies subsidized or underwritten by the Government
> rather than correctly attributing such losses to causes
> that are covered by homeowners policies largely
> underwritten by themselves.  *Defendants also defrauded
> NFIP by grossly exaggerating losses by using inflated
> prices in the adjustments and by including items in the
> adjustment that did not need to be replaced.
> Additionally, by overstating flood damages, defendants
> were able to significantly increase the amount of fees
> that they received from [the Flood Insurance
> Administration] for processing and adjusting claims.*[43]

Branch cannot seriously contend that this amendment does not seek

to include a new theory that had not been pleaded before.  The

First Amended Complaint summarizes the scheme with the opening

phrase "in other words," and then goes on to describe the loss-

shifting theory and no other theory.  The Second Amended

Complaint, by contrast, introduces the loss-shifting theory with

the phrase "for example," and then, using the words "also" and

"additionally," goes on to describe the inflated-revenue theory.

Moreover, the inflated-revenue theory alleges not that actual

losses were misattributed, but that prices for flood damage were

inflated and items were listed for replacement that did not

require replacement.  While the loss-shifting theory requires

proof that, inter alia, the property in question was damaged by

---

[43] R. Doc. 280-8 at 7.

wind, the inflated-revenue theory does not necessarily require such proof.  It would require proof of inflated prices and payment for items that did not need replacement.

None of the language in the Second Amended Complaint that describes the inflated-revenue theory or its *modus operandi* appeared in the First Amended Complaint.  This is a clear addition of a theory to the complaint.  The First Amended Complaint, through the phrase "in other words," makes clear that the loss-shifting theory is its sole allegation.  The Second Amended Complaint expressly relegates this theory to an "example" of a larger allegation.

The Magistrate Judge's interpretation of the complaints is consonant with the courts that have examined Branch's First Amended Complaint to date.  When this Court ruled on defendants' motion to dismiss, it repeatedly noted that Branch's theory was that the defendants fraudulently shifted part of a zero-sum amount of loss onto the government.[44]  Furthermore, the Fifth Circuit was under the impression that Branch asserted the loss-shifting theory only.  Describing Branch's theory, the court noted that "[a]ccording to Branch, [the post-Katrina waiver of the proof-of-loss requirement] created a perverse incentive for WYO insurers to understate losses due to wind (which an insurer would be required to pay under the insured's homeowner's policy)

---

[44] *See, e.g.,* R. Doc. 228 at 3-4.

and overstate losses due to flood, thereby shifting the loss from the WYO insurers to the federal government."[45]   The Fifth Circuit did not mention the inflated-revenue theory.

Again, the First Amended Complaint contains no allegation that would provide an incentive for defendants to overstate flood losses to properties upon which they did not also have a wind policy.   Nor does it allege that defendants inflated prices in their adjustments or paid for property that did not need replacement.   These aspects of the inflated-revenue scheme were clearly added to the Second Amended Complaint, and the loss-shifting theory was demoted from its role as Branch's central allegation to merely one among others.   The Court therefore finds that Branch's First Amended Complaint did not plead an inflated-revenue scheme, and that its Second Amended Complaint seeks to add one.

### 5. Branch May Amend its Complaint to Add the Inflated-Revenue Scheme

The Court finds that the Magistrate Judge erred in not allowing the amendment, and it will allow Branch to amend its complaint to add the inflated-revenue scheme.   All of the parties are aware that this case is not a typical one.   As the Court pointed out in an earlier order, it took more than three years

---

[45] *Branch Consultants*, 560 F.3d at 374.

21

for the case to proceed past the motion-to-dismiss stage and, as the present set of appeals demonstrates, the parties are still vigorously litigating the issues that arose out of the First Amended Complaint.[46]  This suit has been subject to an abnormally long and contentious pretrial phase, which included a lengthy appeal to the Fifth Circuit.  A significant portion of the time between the filing of this suit and Branch's attempt to file its Second Amended Complaint was spent either on appeal or awaiting the Court's determination of defendants' motion to dismiss for lack of subject-matter jurisdiction.  Discovery did not begin until several years after Branch filed its First Amended Complaint.  In short, the history of this case consists largely of long periods of court-imposed inactivity punctuated by intense motion practice, typically regarding the Court's subject-matter jurisdiction.

