## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, *EX REL.* BRANCH CONSULTANTS, L.L.C., <br><br> *Plaintiff* <br><br> v. <br><br> ALLSTATE INSURANCE COMPANY, et al., <br><br> *Defendants* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Case No. 2:06-cv-4091 <br> ) <br> ) <br> ) <br> ) |

### DECLARATION OF ALLAN KANNER

1.      My name is Allan Kanner.  I am over 21 years old and am fully competent to make this declaration.  I have personal knowledge of the facts recounted below.  I submit this declaration in support of Branch's opposition to various summary judgment motions.

2.      I am a partner at Kanner & Whiteley, L.L.C., and a member in good standing of the Louisiana State Bar.  I am counsel of record for Branch Consultants, LLC ("Branch") in this case.

3.      At Branch's request, I served as the principal contact with the federal government in this case with regard to its pre-filing, voluntary disclosure pursuant to § 3730(e)(4)(b) of the False Claims Act.

4.      In that capacity, on behalf of Branch, I contacted Assistant United States Attorney Sharon Smith on the morning of August 2, 2006.  At that time, Branch had not filed its original complaint.

5.      On Branch's behalf, I reported to AUSA Smith the information on which Branch's lawyers had based Branch's original complaint, including the following specifics:

A.    I described Branch's discovery and first-hand knowledge of widespread fraud by the defendants.  I explained that Branch obtained that information by performing work initially on behalf of insurers and subsequently on behalf of homeowners.  I reported that, based on the observations and analysis of Branch personnel, each of the defendants was engaged in a widespread practice of lying to the government about the amount and dollar value of flood damage at homes damaged by Hurricane Katrina.

B.    I further explained that Branch had, at my insistence, began an effort to document its observations and analysis concerning this fraud.  I informed AUSA Smith that this effort was extensive, time-consuming, and ongoing.  I described Branch's ongoing effort as including review and assembly of considerable documentation as well as the creation of summary documents reflecting its analysis.  And I mentioned that Branch was continuing to re-inspect premises where they believed fraud had taken place but as of yet lacked documentation from which particularized details could be extracted.

C.    I provided AUSA Smith with a copy of Branch's original complaint and its written disclosure statement.  These documents also describe the information on which Branch's original complaint is based and reference, in considerable detail, most if not all of the information described above.

D.    I told AUSA Smith that additional, voluminous information was available in Branch's files and available to the government upon request.  I explained that these documents were not likely to be of much use to the government without significant culling and analytical help from Branch or from someone with similar adjusting or construction-estimating expertise.  And I explained that Branch was continuing to work through these files and to conduct physical reexaminations of the properties in order to create more detailed and more helpful documentation of its allegations.

6.    On behalf of Branch, I disclosed all of this information voluntarily.  Branch was not under subpoena or under any other kind of compulsion to make these disclosures.

7.    I made all of these disclosures before filing Branch's original complaint.  I also answered AUSA Smith's questions and offered to make Branch personnel available to the government at the government's earliest convenience.

8.    Finally, I asked if the government needed more time to consider Branch's information before we filed the original complaint or whether we could go ahead and file at that time.

9.      I waited to file Branch's original complaint, specifically for the purpose of satisfying 31 U.S.C. § 3730(e)(4), until I had received confirmation from AUSA Smith that the government did not object to Branch's filing immediately.  I received that confirmation.

10.      I also waited to file the original complaint until I received confirmation from co-counsel at Susman Godfrey that a copy of the original complaint and written disclosure statement with exhibits had been delivered to the Department of Justice in Washington.  I received this confirmation as well.

11.      When and only when I had received these confirmations, I instructed personnel at my firm to file and serve Branch's original complaint.  Filing was accomplished at 3:58 p.m. on August 2, 2006, as is reflected by the file-stamp on the original complaint.

12.      Although we had already provided the government with copies of the original complaint as part of Branch's pre-filing disclosure, we nonetheless served the complaint on the government, pursuant to Rule 4, after it was filed.

13.      Following the filing of the original complaint, Branch has subsequently filed two amended complaints in this action.  Before filing either amended complaint, in a similar fashion to the procedure described above, Branch contacted the government and disclosed the new information on which the amendments were based.

14.      Attached hereto as Exhibit A to this Declaration is a true and correct copy of an excerpt from the deposition of Daniel Duffy, Corporate Representative for Fidelity Insurance Co. and Fidelity National Property and Casualty Co. ("Fidelity").  Mr. Duffy is the Vice President of Information Technology.  He testified that Fidelity maintained both flood claim files and wind claim files.  He further testified that he had recently run data searches on the AS400 system to pull all Fidelity Katrina wind claims to prepare a spreadsheet.  Duffy Deposition, pp. 45-46.

15.     Attached as Exhibit B is the Declaration of Max Johnson and its attachments which were attached as Exhibit 8, A-F to Branch Consultants, L.L.C.'s Memorandum in Opposition to Defendants' Motions for Summary Judgment (Dkt. 631-43) (9/03/10).  As Ex. 8 (A-F) indicates throughout, "Building Valuation Reports" were prepared and adjusters were paid fees in association with these reports.  The actual claim files reveal the correlative fees charged in relation to the overcharge.  However, this specific information could not be identified prior to filing suit and a review of the claim files.

I affirm under penalty of perjury that the foregoing is true and accurate.


/s/ Allan Kanner
Allan Kanner

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4

 5    CIVIL ACTION NO. 06-4091          SECTION "R"

 6

 7

 8    UNITED STATES OF AMERICA EX REL. BRANCH
                  CONSULTANTS, L.L.C.
 9

10                      VERSUS

11

      ALLSTATE INSURANCE COMPANY, ET AL
12

13

14

15          Videotaped Deposition of FIDELITY

16   NATIONAL INSURANCE COMPANY and FIDELITY

17   NATIONAL PROPERTY AND CASUALTY COMPANY, taken

18   through its Corporate Representative, DANIEL

19   DUFFY, taken on Thursday, March 18, 2010,

20   commencing at 9:30 a.m., before Rebecca T.

21   Fussell, Certified Court Reporter in and for

22   the State of Louisiana, at the Nielsen Law

23   Firm, 3838 North Causeway Boulevard, Suite

24   2850, Metairie, Louisiana 70002.

25
```



*ORIGINAL*

```
 1   last name?
 2        A     D-R-E-H-E-R.   And Adrian
 3   Whitehurst.
 4        Q     And are all three located in
 5   Omaha?
 6        A     No.
 7        Q     Where are they located?
 8        A     Tim Love is in St. Petersburg.
 9   Dean is in Omaha, and Adrian is in
10   Jacksonville.
11        Q     Do the members of your
12   management team have employees who must answer
13   to them?
14        A     Yes.
15        Q     Has anybody ever asked you to
16   run any kind of data searches on the AS400
17   system concerning Katrina claim information?
18           MR. TREAS:
19              Objection to form.
20           THE WITNESS:
21              Yes.
22   BY MR. GISLESON:
23        Q     All right.   When was that?
24        A     I don't recall exactly.
25   Sometime within the last six months.
```