The first and perhaps the most significant reason for the Court's holding is that Branch amended its complaint within the period of time that the Court explicitly allowed the parties to make amendments.  In November of 2009 the Court issued the applicable scheduling order — the *first* scheduling order set in this matter — which established deadlines for various filings. One such deadline made clear that "*[a]mendments to pleadings*, third-party actions, crossclaims, and counterclaims shall be

---

[46] *See* R. Doc. 278 at 10.

filed no later than JANUARY 4, 2010."[47]  Accordingly, the Court
set forth a time in which Branch was expressly allowed to amend
its pleadings.  Branch moved to amend its complaint on December
30, 2009, which was before the expiration of the deadline.[48]
Although there is no rule that amendments filed before the
deadline are *per se* appropriate,[49] the Court gives consideration
to Branch's compliance with the date that the Court specifically
set for amendments.[50]  The Fifth Circuit has recognized that
moving for leave to amend "well within" the court-created
deadline could lead to the conclusion that "on its face, the
motion was timely and evidenced no prejudice to the other parties
or potential to delay the proceedings."[51]

    Defendants repeatedly emphasize the amount of time that
elapsed between the filing of this suit and Branch's proposed
amendment.  There is little question that a great deal of time
has elapsed since the filing of this lawsuit, and the Court does

---

    [47] R. Doc. 246 at 2 (italics added).

    [48] R. Doc. 280.

    [49] *See Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 141 (5th Cir.
1993).

    [50] *See, e.g., Mendoza v. City of New Orleans*, Nos. 06-3040,
07-545, 2007 WL 1239123, at *3 (E.D. La. Apr. 26, 2007) ("it
cannot be said that plaintiff's motion was a product of bad
faith, dilatory motive or undue delay when plaintiff satisfied
the deadline set forth in the Court's new Scheduling Order").

    [51] *Halbert v. City of Sherman, Tex.*, 33 F.3d 526, 529 (5th
Cir. 1994).

not disagree that the amendment could have been filed earlier.
But defendants greatly overstate the unreasonableness of the
amendment's timing.  Branch filed this lawsuit on August 2, 2006,
and its complaint remained under seal under the provisions of the
FCA.[52]  This complaint remained under seal until April 30, 2007,
when the court previously handling this matter granted Branch's
motion to unseal.[53]  Less than two months later, on June 22,
2007, Branch filed its First Amended Complaint; less than two
months after that, defendants filed their motion to dismiss for
lack of subject-matter jurisdiction.[54]  The district court
dismissed this case in October of 2007.  Branch appealed, the
Fifth Circuit issued its mandate in April 2009, and the case was
reallotted to this Court in that same month.[55]  Then, slightly
more than two months after the Court determined that it did have
subject-matter jurisdiction over this suit — and roughly the same
time that the Court denied defendants' motion for interlocutory
appeal on the question of subject-matter jurisdiction — Branch

---

[52] R. Doc. 1; 31 U.S.C. § 3730(b)(2)-(4).

[53] R. Doc. 23.

[54] *See* R. Docs. 49 (First Amended Complaint filed June 22,
2007), 116 (defendants' motion to dismiss for lack of subject-
matter jurisdiction filed August 6, 2007).

[55] R. Docs. 210, 212.

24

filed its Second Amended Complaint.[56]

Thus, although defendants are correct that this matter has been proceeding for approximately four years, less than six months elapsed prior to the filing of the Second Amended Complaint when this matter was not either under seal, on appeal to the Fifth Circuit, or under the specter of a challenge to the Court's subject-matter jurisdiction.  Branch promptly moved to amend for the first time after the seal was lifted, and it promptly moved to amend again after the subject-matter-jurisdiction question was resolved.  This is not a scenario in which Branch sat idly during an extended period when it was allowed to file its amendment, only to file at the very last minute.  Instead, Branch moved only slightly more than a month after the Court issued its scheduling order.  In addition, the amendment was filed at the very beginning of discovery, over ten months before discovery was set to close, and over fifteen months before trial was scheduled to commence.  Accordingly, while there can be no doubt that Branch delayed in filing its amendment, under the circumstances of this lawsuit the delay was not