```
 1          Q      Sure.  Do you remember what the
 2   request was?
 3               MR. TREAS:
 4                    Objection to form.
 5               THE WITNESS:
 6                    Not specifically, no.
 7   BY MR. GISLESON:
 8          Q      Generally?
 9          A      Something to do with on the wind
10   side, pulling all the -- the losses that were
11   part of Hurricane Katrina and dumping them
12   into a spreadsheet.
13          Q      Okay.  How long did that process
14   take?
15          A      A few days.
16          Q      How did you go about doing that?
17          A      I use the SQL query language and
18   my knowledge of the AS400 database to pull
19   those out.
20          Q      How long did it take you to do
21   it, though?
22          A      It took a few days to deliver
23   it.  I probably actually spent a half a day
24   total.
25          Q      Okay.  Who requested that
```

1    document?

2         A    Deb Price.

3         Q    What information in terms of

4    fields are reflected on that document?

5         A    Policy number, insured name,

6    property address.  I believe there was an

7    amount paid.  I think that was it.

8         Q    Okay.  When you pulled this

9    information and ran the search, was it only

10   you doing it, or was it you plus another

11   person or a member of your management team?

12        A    I pulled -- I pulled all the

13   information for the wind spreadsheet.

14        Q    Okay.  So it was just you?  It

15   wasn't you and your management team?

16        A    No.  I'm sorry.  That was a

17   multiple question.  It was just me.

18        Q    Sure.  Sorry about that.  Again,

19   if I ever ask you a question that you don't

20   understand or need me to clarify, just go

21   ahead and ask me.

22        A    Yes.

23        Q    And so the report that was

24   actually generated looks like a spreadsheet?

25        A    It actually is a spreadsheet.

# EXHIBIT B

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *EX REL.* BRANCH CONSULTANTS, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:06-cv-4091 |
| | ) | |
| ALLSTATE INSURANCE COMPANY, et al., | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## DECLARATION OF MAX R. JOHNSON

1.  My name is Max Johnson. I am over 21 years old and am fully competent to make this declaration. I have personal knowledge of the facts recounted below. I submit this declaration in opposition to the motions for summary judgment filed by Defendants Standard Fire Insurance Company (Dkt. 495), Fidelity National Insurance Company and Fidelity National Property and Casualty Insurance Company (Dkt. 509), Colonial Claims Corporation (Dkt. 545), Liberty Mutual Fire Insurance Company (Dkt. 565), Simsol Insurance Services, Inc. (Dkt. 570), and American National Property & Casualty Company (Dkt. 580) (collectively, "Defendants").

2.  I am the President of Branch Consultants, LLP ("Branch") and have held that position since I founded the company in 1997. Branch is a catastrophe adjusting and construction consulting firm.

3.  I have approximately 50 years of experience working in the residential and commercial construction industry and am a licensed insurance adjustor.

4.  The allegations in Branch's First Amended Complaint ("FAC"), which I incorporate herein by reference, are based upon the observations and measurements that I and others working for Branch made at hundreds of properties following Hurricane Katrina. The allegations in the FAC concerning the insurers covering the exemplar properties are based on information Branch obtained from the homeowners, either verbally or in writing. For example, with respect to the property located at 7732 Edwards Street in New Orleans, the insured provided Branch the policy attached hereto as Exhibit A.

5.  Following Hurricane Katrina, I personally inspected each of the properties listed in the FAC. Based on my inspection, I determined that Defendants' flood adjustments of those properties were grossly inflated. A summary of my findings was included in Branch's

1

responses to Defendants' interrogatories, which are attached hereto as Exhibits B, C, D, E, F,

6.      Based on my decades of experience, Defendants' inflated adjustments cannot be explained away as innocent or isolated mistakes. Instead, they demonstrate the presence of systemic abuse. And by misattributing damage caused by wind to flood, Defendants necessarily caused the homeowners to receive less from their wind/homeowners policies—even if the Defendants themselves were not the wind/homeowners carriers in each of the particular examples in the FAC.

7.      Shortly after Hurricane Katrina, I personally inspected the property located at 7441 Fieldston Drive in New Orleans, on which Defendant Liberty Mutual issued both the flood and the wind policies. Contrary to Liberty Mutual's allegations, the property suffered extensive wind damage that obviously was *not* caused by any "fraud" by the insured.

8.      Prior to the filing of this lawsuit, Branch provided all material information concerning its claims to the government.

9.      I swear under penalty of perjury that the foregoing is true and accurate.

DATED: _9/3/10_

Max R. Johnson

2

# EXHIBIT A

OVERAGE IS PROVIDED IN THE
.A CITIZENS FAIR PLAN
O BOX 60730
EW ORLEANS, LA 70160

## HOMEOWNERS DECLARATION

| Policy Number | Policy Period | |
|---|---|---|
| | From | To |
| FZH 0216630 04 | 10/16/2005 12:01 A.M. Standard Time at the described location | 10/16/2006 |

LLIN  .FORMATION   DIRECT BILL - INVOICE WILL FOLLOW

### Transaction

RENEWAL DECLARATION

Renewal Of: FZH0216630

| Named Insured and Address | Agent's Name and Address | Agency Number |
|---|---|---|
| COMEAUX, JOSEPHINE 7732 EDWARD STREET NEW ORLEANS LA 70126 | APARICIO,WALKER & SEELING P. O. BOX 95 METAIRIE, LA  70004  Telephone: | 8002552 |

The residence premises covered by this policy is located at the above insured address unless otherwise stated below:

Legal Address  7732 EDWARD ST
               NEW ORLEANS LA 70126         ORLEANS PARISH

Rating Information - Brick Veneer           , Constructed In 1971 , Primary Residence  Protection Class 02
Territory 360  Feet From Hydrant          0 , Section I Loss Deductible  $1,000          ,  1  Family.
Coverage is provided where limit of liability or premium is shown.

| Section I Coverage | Limit of Liability | Premiums |
|---|---|---|
| A. Dwelling | 136,873 | 2,077.00 |
| B. Other Structures | 13,687 | |
| C. Personal Property | 68,437 | |
| D. Loss of Use | 27,375 | |

| Section II Coverage | | |
|---|---|---|
| E. Personal Liability | 100,000 | EACH OCCURRENCE |
| F. Medical Payments to Others | 1,000 | EACH PERSON |

Additional Premiums
    3% Tax Exempt Surcharge                                                          62.00

| Premium Charge This Transaction: | $0.00 | Total Location Premium | $2,139.00 |
|---|---|---|---|
| | | Total Policy Premium | $2,139.00 |

### Forms and Endorsements

HO-01-17   (04/05)   HO-04-96   (10/00)   AAM-9968   (05/01)   HO-00-03   (10/00)   HO-03-42   (01/05)
HO-04-46   (10/00)

### Policy Interests

MORTGAGEE                           Unit # 00001
HIBERNIA NATIONAL BANK
P O BOX 61062
NEW ORLEANS LA 70161

L  #

BRANCH B004051
Authorized Representative

ued Date:  08/17/2005                COPY - INSURED

DEC  05 95                                                          Page  1  of  2

# EXHIBIT B

## ANPAC EXEMPLAR PROPERTIES

1.      Branch has inspected the properties identified below on which ANPAC issued a flood insurance policy through the National Flood Insurance Program. Branch's inspection revealed that the amounts ANPAC caused the Government to pay for purported flood damage were grossly inflated and cannot be justified by any reasonable adjusting standards or guidelines. In this supplemental response,[1] Branch has endeavored to describe the adjusting deficiencies that it has identified and the rules, regulations, and guidelines that were violated. Branch has not had the opportunity to review all of ANPAC's documents relating to the NFIP, and reserves the right to further supplement this response as necessary.

**I.      4870 Alsace Street, 4900 Alsace Street, 4910 Alsace Street, & 4920 Alsace Street**

2.      ANPAC issued separate flood policies for each of these identical quadplex buildings (Policy Numbers: 9901660274-2005, 9901660275-2005, 9901660273-2005, and 9901660277-2005, respectively). Each had a policy limit of $221,000. The properties suffered damage from Hurricane Katrina, and a claim was submitted to ANPAC under the flood policies. Simsol Insurance Services (Larry Roberts) adjusted the claim for ANPAC. The reports on 4870, 4910, and 4920 Alsace St. were all identical and calculated a loss of $95,217.93. The adjuster found the exact amount of damage, to the penny, on each building. 4900 Alsace St. was slightly lower at $82,181.06.

3.      Branch found no evidence of flooding inside these building and therefore found $0 of flood damage to these structures.

### *Adjusting Deficiencies*

4.      Branch conducted several inspections of these buildings and found no evidence of flooding inside. An engineer, Dr. Anthony Lamanna, also surveyed the property for elevation heights for possible flooding. Dr. Lamanna found that no flood waters entered the property, based on his analysis of all pertinent information. Branch's has photographs showing a flood line that sits just below the building foundations, approximately 4" below. Branch also conducted a land survey and found no flood water levels sufficient enough to enter these buildings. ANPAC states in the adjusting report (ANPAC 000048): "[n]o distinct interior water line could be found on the base boards". ANPAC's report also states: "[a] scope of the second floor of a unit believed to be unit A of 4920 showed wind driven rain damage and possible ceiling damage from a roof leak". There is absolutely no evidence that water damage in this building was caused by flood.

5.      Branch's determined that no flood water ever reached inside these buildings, yet ANPAC claims there was a 2" interior flood line in these properties. Even using ANPAC's incorrect flood

---

[1] Branch provides the below information to supplement its responses to ANPAC Interrogatory Nos. 1, 5, 11, 14, and 21. In doing so, Branch specifically preserves any and all objections to those interrogatories, including that they are vague, call for the premature disclosure of expert information and testimony; call for information protected by the attorney client privilege; and because they call for information that is in ANPAC's possession. Branch has endeavored to provide greater detail as to ANPAC's adjusting deficiencies, but expressly reserves the right to supplement and/or revise this information for any reason.

::Odma\Grpwise\Aka-Do01.Aka-Po01.Cases:50237.1

line of 2" there was no justification why ANPAC would pay to replace the entire downstairs. ANPAC paid for drywall, flooring, insulation, ceilings, HVAC, electrical, doors, smoke detectors, framing, countertops, paint and cabinetry.

6.    ANPAC paid $5.378.15 for each living room that included vinyl-tile flooring, 100% of drywall/paint, 25% of wall insulation, wall framing, removing/cleaninglre-installing of doors/lights/smoke detectors/electrical-receptors, as well as flood water cleanup and mold remediation. This was duplicated for the four living rooms in each of the four buildings for an over adjustment of $86.050.40.

7.    ANPAC paid $8.789.40 for each Kitchen that included Vinyl-tile flooring, 100% of drywall/paint, 25% of wall insulation, wall framing, removing/cleaning/re-installing of doors/lights/counters/cabinets/light switches, as well as flood water cleanup and mold remediation. This was duplicated for the four kitchens in each of the four building for an over adjustment of $140.630.40.

8.    ANPAC paid $1,528.08 for the exterior of each building that included pressure washing the brick exterior and replacing sheathing. None of this was damaged by flood waters for an over adjustment of $6,112.32.

9.    Even though ANPAC's report claims there was a 2" flood line; ANPAC's reports on 4870 Alsace St, 4910 Alsace St & 4920 Alsace St. all included payments for the upstairs bedrooms, bathrooms, and landings. ANPAC's report on 4900 Alsace was the only report that did not include paying for items upstairs.

10.    ANPAC paid $750.74 for the upstairs front bedrooms that included replacing carpet, pad, cleaning doors/lights/returns/walls/ceilings and mold remediating the floors/walls/ceilings for an over adjustment of $2,252.22.

11.    ANPAC paid $1.208.38 for the upstairs back bedrooms that included replacing carpet, pad, cleaning doors/lights/returns/walls/ceilings and mold remediating the floors/walls/ceilings for an over adjustment of $3,625.14.

12.    ANPAC paid $369.12 for the upstairs bathrooms that included replacing vinyl tile, cleaning doors/lights/countertops/vanities/commodes/bathtubs/sinks and mold remediating the floors/wails/ceilings for an over adjustment of $1.107.36.

13.    ANPAC paid $618.67 for the upstairs landings that included replacing carpet, pad, cleaning doors/lights/returns/walls/ceilings and mold remediating the floors/walls/ceilings for an over adjustment of $1.856.01.

14.    ANPAC's report also included 2 line items that appear to be manually entered: "Electrical service Check" and Debris Removal". The 4900 Alsace report paid $4,653.09, while the other 3 properties paid $5,260.13 for an overpayment of $22,233.48.

15.   In addition to the individual line items, ANPAC's report included 10% overhead, 10% profit, 8.75% tax "plus excluded O&P trades" on each property.  These charges were identical on 4870, 4910, and 4920 Alsace Street, with an overhead of $5,071.82, profit of $5,071.82, and tax of $2,475.41.  (4920 had only a 7% tax rate and excluded trades).  Since 4900 Alsace did not include any items upstairs, these items were slightly less.  All in all this came to a total of $146,603.30, a pure overcharge, not paying for one damaged item.

16.   Larry Roberts, the Simsol adjuster, billed out ($3,000.00, 4870 Alsace) & ($3,000.00,4920 Alsace) & ($3,000.00, 4900 Alsace) & ($3,000.00,4910 Alsace)for a total of $12,000.00, on a claim that their own adjuster said he could not find an interior water line, and ended up paying a grand total of $367K. Based on the actual flood damage, this would be an exorbitant amount of fees. There is no reasonable excuse for over adjusting this claim.

## II.   7641 Endeavors Court

17.   ANPAC issued a flood policy (Number #99011863782005) on the property at 7641 Endeavors Ct. with a policy limit of $93,500. The property suffered damage from Hurricane Katrina, and a claim was submitted to ANPAC under the flood policy.  Sweet Claim Service Inc (Janette Clements / Wofford) adjusted the claim on behalf of ANPAC, and calculated a loss of $144,960,87. Because this number exceeded policy limits, ANPAC submitted a claim to the NFIP for the policy limits of $93.5K.

18.   Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $30,739.88.

### *Adjusting Deficiencies*

19.   In completing its adjustment, Branch used Xaetimate software and the starting price list of "LAN04S6C". Branch measured the flood line to be approximately 4'.

20.   ANPAC paid the policy limits of $93.5K based on a "Building Valuation Report" that represents the cost to build this house from the ground up.  Even using ANPAC's estimated flood height of 5', paying by valuation is not warranted.   This report paid for generic items that included items well above the flood line. These generic items were grouped together by ANPAC into the following groups:

| | |
|---|---|
| Foundation: | $9,298.12 (not damaged at all) |
| Framing: | $34,635.80 (not damaged from flood waters) |
| Exterior Finish: | $15,031.27 (not damaged at all) |
| Windows and Doors: | $6,519.68 (inflated) |
| Roofing: | $9,507.87 (not damaged from flood waters) |

*They charged for a wooden shingle roof; this is over kill for pricing for a standard roof. It had a 20 year 3 tab shingle roof. This just goes to show how this adjustment was price gauged against the NFIP.*

| | |
|---|---|
| Interior Finish: | $25,671.24 (inflated) |
| Flooring: | $7,606.29 (inflated) |

::Odma\Grpwise\Aka-Do01.Aka-Po01.Cases:50237.1

| | |
|---|---|
| Bathrooms: | $2,037.40 (unclear as to what payment is for) |
| Kitchen: | $11,681.09 (inflated) |
| Plumbing: | $13,039.36 (plumbing not damaged by flood waters) |

21.    None of these descriptions above describe what the NFIP is being charged for. The government is merely being billed for everything below and above the flood line.

22.    ANPAC's "Building Valuation Report" would include all items necessary to rebuild this house 100% from scratch. This style of report would normally include the cost of any HVAC items, yet ANPAC added an additional charge of $9,932.75 for a "Central Ducted Air Systems". None of the attic ductwork was damaged by flood water. If this item is already covered under a "Building Valuation Report", why did ANPAC pay for this item again on-top of the entire house? This is clearly fraud.

23.    Branch's estimate includes individual line items in each room that was found to be damaged by flood waters. ANPAC chose not to provide a detailed breakout of what items were damaged specifically by flood and instead choose to pay for an entire new structure which was not totaled by flood alone.

24.    ANPAC's "Building Valuation Report" total came to $144,960.87, but the flood policy only insured the property for the amount of $93.5K. Branch's estimate showed an estimate of $30,739.88: this was a detailed line item estimate. Based on the ANPAC's "Building Valuation Report", there is no way to extract what ANPAC paid for. The difference is approximately $114,220.99 in over adjustments. The "building valuation report" method values the square footage with generic items and costs applied. This method always results in paying for items above the flood line, in other words, paying for the whole house.

25.    The "Building Valuation Report" is a report that is done in a very minimal amount of time; usually is less than an hour. This as compared too, a line item estimate may take upwards of three to six hours to complete. After reviewing the file and all of its information, it was found that (Janette Clements /Wofford) Sweet Claim Service Inc. billed out ($3,000.00) for this file. Based on the actual flood damage, this would be an exorbitant amount of fees. There is no reasonable excuse for over adjusting this claim.