---

[56] *See* R. Docs. 228 (Court's Order regarding subject-matter jurisdiction filed October 19, 2009); 278 (Court's Order denying interlocutory appeal filed December 22, 2009); 279 (Branch's first attempt to file Second Amended Complaint on December 22, 2009); 280 (Branch's successful filing of Second Amended Complaint on December 30, 2009).

undue.[57]

The Court also finds that defendants and the Magistrate Judge overstate the prejudice to defendants.  There is little question that Branch's Second Amended Complaint has the potential to expand the scope of discovery.  But there is no showing that the asserted prejudice cannot be cured by a continuance.[58] Defendants' principal argument appears to be that if Branch is permitted to add its new theory, defendants will have to defend against it.  This is hardly grounds for a finding of undue prejudice.  "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."[59] Here, the additional discovery that the amendment would require

---

[57] *See Mayeaux*, 376 F.3d at 427 ("delay alone is an insufficient basis for denial of leave to amend: The delay must be *undue*, i.e., it must prejudice the nonmoving party or impose unwarranted burdens on the court") (emphasis in original); *Dussouy*, 660 F.2d at 598 ("mere passage of time need not result in refusal of leave to amend; on the contrary, it is only *undue* delay that forecloses amendment").  After significant delay, a court will often shift the presumption to the plaintiff to demonstrate inadvertence or excusable neglect.  *See Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981); *see also Parish v. Frazier*, 195 F.3d 761, 763 (5th Cir. 1999); *Little v. Liquid Air Corp.*, 952 F.2d 841, 846 (5th Cir. 1992), *ruling reinstated upon en banc review*, 39 F.3d 1069, 1073 n.8 (5th Cir. 1994) (en banc). Because the delay here was not undue, the Court does not shift the burden.

[58] *See Stewart v. City of Houston Police Dept.*, No. 09-20680, 2010 WL 1286925 at *2 (5th Cir. Mar. 30, 2010).

[59] *Foman*, 371 U.S. at 182.

does not constitute prejudice of such magnitude that would compel denying leave to amend.

In many cases, when a plaintiff delays in asserting claims that it was aware of at the outset of litigation, a court may find bad faith or dilatory motive. But this is not the case here. First of all, Branch filed its motion within the Court's deadline, at the beginning of discovery, and fifteen months before the trial date. If Branch now seeks to delay something, the Court does not see what it is. Defendants have also not shown that Branch's filing was in bad faith. Courts have held that

> awareness of facts and failure to include them in the complaint might give rise to the inference that the plaintiff was engaging in tactical maneuvers to force the court to consider various theories seriatim. In such a case, where the movant first presents a theory difficult to establish but favorable and, only after that fails, a less favorable theory, denial of leave to amend on the grounds of bad faith may be appropriate.[60]

But Branch's last theory did not prove unfavorable; in fact, it survived defendants' motion to dismiss nearly intact. And while it is true that defendants have a number of motions for summary judgment pending in this matter, these motions were filed several months after Branch moved to amend its complaint.[61] The Court

---

[60] *Dussouy*, 660 F.2d at 599; *see also Wimm*, 3 F.3d at 141.

[61] *See* R. Docs. 466 (filed March 19, 2010); 495 (filed April 5, 2010); 509 (filed April 8, 2010); 545 (filed April 22, 2010); 565 (filed May 11, 2005); 570 (filed May 19, 2010); 580 (filed June 1, 2010).

cannot say that Branch is amending its complaint to escape the
effect of summary-judgment motions that were filed months after
it moved to amend.

Defendants also repeatedly assert that Branch is in bad
faith because, although the First Amended Complaint survived a
motion to dismiss, Branch cannot supply evidence to support the
allegations it asserts.  If defendants are correct, then the
correct response is to file motions for summary judgment, as they
have done.  The Court has not yet ruled on these motions, and it
will not find that Branch is in bad faith based on defendants'
characterization of evidence that the Court has not yet
considered.