**III.    13701 N. Cavalier Drive**

26.    ANPAC issued a flood policy (Policy Number 99014284292004) on the property at 13701 N Cavalier Dr with a policy limit of $110,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to ANPAC under the flood policy. Simsol Insurance Services (Larry Roberts) adjusted the claim on behalf of ANPAC, and calculated a loss of $208,364.68. Because this number exceeded policy limits, ANPAC submitted a claim to the NFIP for the policy limits of $110,000.

27.    Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $25,520.26.

*Adjusting Deficiencies*

28.     In completing its adjustment, Branch used Xactimate software and the starting price list of "LAN04S6C". Branch measured the flood line to be less than 4' (48") and this can clearly be seen in Branch's photos.

29.     ANPAC paid the policy limits of $110,000 based on a "Building Valuation Report" that represents the cost to build this house from the ground up. Even using ANPAC's estimated flood height of 52" (4' 4"), paying by valuation is not warranted. This report paid for generic items that included items well above the flood line. These generic items were grouped together by ANPAC into the following groups:

| | |
|---|---|
| Foundation: | - $17,143.75 (not damaged from flood waters) |
| Framing: | - $47,007.06 (not damaged from flood waters) |
| Exterior Finish: | - $26,959.85 (not damaged from flood waters) |
| Windows and Doors: | - $8,848.39 (inflated) |
| Roofing: | - $12,903.90 (not damaged from flood waters) |
| Interior Finish: | - $34,840.53 (inflated) |
| Flooring: | - $10,323.12 (inflated) |
| Bathrooms: | - $2,765.12 (unclear as to what is being paid for) |
| Kitchen: | - $15,853.36 (inflated) |
| Plumbing: | - $17,696.78 (not damaged from flood waters) |

30.     None of these descriptions above describe what the NFIP is being charged for. They are paying for everything below and above the flood line.  In addition, ANPAC's "Building Valuation Report" states the house is only a one story building; when in fact it is a two story building. By entering incorrect information into the "Building Valuation Report" these prices would greatly be skewed. The described area in the Building Valuation Summary of 2014 sq. ft., encompasses both floors.  By making this a single story, they were able to greatly inflate damages.  This "Building Valuation Report" does not properly represent this structure.

31.     ANPAC's "Building Valuation Report" would include all items necessary to rebuild this house 100% from scratch. This style of report would normally include the cost of any HVAC items, yet ANPAC added an additional charge of $10.070.00 for a "Central Ducted Air System". None of the attic ductwork was damaged by flood water. The attic is above the second story. If this item is already covered under a "Building Valuation Report", why did ANPAC pay for this item again on-top of the entire house?  This is clearly fraud.

32.     In addition to using a "Building Valuation Report" that pays for the entire structure, ANPAC paid for an attached garage for $12,092 ["Garages - Single Family Dwellings. Attached (1 of 400 SF @ $30.23)"]. Branch properly broke out the individual items that were damaged by flood inside the attached garage and found $1,620.72 in damages.  Based on this room alone, ANPAC over adjusted by $10,471.28.  Normally a "Building Valuation Report" would include all rooms attached to the building including any attached garage. Again, since this item was already included under ANPAC's "Building Valuation Report," this is simply fraudulent.

33.     Branch's estimate includes individual line items in each room that was found to be damaged by flood waters. ANPAC failed to provide a detailed breakout of what items were damaged specifically by flood and instead choose to pay for an entire new structure which was not totaled by flood alone.

34.     ANPAC's "Building Valuation Report" total came to $208,364.68, but the flood policy only insured the property for the amount of $110,000. Branch's estimate showed an estimate of $25.520.26: this was a detailed line item estimate. Based on the ANPAC's "Building Valuation Report", there is no way to extract what ANPAC paid for. The difference is approximately $182,844.42 in over adjustments. The "building valuation report" method values the square footage with generic items and costs applied. This method always results in paying for items above the flood line, in other words, paying for the whole house.

35.     The "Building Valuation Report" is a report that is done in a very minimal amount of time; usually is less than an hour. This as opposed to a proper line item estimate that may take upwards of three to six hours to complete. After reviewing the file and all of its information, it was found that Larry Roberts of Simsol Insurance Services billed out $3,450 for this file. Based on the actual flood damage, this would be an exorbitant amount of fees. There is no reasonable excuse for this amount.

## IV.     13661 N. Cavalier Drive

36.     ANPAC issued a flood policy (Policy Number 99015023522004) on the property at 13661 N Cavalier Dr with a policy limit of $70,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to ANPAC under the flood policy. Simsol Insurance Services (Larry Roberts) adjusted the claim on behalf of ANPAC, and calculated a loss of $102,818.65. Because this number exceeded policy limits, ANPAC submitted a claim to the NFIP for the policy limits of $70,000.

37.     Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $37,870.09.

### *Adjusting Deficiencies*

38.     In completing its adjustment, Branch used Xactimate software. Branch measured the flood line at approximately 4'.

39.     ANPAC paid the policy limits of $70,000 based on a "Building Valuation Report" that represents the cost to build this house from the ground up. Even using ANPAC's estimated flood height of 57" (4' 9"), paying by valuation is not warranted. This report paid for generic items that included items well above the flood line. These generic items were grouped together by ANPAC into the following groups:

| | |
|---|---|
| Foundation: | - $8,965.05 (not damaged from flood waters) |
| Framing: | - $24,581.59 (not damaged from flood waters) |
| Exterior Finish: | - $11,987.09 (not damaged from flood waters) |

24

::Odma\Grpwise\Aka-Do01.Aka-Po01.Cases:50237.1

Windows and Doors: - $4,627.12 (inflated)
Roofing:          - $6,747.89 (not damaged from flood waters)
Interior Finish:  - $18,219.30 (inflated)
Flooring:         - $5,398.31 (inflated)
Bathrooms:        - $3,256.27 (unclear as to what is being paid for)
Kitchen:          - $8,290.26 (inflated)
Plumbing:         - $9,254.25 (not damaged from flood waters)

40.     None of these descriptions above describe what the NFIP is being charged for. They are paying for everything below and above the flood line. Using either given flood height, there is still no justification as to why ANPAC would total out this entire building.

41.     Branch's estimate includes individual line items in each room that was found to be damaged by flood waters. ANPAC failed to provide a detailed breakout of what items were damaged specifically by flood and instead choose to pay for an entire new structure which was not totaled by flood alone.

42.     ANPAC's "Building Valuation Report" would include all items necessary to rebuild this house 100% from scratch. This style of report would normally include the cost of any HVAC items, yet ANPAC added an additional charge of $5,616.40 for a "Central Ducted Air System". None of the attic ductwork was damaged by flood water. The attic is above the second story. If this item is already covered under a "Building Valuation Report", why did ANPAC pay for this item again on-top of the entire house? This is clearly fraud.

43.     ANPAC's "Building Valuation Report" total came to $102,818.65, but the flood policy only insured the property for the amount of $70,000. Branch's estimate showed an estimate of $37,870.09: this was a detailed line item estimate. Based on the ANPAC's "Building Valuation Report", there is no way to extract what ANPAC paid for. The difference is approximately $64,948.56 in over adjustments. The "building valuation report" method values the square footage with generic items and costs applied. This method always results in paying for items above the flood line, in other words, paying for the whole house.

44.     The "Building Valuation Report" is a report that is done in a very minimal amount of time; usually is less than an hour. This as opposed to a proper line item estimate that may take upwards of three to six hours to complete. After reviewing the file and all of its information, it was found that Larry Roberts of Simsol Insurance Services billed out $2,400 for this file. Based on the actual flood damage, this would be an exorbitant amount of fees. There is no reasonable excuse for this amount.

## V.     7562 Horizon

       Branch did not acquire a claims file or adjustment report on this property and is thus unable to generate a comparison report.

# EXHIBIT C

## AMERICAN RELIABLE EXEMPLAR PROPERTIES

Branch has inspected the properties identified below on which American Reliable issued a flood insurance policy through the National Flood Insurance Program. Branch's inspection revealed that the amounts American Reliable caused the Government to pay for purported flood damage were grossly inflated and cannot be justified by any reasonable adjusting standards or guidelines. In this supplemental response,[1] Branch has endeavored to describe the adjusting deficiencies that it has identified and the rules, regulations, and guidelines that were violated. Branch has not had the opportunity to review all of American Reliable's documents relating to the NFIP, and reserves the right to further supplement this response as necessary.

### I.    2705 - 2707 S Miro St, New Orleans, LA 70129

American Reliable has issued a flood policy (Policy Number 1961520869) on the property at 2705 - 2707 S Miro St, with a policy limit of $25,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to American Reliable under the flood policy. Sweet Claim Services Inc. adjusted the claim on behalf of American Reliable, and calculated an ACV loss after depreciation of $62,903.52. Because this number exceeded policy limits, American Reliable submitted a claim to the NFIP for the policy limits of $25,000.00.

The claim amount submitted to NFIP was grossly inflated and is not supported by the rules, regulations, and guidelines governing flood adjustments. An adjustment conducted in accordance with the applicable rules, regulations, and guidelines would show that Katrina caused flood damages of at most $17,804.26 at this property. Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of damages.

### *Adjusting Deficiencies*

In completing its adjustment, Branch used Xactimate software and the price list LANO4S6A. Branch measured the interior flood line at approximately one foot.

Based on its adjustment of the property at 2705 - 2707 S Miro St, Branch concluded that numerous aspects of the American Reliable claim do not comport with the rules, regulations, and guidelines governing flood adjustments, including the following:

1.    Based using either the American Reliable's 29 inch flood line or Branch's 1 foot flood line, a "Total Building Valuation" estimate is unacceptable to pay this claim. Evident by American Reliable and Branch's photographs, this property was extensively damaged by wind. There was no reasonable justification for American Reliable's adjustment to include the removal

---

[1] Branch provides the below information to supplement its responses to American Reliable's Interrogatory No. 7. In doing so, Branch specifically preserves any and all objections to those interrogatories, including that they are vague in "requiring as much detail as possible;" call for the premature disclosure of expert information and testimony; call for information protected by the attorney client privilege; and because they call for information that is in American Reliable's possession. Branch has endeavored to provide greater detail as to American Reliable's adjusting deficiencies, but expressly reserves the right to supplement and/or revise this information for any reason.

11

and replacement of "Roofing".  American Reliable blatantly addressed the wind damaged roof in their flood report resulting in a "shifting of the burden" that cost $5,334.34.

2.      American Reliable improperly paid for damage caused to the "Interior Finishes". American Reliable's adjustment of the Interior Finishes (Plaster) includes damage to the ceilings and walls above the flood line which is inconsistent with the rules, regulations, and guidelines governing flood adjusting.  American Reliable is paying for "painted plaster walls throughout" the entire property using the properties square footage of 24'x45'.  This is an inappropriate method to pay for flood damage that resulted in $22,835.90 of overpayment.  Due to this method to determine the cost, Branch is unable to justify the differences with Branch and American Reliable's estimate.

3.      American Reliable improperly paid for damage caused to the foundation.  Based on Branch's inspection, the flood did not damage the foundation so as to require replacement. American Reliable's adjustment of the foundation was based upon a Building Total Valuation that relies on the square footage of the building which results in paying for items above the flood line.  This is an inappropriate method to pay for flood damage that resulted in $5,334.34 of overpayment.

4.      American Reliable improperly paid for windows.   It is evident from Branch's photographs and American Reliable's photographs that the flood never reached the windows. Due to American Reliable's method to pay this claim using a Building Valuation formula, the cost of the windows was grouped with the cost of doors.  This is an inappropriate method to pay for flood damage that resulted in $3,048.19 of overpayment.

5.      American Reliable improperly paid for the replacement of laminated plastic counter tops. It is evident that even using American Reliable's interior flood line of 29", the countertops would not have been affected by the flood.  If this was American Reliable's attempt to address the flood damaged lower cabinets, the countertops would still not require replacement, only removal and resetting.  .  Due to American Reliable's method to pay this claim using a Building Valuation formula, the cost of the countertops was grouped with the cost of the Kitchen.  This is an inappropriate method to pay for flood damage that resulted in $6,096.38 of overpayment.

6.      American Reliable improperly paid to replace the plumbing fixtures.  What are average fixtures, and how many does this pay for?  This generalized line item results in $9,906.62 of overpayment.

7.      American Reliable improperly paid to replace all of the "exterior walls" (wood framing). Due to American Reliable's method to pay this claim using a Building Valuation formula, the square footage of the property was used to determine the cost of the framing.  There is no evidence provided by American Reliable that the flood damaged the framing and required the full replacement of these materials.  This is an inappropriate method to pay for framing that resulted in $11,144.52 of overpayment.

8.      American Reliable improperly paid to replace all of the "exterior finish" (wood siding). Due to American Reliable's method to pay this claim using a Building Valuation formula, the

square footage of the property was used to determine the cost of the exterior finishes. Relying on Branch's photographs, it's evident that the flood did not reach above the roof. This is an inappropriate method that pays for the entire wood siding, from foundation to the roof. This resulted in $7,308.63 of overpayment.

| | |
|---|---|
| Foundation: | $5,334.34  not damaged from flood waters |
| Exterior Walls: | $11,144.52 not damaged from flood waters |
| Exterior Finish: | $7,308.63  not damaged from flood waters |
| Windows and Doors: | $3,048.19 over inflated |
| Roofing: | $5,334.34 not damaged from flood waters, this is excessive use of padding the estimate. This damage was caused strictly from wind. |
| Interior Finish: | $22,835.90 over inflated |
| Flooring: | $3,810.24 over inflated |
| Bathrooms: | $3,810.24 what is American Reliabe paying for? |
| Kitchen: | $6,096.38 over inflated |
| Plumbing: | $9,906.62 plumbing not damaged, American Reliable says replace with average fixtures, but does not say anything about this in their narrative report. |

9.      American reliable provided a Narrative of the Adjustment & Damages:

Adjustment & Damage

Damage to the dwelling was to the Ext. Siding, subflooring, wall plaster, paint, wiring, trim, doors and cabinetry.  Major appliances affected were the stoves, refrigerators and water heaters.  Risk sat in flood waters for a period of 2 weeks allowing mold to grow above 4 FT. in areas and warping floor joists.

American Reliable improperly paid a flood report that contradicts the Adjusters narrative of damages.  Where is the windows, roof and plumbing fixtures that were paid for in the Building Valuation Report, yet were left out of the narrative?

The loss was paid twice from WYO carriers.  American Reliable paid $25,000 (limits) and Fidelity National Insurance paid $25,000 (limits) on the exact same loss.

American Reliable improperly over adjusted the claim in the amount of $78,629.40 before paying out $25,000.00. This was the total amount of coverage that was on the property.

After taking into account the above items that were grossly inflated, Branch concluded that the maximum amount of flood damages was $17,804.26 which includes 10% overhead, 10% profit, and 9% tax.  It does not account for depreciation, which would lower the damages in the adjustment.  Branch is unable to compare American Reliable's report with Branch's report. American Reliable uses a Building Valuation Report, while Branch uses a Detailed Line Item report.  The building valuation method values the square footage with generic items and costs applied.  This method always results in paying for items above the flood line, in other words, paying for the whole house.

## II.    3121 Marigny Place

American Reliable issued a flood policy (Policy Number 1961526143) on the property at 3121 Marigny Pl with a policy limit of $72,000.  The property suffered damage from Hurricane Katrina, and a claim was submitted to American Reliable under the flood policy.  Sweet Claim Service Inc (Bob Sweet Doug nutter) adjusted the claim on behalf of American Reliable, and calculated a loss of $79,392.29. Because this number exceeded policy limits, American Reliable submitted a claim to the NFIP for the policy limits of $72K.

Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $32,586.48.

### *Adjusting Deficiencies*

1.      In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4S6C". Branch measured the flood line at approximately 3' 3" (39") and this can clearly be seen in Branch's photos.

2.      American Reliable states the following: "Floors, walls, trim, doors, cabinetry, appliances, plumbing, electrical wiring and HVAC systems were all severely damaged by immersion in 65.5" of very nasty water". Branch's photos clearly show 39" flood height in this building. Even though American Reliable is incorrect in the flood height, their stated flood level would not have damaged any foundation, framing, exterior siding, windows, roofing or the HVAC system.

3.      American Reliable paid the policy limits of $72K based on a "Building Valuation Report" that represents the cost to build this house from the ground up. Even using American Reliable's inflated flood height, they would only be authorized to pay for any items damaged by flood and below the flood line. This report paid for generic items that included items well above the flood line. These generic items were grouped together by American Reliable into the following groups; none of these descriptions below describe what the NFIP is being charged for. They are paying for everything below and above the flood line.

Foundation:          $9,287.48 not damaged from flood waters
Framing:             $25,465.67 not damaged from flood waters
Exterior Finish:     $9,187.61 not damaged from flood waters
Windows and Doors:   $4,793.54 over inflated
Roofing:             $6,990.58 not damaged from flood waters, caused strictly from wind.
Interior Finish:     $18,874.55 over inflated
Flooring:            $5,592.46 over inflated
Bathrooms:           $1,497.98 what is American Reliable paying for?
Kitchen:             $8,588.42 over inflated
Plumbing:            $9,587.07 plumbing not damaged.

Using either given flood height, there is still no justification as to why American Reliable would total out this entire building.

14

Branch's estimate includes individual line items in each room that was found to be damaged by flood waters. American Reliable chose not to provide a detailed breakout of what items were damaged specifically by flood and instead choose to pay for an entire new structure which was mostly damaged by wind.

4.      American Reliable's "Building Valuation Report" total came to $99,865.36, but the flood policy only insured the property for the amount of $72,000.00, <u>American Reliable paid $72,000.00 on this claim. Branch's estimate showed an estimate of $32,586.48; this was a detailed line item estimate. Based on the American Reliable's "Building Valuation Report", there is no way to extract what American Reliable paid for. The difference is approximately $39,413.52 in over payment.</u>

After taking into account the above items that were grossly inflated, Branch concluded that the maximum amount of flood damages was approximately $32,586.48 which includes 10% overhead, 10% profit, and 9% tax.  It does not account for depreciation, which would lower the damages in the adjustment.  Branch is unable to compare American Reliable's report with Branch's report.  American Reliable uses a "Building Valuation Report", while Branch uses a Detailed Line Item report.  The "building valuation report" method values the square footage with generic items and costs applied.  This method always results in paying for items above the flood line, in other words, paying for the whole house.

5.      American Reliable- shows square footage to be 1181 sq ft. Branch shows 1035 square feet. This is a difference of 146 sq. ft., used in a total valuation report, this adds $84.56 per sq ft X 146 = <u>$12,345.76 in overpayment.</u>

6.      The U.S. Department of Homeland Security "Preliminary Report" states several flaws in this report; 1st incorrect statement says the structure is not elevated- it sits approximately 1' ft 4"inches off the ground.

The U.S. Department of Homeland Security "Final Report" does not change several flaws in this report, 1st adjuster now claims the house has a 30" crawl space; the adjuster cannot have it both ways, either the property is raised or it isn't. The actual height is 16"inches, and it has no crawl space.

**III.     2610 & 2612 Franklin Ave**

American Reliable issued a flood policy (Policy Number 1961512427) on the property at 2610 & 2612 Franklin Ave with a policy limit of $96,800.  The property suffered damage from Hurricane Katrina, and a claim was submitted to American Reliable under the flood policy. Sweet Claim Service Inc adjusted the claim on behalf of American Reliable, and calculated a loss of $149,799.78. Because this number exceeded policy limits, American Reliable submitted a claim to the NFIP for the policy limits of $96.8K.

Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $60,394.67.

*Adjusting Deficiencies*

1.      In completing its adjustment, Branch used Xactimate software and the starting price list of "LAN04S6D". Branch measured the top flood line at approximately 3' 4" (40") and this can clearly be seen in Branch's photos.

2.      American Reliable states the following: "Floors, walls, trim, cabinetry, appliances, plumbing, electrical wiring and HVAC systems were all severely damaged either by immersion in 58.5" of very nasty water". Branch's photos clearly show ~40" flood height in this building. Even though American Reliable is incorrect in the flood height, their stated flood level would not have damaged any foundation, framing, exterior siding, windows, roofing or the HVAC system.

3.      American Reliable paid the policy limits of $96.8K based on a "Building Valuation Report" that represents the cost to build this house from the ground up. Even using American Reliable's inflated flood height, they would only be authorized to pay for any items damaged by flood and below the flood line. This report paid for generic items that included items well above the flood line. These generic items were grouped together by American Reliable into the following groups; none of these descriptions below describe what the NFIP is being charged for. They are paying for everything below and above the flood line.

| | |
|---|---|
| Foundation: | $13,931.38 not damaged from flood waters |
| Framing: | $38,198.94 not damaged from flood waters |
| Exterior Finish: | $13,781.58 not damaged from flood waters |
| Windows and Doors: | $7,190.39  over inflated |
| Roofing: | $10,485.98 not damaged from flood waters |
| Interior Finish: | $28,312.16 over inflated |
| Flooring: | $8,388.79   over inflated |
| Bathrooms: | $2,247.00  unclear what is being paid for |
| Kitchen: | $12,882.78 over inflated |
| Plumbing: | $14,380.78 plumbing not damaged from flood waters, American Reliable explanation in report says, "8 or 9 good quality fixtures." What does this actually mean? |

        Using either given flood height, there is still no justification as to why American Reliable would total out this entire building.

        Branch's estimate includes individual line items in each room that was found to be damaged by flood waters. American Reliable chose not to provide a detailed breakout of what items were damaged specifically by flood and instead choose to pay for an entire new structure which was mostly damaged by wind.

4.      American Reliable's "Building Valuation Report" total came to $149,799.78, but the flood policy only insured the property for the amount of $96,800.00, American Reliable paid $96,800.00 on this claim. Branch's estimate showed an estimate of $60,394.67; this was a detailed line item estimate. Based on the American Reliable's "Building Valuation Report", there

is no way to extract what American Reliable paid for. The difference is approximately $36,405.33 in over payment.

After taking into account the above items that were grossly inflated, Branch concluded that the maximum amount of flood damages was approximately $60,394.67 which includes 10% overhead, 10% profit, and 9% tax. It does not account for depreciation, which would lower the damages in the adjustment. Branch is unable to compare American Reliable's report with Branch's report. American Reliable uses a "Building Valuation Report", while Branch uses a Detailed Line Item report. The "building valuation report" method values the square footage with generic items and costs applied. This method always results in paying for items above the flood line, in other words, paying for the whole house.

5.      On American Reliable's verification page, the replacement value is stated to be $88,000.00; if this is a true statement, then by American Reliable's own documentation, they over paid by at least $ 8,800.00 Dollars.

6.      American Reliable- shows square footage to be 2106 sq ft. Branch shows 1928 square feet. This is a difference of 178 sq. ft., used in a total valuation report, this adds $71.13 per sq ft x 178 = $12,661.14 in overpayment.

7.      American Reliable – Building estimate describing the property says there is 1.5 Bathrooms, the property has two full Baths, and there are two residences, with two separate addresses. This is just another obvious mistake on this report.

8.      The U.S. Department of Homeland Security "Preliminary Report" states several flaws in this report; 1st incorrect statement says the property is a single dwelling- it is a duplex. 2nd incorrect statement says the structure is not elevated- it sits approximately 3'ft off the ground, and they state the house sits on a concrete slab. 3rd incorrect statement says the exterior surface is a stone/brick veneer- it is wood lap siding.

The U.S. Department of Homeland Security "Final Report" does not change several flaws in this report, 1st mistake still claims the property is a single dwelling. 2nd mistake still claims the property is not raised.

## IV.    VIOLATIONS OF FLOOD ADJUSTING RULES, REGULATIONS, AND GUIDELINES

American Reliable's use of grossly inflated prices and inclusion of items not damaged by flood violated numerous rules, regulations, and guidelines governing flood adjustments, including:

1.      44 C.F.R 62.23(e) requires that a WYO company use "its own customary standards" as it would in the ordinary and necessary conduct of its own business affairs. No reasonable adjuster would have used the above prices and included the above items in the ordinary and necessary conduct of its own business affairs.

17

2.      44 C.F.R 62.23(i) sets forth a number of procedures that must be followed in the adjustment of flood claims. American Reliable's adjustment violated a number of the procedures set for in this section, including: (a) subsection (i)(1), which requires that WYO companies adjust claims in accordance with general company standards and the NFIP Claims Manual (discussed in more detail below); (b) subsection (i)(2), which requires that the WYO company's claims department verify the correctness of the coverage interpretations and reasonableness of the payments recommended by the adjusters—no reasonable claims department would sign off on the reasonableness of the payments described above or would interpret the flood policy as covering items such as the replacement of the ceiling or would agree with the flood lines used; and (c) subsection (i)(10), which governs the content of claims files—American Reliable's claims files covering this property do not justify the coverage conclusions.

3.      44 C.F.R 62.21 states, "All adjustment of losses and settlements of claims shall be made in accordance with the terms and conditions of the policy and parts 61 and 62 of this subchapter." As discussed above, the adjustment was not made in accordance with the terms and conditions of part 62. As discussed below, the adjustment was not made in accordance with the policy.

4.      The adjustment procedures that were used to arrive at the grossly inflated amounts described above violate American Reliable's provider agreement, found at 44 C.F.R 62, Appx. A. Article II section A.2 and section G.1 require that American Reliable comply with FIA Policy Issuances and other written standards, procedures, and guidance issued by FEMA or FIA relating to the NFIP. As further described below, American Reliable's adjustment did not comply with the written standards, procedures, and guidance issued by FEMA.

5.      As discussed above, American Reliable is required to follow the Claims Manual issued by FEMA. Despite that obligation, American Reliable's adjustment was entirely inconsistent with several provisions of the Claims Manual, including:

        A.      Section II.C.1 provides the general standards and requirements for selecting adjusters. It requires that every adjuster handling flood losses be "thoroughly familiar with the provisions of the SFIP, including coverage interpretations issued by FEMA, as explained in the NFIP Claims Presentations conducted by NFIP staff, and to adjust NFIP losses in accordance with these provisions." American Reliable violated this provision by grossly inflating the items on the adjustment and replacing items that did not warrant replacement.

        B.      Section II.C.2 provides specific standards and requirements for adjusting flood claims.  American Reliable's adjustment violated several of these requirements. Subsection (l) requires that the adjuster verify whether the reported loss resulted from flood as defined in the SFIP.  As explained above, much of the damage at these properties resulted in damage caused by wind.  Additionally, subsection (t) requires that the adjuster accurately identify the covered damages caused by flood and to allow in the adjustment only those repairs and replacements reasonably required to restore the structure. American Reliable violated this subsection by replacing items that did not need to be replaced, such as the wall framing system, which only needed to be cleaned. Finally, subsections (p) and (u) describe the contents of the claims file and states that the file must contain adequate notes regarding the scope of the damages and include as

18

many photographs as are necessary to portray the damage. The photographs and notes in the claims file are not sufficient to support the flood lines or to support the adjustments.

C.    American Reliable's adjustment violated several of the guidelines set forth in Section VII, which covers "Basic Adjustment Issues." For example, the section addresses the adjuster's responsibilities and states that an adjuster must check for exterior and interior waterlines and provide the height of each in the report as well as photographs and to investigate and document all other evidence of loss. American Reliable's adjustment failed to adequately document the flood line. As discussed above, flood waters rose to twelve inches (2705-07 Miro), 39 inches (3121 Marigny), and 40 inches (2610-12 Franklin Ave.), but American Reliable's claims file includes different flood lines that are not supported by the evidence as described above. Also, in failing to exclude the loss caused by wind, American Reliable failed to properly investigate and document all other evidence of loss. Additionally, subsection K addresses repair v. replacement and instructs that "[e]verything that becomes wet is not necessarily a total loss. . . . Many buildings and contents items will respond to cleaning and need not be replaced." American Reliable failed to heed that requirement in replacing items that could have simply been cleaned.

# EXHIBIT D

## FIDELITY EXEMPLAR PROPERTIES

1.     Branch has inspected the properties identified below on which Fidelity issued a flood insurance policy through the National Flood Insurance Program. Branch's inspection revealed that the amounts Fidelity caused the Government to pay for purported flood damage were grossly inflated and cannot be justified by any reasonable adjusting standards or guidelines. In this supplemental response,1 Branch has endeavored to describe the adjusting deficiencies that it has identified and the rules, regulations, and guidelines that were violated. Branch has not had the opportunity to review all of Fidelity's documents relating to the NFIP, and reserves the right to further supplement this response as necessary.

2.     Fidelity's discovery responses have been deficient in regards to the following three properties, for which Fidelity did not produce responsive documents: 316-318 N. Galvez, 2705-2707 S. Miro, and 109 Lighthouse Point.  Branch has endeavored to analyze these properties, however, where information was provided in response to discovery requests served upon Colonial Claims.

## I.     3033 LOUISA STREET

3.     Fidelity issued a flood policy (Policy Number 17 2510018252-01) on the property at 3033 Louisa St with a policy limit of $82,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Fidelity under the flood policy.  Colonial Claims Corporation (Ronald J Hollon) adjusted the claim on behalf of Fidelity, and calculated a loss of $83,272.36. Because this number exceeded policy limits, Fidelity submitted a claim to the NFIP for the policy limits of $82K.

4.     Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $33,885.49.

5.     In completing its adjustment, Branch used Xactimate software and the starting pricelist of "LANO4S6C". Branch measured the flood line of less than 2' which is clearly seen in Branch's photos. This house is elevated off of the foundation.

6.     Fidelity claims there was a 4' 8" interior flood line and yet still paid for items well above any recorded flood line.

7.     Fidelity paid to replace 1,159 SF of "Floor Insulation" @ $1.20 SF. Branch found no evidence of any floor insulation in this house; overpayment of $1,390.80.

8.     Fidelity pays to "Clean Treat & Seal Ceiling Framing System" on 1,159 SF of ceilings @ $0.84 SF even though it was not touched by flood; resulting in overpayment of $973.56.

9.     Fidelity is paying to replace 1,159 SF of Ceiling Insulation @ $1.27 SF for an overpayment of $1,471.93.

---

1 Branch provides the below information to supplement its responses to Fidelity Interrogatory Nos. 8, 11, 14, and 18. In doing so, Branch specifically preserves any and all objections to those interrogatories, including that they are vague, call for the premature disclosure of expert information and testimony; call for information protected by the attorney client privilege; and because they call for information that is in Fidelity's possession.  Branch has endeavored to provide greater detail as to Fidelity's adjusting deficiencies, but expressly reserves the right to supplement and/or revise this information for any reason.