This case is thus quite different from *United States ex rel.
Schumer v. Hughes Aircraft Company*, the case upon which the
Magistrate Judge relied.[62]  There, the relator moved to amend his
complaint three years after the complaint was filed.  The court
found that the amendment was barred by undue delay because the
relator knew all of the facts relevant to the motion when he
filed his original complaint, and that allowing the amendment
would have required the defendant to defend itself against new

---

[62] 63 F.3d 1512 (9th Cir. 1995).  Branch notes that this
case was vacated by the Supreme Court, *see Hughes Aircraft Co. v.
United States ex rel. Schumer*, 520 U.S. 939 (1997), but the
Supreme Court did not touch on the issue of amendment.

legal theories that required "extensive additional discovery."[63]

But in *Schumer*, unlike here, there is no indication that the case underwent a year-and-a-half appeal during which no amendment could be filed.  Furthermore, unlike here, the amendment in *Schumer* was filed near the close of discovery.[64]  *Schumer* is therefore an inapt analogue to the case before the Court.

The Court therefore finds that the Magistrate Judge's Order denying Branch leave to amend its complaint was in error.  It is true that Branch knew all the underlying facts that would have given rise to the theory at the outset of this case, and that in certain situations this might lend support to a court's finding of bad faith or dilatory motive.[65]  But, as explained, the circumstances of this case and the timing of Branch's amendment — combined with the presumption in favor of amendment[66] — militate considerably in favor of amendment.[67]  Defendants make no

---

[63] *Id.* at 1527.

[64] The relator filed his amendment in January of 1992, and the court elsewhere noted that he moved to *reopen* discovery in April of 1992.  Therefore, on the most charitable reading of the opinion, only three months remained in discovery when he filed his amendment.  The amendment was likely tardier than this, and may have been filed after the close of discovery.  *See id.* at 1526-27.

[65] *See Wimm*, 3 F.3d at 141; *Dussouy*, 660 F.2d at 598.

[66] *See Mayeaux*, 376 F.3d at 425,

[67] *See Carson v. Polley*, 689 F.2d 562, 584 (5th Cir. 1982) ("A litigant's failure to assert a claim as soon as he could have is properly a factor to be considered in deciding whether to

argument that the amendment is futile or that Branch has failed to cure deficiencies by amendments previously allowed.  The Order is therefore REVERSED and Branch's motion for leave to file its Second Amended Complaint is GRANTED.

## B. The Scope of Discovery

### 1. Standard of Review

Again, the statute that gives magistrate judges authority to make determinations on certain matters establishes a two-tiered system.  For certain dispositive matters, a magistrate judge may issue a report and recommendation to the district judge, which, if objected to, the district judge reviews de novo.  The magistrate judge may "hear and determine" other dispositive matters.[68]  Courts will often review a magistrate judge's decision on a nondispositive matter de novo when the decision has a dispositive effect.[69]  Even though the specific dispute before the Magistrate Judge was one concerning discovery, the Magistrate Judge found that her decision necessarily implicated the Court's subject-matter jurisdiction over a complaint that had already

_____

grant leave to amend.  Merely because a claim was not presented as promptly as possible, however, does not vest the district court with authority to punish the litigant.").

[68] 28 U.S.C. § 636(b)(1).

[69] See, e.g., Woods, 894 F.2d at 187-88; Ocelot Oil, 847 F.2d at 1462-63; see also FED. R. CIV. P. 72(b); 12 CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3068.2.

largely survived a motion to dismiss, and she issued a report and recommendation.  The Court therefore reviews this decision *de novo*.


2. The Magistrate Judge's Report and Recommendation

In the Report and Recommendation, the Magistrate Judge noted that when, as here, the allegations or transactions in a relator's complaint have been publicly disclosed, a court does not have jurisdiction over the claims unless the relator demonstrates that it is an original source of such information.[70] In addressing this issue, the Magistrate Judge considered the First Amended Complaint, which contains only the loss-shifting scheme, and not the inflated-revenue scheme alleged in the Second Amended Complaint.  Relying on *Rockwell International Corporation v. United States*,[71] the Magistrate Judge determined that a party is not permitted to engage in "claim smuggling" — that is, after a public disclosure, a relator may not pursue claims as to which it is not an original source simply because it is an original source as to *some* of the claims in the complaint.  Branch is not the original source for the entire loss-shifting scheme it

---

[70] 31 U.S.C. § 3730(e)(4).  The Court provided an extensive discussion of the jurisprudence surrounding this inquiry in its order on defendants' motion to dismiss.  *See* R. Doc. 226; 668 F. Supp. 2d 780 (E.D. La. 2009).  That general background will not be repeated here.