10.     Fidelity is paying to replace 1,159 SF of Ceiling Drywall @ $2.85 SF for an overpayment of $3,303.15.

11.     Fidelity paid to paint the ceiling drywall (1,159 SF) @ $0.66 SF for an overpayment of $764.94.

12.     Fidelity paid to replace to exterior doorknobs w/deadbolts @ $198.21 ea while Xactimate set the price @ 86.67 ea; overpayment of $223.08.

13.     Fidelity paid to replace and paint 13 windows that were not damaged by flood; overpayment of $6,797.13.

14.     Fidelity paid to replace 16 LF of base cabinets @ $202.79 while Xactimate set the price @ $147.77 for an overpayment of $880.32.

15.     Fidelity paid to replace 10 LF of upper wall cabinets @ $120.43 LF that were not touched by flood waters; overpayment of $1,204.30.

16.     Fidelity paid to replace 16 LF of countertops @ $58.83 LF that were not destroyed by flood waters; overpayment of $941.28.

17.     Fidelity paid $445.59 for a new kitchen sink that was not destroyed by flood.

18.     Fidelity paid $365.97 for a range hood that was not destroyed by flood.

19.     Fidelity paid to replace 5 LF of "Marble Top w/Sink" @ $104.32 LF that was not destroyed by flood waters; overpayment of $521.60.

20.     Fidelity paid to replace 2 commodes @ $362.31 that were not destroyed by flood waters; overpayment of $724.62.

21.     Fidelity paid $545.40 for a new bathtub that was not destroyed by flood.

22.     Fidelity paid to replace 2 faucets for bath sink @ $96.67 that were not destroyed by flood waters; overpayment of $193.34.

23.     Fidelity paid $954.78 for a new shower that was not destroyed by flood.

24.     Fidelity paid to replace a furnace @ $3,589.92 while Xactimate set the price @ $1,174.99 for an overpayment of $1,174.99.

25.     Fidelity paid to replace 4 interior doors @ $260.70 while Xactimate set the price @ $147.78 for an overpayment of $591.12.

26.     Fidelity paid to replace 2 "Lauan Flush Prehung Door" @ $210.75 while Xactimate set the price @ $144.63 for an overpayment of $132.24.

27.     Fidelity paid to paint 6 doors @ $68.96 while Xactimate set the price @ $40.54 for an overpayment of $170.52.

11

28.     Fidelity paid for 6 interior doorknobs @ $58.08 while Xactimate set the price @ $44.58 for an overpayment of $81.00.

29.     Fidelity paid to replace many items that were damaged by wind, not flood. They also inflated the pricing on items.

## II.     9020 W. JUDGE PEREZ

30.     Fidelity issued a flood policy (Policy Number 17251005825401) on the property at 9020 W Judge Perez with a policy limit of $275,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Fidelity under the flood policy. LMB Claim Solutions, LLC (Warren A Dennis) adjusted the claim on behalf of Fidelity, and calculated a loss of $1,184,737.88. Because this number exceeded policy limits, Fidelity submitted a claim to the NFIP for the policy limits of $275K.

31.     Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $57,217.94.

32.     In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4B6B". Branch measured the flood line to be approximately 3.5'.

33.     Fidelity paid the policy limits of $275K based on a "Building Valuation Report" that represents the cost to build this house from the ground up. Even using Fidelity's estimated flood height of 9.5', this does not justify a building valuation approach to adjusting. This report paid for generic items that included items above the flood line. These generic items were grouped together by Fidelity into the following groups:

| Building Component | Value | Branch Comment |
|---|---|---|
| First Floor Structure | $97,078.50 | Concrete slab was not damaged by flood |
| Upper Floor Structure | $77,662.80 | Wood framing not damaged by flood |
| Walls | $87,370.65 | Concrete blocks not damaged by flood |
| Roof Structure | $58,247.10 | Roofing not damaged by flood |
| Exterior Wall Finish | $77,662.80 | Exterior finish not damaged by flood |
| Windows | $48,539.25 | Windows not damaged by flood |
| Roof Cover | $48,539.25 | Roofing not damaged by flood |
| Overhang | $29,123.55 | Roofing not damaged by flood |
| Interior Finish Business Office | $29,123.55 | Damages are overinflated |
| Interior Finish Corridors | $58,247.10 | Damages are overinflated |
| Interior Finish Waiting Rooms | $67,954.95 | Damages are overinflated |
| Interior Finish Private Offices | $19,415.70 | Damages are overinflated |
| Interior Finish Treatment Room | $48,539.25 | Damages are overinflated |
| Interior Finish Bathrooms | $29,123.55 | Damages are overinflated |
| Ceiling Finish | $38,831.40 | Ceilings not damaged by flood |
| Plumbing | $58,247.10 | Plumbing not damaged by flood |
| Lighting | $58,247.10 | Lighting not damaged by flood |
| Cabinets | $38,831.40 | Damages are overinflated |

Heating/Cooling Systems          $107,676.00    HVAC system not damaged by flood

34.    None of these descriptions above describe what the NFIP is being charged for. They are paying for everything below and above the flood line.

35.    Branch's estimate includes individual line items in each room that was found to be damaged by flood waters. Fidelity chose not to provide a detailed breakout of what items were damaged specifically by flood and instead choose to pay for an entire new structure; the vast majority of which was not damaged at all by flood.

36.    Fidelity's "Building Valuation Report" total came to $1,078,461.00, but the flood policy only insured the property for the amount of $275K. Branch's estimate showed an estimate of $57,217.94; this was a detailed line item estimate. Based on the Fidelity's "Building Valuation Report", there is no way to extract what Fidelity paid for. The difference is approximately $1,021,243.06 in overpayments. The "building valuation report" method values the square footage with generic items and costs applied – it is not a proper adjustment. This method always results in paying for items above the flood line, in other words, paying for items not damaged by flood.

## III.    7607 VANDERKLOOT AVENUE

37.    Fidelity issued a flood policy (Policy Number 17 2510116994) on the property at 7607 Vanderkloot Ave with a policy limit of $75,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Fidelity under the flood policy. Colonial Claims Corporation (Greg Seelye) adjusted the claim on behalf of Fidelity, and calculated a loss of $91,272.52. Because this number exceeded policy limits, Fidelity submitted a claim to the NFIP for the policy limits of $75K.

38.    Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $32,047.43.

39.    In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4S6A". Branch measured the flood line at approximately 4'.

40.    Fidelity's report claims there was a 4' 9" flood line in this property and yet still chose to pay for items well above this flood line. Fidelity's report states "[c]eramic tile will have to be removed and replaced in order to replace the sheetrock." The flooring would only need to be removed and replaced if it was directly damaged by flood water. Fidelity paid to replace 1,095.8 SF of tile flooring @ $13.97 for a total of $15,308.33. Yet the existing tile floors are still usable and need only cleaning.

41.    Fidelity states "[t]he complete HVAC system was completely submerged causing severe damage". The HVAC system sits in the attic well above any stated flood line and was not damaged at all by flood. Fidelity paid $5.20 per SF x 1464 SF for $7,612.80 to replace the HVAC/ductwork system that was damaged at all by flood.

42.    Fidelity chose to pay to remove, re-install & clean the iron security bars on the outside of the windows with no justification. Fidelity's estimate paid $9.28 per SF to remove, $0.67 per SF to clean & $52.28 per SF to re-install the security bars (105 SF); for a total of $6,534.15. Branch disagrees that these items need to removed/reset, but even if they were, the Xactimate price to do so

is only $8.02 per SF for an overpayment of $5,692.05.

43.     Fidelity estimated 1,464 SF of electrical systems that needed to be replaced. Fidelity paid $8.22 per SF while Xactimate set the price at $2.31 per SF for an overpayment of $8,652.24.  This pattern, whereby Fidelity "re-adjusts" the price in its pricelists to pay exorbitant amounts can only be explained by fraud.

44.     Fidelity's estimate is paying to remove/replace all the exterior sheathing on the building at $4.00 per SF x 1360 SF for a total of $5440.00. Xactimate set the price at $2.10 per SF.  This sheathing was not damaged by flood waters.

45.     Fidelity also runs up its estimate by repeatedly paying for the same item.  For example, Fidelity is paying to treat the wall framing for the entire structure and then again in each of the individual rooms.  This is no judgment call but is just plain fraud.  In the "Exterior" room of Fidelity's estimate they pay $1,142.40 to "Clean, Treat & Seal Wall Framing System (100.0%)". Fidelity then pays to treat the walls again in each of the individual rooms.

46.     Fidelity paid for "Flood Loss Clean-up" twice in each of the rooms in the estimate.  The greater cleanup @ $0.97 SF and the lesser @ $0.61 SF. There is only need to pay the line item one time leaving an overpayment of $668.44.

47.     In each of the rooms Fidelity paid to texture the walls twice. Fidelity first paid $0.70 SF to "Paint/ Finish & Texture Walls", and then paid an additional $0.70 SF to "Texture Walls".  There was no reason to pay to texture the walls twice, resulting in an overpayment of $1,762.25.

48.     Fidelity's report claims there was a 4' 9" flood line and still chose to pay for ceilings.  The report shows a total of 1,095.8 SF of ceilings. Fidelity paid $1.27 SF for ceiling insulation, $1.88 SF for ceiling drywall, $0.70 SF to "Paint / Finish Popcorn/Blown Texture" ceilings for a total overpayment of $4,218.83.

49.     Fidelity then paid an additional $0.70 SF to "Popcorn/Blown Texture" the ceilings again. This is another example of how this report double-billed for an overcharge of $449.28.

50.     Fidelity's report pays to spray Mildewcide treatment on the floors, walls & ceilings @ $0.29 SF.  Fidelity should have only paid for a portion of the walls and none of the ceilings as they were not touched by flood waters. Fidelity paid $317.18 to spray ceilings that were never damaged by flood.

51.     Fidelity paid $613.57 for "Attic Disappearing Stairs" that were not damaged at all by flood. These stairs were in the attic which was never touched by flood waters, even by Fidelity's estimate of the flood line.

52.     Fidelity paid to replace the base molding in each of the rooms and used an inflated price. Fidelity paid $3.23 LF for base molding and $0.93 LF for shoe molding @ 297 LF.  Xactimate set the prices at $2.64 & $0.33 leaving an overpayment of $353.43.

53.     Fidelity paid to replace ten windows in the building that were not damaged by flood waters; overpayment of $2,909.06.

54.     Fidelity paid to paint an exterior door for $68.96 while Xactimate shows $35.54; difference of $33.42.

55.     Fidelity paid to replace an exterior door deadbolt $252.31 while Xactimate shows the highest grade deadbolt to be only $86.52; difference of $165.79.

56.     Fidelity paid to remove, clean & re-install an exterior security screen door for a total of $1,006.67. This is not replacing the screen door. Xactimate would total $77.93; difference of $928.74.

57.     Fidelity chose to pay for 4 "Good Quality Ceiling Fan" ($204.39 each) and 4 "Light Kit for Ceiling Fan" ($56.43 each) that were well above any stated flood line for an overpayment of $1,043.28.

58.     Fidelity paid $1,783.50 for the upper wall cabinets that sit well above any flood line.

59.     Fidelity paid $445.59 to replace the kitchen sink that was not damaged by any flood waters.

60.     Fidelity's report pays $58.83 LF for 13.5 LF of countertops. Xactimate's price is only $34.46 LF for an overpayment of $329.

61.     Fidelity paid $260.63 for a new garbage disposal while Xactimate shows $159.92 for the same item; difference of $100.71.

62.     Fidelity paid for 4 new interior lights ($124.27) that sit well above the flood line; overpayment of $497.08.

63.     Fidelity paid for a new Oven & range hood @ $1,787.76 while Xactimate would only pay $1,206.51; overpayment of $581.25.

64.     Fidelity paid $2,088.71 to replace the interior doors and an additional $640.36 to pay for "Door Hardware". This "Door Hardware" is normally included in the cost of the interior doors and is not required to pay for again. Xactimate shows a price of $162.80 for an interior door (this includes any "door hardware"); overpayment of $1,426.67.

65.     Fidelity pays to replace 8.1 SF of marble countertops @ 115.29 SF. Marble would not have been damaged by floodwaters; overpayment of $933.85.

66.     Fidelity choose to pay for a brand new "Commode" ($362.31), "Seat for Commode" ($54.73), "Plastic Ring Seal for Commode" ($62.86), "Tub/Shower Combo" ($774.33) and 53 SF of "Cult Marble Surround" ($9.86 SF) in each of the bathrooms. None of these items were damaged by flood waters. Total overpayment of these items is $3,553.62.

67.     Fidelity chose to replace 2 "Fan Heater w/Lite Bathroom Ventilation Fan" @ $257.71 each that were well above the flood lines; overpayment of $515.42.

68.     Fidelity paid $472.82 to replace a screen door while Xactimate would only pay $102.22; overpayment of $370.63.

69.     Fidelity's report paid for the same items multiple times throughout this estimate as well as

15

overpaid on many individual items.

## IV.    2625 GENERAL PERSHING STREET

70.    Fidelity issued a flood policy (Policy Number 17-2510213116-00) on the property at 2625 General Pershing St with a policy limit of $250,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Fidelity under the flood policy.  LMB Claims Solutions LLC (Warren A Dennis) adjusted the claim on behalf of Fidelity, and calculated a loss of $318,520.06. Because this number exceeded policy limits, Fidelity submitted a claim to the NFIP for the policy limits of $250K.

71.    Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $72,472.94.

72.    In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4S6A". Branch measured the flood line to be approximately 4 inches which can be clearly seen in Branch's photos.

73.    Fidelity's report makes the following statement; "The San Bernard river is located approximately 8 miles away and flooded leaving it's banks. Drainage in the area backed up and entered the risk." The San Bernard River is located over 300 miles away in Texas and never flows to the state of Louisiana or anywhere near the city of New Orleans.

74.    Fidelity claims that there was an exterior flood line of 71" (5' 11") and an interior line of 47" (3' 11"). Using these numbers, the house would be raised off the ground by 2 feet. Branch's photos clearly show the house is raised approximately 3.5 feet.

75.    Fidelity pays for the same items multiple times throughout this estimate. In the "General Conditions" section, Fidelity pays $1.09 per SF for Flood Loss Cleanup for the entire house (2,886 SF) for a total of $3,145.74. Then in each of the individual rooms, Fidelity pays $0.95 per SF to for Flood Loss Cleanup again; double-charging the federal government $2,109.38.

76.    Fidelity is paying for 7,687.20 SF of "Wall Furring Strips" that is not found inside this house. Fidelity may be referring to Lathe Strips that would be included in the "Wall Plaster w/ Metal Lathe" items they are already paying for; overpayment of $13,452.60.

77.    Fidelity paid $2.75 per SF to replace all the inside wall insulation (3,264 SF) for a total of $8,976.00. Xactimate states the same (R-19) insulation to be $1.28 per SF. All this wall insulation was not damaged by the ~4" flood line.  Using Xactimate price and Fidelity's claim that all insulation was damaged would still leave an overpayment of $4,798.08.

78.    Fidelity chose to replace many items on the exterior of the building that were never damaged by flood waters. Any of the items that were damaged were above the ~4"flood line and were not damaged by flood at all.

79.    Fidelity paid to replace/paint "Ext Colonial Entrance Trim" for $1,493.99.

80.    Fidelity chose to replace/paint 22 window casings (on the exterior) for a total of $5,984.66. None of the windows were touched by flooding.

81.     Fidelity chose to replace/paint 24 window casings (on the interior of the building) for a total of $6,600.72. None of the windows were touched by flooding.

82.     Fidelity paid for 24 various types of windows that were never touched by flood water; overpayment of $48,408.16.

83.     Fidelity paid to paint 10 windows for an overpayment of $1,330.38.

84.     Fidelity claimed the exterior electrical boxes were damaged by flooding, yet they sit just above any flood line. Fidelity replaced 2 "200 AMP Complete Main Service", 2 "Masthead for Main Service" and 5 "50 AMP Complete Main Service" for a total of $7,922.97.

85.     Fidelity paid to replace 1,632 SF of Smooth Lap Hardwood Siding @ $6.25 SF for a total of $10,200. No exterior siding was damaged by flood.

86.     Fidelity paid to paint the exterior siding (3,264 SF – twice the SF of the exterior siding paid by Fidelity) @ $1.25 SF for a total of $4,080.  Yet there was only 2,725.62 of total Exterior Wall Area, none of which required painting.

87.     Fidelity paid for 4 "Wood Colonial Style Columns" ($1,246.69 ea), painting of the 4 columns ($59.05 ea), and 4 "Ornamental Wood Cap for Colonial Style Columns" ($669.60 ea).  None of these items were damaged by the flooding; overpayment of $7,901.36.

88.     Fidelity paid to replace/paint 246 LF of Exterior Trim not damaged by flooding; overpayment of $1,414.50.

89.     Fidelity replaced 120 LF of Downspout @ $4.26 for a total of $511.20. Fidelity report claims the downspout was "Submerged in salt water"; yet the downspouts sat well above any flood waters.

90.     Fidelity paid to replace 453 SF of Redwood Porch and paint 333 SF of it for a total of $11,143.17. Branch estimated 255.89 SF of Porch Decking @ $10.44 per SF for a total of $2,671.49 and an overpayment of $8,471.68.

91.     Fidelity paid to replace/paint 63 LF of "Railing for Porch" for a total of $2,239.02; none of which was damaged by flood waters.

92.     Fidelity paid to replace/paint a "Ginger Bread Trim at front" that was not damaged by any flood water; overpayment of $1,725.