[71] 549 U.S. 457 (2007).

alleged, she held, so the Court lacks jurisdiction with respect
to other examples of the scheme despite Branch's original-source
status with respect to the examples listed in the First Amended
Complaint.  The Magistrate Judge also engaged in an extensive
review of similar cases and determined that they did not support
Branch's contention that it should be allowed to proceed to
discovery on its entire scheme.  Accordingly, the Report and
Recommendation holds that Branch is not an original source for
the fraudulent scheme beyond those properties that were
specifically mentioned in its complaint, that the Court therefore
lacks jurisdiction over the non-exemplar properties, and that
Branch is not entitled to discovery on the entire loss-shifting
scheme.

   3. The Public-Disclosure Bar and the Original-Source
   Exception Redux

   The question the Court must answer is whether Branch's
original-source status as to the information upon which its claim
is based extends to the entire loss-shifting scheme manifested by
the examples or only to the examples themselves.  The Court holds
that Branch's original-source status entitles it to discovery on
all the alleged instances of fraud in the loss-shifting scheme,
even those outside the examples in the First Amended Complaint.

   The Court begins by an explanation of its Order ruling on
defendants' motion to dismiss.  There, the Court found that,

32

although the allegations of fraud had been publicly disclosed, Branch was properly considered an original source because its complaint "describe[d] in detail the results of Branch's examinations of [numerous] properties.  Each description lists the address of the reexamined property, the insurer, a description of the damage, the amount of flood insurance paid, and Branch's determination of the actual amount of flood damage."[72]  The Court further determined that this information was directly gathered by Branch and not a third party, that it was qualitatively different from the information that was placed into the public domain by the public disclosures, and that it supplied "numerous additional facts and considerable information about the alleged fraud."[73]  Accordingly, the pleadings demonstrated that Branch had direct and independent knowledge of the information upon which the allegations were based, and it thus qualified for original-source status.  While the Court acknowledged that Branch had pleaded a scheme, it did not reach the issue presented here.

A sense of the FCA itself is required for this analysis. The statute allows private citizens — called "relators" — to bring suit for fraud committed upon the government.  They bring these suits on the government's behalf, and, if successful, a

---

[72] R. Doc. 228 at 32.

[73] *Id*. at 32-33, 39.

33

relator might be entitled to a portion of the recovery.  It

therefore provides strong financial incentives for private

citizens to bring suit to expose fraud they are aware of.  But

the statute is beset by a tension that comes from two conflicting

goals.  While the statute encourages suits by providing rewards

for individual citizens to expose fraud that they are well-

positioned to know about, it endeavors to discourage suits by

those who have very little information to add about any fraud but

just want the money.  Put another way, the primary goals of the

FCA are "(1) promoting citizen involvement in exposing fraud

against the government and (2) preventing parasitic suits by

opportunistic late-comers who add nothing to the exposure of

fraud."[74]

These twin goals are partially harmonized by the FCA's

"public disclosure" jurisdictional bar.  Under this bar,

> [n]o court shall have jurisdiction over an action
> [brought under the FCA] based upon the public
> disclosure of allegations or transactions in a
> criminal, civil, or administrative hearing, in a
> congressional, administrative, or Government Accounting
> Office report, hearing, audit, or investigation, or
> from the news media, unless the action is brought by
> the Attorney General or the person bringing the action

---

[74] *United States ex rel. Reagan v. E. Tex. Med. Cent.
Regional Healthcare Sys.*, 384 F.3d 168, 174 (5th Cir. 2004)
(quoting *United States ex rel. Laird v. Lockheed Martin Eng'g &
Sci. Servs. Co.*, 336 F.3d 346, 351 (5th Cir. 2003), *abrogated on
other grounds by Rockwell Int'l Corp. v. United States*, 549 U.S.
at 470-71) (internal punctuation omitted).

is an original source of the information.[75]
An individual is an original source if he "has direct and
independent knowledge of the information on which the allegations
are based and has voluntarily provided the information to the
Government before filing an action [under the FCA] which is based
on the information."[76]

     The statute thus distinguishes between two conditions.  If
the allegations or transactions of fraud have not been publicly
disclosed, the public-disclosure jurisdictional bar does not
apply.  A court's jurisdiction over the relator's claims is not
affected by the bar.[77]  If, however, the allegations or
transactions *have* been publicly disclosed, then a court lacks
jurisdiction unless the relator can demonstrate that it is an
original source.  The Court has already held that there has been
a public disclosure in this case.[78]  It has also held that Branch
is the original source of the information regarding the listed
properties in the complaint.[79]

     The Supreme Court added some degree of clarity to the law

---

[75] 31 U.S.C. § 3730(e)(4)(A).