93.     Fidelity paid to replace 28 LF of "Premium Grade Wood Base Cabinetry" @ $328 LF; while Xactimate shows only $182.81 LF for an over payment of $4,065.32.

94.     Fidelity paid to replace the upper wall cabinets (28 LF) even though they were not touched by flood waters; for an overpayment of $5,147.52.

95.     Fidelity paid to replace the Kitchen counters (28 LF) even though they were not damaged by flood waters; overpayment of $1,779.40.

96.     Fidelity paid to replace 2,220.4 SF of Oak Flooring @ $13.50 SF and $3.10 to sand/finish. Xactimate set the price @ $9.52 SF and $2.84 SF to sand/finish; for an overpayment of $9,414.50.

17

97.     Fidelity paid to replace several doors in the dwelling. These door prices include any required "Door Hardware" such as hinges and doorknobs; yet Fidelity paid for an extra 22 sets of "Door Hardware" ($304.98 ea) for an overpayment of $6,709.56.

98.     Fidelity paid for 8 "Cased Opening" ($1,109.52 ea) and then paid to paint 12 "Cased Opening" for a total of $11,568.

99.     Fidelity paid for 6 phone jacks @ $75.49 ea while Xactimate set the price @ $18.42 ea; overpayment of $342.42.

100.    Fidelity paid for 56 electrical outlets @ $124.50 ea while Xactimate set the price @ $42.21 ea; overpayment of $4,608.24.

101.    Fidelity paid for 12 light switches that sat well above the flood line @ $224.51 ea while Xactimate set the price @ $42.21 ea; overpayment of $2,187.60.

102.    In each of the bathrooms (2), Fidelity paid for a brand new Commode ($374.12 ea), Bathtub ($541.81 ea), Showerhead ($93.28 ea), Faucet for shower ($145.21 ea), and Sink ($463.71 ea). None of these items were damaged by flooding; overpayment of 3,236.26.

103.    Fidelity's report was using very inflated pricing as well as adding in duplicate items to overpay this flood claim.

## V.     2137 SOUTH LOPEZ

104.    Fidelity issued a flood policy (Policy Number 17-7700605689-0) on the property at 2137 S Lopez with a policy limit of $250,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Fidelity under the flood policy.  Colonial Claims Corporation (Ricky Clevinger) adjusted the claim on behalf of Fidelity, and calculated a loss of $127,857.20.

105.    Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $55,768.34.

106.    In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4B6B". Branch measured the flood line at 6' as is clearly seen in Branch's photos.

107.    Fidelity only estimated a 60" (5') interior flood line and yet still paid for items well above any recorded flood line.

108.    Fidelity paid to replace 1,358.1 SF of Exterior Sheathing @ $2.08 SF that was not damaged by flood; overpayment of $2,824.85.

109.    Fidelity paid to replace 1,358.1 SF of Exterior Siding @ $2.91 SF that was not damaged by flood; overpayment of $3,952.07.

110.    Fidelity paid to paint 4,244 SF of the exterior @ $0.96 SF that was not destroyed by flood; overpayment of $4,074.24.

111.    Fidelity paid to treat & seal the wall framing system (4514.6 SF) @ $5.15 SF while Xactimate set the price @ $0.54 SF; overpayment of $20,812.31.

112.   Fidelity is already paying to treat & seal the wall framing system and then pays to treat the wall again in each of the individual rooms (4514.6 SF @ $0.29 SF); overpayment of $1,309.23.

113.   Fidelity is paying for 1,548.2 SF of ceiling treatment @ $0.29 SF when no flood waters ever touched the ceiling; overpayment of $447.41.

114.   Fidelity paid to pressure wash the flooring (1,542 SF) @ $2.89 SF while Xactimate set the price @ $0.48 SF; overpayment of $3,718.15.

115.   Fidelity paid to replace 1,371.8 SF of Premium Grade Tile Flooring @ $18.98 SF that was not destroyed by flood; overpayment of $26,036.76.

116.   Fidelity paid to replace ($1.88 SF) then paint ($0.66 SF) 1,542.8 SF of Ceiling Drywall that was not destroyed by flood; overpayment of $3,918.71.

117.   Fidelity paid to replace 11 Light fixtures @ $124.27 ea that was not destroyed by flood; overpayment of $1,366.97.

118.   Fidelity paid to replace 1,542 SF of electrical wiring @ $8.22 SF while Xactimate set the price @ $2.36 SF; overpayment of $9,040.81.

119.   Fidelity paid for a French Door @ $535.19 while Xactimate set the price @ $369.25; overpayment of $165.94.

120.   Fidelity paid for a Bifold Door @ $228.30 while Xactimate set the price @ $143.84; overpayment of $84.46.

121.   Fidelity paid for a Louvered Bifold Door @ $854.17 while Xactimate set the price @ $228.66; overpayment of $625.51.

122.   Fidelity paid for paint 10 interior doors @ $260.70 ea while Xactimate set the price @ $153.68 ea; overpayment of $1,070.20.

123.   Fidelity paid to replace 1 window @ $222.16 and 9 @ $369.75 ea that were not damaged by flood waters; overpayment of $3,549.91.

124.   Fidelity paid to paint 8 of the new windows @ $44.00 ea for an overpayment of $352.00.

125.   Fidelity paid for 2 new Commodes @ $362.31 ea that were not destroyed by flood; overpayment of $724.62.

126.   Fidelity paid for a new Shower @ $954.76 that was not destroyed by flood.

127.   Fidelity paid for 3 new sinks @ $444.77 ea that were not destroyed by flood; overpayment of $1,334.31.

128.   Fidelity replaced 16 LF of closet shelving @ $6.70 LF that was never touched by flooding; overpayment of $107.20.

129.   Fidelity paid $3,589.92 for a new furnace that was not destroyed by flood waters.

## VI.   4621 VIOLA ST.

130.    Fidelity issued a flood policy (Policy Number 17-7700529707-02) on the property at 4621 Viola St with a policy limit of $76,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Fidelity under the flood policy.  Colonial Claims Corporation (James Slaughter) adjusted the claim on behalf of Fidelity, and calculated a loss of $82,881.83. Because this number exceeded policy limits, Fidelity submitted a claim to the NFIP for the policy limits of $76K.

131.    Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of $37,070.53.

132.    In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4S6A". Branch measured the flood line at <u>approximately 3.5' interior</u>, and can be clearly seen in Branch's interior photos. This house is not elevated off the foundation and Brach found similar exterior flood markings that match the interior flood line. The house sits on a slab, and is on a gradual slope to the street. The slab height is approximately 2' to 3' foot elevation higher than the street level. The NOAA Flood Maps show the water was approximately 4.5' at street level.

133.    Fidelity's narrative makes the following claim: "Flood waters measured 6' on the exterior of the risk and 4' 6" on the interior of the risk". Fidelity's report to the NFIP showed a 48" (4') flood height.  Fidelity's numbers would suggest that this house is raised off the foundation by 1.5'; which it is not. Even using Fidelity's highest reported interior flood of 4.5', would still not justify why they are paying for items well above this flooding.

134.    Fidelity unnecessarily paid for "Topographical Mildewcide Wall Treatment" on the exterior walls; over adjustment of $608.22.

135.    Fidelity paid to pressure wash 1,138 SF of exterior brick @ $3.08 SF, while Xactimate set the price @ $0.45 SF; over adjustment of $3,635.88.

136.    Fidelity paid to clean 1,160 SF of concrete slab @ $0.32 SF. This house sits on the concrete slab foundation and there is no way/reason to clean this; over adjustment of $371.20.

137.    Fidelity paid to replace the exterior lighting that was never damaged by flood at a cost of $215.65.

138.    Fidelity chose to pay for 80 LF of Downspout that was never damaged by flood waters; over adjustment of $388.80.

139.    In each of the rooms Fidelity pays to spray Mildewcide Treatment on the Walls & Floors, but in 3 of the rooms, Fidelity "Double-Dips" by paying to disinfect these rooms a 2nd time; over adjustment of $568.51.

140.    Fidelity paid to "Topographical Mildewcide Ceiling Treatment" on 818 SF of ceilings @ $0.31 SF for an over adjustment of $253.58.

141.    Fidelity choose to "Clean, Seal & Paint" 1,431 SF of ceilings @ $1.15 SF; overpayment

of $1,645.65.

142.    In the Kitchen Fidelity is already incorrectly paying to "Clean, Seal and Paint Walls & Ceilings" and yet then they choose to pay to "Clean Ceilings" again @ $0.33 SF; over adjustment of $60.06.

143.    Fidelity is paying to replace the carpet in this house, but is using 2 different methods and prices in the same estimate. In the Dining Room, Fidelity is charging $6.74 SF to remove & replace the carpet. In the rest of the house, Fidelity is charging $60.77 SY (or a little over $6.75 SF). Xactimate set the price @ 3.73 SF. Fidelity is paying to remove 47.7 SY + 192 SF of carpet and replace 51.1 SY + 205.4 SF for an over adjustment of $2,013.35.

144.    Inside the Dining Room where Fidelity is using a 2nd method to pay for carpet, Fidelity is paying for the removal of the carpet twice; over adjustment of $26.41.

145.    Fidelity paid to replace a chandelier for $428.30 that was not damaged by flooding.

146.    Fidelity paid for 4 new Ceiling Fans ($277.86 ea) as well as 4 Light Kits for Ceiling Fans ($57.44 ea) that were not damaged by flood waters; over adjustment of $1,341.20.

147.    Fidelity paid $223.55 for a fluorescent light fixture that was not damaged by flood waters.

148.    Fidelity paid for 56 LF of Crown Molding @ $4.35 LF that was never damaged by flood waters; over adjustment of $243.60.

149.    Fidelity paid for 18 LF of "Wire Shelving Closet Shelving" @ $4.99 LF that was never damaged by flooding; over adjustment of $89.82.

150.    Fidelity paid to replace 10 interior doors @ $264.30 while Xactimate set the price @ $162.80; over adjustment of $1,015.00.

151.    Fidelity paid to replace a French Door @ $545.72 while Xactimate set the price @ $387.82; over adjustment of $157.90.

152.    Fidelity paid to paint 11 doors @ $73.12 while Xactimate set the price @ $37.54; over adjustment of $391.38.

153.    Fidelity replaced 2 windows that were never damaged by flood waters; over adjustment of $622.56.

154.    Fidelity chose to replace 43 electrical outlets @ 24.89 ea while Xactimate set the price @ $13.86 ea; over adjustment of $474.29.

155.    Fidelity replaced 3 GFI outlets @ $75.21 ea while Xactimate set the price @ $55.88 ea; over adjustment of $57.99.

156.    Fidelity paid to replace 111 SF of countertops @ $26.02 that were above the flood line; over adjustment of $2,888.22.

21

157.    Fidelity paid to replace 20 LF of base cabinetry in the Kitchen @ $205.20 LF, while Xactimate set the price @ $177.26 LF; for an over adjustment of $558.80.

158.    Fidelity paid to replace 24 LF of upper wall cabinetry in the Kitchen @ $120.64 LF that was never damaged by flood waters; over adjustment of $558.80.

159.    Fidelity paid $344.67 in the kitchen and each bathroom for "Allowance to Repair Plumbing Lines". None of the plumbing was ever damaged by flood waters; over adjustment of $1,034.01.

160.    Fidelity chose to replace many items in the bathrooms that were never damaged by flood. These items include Commodes (2x $370.99), Tub/Shower (2x $793.24), Sliding Door for Bathtub (1x $262.07), Shower Head (2x $91.98), Sink (2x $454.50) and Bath Accessories (2x $57.61) for an over adjustment of $3,798.73.

161.    Fidelity paid to replace the Kitchen Faucet for $126.21 that was never damaged by flood waters.

162.    Fidelity paid to replace the Kitchen Garbage Disposal @ $270.17 while Xactimate set the price @ 159.92; over adjustment of $110.25.

163.    In this estimate Fidelity is paying for "Flood Loss Clean-up" using 2 different prices. In the 1st half of the estimate, Fidelity is charging $1.04 SF and near the end the price drops to $0.66 SF.

164.    Fidelity's "Report" total came to $82,881.83, but the flood policy only insured the property for the amount of $76,000.00. Branch's estimate showed an estimate of $37,070.53; this was a detailed line item estimate. The difference is approximately $45,811.30 in over adjustments.

165.    After reviewing the file and all of its information, it was found that (James Slaughter) Colonial Claims Corp. 2200 Bayshore Blvd. Dunedin, Fl. 34698 billed out ($2,280.00) for this file. Based on the actual flood damage, this would be an excessive amount of fees.  There is no reasonable excuse for over adjusting this claim.

# EXHIBIT E

# LIBERTY MUTUAL PROPERTIES

Branch has inspected the properties identified below on which Liberty Mutual issues a flood insurance policy through the National Flood Insurance Program. For each property, Branch has endeavored to provide examples of the type of adjusting deficiencies that it has identified and examples of the rules, regulations, and guidelines that were violated. Branch has not had the opportunity to review all of Liberty Mutual's documents relating to these properties or to the NFIP. Branch reserves the right to supplement this document for any reason, including based on newly produced documents or information from Liberty Mutual.

## I.   7441 Fieldstone Rd. New Orleans, LA

Liberty Mutual issued a flood policy (Policy Number 2947310901) on the property at 7441 Fieldstone Rd, with a policy limit of $104,000. The property suffered damage from Hurricane Katrina, and a claim was submitted to Liberty Mutual under the flood policy. Bellmon Adjusters, Inc., adjusted the claim on behalf of Liberty Mutual, and calculated an ACV loss after depreciation of $108,905.92. Because this number exceeded policy limits, Liberty Mutual submitted a claim to the NFIP for the policy limits of $104,000.

The claim amount submitted to NFIP was grossly inflated and is not supported by the rules, regulations, and guidelines governing flood adjustments. An adjustment conducted in accordance with the applicable rules, regulations, and guidelines would show that Katrina caused flood damages of at most $27,980.67 at this property. Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of damages.

### A.   ADJUSTING DEFICIENCIES

In completing its adjustment, Branch used Xactimate software and the price list LANO4B6B. Branch measured the interior flood line at approximately four feet.

Based on its adjustment of the property at 7441 Fieldstone Rd, Branch concluded that numerous aspects of the Liberty Mutual claim do not comport with the rules, regulations, and guidelines governing flood adjustments, including the following:

1.    Liberty Mutual improperly paid federal funds for a foundation, concrete slab. There was no damage to the slab. This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in $9,221.87 of over payment.

2.    Liberty Mutual improperly paid federal funds for Framing, (reinforced concrete block or brick). This was not damaged in the flood. This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in $30,622.92 of over payment.

3.    Liberty Mutual improperly paid federal funds for Exterior Finish, (Good Quality wood siding, stucco or masonry with good trim); the exterior masonry was not damaged from the

flood. This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in $14,678.69 of over payment.

4.     Liberty Mutual improperly paid federal funds for Windows and Doors, (Minimum Quality wood or Aluminum windows); the windows were not damaged by flood waters. This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in $5,764.32 of over payment.

5.     Liberty Mutual improperly paid federal funds for Roofing, (Minimum shingle or built up with rock cover or good quality composition shingle roof). The flood never reached the roof. The roof was damaged by wind. This is an inappropriate damage in Liberty Mutual's flood report that resulted in $8,406.29 of over payment.

6.     Liberty Mutual improperly paid federal funds all Interior Finish, (Taped and textured gypsum wallboard, some wall paper. Good quality light fixtures, Insulated prefabrication metal fireplace with masonry veneer.) With the flood height less than four feet, payment of these items above the flood line was inappropriate, resulting in a $22,696.99 over payment.

7.     Liberty Mutual improperly paid federal funds for eight or nine average quality plumbing fixtures, resulting in an overpayment of $11,528.63.

8.     Liberty Mutual improperly used a "Building Valuation Report" which values the square footage with generic items and costs applied. A Building Valuation Report is not the proper adjusting tool to determine damage in a mixed loss situation. This method always results in paying for items above the flood line, as well as structural items such as the foundation.

After taking into account the above items that were grossly inflated, Branch concluded that the *maximum* amount of flood damages was approximately $27,980.67 which includes 10% overhead, 10% profit, and 9% tax. It does not account for depreciation, which would *lower* the damages in the adjustment.

## II.    13656 N Cavalier Dr, New Orleans, LA 70129

Liberty Mutual issued a flood policy (Policy Number 2998382601) on the property at 13656 N Cavalier Dr, with a policy limit of $139,400. The property suffered damage from Hurricane Katrina, and a claim was submitted to Liberty Mutual under the flood policy. Wardlaw Claims Services adjusted the claim on behalf of Liberty Mutual, and calculated an ACV loss after depreciation of $101,795.60.

The claim amount submitted to NFIP was grossly inflated and is not supported by the rules, regulations, and guidelines governing flood adjustments. An adjustment conducted in accordance with the applicable rules, regulations, and guidelines would show that Katrina caused flood damages of at most $25,520.26 at this property. This does not account for depreciation, which would further decrease Branch's estimate of damages.

## A.   ADJUSTING DEFICIENCIES

In completing its adjustment, Branch used Xactimate software and the price list LANO4S6C. Branch measured the interior flood line at approximately four feet.  Based on its adjustment of the property at 13656 N Cavalier Dr, Branch concluded that numerous aspects of the Liberty Mutual claim do not comport with the rules, regulations, and guidelines governing flood adjustments, including but not limited to the following:

1.    Liberty Mutual improperly paid federal funds for the "Remove Tear off painted acoustic ceiling (popcorn) texture" at $0.94 per square foot.  The flood did not reach the ceiling.  This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in a $1,430.33 over payment.

2.    Liberty Mutual improperly paid federal funds for the replacement of "Acoustic ceiling (popcorn) texture" at $0.85 per square foot.  The flood did not reach the ceiling.  This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in a $1,293.39 over payment.