[76] *Id.* § 3730(e)(4)(B); *see also Reagan*, 384 F.3d at 177-78.

[77] Of course, jurisdictional issues may arise that do not
implicate the public-disclosure provision.

[78] R. Doc. 228 at 24-26.

[79] *Id.* at 45.

35

surrounding the scope of the jurisdictional bar for publicly disclosed "allegations or transactions" in *Rockwell*.[80]  There, a relator alleged that his former employer had submitted false claims to the government arising out of its operation of a nuclear weapons plant.  The compensation that the government paid to the plant was partially dependent on its environmental and safety record.[81]  In fact, however, the plant had been concealing environmental violations, which included the storage of partially solid blocks of toxic pond sludge dubbed "pondcrete."  The relator made claims based on this violation, as well a violation concerning a similar mixture called "saltcrete" and a waste-water-disposal method known as "spray irrigation."[82]  A jury found that the plant had committed violations related to pondcrete for a certain time period after the relator left the plant's employ, and held for the plant on the other claims.

   The Supreme Court determined that the allegations underlying

---

[80] The issue before the Court involves the scope and operation of the original-source provision, which is distinct from the requirements of Rule 9(b).  The parties discuss several cases establishing that, when appropriate, Rule 9(b) allows a relator to plead examples of a fraudulent scheme and then proceed to discovery on that entire scheme.  *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007); *see also Hebert*, 295 Fed. App'x at 723; *Mason v. Medline Indus., Inc.*, No. 07-5615, 2010 WL 653542, at *4 (N.D. Ill. Feb. 18, 2010).  Because the Court is analyzing the original-source provision and not Rule 9(b), these cases are not relevant.

[81] 549 U.S. at 460.

[82] *Id.* at 465 n.4.

the successful claims were publicly disclosed and that the

relator was not an original source for these claims.  The relator

argued that a court could still hear all of his claims because he

was an original source with respect to his spray-irrigation claim

that was rejected by the jury, and a court could thus properly

exercise jurisdiction over the entire suit.  The Supreme Court

rejected this view.

> Section 3730(e)(4) does not permit jurisdiction in
> gross just because a relator is an original source with
> respect to some claim.  We, along with every court to
> have addressed the question, conclude that § 3730(e)(4)
> does not permit such claim smuggling.  As then-Judge
> Alito explained, "[t]he plaintiff's decision to join
> all of his or her claims in a single lawsuit should not
> rescue claims that would have been doomed by section
> (e)(4) if they had been asserted in a separate action.
> And likewise, this joinder should not result in the
> dismissal of claims that would have otherwise
> survived."[83]

The Supreme Court, however, did not precisely define what it

meant by "claim smuggling."

In the absence of the prohibition on claim smuggling, there

appears to be no reason why Branch could not be considered the

original source of the loss-shifting scheme.  Again, nothing in

the statutory language requires Branch to be the original source

for each manifestation of the allegedly fraudulent scheme.  It

need only have "direct and independent knowledge of the

---

[83] 549 U.S. at 476 (quoting *United States ex rel. Merena v. Smithkline Beecham Corp.*, 205 F.3d 97, 102 (3d Cir. 2000)) (internal citations omitted).

37

information on which the allegations are based."[84]  The Court has determined that, based on the allegations in the First Amended Complaint, Branch is the original source of the information underlying the listed properties.  It therefore appears appropriate for the Court to assert jurisdiction over every example of the fraudulent scheme.  After all, Branch's allegation that defendants engaged in a far-ranging scheme is a natural extension of the specific information asserted in its complaint. Assuming that Branch's allegations are true, the presence of a large number of fraudulent adjustments suggests that there are many more examples of the same conduct — a "scheme," even — that are not listed in the complaint.  And because Branch's allegation of a scheme is thus based upon the information about the exemplar properties, it would appear that Branch could be considered the original source of the entire loss-shifting scheme and that the Court is not divested of jurisdiction.