3.    Liberty Mutual improperly paid federal funds for "Seal floor or ceiling joist sys (white pigmented shellac) at $0.93 per square foot.  This property is built upon a concrete foundation. This line item appears to pay for the ceiling joist system that sits well above the flood line, and has ceiling drywall and insulation in between.  This is an inappropriate damage in Liberty Mutual's flood adjustment that resulted in a $1,125.01 over payment.

4.    Liberty Mutual improperly paid federal funds for Light fixtures in the amount of $2,685.94. The flood never reached the ceiling lights.  This is an inappropriate damage in Liberty Mutual's flood report that resulted in a $2,685.94 over payment.

5.    Liberty Mutual improperly paid federal funds for the removal and replacement of six ceiling fans at $393.21 each.  The flood never reached the fans.  This is an inappropriate damage in Liberty Mutual's flood report that resulted in a $2,359.26 over payment.

6.      Liberty Mutual improperly paid federal funds for 8' ft. of Dry wall at $1.98, (Xactimate price is $1.69) when they should have only paid for 4' and down.  L.M. paid $8,423.31 for 4608.06 sq. ft. of Dry Wall (8'ft.Walls). The cost of Dry Wall from Xactimate for 2304 sq. ft. of dry wall would be approximately $3,893 (4'ft. Walls), this is approximately $4,530.31 of an over payment.

7.      Liberty Mutual improperly paid federal funds to paint and seal (8' ft.) of wall at $1.10, (Xactimate price is $.69) L.M. paid $5,068.86 for (4608.06 sq. ft.) of painted wall (8'ft.Walls) when they should have only paid for 4' and down. The cost of painted wall from Xactimate for

(2304 sq. ft.) of painted wall would be approximately $1,589.76; this is approximately $3,479.10 of an over payment.

8.     Liberty Mutual improperly paid federal funds to replace carpet at ($3.23 sq. ft. x 793.45) for a total cost of $2,331.35. Xactimate price of ($2.59 sq. ft. X 793.45) is a cost of $2,055.03, resulting in an overpayment of $276.22.

9.     Liberty Mutual improperly paid federal funds to replace carpet pad at ($.76 sq. ft. X 793.45) for a total cost of $603.02. Xactimate price of ($.63 sq. ft. X 793.45) is a cost of $499.87 , resulting in an overpayment of $103.15.

10.    Liberty Mutual improperly paid federal funds to replace base board at ($2.90 LF. X 538.75 LF.), for a total cost of $1,562.37. Xactimate price of (1.80 LF X 538.75 LF) is a cost of $969.75.  This would result in a $592.62 overpayment.

11.    Liberty Mutual improperly paid federal funds to replace vinyl floors with prices ranging from $3.92 to 6.32 per sq. ft., the average prices is ($5.12 per sq. ft. X 150.95 sq. ft.) for a total of $772.86. Xactimate price of comparable vinyl is (4.08 per sq. ft. X 150.95 sq. ft.) is a cost of $615.87.  This would result in a $156.99 overpayment.

12.    Liberty Mutual improperly paid federal funds to replace 1581 sq. ft. of electrical wiring at $3.12 sf., for a cost of $4,935.27. Xactimate price is ($2.23 sf. X 1581 sf.) is a cost of $3,525.63. This would result in a  $1,409.64 overpayment.

13.    Liberty Mutual improperly paid federal funds to replace a water heater at the cost of $693.70. Xactimate cost for comparable water heater is $556.78.  This would result in a $13600 overpayment.

14.    Liberty Mutual improperly paid federal funds to replace the exterior front door, with a deluxe grade wood door with detail, at a cost of $2,200.22. Branch disagrees with LM adjuster that the front door needed to be replaced. The insured is still using the same front door today. The door was metal, and a metal door with detail glass, has an average price in Xactimate of $350.00. Given that the door was replaced in the adjuster report.  This would result in a $1,850.00 overpayment.

15.    Liberty Mutual improperly paid federal funds to paint the door for a cost of $24.75; the Xactimate price is $18.59.  This would result in a $6.16 overpayment.

16.    Liberty Mutual improperly paid federal funds for nine interior doors at a price of $197.26 totaling $1,775.34.  The Xactimate price for the doors is $153.68 X 9 = $1,383.12.  This resulted in a $392.22 overpayment.

17.    Liberty Mutual improperly paid federal funds for (1226 sq. ft. X $1.15) of 6" thick insulation in the exterior walls up to eight feet.  The total cost is $1409.90. Insulation should

only have been replaced to the height of the flood water. The Xactimate price is (1226 sq. ft. X .85) = $1042.10. This is a difference of $367.80. This resulted in a $888.85 overpayment.

18.    Liberty Mutual improperly paid federal funds to replace the exterior side and back door, with a deluxe grade wood door with detail, at a cost of $2,200.22 X 2 = $4,400.44. The doors did not need to be replaced. The doors were metal, and a metal door with a glass panel, have an average price in Xactimate of ($250.00 X 2 = $500.00). This resulted in an overpayment of $3,900.44.

19.    Liberty Mutual improperly paid federal funds for ceiling insulation – (186 sq. ft X $1.62 sq. ft.) for a total $284.57. There were no flood waters over 4' ft. This resulted in an overpayment of $284.57.

20.    Liberty Mutual improperly paid federal funds to remove and replace 17LF of lower cabinetry at $210.24 per ft. = $3,574.08. The Xactimate price is $147.78 X 17LF = $2,512.26. This resulted in an overpayment of $1,061.82.

21.    Liberty Mutual improperly paid federal funds to remove and replace 17LF of upper wall cabinetry at $155.17 per ft. = $2,637.89. There was no damage to the upper cabinets from flood waters because they were higher than four feet. This resulted in a $2,637.89 overpayment.

22.    Liberty Mutual improperly paid federal funds to remove and replace nine Vinyl Windows at $226.26 = $2,036.34. There was no damage to the Vinyl Windows from flood waters. There were only three broken window panes from blowing debris from wind. The $2,036.34 is an overpayment.

23.    Liberty Mutual improperly paid federal funds to remove the Overhead Garage door and hardware at a cost of $1,131.90. There was no damage to the Overhead Garage door from flood waters. This resulted in a $1,131.90 overpayment.

24.    Liberty Mutual improperly paid federal funds to remove and replace 1528 sq. ft. of Vinyl siding at $3.15 = $4,813.20 for eight feet around the whole exterior. However, the flood only reached approximately four feet. The total amount of siding affected would be 757 sq. ft. X $2.46 = $1,862. This resulted in a $2,951.20 overpayment.

25.    Liberty Mutual improperly paid federal funds to remove and replace an AC unit at a cost of $2,141.45. The Xactimate price for the AC unit is $1,173.25. This resulted in a $968.20 overpayment.

26.    Liberty Mutual improperly paid federal funds to remove and replace two Ornamental Iron doors at $174.79 = $349.58. The Ornamental Iron doors were not damaged from flood waters. These doors are still in use today. This resulted in a $349.58 overpayment.

27.  Liberty Mutual improperly paid federal funds to remove and replace 45 sq. ft. of ornamental iron security grill at $19.49 sq. ft. = $801.09.  The Ornamental Iron security grill was not damaged from flood waters. The Ornamental Iron grill is still in use today. This resulted in a $801.09 over payment.

28.  Liberty Mutual improperly paid federal funds to remove and replace the Heat Furnace. The furnace sits in the attic above the second floor. The price from LM adjuster is $1,368.90.  Flood waters did not exceed four feet.  The Heat Furnace was damaged from the wind. This resulted in a $1,368.90 overpayment.

29.  Liberty Mutual improperly paid federal funds to remove and replace three door openings (jamb & casing). The pre- hung doors already come with the door openings. LM adjuster is double dipping for 3units X $160.12 = $480.36.  There is no need to have the casings. This resulted in a $480.36 overpayment.

30.  Liberty Mutual improperly paid federal funds to remove and replace 1581 sq. ft. of electrical wiring. The price from LM adjuster is ($3.12 sq. ft. X 1581 = $4,935.27).  The Xactimate price is ($2.33 X 1581 sq. ft. = $3,683.73). This resulted in a $1,251.54 overpayment.

31.  Liberty Mutual improperly paid federal funds for General Demolition in the amount of $7,486.80. The industry standard for demolition of this size property is $1,500.00.  This resulted in a $5,986.80 overpayment.

32.  Liberty Mutual improperly paid federal funds for cleaning with pressure/chemical spray to cover 6,158.54 sq. ft. of walls and ceilings. However, LM already paid for removing and replacing the dry wall.  This results in an overpayment of $3,633.54.

33.  Liberty Mutual improperly paid federal funds for plumbing such as the removal and replacement of the shower unit, shower faucets, toilets, bathtub and tub tile surround in the amount of $4,954.60.  These items were not destroyed by flood water. They only needed to be cleaned. This resulted in an overpayment of $4,954.60.

34.  Liberty Mutual improperly paid federal funds to remove and replace the microwave oven, which sits above the flood line and was not damaged by flood water.  The cost is $434.24.  This resulted in an overpayment of $434.24.

35.    Liberty Mutual used a "Building Valuation Report" which values the square footage with generic items and costs applied.  A Building Valuation Report is not the proper adjusting tool to determine damage in a mixed loss situation.  This method always results in paying for items above the flood line, as well as structural items such as the foundation.

36.    Liberty Mutual used two different price lists.  One price list totaled $101,795.60, and the second price list totaled $90,605.60.  Liberty Mutual paid from the higher price.

Liberty Mutual improperly over paid the claim in the amount of **$56,948.20**. After taking into account the above items that were grossly inflated, Branch concluded that the maximum amount of flood damages was approximately $25,520.26 which includes 10% overhead, 10% profit, and 9% tax. It does not account for depreciation, which would lower the estimate.

## III.   VIOLATIONS OF FLOOD ADJUSTING RULES, REGULATIONS, AND GUIDELINES.

Liberty Mutual's use of grossly inflated prices and inclusion of items not damaged by the flood violated numerous rules, regulations, and guidelines governing flood adjustments, including:

1. 44 C.F.R 62.23(e) requires that a WYO company use "its own customary standards" as it would in the ordinary and necessary conduct of its own business affairs. No reasonable adjuster would have used the above prices and included the above items in the ordinary and necessary conduct of its own business affairs.

2. 44 C.F.R 62.23(i) sets forth a number of procedures that must be followed in the adjustment of flood claims. Liberty Mutual's adjustment violated a number of the procedures set for in this section, including: (a) subsection (i)(1), which requires that WYO companies adjust claims in accordance with general company standards and the NFIP Claims Manual (discussed in more detail below); (b) subsection (i)(2), which requires that the WYO company's claims department verify the correctness of the coverage interpretations and reasonableness of the payments recommended by the adjusters—no reasonable claims department would sign off on the reasonableness of the payments described above or would interpret the flood policy as covering items such as the replacement of the ceiling, heat furnace in the attic, and upper cabinetry; and (c) subsection (i)(10), which governs the content of claims files—Liberty Mutual's claims files covering this property do not justify the coverage conclusions such as explaining why the ceiling and upper cabinetry were replaced when the flood waters reached only four feet.

3. 44 C.F.R 62.21 states, "All adjustment of losses and settlements of claims shall be made in accordance with the terms and conditions of the policy and parts 61 and 62 of this subchapter." As discussed above, the adjustment was not made in accordance with the terms and conditions of part 62. As discussed below, the adjustment was not made in accordance with the policy.

4. The adjustment procedures that were used to arrive at the grossly inflated amounts described above violate Liberty Mutual's provider agreement, found at 44 C.F.R 62, Appx A. Article II section A.2 and section G.1 require that Liberty Mutual comply with FIA Policy Issuances and other written standards, procedures, and guidance issued by FEMA or FIA relating to the NFIP. As further described below, Liberty Mutual's adjustment did not comply with the written standards, procedures, and guidance issued by FEMA.

5.   As discussed above, Liberty Mutual is required to follow the Claims Manual issued by FEMA. Despite that obligation, Liberty Mutual's adjustment was entirely inconsistent with several provisions of the Claims Manual, including:

A.   Section II.C.1 provides the general standards and requirements for selecting adjusters. It requires that every adjuster handling flood losses to be "thoroughly familiar with the provisions of the SFIP, including coverage interpretations issued by FEMA, as explained in the NFIP Claims Presentations conducted by NFIP staff, and to adjust NFIP losses in accordance with these provisions." Liberty Mutual violated this provision by grossly inflating the items on the adjustment and replacing items that did not warrant replacement. For example, the NFIP Claims Presentations and SFIP would not permit the replacement of the ceiling and upper cabinetry with flood waters of only four feet and would instruct that the tile floor be cleaned, not replaced.

B.   Section II.C.2 provides specific standards and requirements for adjusting flood claims. Liberty Mutual's adjustment violated several of these requirements. Subsection l requires that the adjuster verify whether the reported loss resulted from flood as defined in the SFIP. Much of the damage at this property resulted in damage caused by wind. The hurricane force winds blew away shingles and damaged some of the felt and board plank sheathing. Wind also blew away the aluminum patio and a window was blown out a turbine ventilator, some plumbing stack vents, and the soffit and fascias were damaged. Wind driven rain penetrated the damaged roof, the broken window, the turbine ventilator, and the damaged soffit and fascia long before any flood waters entered the dwelling. The residence was left, of necessity, for several weeks without electricity, air conditioning or human care. Additionally, subsection t requires that the adjuster accurately identify the covered damages caused by flood and to allow in the adjustment only those repairs and replacements reasonably required to restore the structure. Liberty Mutual violated this subsection by replacing items that did not need to be replaced, such as the tile floor, which only needed to be cleaned. Finally, subsections p and u describe the contents of the claims file and states that the file must contain adequate notes regarding the scope of the damages and include as many photographs as are necessary to portray the damage. The photographs and notes in the claims file are not sufficient to support replacement of items such as the tile floor and exterior doors.

C.   Liberty Mutual's adjustment violated several of the guidelines set forth in Section VII, which covers "Basic Adjustment Issues." For example, the section addresses the adjuster's responsibilities and states that an adjuster must check for exterior and interior waterlines and provide the height of each in the report as well as photographs and to investigate and document all other evidence of loss. Liberty Mutual's adjustment failed to adequately document the flood line. As discussed above, flood waters rose to four feet, but Liberty Mutual's claims file includes several internal flood lines that actually conflict with each other. In failing to exclude the loss caused by wind, Liberty Mutual failed to properly investigate and document all other evidence of loss. Additionally, subsection K addresses repair v. replacement and instructs that "[e]verything that becomes wet is not necessarily a total loss. . . . Many buildings and contents items will respond to cleaning and need not be replaced." Liberty Mutual failed to heed that requirement in replacing items such as the tile floors and exterior doors.

# EXHIBIT F

## STANDARD FIRE EXEMPLAR PROPERTIES

Branch has inspected the properties identified below on which Standard Fire issued a flood insurance policy through the National Flood Insurance Program. Branch's inspection revealed that the amounts Standard Fire caused the Government to pay for purported flood damage were grossly inflated and cannot be justified by any reasonable adjusting standards or guidelines. In this supplemental response,[1] Branch has endeavored to describe the adjusting deficiencies that it has identified and the rules, regulations, and guidelines that were violated. Branch has not had the opportunity to review all of Standard Fire's documents relating to the NFIP, and reserves the right to further supplement this response as necessary.

## I.     7568 Horizon Dr, New Orleans, LA 70129

Standard Fire issued a flood policy (Policy Number 6500508939) on the property at 7568 Horizon Dr, with a policy limit of $81,000.00. The property suffered damage from Hurricane Katrina, and a claim was submitted to Standard Fire under the flood policy. American Catastrophe Claims adjusted the claim on behalf of Standard Fire, and calculated an ACV loss after depreciation of $102,719.23. Because this number exceeded policy limits, Standard Fire submitted a claim to the NFIP for the policy limits of $81,000.00.

The adjustment and the claim amount submitted to NFIP were grossly inflated and were not supported by the rules, regulations, and guidelines governing flood adjustments. An adjustment conducted in accordance with the applicable rules, regulations, and guidelines would show that Katrina caused flood damages of at most $31,306.40 at this property. Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of damages.

### A.     ADJUSTING DEFICIENCIES

In completing its adjustment, Branch used Xactimate software and the price list LANO4S6D. Branch measured the interior flood line at approximately four feet and an exterior flood line that is approximately six feet from street level.

Based on its adjustment of the property at 7568 Horizon Dr, Branch concluded that numerous aspects of the Standard Fire claim do not comport with the rules, regulations, and guidelines governing flood adjustments, including the following:

---