This is only the case, of course, if such a result is not foreclosed by *Rockwell's* prohibition on claim smuggling.  The Supreme Court in *Rockwell* made clear that claims cannot be smuggled, nor may they be brought if they could not have been brought in a separate complaint.[85]  It did not, however, explain what it meant by "claim."  Defendants argue that the Supreme

---

[84] 31 U.S.C. § 3730(e)(4)(B).

[85] 549 U.S. at 476.

38

Court imposed a prohibition on the smuggling of individual examples or instances of the fraudulent scheme.  Thus, they contend that even if Branch is the original source for the examples in the First Amended Complaint, it cannot use its original-source status to include additional instances of the same conduct that go unmentioned in the First Amended Complaint.

*Rockwell* makes clear that the Supreme Court does not use the term "claim" in this sense.  As is made clear from the Court's discussion of the "pondcrete claim" and the "spray-irrigation claim," the Court's claim-smuggling discussion uses the term "claim" in the sense of a theory or type of fraudulent conduct.[86] The discussion of the pondcrete claim focuses upon the procedure underlying pondcrete and the relator's allegations as to how the defendant was committing fraud.  *Rockwell*'s claim-smuggling analysis does not use the term "claim" to refer to any one, single example of fraudulent conduct.

Defendants have pointed to no cases that support their theory of the public-disclosure provision.  And their interpretation of *Rockwell* is inconsistent with the lower-court cases that *Rockwell* cited in its claim-smuggling discussion.  In the Eighth Circuit case of *Hays v. Hoffman*,[87] for example, the relator asserted a number of FCA claims, and the court noted that

---

[86] *Id.* at 476.

[87] 325 F.3d 982 (8th Cir. 2003).

it was bound to "resolve the original source issue on a claim-by-claim basis."[88]  But it then noted that the case involved "eleven *types* of false claims," and that the relator was an original source of only one of these types.[89]  The "claim-by-claim' inquiry, as employed by the Eighth Circuit, is thus consistent with the Court's interpretation of *Rockwell* — that "claim" denotes the allegation of a theory or type of fraudulent conduct and not an individual example of the theory.  This is made all the more clear in *Hays* because the opinion states that the theory for which the relator *was* an original source included the submission of multiple invoices over the course of "a number of years."[90]

Likewise, the Ninth Circuit in *Wang v. FMC Corporation*[91] does not use the term "claim" to refer to isolated and individual instances of fraudulent conduct.  There, the relator alleged that the defendant defrauded the government on four different defense projects, all of which allegedly had different types of undisclosed failures.  The relator did not allege a scheme with multiple examples of the same type of conduct.  Rather, he described four complex projects and provided for each project a

---

[88] *Id.* at 990.

[89] *Id.* at 990-91 (emphasis added).

[90] *Id.* at 991.

[91] 975 F.2d 1412 (9th Cir. 1992).

theory of how the defendant defrauded the government.  In its analysis, the Ninth Circuit examined each theory separately.  Of these four theories, the court found that three had not been publicly disclosed and were thus not subject to the public-disclosure bar.[92]  But it still determined that it needed to engage in the original-source inquiry for the fourth theory that was subject to a public disclosure.[93]  Nothing in the Ninth Circuit's approach is inconsistent with the Court's interpretation of *Rockwell*'s claim-smuggling prohibition.

Finally, in *United States ex rel. Merena v. Smithkline Beecham Corporation*, the Third Circuit noted that the FCA is designed on the model of a single-count complaint, and that multi-count complaints complicate the statute's application.  Nevertheless, when applying the public-disclosure bar, "each claim in a multi-count complaint must be treated as if it stood alone."[94]  The court described one of relators' theories of Medicare fraud, what it called the "automated chemistry" scheme, and suggested that the relators might not be the original source for that theory.  It remanded with instructions that the district court determine whether the relators were the original sources of

---

[92] *Id.* at 1415-16.

[93] *Id.* at 1417-20.