[1] Branch provides the below information to supplement its responses to Standard Fire's Interrogatory Nos. 6 and 9. In doing so, Branch specifically preserves any and all objections to those interrogatories, including that they are vague in "requiring as much detail as possible;" call for the premature disclosure of expert information and testimony; call for information protected by the attorney client privilege; and because they call for information that is in Standard Fire's possession. Branch has endeavored to provide greater detail as to Standard Fire's adjusting deficiencies, but expressly reserves the right to supplement and/or revise this information for any reason.

1.      Based on the flood line of four feet, only four feet of drywall should have been replaced. There was no reasonable justification for Standard Fire's adjustment to include the removal and replacement of eight feet of drywall. Additionally, Standard Fire used a price per foot of Gypsum Drywall of $1.71 (removed and replaced). Standard Fire paid a total of $2,742.44 for Wall Drywall. If Standard Fire had paid for four feet of drywall, it would total $1,371.22, inflating the adjustment by **$1,371.22.**

2.      Standard Fire improperly paid for damage caused to the ceiling. Based on the flood line of approximately four feet and Branch's inspection, the flood did not damage the ceiling. Standard Fire's adjustment included several items relating to purported damage to the ceiling, which is inconsistent with the rules, regulations, and guidelines governing flood adjusting. These items include removing and replacing the drywall in the ceiling at $1.71 per square foot; painting the ceiling at $0.60 per square foot; on these errors alone, Standard Fire's adjustment was improperly inflated by **$2,725.14.**

3.      Standard Fire improperly paid for damage caused to the ceiling insulation. Based on the flood line of approximately four feet and Branch's inspection, the flood did not damage the ceiling insulation. Standard Fire's adjustment included several items relating to purported damage to the ceiling insulation, which is inconsistent with the rules, regulations, and guidelines governing flood adjusting. These items include removing and replacing the insulation in the ceiling at $1.27 per square foot. Standard Fire's adjustment was improperly inflated by **$1,819.65.**

4.      Standard Fire improperly paid to Clean, Treat & Seal Ceiling Framing System at a cost of $0.75 per square foot, inflating the adjustment by **$1,299.75.**

5.      Standard Fire improperly paid to paint the ceiling at a cost of $0.60 per square foot, inflating the adjustment by **$930.62.**

6.      Standard Fire improperly paid to replace the entire wall framing system at $20.21 per linear foot. Branch disagrees that the flood damaged the framing system which then required Standard Fire to pay $4,234.00. Anti-microbial would have been sufficient. This caused the adjustment to be inflated by **$4,234.00**

7.      Standard Fire improperly paid to replace 1744 square feet of exterior wall sheathing. Branch found approximately 384 square feet of exterior wall sheathing and none of it was damaged by flood. Standard Fire's adjustment was improperly inflated, inflating the adjustment by **$3,266.51.**

8.      Standard Fire improperly paid for the removal Exterior Siding. Standard Fire estimated 1744 square feet of removal of Exterior Siding at $0.53 per square foot. Standard Fire determined the property only had 1306 square feet of exterior vinyl siding and only Standard Fire's flood line of five feet was exposed to flood waters (653 square feet). Based on Standard Fire's report, the adjustment was improperly inflated by **$432.48.**

9.      Standard Fire improperly paid for the replacement of Exterior Siding.  Standard Fire estimated 1306 square feet of replacement Exterior Siding at $2.28 per square foot.  Standard Fire determined five feet was exposed to flood waters (816 square feet).  Based on Standard Fire's report, the adjustment was improperly inflated by **$1,860.48.**

10.     Standard Fire improperly paid for the removal of Brick Veneer.  Standard Fire estimated 1744 square feet of removal of brick veneer at $2.78.   The property does not have 1744 square feet of brick veneer that could be removed.  The property has brick veneer only on the right front face (approximately 240 square feet).  Standard Fire improperly paid, inflating the adjustment by **$4,846.32.**

11.     Standard Fire improperly paid for replacement of Brick Veneer.  Standard Fire estimated 436 square feet of replacement to the brick veneer at $11.46.  Standard Fire improperly paid, inflating the adjustment by **$4,849.96.**

12.     Standard Fire improperly paid for 1733 square feet of Residence H.V.A.C.  This property is built upon a concrete foundation.  All ductwork and furnaces are in the attic, well above the five foot interior flood line.  Standard Fire improperly paid, inflating the adjustment by **$7,534.22.**

13.     Standard Fire improperly paid for the removal and replacement of a 3 ton heat pump that was located in the attic.  If this item was damaged, it would not be covered by the flood policy. Standard Fire improperly paid, inflating the adjustment by **$2,322.73.**

14.     Standard Fire improperly paid for the removal and replacement of two commodes.  Standard fire estimated each commode to cost $369.18.  Standard fire improperly paid, inflating the adjustment by **$525.24** after depreciation.

15.     Standard Fire improperly paid for the removal and replacement of two bathtubs that were not damaged by flood.  Standard Fire improperly paid, inflating the adjustment by **$812.14.**

16.     Standard Fire improperly paid a generalized line item for "Residence Plumbing" at a cost of $7.60 per square foot (1733). The flooding does not cause any damage to the plumbing fixtures or pipe work. Standard Fire improperly paid, inflating the adjustment by **$11,529.12.**

17.     Standard Fire improperly paid a generalized line item for "Residence Electrical" at a cost of $8.37 per square foot (1733).  That cost is not supportable. Xactimate figures approximately $2.83 per square foot. $8.37 - $2.83 = $5.54 X (1733) sq ft = **$9,600.82** in overpayment

18.     Standard Fire improperly replaced all windows at this property.

Standard Fire's adjustment improperly overpaid at least **$59,960.40** before overhead and profit. When adding the 10% ($5,996.04) overhead and the 10% ($5,996.04) profit, the Standard Fire adjustment was inflated by at least **$71,952.48** on this claim.

After taking into account the above items that were grossly inflated, Branch concluded that the *maximum* amount of flood damages was $31,306.40, which includes 10% overhead, 10% profit, and 9% tax. It does not account for depreciation, which would *lower* the damages in the adjustment.

## II.    7732 Edward St

Standard Fire/Travelers issued a flood Policy Number (6-0020-3154-7) on the property at 7732 Edward St. with a policy limit of $148,100. The property suffered damage from Hurricane Katrina, and a claim was submitted to Standard Fire under the flood policy. American Catastrophe Claims (Don Tigart) adjusted the claim on behalf of Standard Fire, and calculated a loss of $176,206.98. Because this number exceeded policy limits, Standard Fire submitted a claim to the NFIP for the policy limits of $148K.

The adjustment and claim amount submitted to NFIP were grossly inflated and not supported by the rules, regulations, and guidelines governing flood adjustments. An adjustment conducted in accordance with the applicable rules, regulations, and guidelines would show that Katrina caused flood damages of at most $31,825.11 at this property. Branch's estimate does not account for depreciation, which would further decrease Branch's estimate of damages.

### A.    ADJUSTING DEFICIENCIES

In completing its adjustment, Branch used Xactimate software and the starting price list of "LANO4B6B". Branch measured the flood line at approximately one foot interior. This low flood line can be seen in both Branch's and Standard Fire's photos. Standard Fire's photos show many contents still in place on top of the counters/tables. Any flood waters above these tables would have moved these contents from the original location. The flood line is very evident, and there are NOAA Flood Maps that show the water was 1' to 2' ft from street level.

Standard Fire states that the house was made of "wood frame and brick construction and is non-elevated." Standard Fire then makes a contradicting statement that the building had an 8' exterior and a 7' interior flood. The difference in water levels would seem to indicate the house was raised off the ground by 1 foot; which it is not. Both Standard Fire's and Branch's photos show approximate interior flood line of 1'.

Standard Fire made the claim that all the exterior brick, vinyl siding, including the interior framing was damaged by flood. None of these items suffered substantial damage from flood. Based on Standard Fire's report, the property should have been demolished. If you replace the wall framing system, the brick, and the siding; the only thing left is the roof framing. None of the items needed to be fully replaced due to flood damage. Standard Fire's own report supports this statement.

The 1' flood line was well below any windows. Standard Fire paid for 14 windows; 9 @ 839.66 and 5 @ $617.32 for an ................................................... Overcharge of $9,047.01.

Standard Fire paid for 2,052 SF of wall insulation with an RCV of $1,846.80. Branch estimated approximately 1,477 SF = 1,329.30. …………………………….. Overcharge = $517.50

Standard Fire replaced 12 interior doors @ $277.86 + $84.05 for door hardware (RCV: $4,342.92). Branch estimated 13 interior doors @ $153.68 for a RCV of $1,997.84. Overcharge of $2,345.08

The 1' flood line was below any electrical wiring in the building, yet Standard Fire paid for 2,394 SF of electrical @ $8.28 for a RCV of $19,822.32. There was little damage to electrical system that was caused by flood. Xactimate's normal price for whole-house wiring is: $2.83 X 2,394 = $ 6,775.02 =    Overcharge of $13,047.30.

Flood waters would not have damaged any of the plumbing in this building, yet Standard Fire replaced 2,394 SF of plumbing @ $6.45 SF for a RCV of $15,441.30.   (Overcharge of $15,441.30)

Branch estimated the drywall & paint to repair the walls below the 1' flood line @ $3,620.12. Standard Fire paid for all the drywall/paint on the walls for $10,995.27 and a difference and overcharge of $7,375.15.

The 1' flood line that is shown in both Branch's and Standard Fire's photos would never have damaged the HVAC system located in the attic. Standard Fire paid for 2,394 SF of HVAC @ $4.78 SF for a RCV of $11,443.32. Xactimate's (LANO 436D) normal price for whole-house HVAC system is Approx. $6,944.02 which is an   ……….……. Overcharge of $ 4,499.30

Branch is not aware of any adjustments which allow for Construction materials Debris pick up "after County /Parish service stops". (pg. 000029 Simsol Estimate) equals $ 7,182.88 Overcharge.

If you use his stated Sq. Ft. of Exterior wall insulation or his sq. ft. of exterior wall sheathing of 2052 divided by 8 ft. high equals 256.5 Lin. Ft. (Pg. 000025 Simsol estimate).

Yet, on page 000025 of the Simsol estimate he charges for 561 lin ft. of framing at $ 19.76 = ……………………… Overcharge $ 11,085.36.

There was no reason to replace any of the exterior brick or vinyl siding in this building. You would not need to remove both the wall framing and the brick veneer in order to replace the moldy insulation board (or exterior sheathing).
Therefore:
 1,026 Sq. ft. exterior Vinyl siding @ $ 4.17 equals. ……………   $ 4,278.42 Overcharge.
And .. 1,026 Sq. ft. Brick Veneer @ $ 13.84 equals ………………   $ 14,199.84 Overcharge.

Since there was only 1 ft. of flooding, the ceilings and insulation would not have been damaged by flooding:
Therefore: 2,394 Sq. Ft. Ceiling Insulation @ $ 1.33 equals ………..   $ 3,184.02 Overcharge.
And: 2,394 Sq. Ft. of Ceiling Drywall @ $ 1.75 equal ………..   $ 4,189.50 Overcharge.

And: 2,394 Sq. Ft. <u>Paint/finish Ceiling</u> @$ 0.58 equals ………     <u>$ 1,388.52 Overcharge.</u>
And: 2,394 Sq. Ft. of <u>Texture Ceiling</u> @$ 0.50 equals ………….. <u>$ 1,197.00 Overcharge.</u>

Standard Fire's adjustment was improperly inflated by at least $98,978.18 before overhead and profit. When adding the 10% ($9,897.81) overhead and the 10% ($9,897.81) profit, <u>Standard Fire's adjustment was inflated by at least **$118,773.80** on this claim.</u>

## III.   VIOLATIONS OF FLOOD ADJUSTING RULES, REGULATIONS, AND GUIDELINES

Standard Fire's use of grossly inflated prices and inclusion of items not damaged by flood violated numerous rules, regulations, and guidelines governing flood adjustments, including:

1.     44 C.F.R 62.23(e) requires that a WYO company use "its own customary standards" as it would in the ordinary and necessary conduct of its own business affairs. No reasonable adjuster would have used the above prices and included the above items in the ordinary and necessary conduct of its own business affairs.

2.     44 C.F.R 62.23(i) sets forth a number of procedures that must be followed in the adjustment of flood claims. Standard Fire's adjustment violated a number of the procedures set for in this section, including: (a) subsection (i)(1), which requires that WYO companies adjust claims in accordance with general company standards and the NFIP Claims Manual (discussed in more detail below); (b) subsection (i)(2), which requires that the WYO company's claims department verify the correctness of the coverage interpretations and reasonableness of the payments recommended by the adjusters—no reasonable claims department would sign off on the reasonableness of the payments described above or would interpret the flood policy as covering items such as the replacement of the ceiling or would agree with the flood lines used; and (c) subsection (i)(10), which governs the content of claims files—Standard Fire's claims files covering this property do not justify the coverage conclusions.

3.     44 C.F.R 62.21 states, "All adjustment of losses and settlements of claims shall be made in accordance with the terms and conditions of the policy and parts 61 and 62 of this subchapter." As discussed above, the adjustment was not made in accordance with the terms and conditions of part 62. As discussed below, the adjustment was not made in accordance with the policy.

4.     The adjustment procedures that were used to arrive at the grossly inflated amounts described above violate Standard Fire's provider agreement, found at 44 C.F.R 62, Appx. A. Article II section A.2 and section G.1 require that Standard Fire comply with FIA Policy Issuances and other written standards, procedures, and guidance issued by FEMA or FIA relating to the NFIP. As further described below, Standard Fire's adjustment did not comply with the written standards, procedures, and guidance issued by FEMA.

5.      As discussed above, Standard Fire is required to follow the Claims Manual issued by FEMA. Despite that obligation, Standard Fire's adjustment was entirely inconsistent with several provisions of the Claims Manual, including:

A.      Section II.C.1 provides the general standards and requirements for selecting adjusters. It requires that every adjuster handling flood losses be "thoroughly familiar with the provisions of the SFIP, including coverage interpretations issued by FEMA, as explained in the NFIP Claims Presentations conducted by NFIP staff, and to adjust NFIP losses in accordance with these provisions." Standard Fire violated this provision by grossly inflating the items on the adjustment and replacing items that did not warrant replacement. For example, the NFIP Claims Presentations and SFIP would not permit the replacement of the ceiling on these properties with flood waters of only one foot or four feet.

B.      Section II.C.2 provides specific standards and requirements for adjusting flood claims. Standard Fire's adjustment violated several of these requirements. Subsection (l) requires that the adjuster verify whether the reported loss resulted from flood as defined in the SFIP. Much of the damage at this property resulted in damage caused by wind. The roof shingles were blown off, the soffit and fascia as well as the vinyl siding were damaged by the winds, and the rain penetrated these breaches. And at the 7568 Horizon Drive property, the high winds blew away most of the roofing shingles, the felt and flashing. Some turbine vents, plumbing jack flashings as well as some of the windows were blown out or badly damaged. These breaches allowed the wind-driven rains to enter the dwelling. Additionally, subsection (t) requires that the adjuster accurately identify the covered damages caused by flood and to allow in the adjustment only those repairs and replacements reasonably required to restore the structure. Standard Fire violated this subsection by replacing items that did not need to be replaced, such as the wall framing system, which only needed to be cleaned. Finally, subsections (p) and (u) describe the contents of the claims file and states that the file must contain adequate notes regarding the scope of the damages and include as many photographs as are necessary to portray the damage. The photographs and notes in the claims file are not sufficient to support the flood lines or to support the adjustments.

C.      Standard Fire's adjustment violated several of the guidelines set forth in Section VII, which covers "Basic Adjustment Issues." For example, the section addresses the adjuster's responsibilities and states that an adjuster must check for exterior and interior waterlines and provide the height of each in the report as well as photographs and to investigate and document all other evidence of loss. Standard Fire's adjustment failed to adequately document the flood line. As discussed above, flood waters rose to four feet (7568 Horizon) and one foot (7732 Edwards Street), but Standard Fire's claims file includes different flood lines that are not supported by the evidence as described above. Also, in failing to exclude the loss caused by wind, Standard Fire failed to properly investigate and document all other evidence of loss. Additionally, subsection K addresses repair v. replacement and instructs that "[e]verything that becomes wet is not necessarily a total loss. . . . Many buildings and contents items will respond to cleaning and need not be replaced." Standard Fire failed to heed that requirement in replacing items that could have simply been cleaned.