[94] 205 F.3d at 101-02.

the information underlying that theory.[95]

The Court's interpretation of *Rockwell* is confirmed by the post-*Rockwell* cases that have enforced the prohibition on claim smuggling. For example, the Tenth Circuit in *United States ex rel. Boothe v. Sun Healthcare Group, Inc.*, interpreted *Rockwell*'s claim-smuggling mandate as the Court does here. It held "that district courts should assess jurisdiction on a claim-by-claim basis, asking whether the public disclosure bar applies *to each reasonably discrete claim of fraud.*"[96] It noted, however, that the parties did not dispute that "each of the ten *fraudulent schemes* [the relator] identifies is tantamount to a discrete and independent cause of action for fraud."[97] It remanded the case to the district court to determine whether the remaining schemes

---

[95] *Id.* at 99, 102, 108. The opinion, unlike *Rockwell*, does employ the term "automated chemistry claims" and does not speak merely of a "claim." But, in requiring that the original-source inquiry be undertaken claim-by-claim, it consistently indicates that the automated chemistry claims should be analyzed all together. *See, e.g., id.* at 102 ("in determining whether the relators in this case are entitled to a share of any proceeds that are attributable to the 'automated chemistry' claims, we must consider whether they would have been entitled to such a share had their complaints asserted those claims alone"). This is consistent with *Rockwell* as well as *Hays* and *Wang*.

[96] 496 F.3d 1169, 1176 (10th Cir. 2007) (emphasis added).

[97] *Id.* at 1177 (emphasis added). That the parties agreed to this point is of no moment; as a matter of subject-matter jurisdiction, it is not susceptible to stipulation by the parties. *See Rockwell*, 549 U.S. at 467-70.

were subject to the public-disclosure bar.[98]

Accordingly, none of the relevant case law — as articulated in *Rockwell*, the cases cited in *Rockwell*, as well as post-*Rockwell* cases that apply the claim-smuggling prohibition — holds that the claim-by-claim analysis requires a district court to make original-source determinations with respect to every example or instance of a single scheme of fraudulent conduct.  Defendants have not cited to any cases that would support their interpretation.  Rather, the cases suggest that *Rockwell*'s prohibition on claim-smuggling applies to discrete theories or types of fraud.  Branch would thus be prohibited from alleging a separate scheme as to which it was not an original source, because its original-source status for the loss-shifting theory does not allow it to shoehorn other theories for which it was not an original source into the complaint.  But Branch has demonstrated that it is the original source for the entire fraudulent scheme based on loss shifting.  Again, the Court has already determined that Branch has direct and independent knowledge of the information surrounding the exemplar properties.

---

[98] *Id.*; *see also In re Pharm. Indus. Average Wholesale Price Litig.*, 538 F. Supp. 2d 367, 379, 382-89 (D. Mass. 2008) (applying *Rockwell*'s claim-by-claim analysis to discrete theories of fraud and not to individual claims for payment); *United States ex rel. Kennedy v. Aventis Pharmaceuticals, Inc.*, No. 03-2750, 2007 WL 3145010, at *2 (N.D. Ill. Oct. 23, 2007) (interpreting *Rockwell* to mean that a relator cannot "bootstrap his original source status regarding one *theory of fraud* into original source status for an *entirely different theory*") (emphasis added).

And its allegation that defendants engaged in a much broader scheme is based upon that knowledge.  The Court may thus exercise jurisdiction over all the instances or examples of the alleged scheme, and Branch is not prohibited from proceeding to discovery on properties outside those explicitly listed in the First Amended Complaint.

### III. Conclusion

For the foregoing reasons, the Magistrate Judge's Order denying Branch leave to amend its complaint is REVERSED. Further, the Court has reviewed the Report and Recommendation *de novo* and declines to adopt it as its opinion.  Branch may proceed to discovery in a manner consistent with this Order.

Under the Court's earlier Order modifying the briefing schedule for defendants' summary-judgment motions,[99] responses to pending motions for summary judgment may be filed no later than ten business days from the issuance of this Order.  Replies may be filed in accordance with the local rules of this jurisdiction.

New Orleans, Louisiana, this ___13th___ day of August, 2010.

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[99] R. Doc. 550.

44